NO 13-50156

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT


UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff and Appellee,      )
                                     )
        vs.                          )
                                     )
JESSICA MEDINA,                      )
                                     )
        Defendant and Appellant.     )
_____)


APPELLANT'S OPENING BRIEF


APPEAL FROM THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE OTIS D. WRIGHT
UNITED STATES DISTRICT JUDGE


                    JOSEPH F. WALSH
                    California Bar No.  67930
                    Attorney at Law
                    205 S. Broadway, Ste. 606
                    Los Angeles, CA 90012
                    (213) 627-1793

                    Attorneys for Appellant
                    JESSICA MEDINA

**TOPICAL INDEX**

Page

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . 1

JURISDICTION  . . . . . . . . . . . . . . . . . . . . . 1

BAIL STATUS . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS  . . . . . . . . . . . . . . . . 3

ARGUMENT

I        THE COURT ERRED IN DENYING MEDINA'S MOTION
         TO SUPPRESS WIRETAP EVIDENCE MADE ON THE
         GROUNDS THAT THE WIRETAP APPLICATION ON
         TARGET TELEPHONE # 9 FAILED TO SATISFY THE
         NECESSITY REQUIREMENT OF TITLE III
                                        . . . . .11

II       THE COURT ERRED IN FAILING TO HOLD A FRANKS
         HEARING ON THE FALSE STATEMENT      . . . . 42

III      THE COURT ERRED IN DENYING MEDINA'S MOTION
         TO SUPPRESS WIRETAP EVIDENCE MADE ON THE
         GROUNDS THAT THE GOVERNMENT FAILED TO OBTAIN
         THE NECESSARY JUSTICE DEPARTMENT AUTHORIZATION
         TO WIRETAP CARLOS RIVERA, THE PRIMARY USER OF
         TARGET TELEPHONE #9
                                        . . . . .47

IV       THE COURT ERRED IN DENYING A SENTENCE
         REDUCTION UNDER THE GUIDELINES FOR MINOR
         ROLE IN THE OFFENSE
                    . . . . . . . . . . . . . . . . 52


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 60

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                <u>Page</u>

<u>Franks v Delaware</u>, 438 U.S. 154 (1978) . . . .  29,39,42,43

<u>Griffith v Kentucky</u>, 479 U.S. 314 (1987) . . . . . . . . 54

<u>Kotteakos v United States</u>, 328 U.S. 750 (1946) . . . . . 41

<u>United States v. Blackmon</u>, 273 F.3d 1204
        (9th Cir. 2001) . . . . . . . . . . . . . . . . . . passim

<u>United States v. Canales Gomez</u>, 358 F.3d 1221
        (9th Cir. 2004) . . . . . . . . . . . . . 12,37,39,40

<u>United States v Carneiro</u>, 861 F.2d 1171
        (9th Cir. 1988) . . . . . . . . . . . 12,22,27,39,41

<u>United States v Chesher</u>, 678 F.2d 1353 (9th Cir. 1982) . 45

<u>United States v. Echavarria-Olarte</u>, 904 F.2d 1391
        (9th Cir. 1990) . . . . . . . . . . . . . . . . . . 12

<u>States v Fernandez</u>, 388 F.3d 1199 (9th Cir. 2004) . . . . 37

<u>United States v Garcia-Villalba</u>, 585 F.3d 1223
        (9th Cir. 2009) . . . . . . . . . . . . . . . . . . 23

<u>United States v. Giordano</u>, 416 U.S. 505 (1974) . . 48,49,50

<u>United States v Gonzalez, Inc.</u>, 412 F.3d 1102
        (9th Cir. 2005 . . . . . . . . . . . . . . . . . passim

<u>United States v. Ippolito</u>, 774 F.2d 1482
        (9th Cir. 1985) . . . . . . . . . . . . . . . . . passim

<u>United States v. Kahn</u>, 415 U.S. 143 (1974) . . . . . . . 21

<u>United States v Kalustian</u>, 529 F.2d 585 (9th Cir. 1976) . 37

<u>United States v Krupa</u>, 633 F.3d 1148 (9th Cir. 2011) . . 38

<u>United States v Landeros-Lopez</u>, 718 F.Supp.2d 1058

(D.C. Ariz 2010) . . . . . . . . . . . . . . . . . 26

United States v. Lynch, 367 F.3d 1148 (9th Cir. 2004) . . 12

United States v. McGuire, 307 F.3d 1192
    (9th Cir. 2002) . . . . . . . . . . . . . . . . . 11

United States v Meling, 47 F.3d 1546 (9th Cir. 1995)  . . 42

United States v Reyna, 218 F.3d 1108 (9th Cir. 2000)  . . 47

United States v. Rodriquez-Castro, 641 F.3d 1189
    (9th Cir. 2011) . . . . . . . . . . . . . . . . . 54

United States v Staffeldt, 451 F.3d 578
    (9th Cir. 2006) . . . . . . . . . . . . 48,49,50,51

United States v. Shryock, 342 F.3d 948 (9th Cir. 2003)  . 12

**STATUTES**

18 U.S.C. §3553 . . . . . . . . . . . . . . . . . . . 48

18 U.S.C. §2515 . . . . . . . . . . . . . . . . . . . 49

18 U.S.C. §2516 . . . . . . . . . . . . . . . . . . . 49

18 U.S.C. §2518 . . . . . . . . . . . . . . . . . 20,21,49

U.S.S.G.  §2D1.1 . . . . . . . . . . . . . . . . . . 52

U.S.S.G.  §3B1.2 . . . . . . . . . . . . . . . 53,54,55

Justice Safety Valve Act of 2013, S.619 . . . . . . . . 54

NO 13-50156

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT


UNITED STATES OF AMERICA,     )
                                )
     Plaintiff and Appellee,    )
                                )
     vs.                          )
                                )
JESSICA MEDINA,               )
                                )
     Defendant and Appellant.   )
_____)

**QUESTIONS PRESENTED**

    1.  Whether the court erred in denying Medina's motion to suppress wiretap evidence made on the grounds that the wiretap application on Target Telephone # 9 failed to satisfy the necessity requirement of Title III?

    2.  Whether the court erred in failing to hold a <u>Franks</u> hearing on the false statement?

    3.  Whether the court erred in denying Medina's motion to suppress wiretap evidence made on the grounds that the government failed to obtain the necessary Justice Department authorization to wiretap Carlos Rivera, the primary user of Target Telephone #9?

    4.  Whether the court erred in denying a sentence reduction under the Guidelines for minor role in the

offense?

## JURISDICTION

The District Court had jurisdiction over this criminal prosecution under 21 U.S.C. §846 and 841(a)(1). This Court has jurisdiction over this appeal from a final judgment of conviction pursuant to 28 U.S.C. §1291.

## BAIL STATUS

The appellant is in custody and no bail has been set pending appeal.

## STATEMENT OF THE CASE

In April of 2010 a federal grand jury in Los Angeles indicted appellant, Jessica Medina, on four charges: Conspiracy to violate the RICO statute, 18 U.S.C. §1962(d), (Count 1), violation of the RICO statute, 18 U.S.C. §1962(c) (Count 2), Conspiracy to Distribute Methamphetamine, 21 U.S.C. §846 (Count 6), and Possession with Intent to Distribute Methamphetamine. 21 U.S.C. §841(a)(1) (Count 10). (ER 91) Medina entered a plea of not guilty. The indictment named a total of 50 defendants, charged in 30 counts. Jessica Medina's case was tried separately, with only two co-defendants, Carlos Rivera and Raul Prieto.

Medina filed a motion to suppress evidence wiretap evidence. (ER 172) The motion was denied. (ER 1) The case

2

proceeded to a jury trial.  Medina was convicted of all four counts.  She was sentenced to a term of 151 months in custody. (ER 501) She filed a timely notice of appeal from the judgment and sentence. (ER 507)  Rivera and Prieto were also convicted and sentenced and their cases are also pending on appeal.

## STATEMENT OF THE FACTS

On July 22, 2009, Ontario Police officers were conducting surveillance at the home of Raul Prieto in the City of Ontario.  The police observed Carlos Rivera standing in the front yard holding a gun case.  He was in a group of about five people.  As the officers approached the group, Carlos Rivera walked down the driveway and away from the officers.  Rivera entered Prieto's house.  Officer Wes Willenstym entered the house and spoke to Rivera, who said it was his aunt's house.  Willenstym searched the house and found a gun inside of the freezer.  The gun was inside a gun case that Rivera had been seen holding prior to entering the house.  (1 RT 28-34; 37-49.)

On July 31, 2009, Ontario Police officers stopped a Volkswagan.  The vehicle was driven by Carl Cook.  Robert Tohlson was the passenger.  Cook was searched by the officers.  Cook had a knife on his person.  He also had 4.4

3

grams of methamphetamine in a clear plastic bag in his sock. (2 RT 135-144.)  The government introduced wiretap telephone calls between Carlos Rivera and Robert Tohlson on July 31, 2009.  In a call before the vehicle stop, Tohlson called Rivera and asked for a "quarter," [drugs].  Rivera said he could have it for "three."  Exh. 81A.  In a call after the vehicle stop, Tohlson told Rivera that they were pulled over by the police and they took the other guy to jail because he had it [drugs] in his sock.  Exh. 83A. (2 RT 145-146.)

On August 6, 2009, Ontario Police officers were conducting surveillance at 815 N. Vinyard Avenue, the residence of Jessica Medina and Carlos Rivera, in the City of Ontario.  Officer Maynor Arana saw an unknown man, driving a Gray Lincoln, park in front of the house. The man exited the Lincoln carrying a black box that measured 4 inches by 6 inches.  Carlos Rivera walked out of the residence and spoke to the man.  Rivera and the man entered the residence.  Later, the unknown man left the residence without the box and drove away.  After that, Carlos Rivera walked out of the house and entered a red Acura automobile that was parked in front of the residence.  (2 RT 65-69.)

At around 11:00 p.m., Ontario Police officers decided to conduct a parole search at Carlos Rivera's residence.  Officer Mike Lorenz knocked on the front door of

4

the residence.  Carlos Rivera answered the door and allowed the officers to enter.  In addition to Rivera, there were several other males, some children, and Jessica Medina inside the residence.  Carlos Rivera was searched and the officers recovered $3,335 from Rivera's right front pocket. (2 RT 74-78, 81.)

Pursuant to the parole search, the officers decided to search the red Acura that was parked in front of the residence.  Officer Josh Burks asked Carlos Rivera for the keys to the vehicle.  Rivera said they were on a hook in the apartment.  Officer Burks looked for the keys but could not find them.  He asked Jessica Medina for help in locating the keys but she was unable to find them.  The police then entered the Acura using a slim jim to force entry. (2 RT 85-88.)

Inside the rear hatch area of the Acura, Officer Burke located and recovered a black car battery.  Officer Chris Martinez took custody of the battery.  It was not a real battery, but was a container that looked like a battery.  Inside the battery, Officer Martinez found two plastic containers containing a white crystal substance.  A chemical analysis of the substance established that it was 219 grams of methamphetamine.  (2 RT 88-96; 118, 122.) Fingerprints lifted from the container holding the

5

methamphetamine were identified as belonging to Carlos Rivera. (2 RT 112-115.)

David Navarro was a co-defendant in this case. He had pleaded guilty and agreed to cooperate with law enforcement. He testified as a prosecution witness. Prior to his arrest, Navarro was a member of the Ontario Black Angeles gang. He was one of the leaders of the gang. (3 RT 20-29, 36, 46-52.) Navarro testified that Carlos Rivera was a member of the Black Angeles gang and that Carlos Rivera sold drugs. (3 RT 81-84, 107-111.) Navarro also knew Jessica Medina. Medina was the wife of Carlos Rivera and they had children together. Navarro had met Medina on several prior occasions, but they were always social gatherings, like barbeques. According to Navarro, Jessica Medina was not a member of the Black Angeles gang or any gang. There were no female members of the Black Angeles gang. (3 RT 123-126, 3 RT (VOL. 2) 37-44, 55-56, 4 RT 74-75.)

During the months of July and August of 2009, the government had a wiretap on Target Telephone # 9, a cell phone used by Carlos Rivera. Prior to the arrest of Rivera on August 6, 2009, the wiretap only intercepted the telephone conversations of Carlos Rivera. Many of Rivera's pre-arrest telephone calls were introduced into evidence

showing Rivera's connection to narcotics trafficking and to illegal weapons possession.   After Rivera's arrest, Jessica Medina began using Rivera's telephone.  Her conversations were intercepted over the wiretap and several of those conversations were introduced into evidence during the trial.

On August 7, 2009 the government's wiretap intercepted seven telephone call conversations between Jessica Medina and other individuals.

At 9:36 a.m. Jessica Medina spoke with Junior. She told him of the arrest of Carlos Rivera the day before and that prior to the arrest she had angrily told Rivera to get the drugs out of the house. Rivera had then taken the drugs to the car. Exh. 92A, p.3.

At 1:27 p.m. Jessica Medina again spoke to Junior. Medina described how the police found the drugs in the car and tried to get her to say that the car belonged to Carlos Rivera.  She told them it was not Rivera's car.  Later in the call Medina told Junior that she has Rivera's telephone, and that Rivera had told her to give it to his "little homey" and "slide the numbers over there."  Exh. 93A, pp. 2, 6.

At 1:32 p.m. Jessica Medina spoke to Jorge. Medina explains that the police came in on a parole search

and arrested Carlos Rivera.  They searched both the house and the car.  The police asked for the keys to the car because the car was not in the name of Carlos Rivera and the police were trying to prove that the car belonged to Rivera. Medina also told Jorge that the police took all of Rivera's money.  Exh. 94A, pp. 2–4, 8.

At 2:25 p.m. Jessica Medina spoke to Robert.  She told Robert that Carlos Rivera had been arrested.  She said she was Chino's [Rivera's] girl and Rivera had told her to contact Robert and Patrick and collect any money they owed Rivera.  Exh. 112, pp. 2–3, 5.

At 5:18 p.m. Jessica Medina spoke to Nacho.  Nacho was the registered owner of the car where the drugs were found.  Medina asked Nacho to lie to the police and tell the police that he had not sold the car to Medina and Carlos Rivera.  Exh. 141A.

At 8:17 p.m. Jessica Medina spoke to Francisco Venegas.  Medina told Venegas that she had talked to Robert and Patrick about collecting the money they owed Carlos Rivera.  However, she had not collected the money yet. Venegas said that he thought Robert owed Rivera three hundred dollars.  Medina said she needed the money to buy clothes for her children for school.  Exh. 143A.

At 9:19 p.m. Jessica Medina spoke to Francisco

8

Venegas.  Venegas said he spoke to Robert.  Venegas asked
Medina if he was supposed to give something to Robert.
Medina said "I don't know."  Venegas says he could either
give him "two more" or he could just get the money he owes
Chino [Rivera].  Venegas then asked Medina if he should
"shoot it to him or not."  Medina says "don't leave that to
me . . . I'm not going to make that decision."  Then later
Medina says "probably not two maybe one . . . I don't
know."  Exh. 144.

On August 8, 2009, the government intercepted one
telephone call involving Jessica Medina.  At 10:35 a.m.
Jessica Medina spoke to David Navarro.  Medina told Navarro
about the arrest of Carlos Rivera.  Medina related that
Rivera had gone out earlier in the day and obtained the
drugs.  When Rivera came home with the drugs, Medina told
him to "get that shit out of here . . . I can't have my kids
taken away."  When the police arrived, they said it was a
parole search, but Medina thought the search may have been
the result of an informant.  Medina told Navarro that the
police found the drugs in the car, but "I don't know how
much or whatever."  Medina said she told the police that
the car was not registered to her and Rivera and that they
did not have the keys.  Navarro told Medina not to say
anything about there being an informant until there was more

9

proof.  Exh. 146A, pp. 2-3, 7-8, 12-13.

On August 11, 2009 the government intercepted one telephone call involving Jessica Medina.  At 6:30 p.m. Medina spoke to Francisco Venegas.  They discuss waiting until Rivera gets released from jail.  Medina states that her cousin visited her the day before and offered "to push some stuff . . . cause he used to deal with Chino [Rivera] too."  Medina stated that she told her cousin that she was waiting because it was "too hot right now."  Medina stated that she intended to pay Rivera's telephone bill and then start forwarding his telephone calls.  Venegas stated that if you wait too long, people will stop calling.  Venegas said that "it is too hot right now" but "we could get it cracking . . . in a couple of days."  Medina responded that she would "rather wait a couple of days too."  Exh. 148A, pp. 3-7.

The government also offered two earlier intercepted calls from July 20, 2009 on Rivera's telephone. At 6:19 p.m. Rivera spoke to Jessica Medina.  Rivera told Medina that he has been trying to meet with someone and that he was going to "hook her up fat" with a "little dove."  The government contended that Rivera's comments referred to an ongoing drug transaction.  However, Rivera did all of the talking on the call.  At one point, Rivera asked Medina to

10

tell the woman if she called that Rivera was going to hook her up fat and Medina agreed.  Exh. 97A.

At 8:47 p.m. Carlos Rivera spoke to Francisco Venegas.  Rivera told Venegas that the woman did not have a cell phone, but "my chick is giving her directions" and "she just wants a little dub."  Rivera then stated that "my chick, you know how my chick be going to pick up for her, and bring it to the pad?  Member how she, my chick be going over to grab it? . . . its not going to happen like that, dude.  She gave her directions so she should be there, like within twenty minutes."  Exh. 99A.

## ARGUMENT

### I

### THE COURT ERRED IN DENYING MEDINA'S MOTION TO SUPPRESS WIRETAP EVIDENCE MADE ON THE GROUNDS THAT THE WIRETAP APPLICATION ON TARGET TELEPHONE # 9 FAILED TO SATISFY THE NECESSITY REQUIREMENT OF TITLE III

Prior to trial, Jessica Medina made a motion to suppress wiretap evidence on the grounds that the wiretap application failed to satisfy the necessity requirement of Title III.  (ER 172)  The district court denied the motion.  (ER 1)  The court erred in denying the motion to suppress evidence.  The error is reversible because the only evidence

11

of Jessica Medina's guilt came from the wiretap
interceptions on Carlos Rivera's telephone, Target Telephone
# 9.

## A. The Standard of Review

The standard of review on this appeal is as
follows.  A district court's authorization of a wiretap is
reviewed for an abuse of discretion.  United States v.
McGuire, 307 F.3d 1192, 1197 (9th Cir. 2002);; United States
v. Echavarria-Olarte, 904 F.2d 1391, 1395 (9th Cir. 1990).
However, the court reviews de novo whether the requisite
full and complete statement of facts was submitted in
compliance with 18 U.S.C. § 2518(1)(c).  United States v.
Canales Gomez, 358 F.3d 1221, 1224 (9th Cir. 2004); United
States v. Shryock, 342 F.3d 948, 975 (9th Cir. 2003); United
States v. Blackmon, 273 F.3d 1204, 1207 (9th Cir. 2001);
United States v. Carneiro, 861 F.2d 1171, 1176 (9th Cir.
1988).  Whether other investigative procedures have been
exhausted or why they reasonably appear not likely to
succeed is also reviewed de novo.  United States v. Lynch,
367 F.3d 1148, 1159 (9th Cir. 2004).

## B. The Wiretap Application

The wiretap application for Target Telephone # 9
was submitted on July 17, 2009.  The telephone number was
(909) 419-9937. The subscriber was Jessica Medina, but the

phone was used primarily by Carlos Rivera. (ER 182, 209;
Bates 522; 549)  The government had a prior wiretap on the
telephone of David Navarro, Target Telephone # 5. (ER 181-
182; Bates 521-522)  The requested wiretap on Carlos
Rivera's telephone (TT # 9) was a "spin-off wiretap" from
the David Navarro wiretap.  Using the language of the
statute for the "necessity requirement," the application
alleged that "Normal investigative procedures have been
tried and have failed, reasonably appear unlikely to succeed
if continued, reasonably appear unlikely to succeed if
tried, or are too dangerous." (ER 186; Bates 526)

　　　　Ontario Police Officer Kris Lavoie, the affiant on
the wiretap application, provided an overview of the wiretap
investigation.  Law enforcement was focusing on the Ontario
Black Angeles street gang.  The gang was involved in
narcotics trafficking, extortion, and other violent crimes.
The initial suspects in the investigation were a man named
Alex, who controlled a drug trafficking organization and
David Navarro, an Ontario Black Angeles gang member, who was
involved in collecting extortion payments. (ER 225-226;
Bates 565-566)

　　　　The investigation started with information from a
confidential source about the drug trafficking activity of
Sara Mizquez. The agents conducted surveillance, trash

13

searches, and residence searches of several suspects. Several of the gang members had been arrested in the past and drugs had been seized. (ER 226-231; Bates 566-571)

Several prior wiretaps had been obtained on Black Angeles gang members which revealed drug trafficking and extortion activity by various gang members. These taps were on Target Telephones # 5, 7, and 8. (ER 231-249; Bates 571-589) The wiretap on Target Telephone # 5 was on the telephone of David Navarro. During this wiretap, the agents had intercepted telephone call conversations between David Navarro and Carlos Rivera. During these calls, Navarro and Rivera had discussed extortion payments, narcotics trafficking, and firearms transactions. (ER 252-260; Bates 592-600)

Since Carlos Rivera was using Target Telephone # 9 during these calls, the wiretap application now sought a wiretap on Target Telephone # 9. (ER 252, 260; Bates 592, 602) Before applying, the agents reviewed the toll records for Target Telephone # 9 for the period of June 16, 2009 through July 6, 2009. The records revealed that during that three week period, Target Telephone # 9 had on several occasions called the telephone numbers of two other Black Angeles gang members, who were suspected of collecting extortion payments. (ER 260-261; Bates 600-601)

14

The application stated that a wiretap was needed in order to obtain evidence to enable the government to achieve the goals of the investigation, which included (a) the identification of the narcotics distributors, (b) the locations where narcotics were stored, (c) the management and disposition of the money generated by the narcotics sales, and (d) the nature, scope, places, and methods of the operation of the narcotics distribution network. (ER 262; Bates 602)

Additional goals of the investigation were (a) identifying the co-conspirators and their roles in the narcotics distribution network, (b) the current locations used to distribute narcotics, (c) the source of supply for the narcotics, and (d) the involvement of Navarro and other Black Angeles gang members in narcotics distribution and extortion activities. (ER 262-263; Bates 602-603)

## C. The Necessity Section of the Wiretap Application

The necessity showing in the wiretap application listed several investigative techniques that had been used or considered, or that would not reasonably succeed in identifying suspects and determining the full scope of the conspiracy. (ER 263-285; Bates 603-625)

A. <u>Physical Surveillance</u>.  The agents conducted surveillance of several suspects during the months of June

15

and July of 2009.  The surveillance seemed to particularly focus on David Navarro.  On July 3, 2009, while conducting surveillance of David Navarro, the agents observed Carlos Rivera enter Navarro's car.  Navarro and Rivera were followed that day driving to two locations.  (ER 268-271; Bates 608-611)  On this occasion, police officers were able to identify Carlos Rivera for the first time by consulting Parole Leads, a computer system used to access parolee records. Bates 611.  However, the application states that physical surveillance without the assistance of a wiretap would not achieve the goals of the investigation. (ER 273; Bates 613)

     B.  <u>Interviews of Witnesses and Confidential Sources, Grand Jury Subpoenas, Grants of Immunity, and Financial Investigation/Mail Covers</u>.  Many interviews of Black Angeles gang members in the past had yielded little information due to fear of retaliation and loyalty to the gang.  The affiant states there are no witnesses or confidential sources, who could assist in accomplishing the goals of the investigation, and no individuals are cooperating in the investigation.  One informant provided information on Monica Cornejo.  With the exception of Alex, no assets or bank accounts have been located on David Navarro or any other Target Subjects.  A mail cover was

requested on Virgina Gil at her home.  The affiant then
concludes that interviews, grand jury subpoenas and
immunity, and any financial investigation are unlikely to
advance the investigative objectives.  (ER 274-2767; Bates
614-616)

     C. <u>Undercover Agents</u>.  Implanting a government
agent was rejected as not feasible because there was no
confidential source who could facilitate an introduction to
the Black Angeles gang. (ER 277; Bates 617)

     D. <u>Search Warrants/Seizures</u>.  On June 24, 2009
after overhearing David Navarro talking on the telephone to
Carlos Vasquez, agents, knowing Vasquez was on parole,
conducted a parole search at Vasquez's residence.  They were
unable to locate Vasquez's firearm.  The affiant then stated
that additional search warrants would be unlikely to reveal
the full scope of Alex's narcotics trafficking organization
and the extortion activities of the Black Angels gang.
Although the service of warrants may result in the seizure
of narcotics and weapons, premature execution of warrants
would likely alert the subjects and cause them to
discontinue using their telephones.  (ER 277-279; Bates 617-
619)

     E. <u>Pen Registers/Toll Records</u>. The agents have
used pen registers on the telephones of Monica Cornejo and

Daniel Reyes and have reviewed the toll records of Target Telephone # 8. However, this technique will only provide a list of numbers called and will not reveal the identities of the callers or the subject of the conversations. (ER 280; Bates 620)

       F. <u>Trash Searches</u>. The agents had conducted trash searches at the residences of Misquez and a possible source of supply. A future trash search was planned for the residence of Virginia Gil. The affiant then states that he does not know the residences of the users of Target Telephone # 7, Target Telephone # 8, or Target Telephone # 9 (Carlos Rivera's phone). The affiant concludes by stating that trash searches would only provide limited evidence in assisting the goals of the investigation, which is to identify the full scope of the Black Angels extortion activities. (ER 280-283; Bates 621-623)

       G. <u>Other Investigative Methods</u>. a. <u>Recorded Jail Calls</u>. A review of L.A. County Jail calls showed a gang related call to Monica Cornejo. No jail calls were found to have been made to Target Telephone # 5, Target Telephone # 7, Target Telephone # 8, or Target Telephone # 9. (ER 283-284; Bates 623-624)

       b. <u>Pole Cameras</u>. The affiant considered using a pole camera on the residence of Alex and the residence of

18

David Navarro, but decided that using a pole camera would
not further the goals of the investigation or provide
evidence of the full scope of Alex's narcotics distribution
network.  (ER 284-285; Bates 624-625)

      c. <u>Tracking Devices</u>.  The affiant considered using
a tacking device on the car of David Navarro and other
subject's vehicles, but did not, because many of the
subjects are seen driving different vehicles, making it
difficult to select the proper vehicle to track.  (ER 285;
Bates 625)

**D. The Motion To Suppress Wiretap Evidence**

      In moving to suppress the wiretap evidence,
counsel argued that the wiretap application for Target
Telephone # 9 was a "spin-off" wiretap from the tap on David
Navarro's telephone, Target Telephone # 5.  Counsel argued
that in the case of an application for a new telephone that
is a spin-off from the wiretap on another phone, the law
required that necessity be shown concerning the suspect on
the new telephone and that the government cannot transfer
necessity from one application to another even within the
same investigation.  (9-11-12 RT 28-29.)

      In this case, the government conducted only one
day of surveillance of Carlos Rivera on July 3, 2009 and
examined the toll records for Rivera's phone for a three

week period.  Counsel argued that this failed to establish
that a sufficient traditional investigation was conducted of
Carlos Rivera prior to applying for a wiretap on his
telephone.  (9-11-12 RT 29-30.)  Counsel also noted that the
government conceded that the affidavit falsely stated that
the government was unable to conduct a trash search at
Carlos Rivera's home, by falsely claiming they did not know
where he resided.  The truth was that the agents knew Carlos
Rivera resided at 815 N. Vinyard in Ontario.  (9-11-12 RT
30-31; ER 177, Decl. Of Kris Lavoie, p. 2.)

        The government argued that this was not a "spin-
off" investigation and the court should consider all of the
investigation set forth in the previous wiretap applications
on other telephones leading up to the wiretap application on
Carlos Rivera's phone.  (9-11-12 RT 38-39, 41.)  The
government also argued that the defendants had not shown how
further surveillance, parole searches and trash searches, or
any other traditional investigative techniques would have
furthered the goals of the investigation or would have led
the agents to Medina and Prieto without the wiretap.  (9-11-
12 RT 39-41.)

        The district court noted that the necessity
argument was a "stronger argument" than any of the other
wiretap arguments made by counsel.  (9-11-12 RT 27.)  The

20

court took the matter under submission. (9-11-12 RT 44.)
On October 16, 2012, after considering the motion for more
than a month, the court denied the motion stating only that
"Ample evidence of necessity had been shown to the issuing
Court; and the arrest of Rivera did not negate the previous
showings of probable cause and necessity." (ER 1)

**E. The Necessity Requirement For Wiretaps**

Title 18 U.S.C. § 2518(1)(c) provides that each
application for a wiretap authorization shall include: "a
full and complete statement as to whether or not other
investigative procedures have been tried and failed or why
they reasonably appear to be unlikely to succeed if tried or
to be too dangerous."

Title 18 U.S.C. § 2518(3)(c) provides that in
issuing a wiretap authorization order, the district court
must determine whether: "normal investigative procedures
have been tried and have failed or reasonably appear to be
unlikely to succeed if tried or to be too dangerous."

"These two sections together make up the so-called
necessity requirement for granting a wiretap order. The
statutory language suggests that before finding that a
wiretap is necessary, the court must find that alternative
methods have been tried or would not have succeeded."
United States v Ippolito, 774 F.2d 1482, 1485 (9th Cir.

1985).  "The purpose of these requirements is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v Blackmon, 273 F.3d 1204, 1207 (9th Cir. 2001) citing United States v. Kahn, 415 U.S. 143, 153 n. 12 (1974).

This case involves a "spin-off" wiretap.  A spin-off wiretap occurs when the government has an original wiretap on one subject and discovers through the original wiretap that a second subject is involved in criminal activity.  When the government seeks a subsequent wiretap on the second subject's telephone based on conversations overheard on the first subject's telephone, the wiretap on the second phone is a spin-off from the first wiretap investigation. See United States v Blackmon, 273 F.3d 1204, 1206 (9th Cir. 2001).  In this case, the wiretap on Carlos Rivera's telephone, Target Telephone # 9, is a spin-off from the wiretap on David Navarro's telephone, Target Telephone # 5.

When the government seeks a wiretap on a spin-off telephone number, the government in its wiretap application must establish necessity for the wiretap on the spin-off telephone.  In the leading case of United States v Carneiro, 861 F.2d 1171, 1182 (9th Cir. 1988) the Court stated that

22

"there must be a showing of necessity with respect to each telephone and conspirator." Furthermore, in a more recent case, the Court stated that "the government is not free to transfer a statutory showing of necessity from one application to another — even within the same investigation." United States v Gonzalez, Inc., 412 F.3d 1102, 1115 (9th Cir. 2005).

The government in the district court violated both of these legal principles. The government argued that the wiretap on Carlos Rivera's telephone was not a spin-off wiretap. That argument is contrary to the facts of the case. The government overheard Rivera discussing criminal activity when the agents listened to the wiretaps on David Navarro's telephone. The tap on Rivera's telephone was a result of the wiretapping of Navarro's telephone.

The government also argued that the court should look at the showing of necessity made in several prior wiretap applications for other telephones prior to the application on Rivera's telephone. This clearly violates the Carneiro and Gonzalez, Inc, where the Court has stated that "Each wiretap application must separately satisfy the necessity requirement. See Carneiro, 861 F.2d at 1180-81 (upholding an initial wiretap order, but invalidating subsequent orders covering other suspects because the later

23

applications did not show that particularized investigative actions were targeted, without success, at each later suspect)." <u>United States v Gonzalez, Inc.</u>, 412 F.3d at 1115.

To decide whether necessity was shown for the Carlos Rivera wiretap on Target Telephone # 9, the Court must review the wiretap application to see if it established that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(c); <u>United States v Garcia-Villalba</u>, 585 F.3d 1223, 1228 (9th Cir. 2009). The first question is what type of non-wiretap police investigation was conducted on Carlos Rivera, the target subject.

"Although law enforcement agencies need not exhaust all conceivable alternative procedures before resorting to a wiretap, the government must show, by a full and complete statement, and the issuing court must find, that 'normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time.'" <u>United States v Ippolito</u>, 774 F.2d at 1486. This requires that the government make a "good faith effort to use normal alternative means" to investigate the target subject prior to seeking a wiretap.

24

United States v Ippolito, 774 F.2d at 1486; United States v
Blackmon, 273 F.3d at 1207.

     The government has not conducted a good faith
investigation of a target subject through the use of normal
investigative means when it does practically nothing to
investigate a target subject.  That was the case in United
States v Gonzalez, Inc., 412 F.3d 1102 (9th Cir. 2005).
Indeed, Jessica Medina relied upon the Gonzalez, Inc. case
in the district court in moving to suppress the wiretap
evidence.

     In United States v. Gonzalez, Inc., 412 F.3d 1102
(9th Cir. 2005) the government, while investigating a bus
company, wiretapped company telephones in Phoenix and
Tucson.  Through these wiretaps, the government intercepted
a call from the founder of the company in the Los Angeles
head office.  Based on this call, the government conducted a
brief investigation of the Los Angeles office.  It collected
five days of pen registers on the office's telephones and
five days of trap-and-trace analyses of the telephones.  The
government also conducted limited physical surveillance of
the office and made a preliminary inquiry into the
possibility of placing an undercover agent there. After this
limited investigation, the government sought a wiretap on
the Los Angeles office's telephones, which was granted.

On appeal, the Ninth Circuit held that the wiretap affidavit failed to show that law enforcement officers had adequately pursued traditional investigative methods before seeking the wiretap on the Los Angeles office.  The investigators, after learning that the Los Angeles office might be involved in the conspiracy, did not conduct an adequate, individual investigation of the Los Angeles office, but instead sought a wiretap based on the past failure of investigative methods at the Phoenix and Tucson bus terminals. The Ninth Circuit held that the attempt to piggy-back the Los Angeles office wiretap on the substantial investigation of the Phoenix and Tucson terminals was insufficient to show necessity.  The Court suppressed the wiretap evidence from the Los Angeles office.

In suppressing the evidence, the Court stated: "Each wiretap application must separately satisfy the necessity requirement." United States v. Gonzalez, Inc., 412 F.3d 1102, 1115 (9th Cir. 2005).  "[T]he government is not free to transfer a statutory showing of necessity from one application to another – even within the same investigation." United States v. Gonzalez, Inc., supra, 412 F.3d at 1115.   The Court held that the government could not establish the requisite necessity to wiretap the Los Angeles office based upon the extensive investigatory work the

26

government conducted on the Phoenix and Tucson offices. See also, United States v Landeros-Lopez, 718 F.Supp.2d 1058, 1065 (D.C. Ariz 2010)(The entire pre-wiretap investigation of the defendant, which consisted of a toll record analysis, a pen register, some limited surveillance of defendant's home and some investigation of defendant's criminal record, was held to be insufficient use of traditional investigative techniques).

In reviewing the necessity showing in the wiretap application for Carlos Rivera's telephone, the Court must also focus on what type of normal or traditional investigative techniques were used by the agents to investigate Carlos Rivera.  In the district court, the government argued that there were 23 pages of information in the affidavit establishing necessity for the wiretap.

However, the 23 pages of the affidavit that focus on the investigation of Carlos Rivera, shows that the government did only two things related to Carlos Rivera. First, the officers conducted one day of surveillance of Rivera. (ER 286-271; Bates 608-611)  Second, the officers examined the telephone toll records of Rivera's calls for a three week period prior to applying for the wiretap.  (ER 260-261; Bates 600-601)

This was an insufficient effort to constitute a

27

good faith traditional investigation.  As a matter of law, the wiretap application failed to satisfy the necessity requirement and the district court should have suppressed the wiretap evidence.  United States v. Gonzalez, Inc., 412 F.3d 1102, 1112-15 (9th Cir. 2005); United States v. Blackmon, 273 F.3d 1204 (9th Cir. 2001); United States v. Carneiro, 861 F.2d 1171 (9th Cir. 1988).

In United States v Carneiro, 861 F.2d 1171, 1180-1181 (9th Cir. 1988), for example, the Court upheld the initial wiretap order on McNeil, but invalidated the subsequent orders to wiretap Harty and Boyd, two suspects overheard talking to McNeil.  The wiretaps on Harty and Boyd were invalid because the government conducted no traditional investigation of Harty and Boyd before applying for the wiretap.  The Court stated that the affidavit was misleading when it said that physical surveillance of Harty's residence was extremely difficult because it was fenced off.  The affidavit failed to mention that the agents never attempted surveillance until after the wiretap order was issued.

The Court in Carneiro also noted that the fact that the agents had adequately exhausted traditional investigative techniques before seeking the first wiretap on McNeil's telephone did not establish necessity to wiretap the telephones of Harty and Boyd.  The Court stated that:

28

"there must be a showing of necessity with respect to each telephone and conspirator."  United States v Carneiro, supra, 861 F.2d at 1182.

## F. The False Statement and Lying About Necessity

The wiretap application in Jessica Medina's case also contained a material false statement.  The wiretap application for Rivera's telephone stated that a trash search could not be done in the case of Target Telephone # 9 because law enforcement did not know the residence of Carlos Rivera.  (ER 282; Bates 622)  Officer Lavoie in a declaration filed in the district court stated that he inadvertently failed to update the section related to trash searches to reflect the Vineyard address of Carlos Rivera. (ER 177; Decl. Of Kris Lavoie, p. 2)  This was a concession by the government that the wiretap application contained a false statement.

The false statement was in the critical section of the application where the government was attempting to establish necessity for the wiretap on Rivera's telephone. It was clearly a material false statement.  This Court has held that "false statements that are material in causing the warrant to issue will invalidate it," and "[t]he necessity showing and finding are . . .  material to the issuance of a wiretap order and are subject to Franks."  United States v

29

Ippolito, 774 F.3d 1482, 1485 (9th Cir. 1985) (Franks
referring to Franks v Delaware, 438 U.S. 154 (1978)).

      The agent's explanation that he failed to update
the section in the wiretap application is another way of
saying that the application was a "carbon copy" of a prior
application.  Indeed, the trash search summary in the
necessity section of the July 17, 2009 wiretap application
for Carlos Rivera's telephone (ER 281-283; Bates 621-623)
contains the exact same language that appears in the June
17, 2009 wiretap application for David Navarro's telephone.
(ER 452-454; Bates 471-473)  The only difference is the
paragraph containing the false statement about not knowing
Rivera's address.

      In United States v. Blackmon, 273 F.3d 1204, 1208
(9th Cir. 2001), statements in the wiretap application had
been copied from an application for an earlier wiretap in a
related case.  This resulted in the inclusion of an untrue
statement in the application.  In Blackmon, removing the
false statements left only boilerplate assertions in support
of the affidavit's showing of necessity because they were
"unsupported by specific facts relevant to the particular
circumstances of the case."  United States v. Blackmon,
supra, 273 F.3d at 1210.

      In the case of Carlos Rivera, the truth is that

the agents had Rivera's address and never conducted nor considered a trash search at his residence.  Once the false paragraph is removed, there is a discussion of trash searches related to Misquez and an unknown SOS (source of supply), a plan to search Gil's trash, and reasons why they cannot search the trash of Alex and Navarro. (ER 281-282; Bates 621-622)  The corrected affidavit makes no mention of Carlos Rivera and therefore cannot establish necessity for a wiretap on Rivera's phone.

## G. General Allegations That Are True In Most Narcotics Investigations Are Insufficient To Show Necessity

The remaining allegations in the trash search section are broad generalities that could apply to any criminal investigation.  For example, the application states that "I do not believe that trash searches, even in conjunction with other traditional methods of investigation, would yield information that would meet the objectives of this investigation, including the development of prosecutable evidence against the Target Subjects, the identification of sources of supply, and methods of operations." (ER 281; Bates 621)

Next the application states: "I am also aware that trash searches may not always be feasible because in some residential neighborhoods law enforcement runs a risk of

31

being detected while conducting these searches." (ER 282;
Bates 622)  And finally it states: "While it is possible
that pay-owe sheets or other records of drug transactions
could be recovered from the trash of narcotics traffickers,
it is unlikely.  Moreover, even if such documents were
recovered, they are generally difficult if not impossible to
decipher without additional information from another source
regarding the parties and transactions involved.  While
other evidence may be recovered, narcotic traffickers rarely
throw out clear evidence that can prove the Target Offenses
beyond a reasonable doubt." (ER 283; Bates 623)

        In a similar situation, in the <u>Blackmon</u> case, the
Court stated that "The purged application does not meet the
full and complete statement requirement of §2518(1)( c)
because it makes only general allegations that would be true
in most narcotics investigations." <u>United States v.
Blackmon</u>, 273 F.3d 1204, 1210 (9th Cir. 2001).  For example,
in <u>Blackmon</u>, the agent decided not to use a pen register
because it would not identify the caller or reveal the
subject of the call.  Likewise, he decided not to use search
warrants because they were unlikely to produce evidence
which would identify fully the other members of the
conspiracy or the sources of supply.  The Court stated that:
"These boilerplate assertions are unsupported by specific

facts relevant to the particular circumstances of this case and would be true of most if not all narcotics investigations.  This is simply not enough."  United States v. Blackmon, 273 F.3d 1204, 1210.

Boilerplate assertions unrelated to the specific investigation of Carlos Rivera appear throughout the application as justification for not conducting any further traditional investigation of Rivera.  In the Physical Surveillance section, the agent states "I believe physical surveillance typically cannot be done effectively and efficiently unless the agents know the time and place of an activity. . . Use of the wiretap will allow law enforcement to be more selective in its surveillance activities, thus reducing the risk of compromising the investigation.  For these reasons, I believe that physical surveillance, without the aid of wiretap interception of the [Target Telephones] will not achieve the current goals of the investigation."  (ER 273; Bates 613)  This boilerplate assertion has the necessity issue backwards.  The agent is requesting a wiretap first so he can then conduct the traditional investigation of physical surveillance.

In the Interviews of Witnesses and Confidential Sources, Grand Jury Subpoenas, Grants of Immunity, and Financial Investigation/Mail Covers Section, the agent makes

33

no mention of Carlos Rivera.  The agent states generically that there are no witnesses, no confidential sources, and no individuals that are cooperating at this time. (ER 275-276; Bates 615-616)  The affidavit is silent on the issue of what the agents did to attempt to locate such witnesses in the case of Carlos Rivera.  Conducting no traditional investigation would also likely result in the agent stating there are no witnesses and no confidential sources.

The affidavit, in the same section, states that no financial information or assets on the other Target Subjects have been identified. (ER 276; Bates 616)  Once again, this could be the result of no financial investigation being conducted on Carlos Rivera.  A mail cover was placed on Virgina Gil's address, but there is no explanation of why this was not done on Carlos Rivera, except for the generic rejection of all of these techniques.  The affiant states: "For the foregoing reasons, use of interviews, grand jury subpoenas and immunity, and any financial investigation that could be conducted, even in conjunction with conventional investigative techniques, is unlikely to advance, and, in some instances would likely impede, the government's investigative objectives." (ER 276; Bates 616)

The Undercover Agent's Section merely states that "implanting a law enforcement officer in an undercover

34

capacity is not feasible. . . Presently, there is no CS that could facilitate such an introduction." (ER 277; Bates 617) Once again, the absence of a CS could be the result of no investigation. The affidavit then concludes with the generic statement that it would be highly unlikely that an undercover agent, even if introduced, "would be privy to such information as to accomplish the goals of this investigation." (ER 277; Bates 617) Again, this conclusion appears to be unrelated to any effort to conduct a traditional investigation of Carlos Rivera.

In the Search Warrants/Seizures Section the agent rejects the use of a search warrant despite knowing the residence of Rivera (ER 279; Bates 619), and does not consider the parole search option, even knowing Rivera is on parole. (ER 271; Bates 611) The agent states: "When the investigation is closer to the completion of the stated objectives, the use of search warrants is likely to be a valuable tool, but the use of search warrants at this time would jeopardize the overall investigation by prematurely notifying members of the conspiracy that they are being investigated by law enforcement and compromise the ultimate goals of the investigation." (ER 279; Bates 619) The agent also states in the same section that "the premature execution of warrants will likely alert the Target Subjects

35

of the current ongoing investigation, and will potentially cause the Target Subject to discontinue using the Target Telephones." (ER 279; Bates 619)

These are just "boilerplate assertions [that] are unsupported by specific facts relevant to the particular circumstances of this case and would be true of most if not all narcotics investigations." <u>United States v Blackmon</u>, 273 F.3d at 1210. Furthermore, the credibility of these statements is undermined by the fact that on August 6, 2009, three weeks after the wiretap was authorized, the agents did conduct a parole search of Carlos Rivera's residence. Once again, the agents have the necessity issue backwards. They are getting the wiretap first and then conducting the traditional investigation, when it should be the other way around.

In the Pen Register/Toll Records Section, the agent discusses the use of pen registers on other subjects, but there is no mention of Carlos Rivera. It appears that the agents neither tried to use a pen register on Rivera, nor even considered the pen register in his case. The agent concludes with the generic assessment that "The technique [pen registers] will not always establish the identities of the persons called and not reveal the content of the conversations." (ER 280; Bates 620)

36

In the Pole Cameras Section the agent mentions his consideration of the use of pole cameras in the investigation of Alex and Navarro, but rejects using them at those locations for reasons specific to those subjects.  No mention is made of Carlos Rivera or whether a pole camera would be of assistance in the investigation of Rivera.  The agent then rejects any use of a pole camera by giving a generic reason: "I do not presently have knowledge of a location where a pole camera would benefit the investigation, since I would only be able to see vehicles and or subjects arriving or leaving, which without wire intercepts, I would not have information as to why they are at the location." (ER 285; Bates 625)  This is merely a statement of the limitations of the pole camera as a traditional investigative tool.  Again, "This is simply not enough."  United States v Blackmon, 273 F.3d at 1210.

In the Tracking Devices Section, the agent states that he had considered and rejected using a tracking device on the car of David Navarro, because Navarro used different vehicles.  (ER 285; Bates 625)  Once again, there is no mention of Carlos Rivera and it appears that the agent never even considered using a tracking device to investigate Rivera.

In short, all of the remaining traditional types

of investigative techniques were either not considered at all in connection with the Carlos Rivera investigation or were rejected outright for generic reasons that "would be true of most or all drug conspiracy investigations." United States v Blackmon, 273 F.3d at 1210. See also United States v Kalustian, 529 F.2d 585, 588-89 (9th Cir. 1976) (suppressing wiretap evidence in a gambling investigation because the "affidavit does not enlighten us as to why this gambling case presented investigative problems which were distinguishable in nature or degree from any other gambling case.")

**H. When Suppression Is Required**

In the district court the government cited United States v Fernandez, 388 F.3d 1199, 1237 (9th Cir. 2004) and argued that in Fernandez, the Court refused to invalidate a wiretap where the application contained conclusory language concerning the inherent limitations of particular investigative techniques, similar to that condemned in Blackmon. The Court upheld the wiretap on the ground that, in contrast to Blackmon, the affidavit in Fernandez "was not plagued by material misrepresentations and omissions." United States v Fernandez, supra, 388 F.3d at 1237. In this case, however, the false representation about lack of knowledge of Rivera's residence as the reason for not

38

conducting a trash search, means that <u>Blackmon</u>, and not
<u>Fernandez</u>, is the controlling case. Thus, the Court should
suppress the wiretap evidence.

The Government attempted to downplay the
importance of conducting a trash search because in
preparation for the suppression hearing Officer Lavoie went
to 815 N. Vineyard Avenue, Rivera's residence, on August 27,
2012, to investigate, three years after the wiretap
application. Lavoie stated in his declaration that trash
searches would be ineffective because there was more than
one dumpster, plus multiple trash cans in the alley, making
it difficult to determine which trash belonged to Rivera.
(ER 177, Decl. Of Kris Lavoie, p. 2)

The government cannot save a wiretap application
by adding favorable information to the affidavit that was
never considered by the issuing Judge. The validity of the
wiretap application is evaluated solely on the basis of the
facts contained in the affidavit. In <u>United States v Krupa</u>,
633 F.3d 1148, 1154 (9th Cir. 2011) the Court states that
"[I]n reviewing a search warrant, we are `limited to the
information and circumstances contained within the four
corners of the underlying affidavit.'" The government
cannot supplement those facts with information that was
never before the issuing Judge who signed the wiretap order.

39

It is only the defendant in a criminal case who may go beyond the facial sufficiency of an affidavit supporting a warrant and challenge the truthfulness of the factual statements. Franks v. Delaware, 438 U.S. 154 (1978). After a defendant has made a showing that the affidavit contains false statements, deliberately or recklessly made, then the statements are removed from the applications and the warrant is retested for probable cause and necessity. United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir. 1985).

Once the false statement is removed and the truthful information inserted, if a reasonable judge could have denied the wiretap request, the intercepted conversations must be ordered suppressed. United States v. Ippolito, 774 F.2d 1482, 1487 (9th Cir. 1985)("We conclude that a reasonable district court judge could have denied the application because necessity for the wiretap order had not been shown. Therefore, suppression was properly ordered."); United States v. Blackmon, 237 F.2d 1204, 1208 (9th Cir. 2001)("If an application contains inaccuracies or significant omissions, the court must determine the facts relying on credible evidence produced at the suppression hearing to determine whether a 'reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown."); United States v. Carneiro,

40

861 F.2d 1171, 1180 (9th Cir. 1988)("If these omissions and misstatements had been revealed, a reasonable district court judge could have denied the wiretap request because the errors show that the DEA failed to pursue traditional methods of investigation before seeking the wiretap.").

## I. Conclusion

Medina's motion to suppress the wiretap evidence obtained over Carlos Rivera's telephone should have been granted.  The government's necessity investigation consisted of only one day of surveillance of Carlos Rivera and the examination of three weeks worth of his telephone records. As a matter of law this was an insufficient showing of necessity for the wiretap. United States v. Gonzalez, Inc., 412 F.3d 1102, 1112-15 (9th Cir. 2005).

A false statement was made in the application in the necessity section of the application.  The agent falsely stated that he could not conduct a trash search at Rivera's residence because law enforcement did not know his residence.  This false statement was material and requires suppression because a reasonable judge reviewing a corrected application could have denied the wiretap application on the grounds that necessity had not been established. United States v. Ippolito, 774 F.2d 1482, 1487 (9th Cir. 1985).

Aside from the one day of surveillance of Rivera

41

and an examination of three weeks of Rivera's telephone records, the government conducted no further traditional investigation of Rivera.  The government could not rely upon the necessity showing made in prior wiretap applications against different target subjects.  <u>United States v Carneiro</u>, 861 F.2d 1171, 1182 (9th Cir. 1988).  Furthermore, the generalized statements in the application concerning the inherent limitations of other traditional investigative techniques are insufficient to meet the necessity requirement.  <u>United States v. Blackmon</u>, 273 F.3d 1204, 1210 (9th Cir. 2001).

  The error in this case is reversible.  All of the incriminating evidence in the case of Jessica Medina came from the wiretap interceptions on Carlos Rivera's telephone. The erroneously admitted wiretap evidence had a prejudicial impact on the jury's verdict and Ms. Medina's substantial rights were affected.  If the wiretap evidence had not been admitted, the verdict would have been not guilty, because the remaining evidence was insufficient to convict her. Thus, this case meets the test for reversible error. <u>Kotteakos v United States</u>, 328 U.S. 750, 763-765 (1946).

## II

## <u>THE COURT ERRED IN FAILING TO HOLD A</u> <u>FRANKS HEARING ON THE FALSE STATEMENT</u>

In the first argument, Jessica Medina argued that the wiretap motion should have been granted as a matter of law based upon the showing made in the district court.  If this Court disagrees, Ms. Medina makes the alternative argument that the district court erred in failing to hold a <u>Franks</u> hearing, based upon the false statement made in the necessity section of the wiretap application.

Medina, in her motion to suppress wiretap evidence, did request that the district court hold a <u>Franks</u> hearing pursuant to <u>Franks v Delaware</u>, 438 U.S. 154 (1978). (ER 172) The district court implicitly denied that request when it entered its order denying the motion to suppress.  (ER 1) This Court reviews de novo the district court's denial of a <u>Franks</u> hearing.  <u>United States v Meling</u>, 47 F.3d 1546, 1553 (9th Cir. 1995); <u>United States v Ippolito</u>, supra, 774 F.2d at 1484.

A defendant is entitled to an evidentiary hearing if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the

43

[wiretap] affidavit, and if the allegedly false statement is necessary to the finding of probable cause" or necessity. <u>Franks v Delaware</u>, 438 U.S. 154, 155-56 (1978); <u>United States v Ippolito</u>, 774 F.2d 1482, 1485 (9th Cir. 1985). If, "at [the] hearing the allegation of . . . reckless disregard is established by the defendant . . . and, with the affidavit's false material set to one side" and the false omissions included, "the affidavit's remaining content is insufficient to establish probable cause" or necessity, the wiretap "must be voided and the fruits of the search excluded to the same extent as if probable cause" or necessity "was lacking on the face of the affidavit." <u>Franks v Delaware</u>, supra, 438 U.S. at 157; <u>United States v Ippolito</u>, supra, 774 F.2d at 1485.

The wiretap application for Carlos Rivera's cell phone contained a false representation concerning necessity. When discussing the possibility of conducting trash searches, a traditional method of criminal investigations, the affiant stated that he could not conduct such a trash search on the home of the user of TT #9 [Carlos Rivera], because the residence of the user of TT #9 was unknown. (ER 282; Bates 622)  This was a false statement.

The officers had the residence address of Carlos Rivera and could have conducted a trash search at that

location.  In the Target Subjects Section of the wiretap application, it states: "Carols Rivera ("RIVERA") also known as "Chino" is an Ontario Black Angel gang member using Target Telephone # 9 who, based on intercepted conversations over Target Telephone # 5, is involved in collecting extortion payments, dealing narcotics, and possibly brokering transactions to obtain firearms for the gang. RIVERA is a Hispanic male born on December 3, 1985, believed to reside at 815 North Vineyard Avenue Apartment B." (ER 223; Bates 563)

The government conceded that the representations in the trash search section of the affidavit concerning not knowing Rivera's residence were false.  In a declaration filed by the government, the affiant, Officer Kris Lavoie, stated that "I inadvertently failed to update the section related to trash searches to reflect the Vineyard address that was associated with Carlos Rivera.  The paragraph should state that I was aware that 815 North vineyard Avenue, Apartment B is an address where Carlos Rivera possibly resides."  (ER 277, Decl. Of Kris Lavoie, p. 2)

By denying the motion to suppress the wiretap evidence without conducting a Franks hearing, the district court committed error under Franks and Ippolito.  The false statements made in the wiretap application were material

45

because they went directly to the issue of necessity. Although the affiant claimed in his declaration that the falsity was an inadvertent failure to update the affidavit, the evidence suggests that the false statement was made with at least reckless disregard of the truth. The trash search section of the affidavit for the Rivera wiretap was a carbon copy of the trash search section for the David Navarro tap from a month earlier. The only difference between the two was the false statement in the Rivera affidavit, claiming the agents did not know Rivera's address and thus could not conduct a trash search.

One of the goals of the investigation was to find the locations where the target subjects sold narcotics. By falsely stating that the agents did not know Carlos Rivera's residence, the affiant appeared to be asking for a wiretap on Rivera's telephone in order to learn where his residence was, as a potential place where narcotics was being sold. This was no small inadvertent misrepresentation. It was a major misrepresentation in a critical section of the wiretap application.

Finally, in asking for a <u>Franks</u> hearing, a defendant need only establish that material false statements were made in the affidavit in order to get a hearing. It is at the evidentiary hearing where the district court decides whether

46

the false statements were deliberately or recklessly made. United States v Chesher, 678 F.2d 1353, 1363-64 (9th Cir. 1982). ("Under Franks, Chesher is therefore entitled to an evidentiary hearing on the issue whether Bertolani's statement that he knew Chesher to be a member of Hells Angels in 1979 was deliberately or recklessly false.")

Therefore, if the Court rejects the first argument in this brief, that the existing record required the suppression of the wiretap evidence, then the Court must nevertheless reverse the case because of the district court's failure to hold a Franks hearing.

### III

**THE COURT ERRED IN DENYING MEDINA'S MOTION TO SUPPRESS WIRETAP EVIDENCE MADE ON THE GROUNDS THAT THE GOVERNMENT FAILED TO OBTAIN THE NECESSARY JUSTICE DEPARTMENT AUTHORIZATION TO WIRETAP CARLOS RIVERA, THE PRIMARY USER OF TARGET TELEPHONE # 9**

Jessica Medina also moved to suppress wiretap evidence on the grounds that the government had failed to obtain the necessary Justice Department authorization to wiretap Carlos Rivera, the primary user of Target Telephone #9. (ER 27-28)  The district court denied this motion. (ER 1)  Medina now argues that the court erred in denying the

47

motion and the wiretap evidence should have been suppressed. The standard of review on appeal from the denial of a wiretap motion alleging a lack of proper Justice Department authorization is de novo review.  <u>United States v Reyna</u>, 218 F.3d 1108, 1110 (9th Cir. 2000).

The wiretap application requested an order allowing the wiretapping of a "cellular telephone, subscribed to Jessica Medina at P.O. Box 54988, Irvine, CA, with a telephone number of 909-419-9937 . . . and believed to be used primarily by Carlos Rivera ("Target Telephone #9")." (ER 182; Bates 522)  The probable cause was based entirely upon the criminal activity of Carlos Rivera.  The application states "Carlos Rivera ("RIVERA") also known as "Chino" is an Ontario Black Angel gang member using Target Telephone #9 who, based on intercepted conversations over Target Telephone #5, is involved in collecting extortion payments, dealing narcotics, and possibly brokering transactions to obtain firearms for the gang." (ER 223; Bates 563)

The Justice Department letter of authorization signed by Deputy Assistant Attorney General Kenneth A. Blanco authorized the application for a wiretap on "(909) 419-9937, subscribed to by Jessica Medina, P.O. Box 54988, Irvine, California," and listed 46 persons whose

48

conversations were expected to be intercepted.  However, the
name, Carlos Rivera, did not appear in the authorization
letter as one of the person's whose intercepted
communications were being authorized for wiretapping.  (ER
197-198; Bates 537-538)  The omission of Carlos Rivera's
name from the authorization letter means that the government
had not obtained the necessary Justice Department
authorization for the wiretap on Carlos Rivera's telephone,
Target Telephone #9.

        Before an Assistant United States Attorney may
apply for a wiretap order, the Assistant must obtain the
required authorization from the Attorney General or his
authorized Assistant Attorney General. United States v
Staffeldt, 451 F.3d 578 (9th Cir. 2006); 18 U.S.C. § 2516
(1).  Wiretap evidence obtained in violation of Title III
must be suppressed.  United States v. Giordano, 416 U.S.
505, 527 (1974); 18 U.S.C. §2515 and § 2518 (10) (a)(i).

        In United States v. Giordano, 416 U.S. 505, 527
(1974), an application for a wiretap stated that it had been
authorized by a specially designated Assistant Attorney
General. At a suppression hearing, it developed that the
wiretap application had not in fact been authorized by a
specially designated Assistant Attorney General.  It had
been authorized by the Attorney General's Executive

Assistant, a person not authorized under Title III to approve wiretap applications.  Thus, the wiretap evidence was ordered suppressed because the government had not obtained the necessary Justice Department authorization prior to applying for the wiretap.

In Giordano, the Court held that Congress did not intend the power to authorize wiretap applications to be exercised by any individuals other than the Attorney General or an Assistant Attorney General specially designated by him. United States v. Giordano, supra, 416 U.S. at 512-523. The failure to obtain the proper Justice Department authorization, rendered the wiretap conversations "unlawfully intercepted" within the meaning of 18 U.S.C. §2518(10)(a)(I).

 The Supreme Court stated that the statute was intended to require suppression where there is a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.  United States v. Giordano, supra, 416 U.S. at 524-528.  The limitation of wiretap authorization to a senior Justice Department official was seen by the Court as one of the provisions that played a central role in the

50

statutory scheme.  Thus, suppression was required in the
case because the required authorization had not been
obtained.  United States v. Giordano, supra, 416 U.S. at
528-529.

     The Authorization letter in Medina's case, does
not authorize the wiretapping of Carlos Rivera over Target
Telephone # 9.  On its face, the Justice Department
authorization letter does not authorized the wiretapping of
Carlos Rivera over Target Telephone #9.  Thus, the wiretap
evidence should have been suppressed under Giordano.

     Medina's case is similar to the Ninth Circuit case
of United States v Staffeldt, 451 F.3d 578 (9th Cir. 2006).
In Staffeldt, the court found that the wiretap application
was "facially insufficient," and suppressed the evidence in
a case where the wiretap application contained a Justice
Department authorization letter for an entirely unrelated
telephone.  A Justice Department official had faxed the
wrong authorization letter to the prosecutor and neither the
prosecutor nor the District Court in signing the wiretap
order had noted the mistake.

      The Court in Staffeldt held that the wiretap
application failed to establish that the application to
wiretap Staffeldt's telephone had been authorized by the
Attorney General.  Staffeldt's name was not mentioned in the

51

authorization letter.  Thus, the Court ordered the wiretap evidence suppressed because the government's application on its face failed to establish that the necessary Justice Department authorization had been obtained.  United States v Staffeldt, supra, 451 F.3d at 583-584.

Like Staffeldt, a facial insufficiency exists in the wiretap application for Target Telephone # 9.  The Justice Department Authorization Letter does not authorize the wiretapping of Carlos Rivera, the primary user of the phone.  The required authorization is lacking in the wiretap application.  The district court erred in denying Medina's motion to suppress.

IV

**THE COURT ERRED IN DENYING A SENTENCE REDUCTION UNDER THE GUIDELINES FOR MINOR ROLE IN THE OFFENSE**

The District Court erred in denying a sentence reduction under the Guidelines for minor role in the offense.  If the Court had granted a minor role adjustment, it would have resulted in a five level reduction in the offense level in this case.  Jessica Medina's Guideline final Offense level would have been reduced from a Level 34, with a 151 to 188 months sentencing range, to a Level 29,

with an 87 to 108 months sentencing range.  Since Ms. Medina was sentenced to the low end of Level 34 for a sentence of 151 months, the error was prejudicial.  With a minor role adjustment, she would have received a substantially less sentence.

Based upon the amount of methamphetamine involved in the case, 219 grams of actual methamphetamine, the base offense level was 34.  U.S.S.G. §2D1.1 ( c)(3) (Drug Quantity Table).  However, Guidelines §2D1.1 (a)(5) provides that if the offense level specified in the Drug Quantity Table is Offense Level 34, the Court should "decrease by 3 levels" if "the defendant receives an adjustment under §3B1.2 (Minor Role)."  With a minor role adjustment, the offense level based on the drug quantity would have been reduced to a final Offense Level of 31.

The minor role adjustment provides that "If the defendant was a minor participant in any criminal activity, decrease by 2 levels."  U.S.S.G. §3B1.2 (b).  Application Note 3 (A) states:

> This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant.
> A defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted

53

criminal activity is not precluded from
consideration for an adjustment under this
guideline. For example, a defendant who is
convicted of a drug trafficking offense, whose
role in that offense was limited to transporting
or storing drugs and who is accountable under §
1B1.3 only for the quantity of drugs the
defendant personally transported or stored is
not precluded from consideration for an
adjustment under this guideline.

If the district court had granted Medina a minor
role adjustment, the 2 level reduction would have resulted
in a final Offense Level of 29. At that level, the
sentencing range was below the mandatory minimum of 10
years. However, at Offense Level 29, Ms. Medina would have
received a sentence of 120 months, rather than 151 months.
Also, Ms. Medina might possibly have qualified for an even
further reduction in her sentence if a bill pending in the
United States Senate, S.619, The Justice Safety Valve Act of
2013, is passed. The bill would allow judges to sentence
any defendant below the mandatory minimums if the judge
determines that the mandatory minimum sentence does not
fulfill the goals of punishment listed in 18 U.S.C.
§3553(a).[1]

---

[1]In the district court, Medina asked the court for a
sentence below the mandatory minimum 10 years, citing the
pending Justice Safety Valve Act. (ER 75) If the Act is
passed into law by Congress while Medina's appeal is
pending, it should apply to her case on the grounds that the
judgment is not yet final. Griffith v Kentucky, 479 U.S.

"A district court's finding that a defendant is not a minor participant in criminal activity is a factual determination reviewed for clear error." <u>United States v. Rodriquez-Castro</u>, 641 F.3d 1189, 1192 (9th Cir. 2011). This court has held that "a minor participant is one who plays a part in committing the offense that makes him substantially less culpable than the average participant." <u>United States v. Rodriquez-Castro</u> , supra, at 1193.  The determination whether to apply this adjustment "is heavily dependent upon the facts of the particular case."  U.S.S.G. § 3B1.2, App. Note ( c).

In the presentence report, under Role in the Offense, the probation officer stated: "Medina instructed the owner of the vehicle from which the methamphetamine was seized on August 6, 2009, to tell police officers the same lie she told them (the vehicle had been stolen often, thus, she did not know how the drug ended up inside) does not qualify her as a manager, supervisor, or leader of others. Moreover, based on her actions and her relationship with Rivera, Medina does not appear to have a mitigating role either, as she is not substantially less culpable than the average co-conspirator as defined in U.S.S.G. §3B1.2.  Thus,

---

314, 328 (1987).

neither a role enhancement nor a role reduction is applied."
PSR, p. 15.

In describing Medina's criminal conduct in this
case, the probation officer stated that Jessica Medina and
Carlos Rivera received 219 grams of methamphetamine from the
co-defendant Meza.  Rivera then hid the drugs in the
vehicle.  When the police searched the car and found the
drugs, Medina hid the keys and lied to the police that she
did not know who the car belonged to.  Medina also asked the
owner of the vehicle in which the drugs were seized to lie
to the police and tell them that the car had been stolen
many times and it could not be determined how the drugs got
in the car. After Rivera was arrested, Medina tried to
collect money owed to Rivera for methamphetamine debts.
Finally in a conversation with David Navarro, she speculated
that Meza may be cooperating with the police.  PSR, p. 12-
13.

At sentencing, defense counsel argued for a 2
level reduction for Medina's minor role in the offense.  The
evidence was clear that her common law husband, Carlos
Rivera, had obtained the methamphetamine, brought it into
the house, and later hid it in the vehicle.  In some of the
wiretap calls, Jessica Medina was overheard saying she told
Rivera to get the drugs out of the house and that she did

56

not know the amount of drugs that Rivera had acquired. Exh. 146A. Counsel argued that it was her husband's drug business and any participation she had in the business was small, thereby qualifying for a minor role. (ER 73-74; 4-8-13 RT 7-8.)

The government argued against a minor role stating that Medina had hid the keys to the car containing the methamphetamine. She also knew that Rivera had $3000 in his pocket on the day of his arrest. Furthermore, the government argued that the wiretap conversations indicated that Jessica Medina began running the methamphetamine distribution operation once Rivera was put in jail. (ER 76-77; 4-8-13 RT 10-11.) Ultimately, the district court refused to grant a reduction for a minor role, adopting the government's position. (ER 77; 4-8-13 RT 11.) The court then sentenced Ms. Medina to 151 months. (ER 81; 4-8-13 RT 15.)

The district court committed clear error in denying Jessica Medina a minor role adjustment. Her role in the offense was that of a housewife, with four children, and a husband who sold drugs. There is no indication in the record that Jessica Medina was involved in acquiring the 219 grams of methamphetamine on August 6, 2009. The evidence shows that Carlos Rivera acquired the drugs from Meza. He

brought the drugs home and hid them in the car parked in front of the house.  Although the jury found Jessica Medina guilty of possession with intent to distribute the 219 grams of methamphetamine, there still remains the question of what her role in that offense is.

Beyond the obvious finding by the jury that Medina had dominion and control over the drugs, there is no evidence that she was to play any role in the sale or distribution of the drugs.  Carlos Rivera was the person who was distributing the drugs.  What little help she gave Rivera after his arrest was not so great as to deny her a minor role adjustment.

The government argued that she should be denied a minor role because she hid the key to the car and told the car owner to lie to the police.  However, hiding the key to the car and asking the car owner to lie to the police were not actions designed to carry on the drug distribution operation.  Jessica Medina was trying to shield Carlos Rivera from being connected to the drugs in the car.  As the wife of Rivera, she did not want Rivera convicted and sentenced to a long jail sentence.  Hence she lied to protect him.  These actions do not give her a greater role in the drug conspiracy.  Rather, they are the acts of a wife trying to cover up her husband's crime.  The actions are not

58

grounds for denying a minor role adjustment.

The government also argued that Medina tried to collect drug money after Rivera's arrest and that she tried to carry on his drug business while he was in jail. It is true there were calls in which Medina tried to collect money owed Rivera after he was in jail. But this, once again, played only a minor role in the offense if any. The wiretap calls indicated that Medina stated she needed the money to pay family bills and buy shoes for the children, Exh. 143A, and the amounts mentioned were in the small range of $200 to $300 dollars. Exh. 144A. Trying to collect the money owed her drug dealer husband after he goes to jail is the type of criminal conduct that qualifies as a minor role in the crime.

Finally, the government argues that the wiretap calls showed Medina trying to carry on Rivera's drug business while Rivera was in jail. In one call, Medina tells one of Rivera's co-conspirators that she would slide over the numbers on Rivera's phone to the co-conspirator. Exh. 93A. In another call, Medina discussed with one of Rivera's co-conspirators about whether it would be better to wait awhile before continuing to sell drugs because of the recent arrest of Rivera and all of the recent police activity. Exh. 148A.

Nothing developed from these conversations. There is no evidence that Medina was in fact able to continue Rivera's drug activity beyond the few phone calls to some of the co-conspirators. In other words, her post-Rivera arrest help was so minor that nothing ever came of it. Therefore, Jessica Medina urges the Court to find that the district court committed clear error in denying a minor role adjustment. She urges the Court to reverse her sentence.

## CONCLUSION

Based upon the foregoing, the appellant urges the Court to reverse the District Court's order denying the motion to suppress wiretap evidence and reverse the conviction. Alternatively, appellant urges the Court to reverse her sentence.

Respectfully Submitted,

/S/ Joseph F. Walsh

_____

JOSEPH F. WALSH
Attorney for Appellant
JESSICA MEDINA

## **STATEMENT OF RELATED CASES**

There are two related cases in this matter.  They the appeals of the co-defendants in this case.  United States v Carlos Rivera, No. 13-50115, and United States v Raul Prieto, No. 13-50135.


## **CERTIFICATE OF COMPLIANCE**

I certify that :

The brief is

X    Monospaced, 10.5 or few characters per inch and contains 12,002 words.

/s/ Joseph F. Walsh

_____

JOSEPH F. WALSH

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system.

I certify that all participants in the case are register CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Joseph F. Walsh

JOSEPH F. WALSH