NO. 13-50156

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff and Appellee, | ) |
| | ) |
| vs. | ) |
| | ) |
| JESSICA MEDINA | ) |
| | ) |
| Defendant and Appellant. | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |


APPELLANT'S EXCERPT OF RECORD

VOLUME I

APPEAL FROM THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE OTIS D. WRIGHT
UNITED STATES DISTRICT JUDGE

JOSEPH  F. WALSH
California Bar No.  67930
Attorney at Law
205 S. Broadway, Ste 606
Los Angeles, CA 90012
(213) 627-1793
Email: Attyjoewalsh@aol.com

Attorney for Appellant
JESSICA MEDINA

## TOPICAL INDEX

**VOLUME I**

ORDER DENYING MOTION TO SUPPRESS WIRETAP EVIDENCE
DATED OCTOBER 16, 2012 (DOC 1830)  . . . . . . . . . . . 1

REPORTER'S TRANSCRIPT OF HEARING ON MOTION TO
SUPPRESS WIRETAP EVIDENCE
DATED September 11, 2012 . . . . . . . . . . . . . . . . 2

REPORTER'S TRANSCRIPT OF SENTENCING HEARING
DATED APRIL 8, 2013  . . . . . . . . . . . . . . . . . . 67

**VOLUME II**

INDICTMENT (DOC 1)
DATED APRIL 7, 2010 . . . . . . . . . . . . . . . . . . . 91

MOTION TO SUPPRESS WIRETAP EVIDENCE (DOC 1590)
DATED JULY 13, 2012 . . . . . . . . . . . . . . . . . . 172

GOVERNMENT OPPOSITION TO MOTION TO SUPPRESS WIRETAP
EVIDENCE AND DECLARATION OF KRIS LAVOIE (DOC 1668)
DATED AUGUST 27, 2012 . . . . . . . . . . . . . . . . . 174

APPLICATION FOR WIRETAP ON TARGET TELEPHONE #9
(DOC 1574-5)
DATED JULY 17, 2009 . . . . . . . . . . . . . . . . . . 179

**VOLUME III**

APPLICATION FOR WIRETAP ON TARGET TELEPHONE #5
(DOC 1574-4)
DATED JUNE 17, 2009 . . . . . . . . . . . . . . . . . . 366

JUDGMENT AND SENTENCE (DOC 2114)
DATED APRIL 8, 2013 . . . . . . . . . . . . . . . . . . 501

NOTICE OF APPEAL (DOC 2123)
DATED APRIL 8, 2013 . . . . . . . . . . . . . . . . . . 507

DOCKET  . . . . . . . . . . . . . . . . . . . . . . . . 508

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| Case No. | CR 10-00351-ODW-7, 27, 29 | | Date | October 16, 2012 |
|---|---|---|---|---|

| Present: The Honorable | OTIS D. WRIGHT II, UNITED STATES DISTRICT JUDGE |
|---|---|
| Interpreter | |

| Sheila English | N/A | N/A |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 27) Jessica Medina | Not | X | | 27)  Joseph F Walsh | Not | X | |

**Proceedings:**           **MINUTE ORDER  (IN CHAMBERS)**

The Motion To Suppress Wiretap Evidence from Target Telephone # 9 filed by 27-Medina [**1590**] together with joinders: 7-Rivera [**1593**] and 29-Prieto [**1594**], submitted on September 11, 2012 is **DENIED**.

Ample evidence of necessity had been shown to the issuing Court; and the arrest of Rivera did not negate the previous showings of probable cause and necessity.

:                00

Initials of Deputy Clerk    se

ER000001

1

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4                              ---

5             HONORABLE OTIS D. WRIGHT, JUDGE PRESIDING

6                              ---

7

8    UNITED STATES OF AMERICA,   )
                                 )
9                  Plaintiff,    )
                                 )
10                               )
         vs.                     ) NO:  CR 10-351-ODW
11                               )
                                 )
12   ARMANDO BARAJAS, et al.,    )
                                 )
13                 Defendants.   )
     _____ )

14

15

16

17             REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                  Los Angeles, California

19               Tuesday, September 11, 2012

20

21

22                         KATHERINE M. STRIDE, RPR, CSR
                           Official Court Reporter
23                         Roybal Federal Building
                           255 E. Temple Street, Rm. 181-B
24                         Los Angeles, California  90012

25                         (213)894-2187

2

1

2    **APPEARANCES:**

3

4    In behalf of the Government:

5                    REEMA M. EL-AMAMY
                     MICHAEL DORE
6                    ASSISTANT UNITED STATES ATTORNEYS
                     Criminal Division, United States Courthouse
7                    312 North Spring Street
                     Los Angeles, California  90012
8                    (213)894-2434

9

10

11

12

13    In behalf of Defendant Armando Barajas:

14                    LAW OFFICE OF WILLIAM HARRIS
                      BY:  WILLIAM HARRIS
15                    1499 Huntington Drive, Suite 403
                      South Pasadena, CA  91030
16                    (626)441-9300

17

18    In behalf of Defendant Juan Gil:

19                    KESTENBAUM EISNER & GORIN
                      BY:  ALAN EISNER
20                    14401 Sylvan Street, Suite 112
                      Van Nuys, CA  91401
21                    (818)781-1570

22

23

24

25

3

1

2    **APPEARANCES (CONTINUED):**

3

4    In behalf of Defendant Carlos Rivera:

5                 LAW OFFICE OF ANGEL NAVARRO
                  BY:  ANGEL NAVARRO
6                 714 West Olympic Boulevard, Suite 450
                  Los Angeles, CA  90015
7                 (213)744-0216

8

9    In behalf of Defendant Juan Diaz:

10                LAW OFFICE OF THOMAS NISHI
                  BY:  THOMAS NISHI
11                725 South Figueroa Street, 31st Floor
                  Los Angeles, CA  90017
12                (213)629-9066

13

14   In behalf of Defendant Steven Espinoza:

15                LAW OFFICE OF MICHAEL MAYOCK
                  BY:  MICHAEL MAYOCK
16                65 N. Raymond Avenue, Suite 235
                  Pasadena, CA  91103
17                (626)405-1465

18

19   In behalf of Defendant Maria Lopez:

20
                  LAW OFFICE OF WILLIAM R. DOMNARSKI
21                BY:  WILLIAM R. DOMNARSKI
                  6144 Omega Street
22                Riverside, CA  92506
                  (951)334-0529

23

24

25

4

1

2    **APPEARANCES (CONTINUED):**

3

4    In behalf of Defendant Jessica Medina:

5                    LAW OFFICE OF JOSEPH F. WALSH
                     BY:   JOSEPH F. WALSH
6                    205 South Broadway, Suite 606
                     Los Angeles, CA  90012
7                    (213)627-1793

8

9    In behalf of Defendant Raul Prieto:

10                   CEPHAS LAW FIRM
                     BY:  DANA CEPHAS
11                   72960 Fred Waring Drive
                     Palm Desert, CA  92260
12                   (760)844-2662

13

14   In behalf of Defendant Steven Vega:

15                   LAW OFFICE OF LARRY M. BAKMAN
                     BY:   LARRY M. BAKMAN
16                   1901 Avenue of the Stars, Suite 200
                     Los Angeles, CA  90067
17                   (310)461-1555

18

19   In behalf of Defendant Salvador Gutierrez Martinez:

20                   PEREZ & ASSOCIATES
                     BY:  HECTOR C. PEREZ
21                   3020 Old Ranch Parkway, Suite 300
                     Seal Beach, CA  90740
22                   (562)799-5524

23

24

25

1       **LOS ANGELES, CALIFORNIA; TUESDAY, SEPTEMBER 11, 2012;**

2                           **10:11 A.M.**

3

4              THE CLERK:  Remain seated and come to order.

5       This United States District Court is now in session, the

6       Honorable Otis D. Wright, United States District Judge

7       presiding.

8              Calling Item 1, CR 10-351, United States of

9       America versus Armando Barajas, et al.  Also present are

10      Defendants No. 2, No. 7, No. 9, No. 12, No. 26, No. 27,

11      No. 29, No. 32, and No. 45.

12             Counsel, may I have your appearances, please?

13             MS. EL-AMAMY:  Good morning, Your Honor.  Reema

14      El-Amamy and Michael Dore on behalf of the

15      United States.

16             THE COURT:  Good morning, Counsel.

17             MR. WALSH:  Good morning, Your Honor.  Joseph

18      Walsh appearing with Jessica Medina, who is present in

19      court on bond.

20             MR. DOMNARSKI:  Good morning, Your Honor.

21      William Domnarski with Ms. Maria Lopez.  There's a

22      waiver of the Defendant's presence on bond.

23             THE COURT:  Thank you.

24             MR. CEPHAS:  Good morning, Your Honor.  Dana

25      Cephas for Raul Prieto, who is on bond, and he's in the

6

1    first row.

2         MR. NAVARRO:  Good morning, Your Honor.  Angel

3    Navarro appearing for Carlos Rivera, who is seated to my

4    right.

5         MR. NISHI:  Good morning, Your Honor.  Thomas

6    Nishi on behalf of Mr. Juan Diaz, who is present in

7    court.

8         MR. MAYOCK:  Good morning, Your Honor.  Michael

9    Mayock present with Mr. Steven Espinoza, who is present

10   in court.

11        THE COURT:  Welcome, sir.  I was in another

12   court in the other building and found out I was in the

13   wrong place.  I apologize.

14        MR. BAKMAN:  Good afternoon, Your Honor.  Larry

15   Bakman appearing for Steven Vega, who is present in

16   court.

17        THE COURT:  Welcome back.

18        MR. BAKMAN:  Thank you, Your Honor.  Good to be

19   back.

20        MR. PEREZ:  Good morning, Your Honor.  Hector

21   Perez appearing for Salvador Gutierrez Martinez, who is

22   present in custody, Your Honor.

23        THE COURT:  Good morning.

24        MR. EISNER:  Good morning, Your Honor.  Alan

25   Eisner representing Juan Gil.  He's present in court.

7

1          MR. HARRIS:  Good morning, Your Honor.  William

2     Harris on behalf of Armando Barajas.  He's present in

3     custody.

4          THE COURT:  Good morning to you all.  All

5     right.  We're going to have to go through this fairly

6     quickly for a number of reasons, and I think I'm going

7     to be encouraged to take a lot of the future motions

8     under submission.

9          With respect to the motion to sever brought by

10     Moreno and Barajas, Docket Nos. 1569 and 1602, as I

11     indicated when we last met, that motion or those motions

12     and the joinders will be granted.  All I wanted to was

13     for there to be some consideration given through an

14     intelligent way of grouping the remaining cases.  I have

15     received in writing at least the Government's input, but

16     that is all I've received.

17          Does that indicate that there is acquiescence

18     in the Government's grouping.

19          MR. CEPHAS:  No, Your Honor.

20          THE COURT:  Anyone?  All right.  Mr. Cephas.

21          MR. CEPHAS:  Your Honor, I believe -- well,

22     first of all, we received the Government's proposed.

23          THE COURT:  Don't cry.  Just give whether or

24     not you've got another grouping.

25          MR. CEPHAS:  What I was going to say is I need

 1     a little more time to consider the -- their proposal

 2     because I just got it yesterday afternoon, and I also

 3     would like to see the Superseding Indictment so that I

 4     know exactly what's there so that I can accurately

 5     assess the proposal, and until I see what's in the

 6     Superseding Indictment, I believe it would be difficult

 7     for any of us to adequately assess the proposal and --

 8     and, again, like I said, we just got it yesterday

 9     afternoon.  That's all Your Honor.

10          THE COURT:  My understanding is that it is

11     going to remove a number of overt acts.

12          MS. EL-AMAMY:  That is correct, Your Honor.  As

13     the Government indicated, there will be minimal

14     revisions to the Indictment that will remove overt acts,

15     no additional violent crime and overt acts will be

16     included.  There will be an additional charge brought

17     against Defendant Rivera related to his possession of a

18     firearm in furtherance of a drug trafficking crime.

19          THE COURT:  That's the 924 you referenced?

20          MS. EL-AMAMY:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MS. EL-AMAMY:  The Government may also include

23     additional phone counts, Title 21, United States Code,

24     Section 843(b), but it will look substantially similar.

25          THE COURT:  Okay.  Mr. Cephas, does that change

9

```
1    your position at all?

2            MR. CEPHAS:  No, Your Honor.  My other, I

3    guess, initial point is I think six people -- my

4    client's in the first proposed grouping of six.  I would

5    propose breaking that six up into two separate groups,

6    and the first grouping would be my client, Mr. Rivera,

7    and Jessica Medina.

8            MR. WALSH:  And, Your Honor, Joseph Walsh for

9    Jessica Medina, that would be my comment also.  I think

10   the divisions proposed by the Government is a little bit

11   heavy on the first trial and light on the second trial,

12   and I think that Mr. Cephas's proposal of severing his

13   client, my client, and Mr. Rivera in a single trial

14   would -- would be an appropriate grouping because all of

15   them are directly related to the investigation

16   surrounding the wiretap of Target Telephone No. 9.

17           THE COURT:  All right.  So is -- is -- is your

18   concern primarily with the numbers?  My concern is

19   primarily with the evidence.  I would like to have those

20   who were going to have to defend common evidence be

21   tried together regardless of the numbers.

22           That was a question to you.

23           MR. CEPHAS:  And, Your Honor, I believe that

24   the common evidence would be with Medina, Rivera, and

25   Prieto.  I think if they try us with those other three,
```

1   it's just going to result and spillover from those three

2   onto my client, Mr. Rivera, and Ms. Medina that really

3   has no relationship to the allegations in the

4   Indictment.  That is why I think that is a fair

5   proposal.

6          THE COURT:  Okay.

7          MS. EL-AMAMY:  Your Honor, respectfully, the

8   Government disagrees.  What I think the Defendants are

9   trying to do is take an extremely narrow view of this

10  case.  However, the Defendants' participation in this

11  conspiracy is much broader than what's being portrayed

12  in just a limited -- what they'd like to do is just look

13  at August, 2009.  However, Carlos Rivera has been a

14  long-time member of the Black Angles gangs.  During a

15  conversation with at least one narcotics trafficker, he

16  threatened him saying "I'm a Black Angels gang member.

17  His co-conspirator better not be informing to law

18  enforcement on me."  Defendant Prieto owns or lives at

19  the residence where a firearm transaction took place

20  where Carlos Rivera admits in a telephone conversation

21  that he was getting a firearm for the gang at that

22  location because he was on parole.  After

23  Defendant Rivera was arrested, Defendant Medina gets on

24  the phone with one of leaders of the Black Angels gang.

25  Defendant Navarro, then, talks about who might be

```
 1    informing with law enforcement and also talks about the
 2    fact that other Black Angels gang members have been
 3    arrested.  She takes steps to protect the conspiracy as
 4    well as to continue the drag trafficking activity.  I
 5    think in this case limiting it to just these three
 6    Defendants doesn't serve necessarily any judicial -- any
 7    purpose for judicial economy.  The same evidence will be
 8    presented at their trial as would be other Black Angel
 9    gang members' trials.  Additionally, limiting
10    instructions can be taken to cure any spillover effects
11    if there are any, which the Defendants have not shown,
12    and so the Government maintains that at trial with, you
13    know, Defendant Barajas, Defendant Maria Lopez, and
14    Defendant Prieto and Medina and Rivera would be
15    appropriate.
16              MR. CEPHAS:  Your Honor, could I simply suggest
17    that the Defendants have a chance, perhaps a week, to
18    meet and prepare a written response?
19              THE COURT:  Mr. Cephas, did I not ask you all
20    to do that when we all last met?
21              MR. CEPHAS:  Your Honor --
22              THE COURT:  Yes, I did.
23              MR. CEPHAS:  It was my understanding that the
24    Government was going to give us a proposal that we could
25    respond to.
```

12

1            THE COURT:  I didn't -- I didn't say anything

2    about that.  I told you all to get together and work out

3    something that makes sense before we met today.

4            MR. CEPHAS:  And to the extent it was going to

5    be a joint effort, then I would have expected the

6    Government to reach out to the Defendants.  That never

7    happened.  All we -- we just got a proposal dropped on

8    us, Your Honor.

9            THE COURT:  What have you -- what have you all

10   done, the Defendants, separately?  Separate and apart

11   from the Government, what have you all done in deciding

12   among yourselves what is an intelligent grouping?

13           MR. CEPHAS:  Your Honor, we didn't do anything.

14           THE COURT:  Okay.  Good.  Thank you.

15           Well, anyway, like I said, I'm going to grant

16   the motion.  The difficulty that I have, of course, is

17   that I'm not in a position of knowing what evidence is

18   going to be presented.  I'm afraid that information

19   resides with the Government.  The Government knows how

20   it's going to put on its case.  So for now, then, seeing

21   I don't have a really contrary proposal, for now, I'm

22   going to go along with the Government's proposal.

23           All right.  Let's move on, then, to -- I'm not

24   sure of the next in any order, but the motion for an

25   order requiring that the Government provide a witness

1    list thirty days before trial.  This is -- I guess this

2    is yours Mr. Cephas, Docket No. 1581.

3            Why do you feel that the Government is

4    obligated to provide you with a witness list?

5            MR. CEPHAS:  Well, first, Your Honor, the

6    Government did -- has agreed to do that but --

7            THE COURT:  Answer my question.

8            MR. CEPHAS:  I believe that we are entitled to

9    it in order to adequately prepare because --

10           THE COURT:  No, no, no.  That means you would

11   like it.  I want to know why you feel that you're

12   entitled to have it.

13           MR. CEPHAS:  I believe that, if my clients are

14   to have a fair trial, that I have to have a witness list

15   prior to trial.  I don't believe --

16           THE COURT:  Why don't you give me your

17   recitation to a rule.

18           MR. CEPHAS:  I am -- I am relying --

19           THE COURT:  Why don't you just simply say there

20   is no rule, there is no requirement that they provide

21   you with a witness list.

22           MR. CEPHAS:  Of course, there's not.  It's in

23   the --

24           THE COURT:  Well, why don't you just say that.

25           MR. CEPHAS:  It's in my motion that the Court

14

1    has discretion to order it.

2          THE COURT:  Okay.  Now listen.  Here's the

3    problem that I have with an earlier order.  I would not

4    have issued that order requiring the disclosure of

5    cooperating witnesses.  To the extent that the

6    Government has already made disclosures, fine.  I'm not

7    requiring that the Government make any further

8    disclosures of any kind, non-expert, non-expert

9    witnesses.  Okay.  So that motion is denied.

10          MR. EISNER:  Your Honor, may I be heard on

11   that?

12          THE COURT:  Yes, go ahead, Mr. Eisner.

13          MR. EISNER:  I do acknowledge that this was a

14   motion that was initially filed by Mr. Cephas and also

15   by Mr. Solis on behalf of Mr. Barajas.

16          THE COURT:  And you didn't file a joinder.

17          MR. EISNER:  I believe I did, Your Honor.

18          THE COURT:  Who's your client?

19          MR. EISNER:  Mr. Gil.

20          THE COURT:  Mr. Gil.  Yes, you did.  1610.

21   Okay.  Go ahead.

22          MR. EISNER:  In the Government's reply, the

23   Government agreed to give a witness list, and I think

24   that that acknowledgement -- first of all, it's a

25   appreciated; second of all, it's an acknowledgement of

15

1    the length and the breadth and the difficulty of

2    defending a case like this.  We're talking about fifty

3    different people --

4            THE COURT:  Uh-huh.

5            MR. EISNER:  -- who, at various times, are

6    pleading out and whose conduct may or may not be part

7    the evidence in the case.

8            THE COURT:  Uh-huh.

9            MR. EISNER:  We're talking about conduct that

10   spans over a decade or decades.  We're talking about

11   violent conduct.  We're talking about wiretaps.  To have

12   the Defendants go in on day one without some degree

13   of -- of knowing the order of the evidence, really puts

14   them at a handicap because of the unique nature of a

15   RICO case.  Again, we're talking about months or years

16   of wiretaps, and -- and there are so many moving

17   parties.  I just --

18           THE COURT:  How do you -- that was raised --

19   maybe it was raised in your papers.  You wanted really

20   to know the order of the evidence, and I'm wondering how

21   are you going to get that unless the Government decides

22   to give you its playbook.

23           MR. EISNER:  I'm not asking for a playbook,

24   Your Honor.  I'm asking for a witness list, which the

25   Government has already agreed to provide thirty days in

16

1    advance of trial.

2              THE COURT:  Okay.  Why aren't you happy with

3    that?  Why aren't you happy with whatever the Government

4    gives you?

5              MR. EISNER:  Well, I think there are due

6    process concerns in a case like this that require some

7    orderly disclosure of what the anticipated evidence will

8    be.

9              THE COURT:  Uh-huh.

10             MR. EISNER:  These are -- I asked that

11   Your Honor acknowledge these are unique cases.  It's not

12   every day that you sit in a court among what starts out

13   as fifty but dwindles down to thirteen or so Defendants

14   over the course of two years.

15             Another reason, Your Honor, is because, as you

16   can see from some of our other motions, within the last

17   thirty days -- thirty to forty days, there has been over

18   a thousand pages of new, brand new material provided to

19   the Defendants.  When is that going to come in?  In the

20   beginning or the end?  So I don't want to belabor the

21   point, Your Honor, just to emphasize the Government's

22   already agreed to give a witness list thirty days before

23   trial.  They didn't address the exhibit list issue.

24   I've put in my reply the reasons why an exhibit list, I

25   think, is fair and appropriate.  The Government is

17

1    silent on that.

2            THE COURT:  No, I do want to talk about that.

3            Ms. El-Amamy, what's wrong with the Government,

4    perhaps, even on a rolling basis, continuing to update

5    it's exhibit list?  I understand that, up until the

6    night before trial, that thing may still be modified,

7    but what's wrong with, as you modify it, perhaps, making

8    it available to Defense Counsel?

9            MS. EL-AMAMY:  Well, Your Honor, typically I

10   don't think that I would have an issue with it.

11   However, the posture of this case has put the Government

12   in a difficult situation.  There have been -- the

13   Government's made its best effort to disclose things

14   early, and when it fails to disclose some of those,

15   what's represented not just to the Court but to

16   Government counsel personally in a barrage of e-mails is

17   overwhelming.

18           THE COURT:  I can imagine, and I need to make

19   it clear -- well, what seems to be happening is the

20   Government is being criticized and basically persecuted

21   for making evidence available, and they continue to make

22   evidence available on an ongoing and rolling basis.  I

23   would think that that would be a good thing, but what

24   the Government, then, is being criticized for is now

25   you've got to look at this evidence and maybe alter

1    your -- your strategy somewhat.  I would think that

2    continuing to make things available as it becomes known

3    to the Government is something that you would desire.

4    So I can understand counsel becoming somewhat frustrated

5    and, perhaps, even take the Government personally when

6    you're called into Court to defend these things, and

7    literally the basis for some of these motions is that so

8    much material seems to be produced.  I think it's a good

9    thing that the material continues to be produced.  So

10    don't use that as an argument in the future.  All right.

11          All right.  Ms. El-Amamy, I'm going to ask you

12    to at least every couple of weeks would you please

13    update your exhibit list.  I understand you'll be adding

14    things.  You may be removing things, but I think it's --

15    it's only -- well, I would appreciate if you would do

16    it.

17          MS. EL-AMAMY:  Yes, Your Honor.

18          THE COURT:  All right.

19          MR. CEPHAS:  Your Honor, could I ask for a

20    clarification?

21          THE COURT:  Yes, and I was about to do that

22    now.  With respect to the witnesses, I am not making an

23    order that the Government produce or identify any

24    additional non-expert witnesses that it has not already

25    identified.  I am frankly concerned about witness

1    safety.

2             With respect to the request for the exhibit

3    list -- you've heard the order -- I'm asking that every

4    couple of weeks that the Government provide Defense

5    Counsel any changes made to the exhibit list.

6             With respect to the motion for discovery of

7    information regarding the legal drug allegations and

8    gang membership --

9             MR. EISNER:  I'm sorry, Your Honor.  Can I ask

10   for a clarification on behalf of Mr. Gil.  You said the

11   non-cooperating witnesses.

12             THE COURT:  No, non-expert.

13             MR. EISNER:  All right.  Are we entitled to a

14   list of any -- I'm sorry, Your Honor.  Which witnesses

15   are we entitled to be disclosed of thirty days before

16   trial?

17             THE COURT:  Entitled to?

18             MR. EISNER:  Well --

19             THE COURT:  Okay.  The Government -- let me do

20   it again.  The Government has already identified and

21   disclosed to you a number of witnesses.  I don't think

22   the Government was required to do that, and I'm not

23   ordering that the Government make any further disclosure

24   of non-expert witnesses because I have two concerns,

25   they're not legally required to do it and I'm also

```
 1    concerned by the safety of these witnesses.  Okay.  Is
 2    that clear?
 3                MR. EISNER:  Right.  I understand the safety
 4    issue with respect to cooperators, but are you also not
 5    having them provide a list of law enforcement officers,
 6    let's say?
 7                THE COURT:  Okay.  Let me put it again.  Other
 8    than witnesses already identified by the Government, I'm
 9    not ordering that the Government disclose any additional
10    non-expert witnesses, period.
11                MR. EISNER:  Thank you.
12                THE COURT:  Okay.
13                MR. BAKMAN:  Your Honor, if I might.  Before we
14    leave that, the only --
15                THE COURT:  We have left that, Mr. Bakman.
16                MR. BAKMAN:  I'm sorry, Your Honor.
17                THE COURT:  We have left that.
18                MR. BAKMAN:  All right.
19                THE COURT:  All right.  All right.  This is
20    Mr. Prieto's motion, Docket No. 1582.  This is with
21    respect to illegal drug allegations and gang membership.
22    The Government has already indicated that there is no
23    intention to introduce any 404(b) evidence.  So this
24    motion has been rendered moot, and on that basis, it's
25    denied.
```

1          MR. CEPHAS:  Your Honor.

2          THE COURT:  Yeah.

3          MR. CEPHAS:  It seems to me that the Government

4     has not indicated that it will not admit evidence

5     related to this vague allegation that my client was --

6     was storing drugs.  Could I at least ask the Government

7     to clarify that that's not coming in?

8          THE COURT:  The clarification I got from the

9     Government, or the explanation I got from the

10    Government, this isn't going to be used for 404(b)

11    purposes but to establish elements of the offense.

12         MR. CEPHAS:  Well, Your Honor, the problem I

13    have with preparing a defense for this is they've still

14    not provided me any discovery.  I don't know -- I don't

15    know what types of drugs, when.  I don't know where this

16    drug -- this alleged drug happened.  They won't identify

17    the alleged informant who, perhaps, had -- it's not in

18    the Indictment.  So it's a very difficult -- well, it's

19    impossible for me to prepare unless I get something else

20    if the Court is saying they have carte blanche to bring

21    it in as it's inextricably intertwined, and that's why I

22    don't understand.  If they can bring it in, then I need

23    to have some advance notice of it if I'm going to have a

24    fair trial.  That's -- that's my problem, and right now,

25    I have no advance notice of it other than a vague

22

```
 1   statement of some drug at some time, and that's just not

 2   enough.

 3            THE COURT:  That's a different motion.

 4            MR. CEPHAS:  Well --

 5            THE COURT:  Well, bring that motion.

 6            MR. CEPHAS:  I brought that motion, Your Honor.

 7            THE COURT:  All right.

 8            MR. CEPHAS:  And the Government responded in

 9   one of their response.  And a footnote -- they footnoted

10   the vague response.  The cooperating witness did not say

11   kilogram, and the Government recalls conveying

12   information that it was a large quantity, not a

13   kilogram.  That doesn't tell me anything.  I don't know

14   what they're referring to.  I don't know when.  I don't

15   know if this is a year ago, five years ago, ten years

16   ago.  I don't know anything about this.

17            THE COURT:  Have you sent the Government an

18   e-mail asking for clarification on that point?

19            MR. CEPHAS:  Yes, Your Honor.

20            THE COURT:  Okay.  Try it again.  Yes.

21            MS. EL-AMAMY:  Your Honor, that -- that

22   information comes from a cooperating witness.  As in the

23   Government's paper, Defendant Prieto was provided an

24   opportunity to have discovery related to that over a

25   year ago.  He didn't show up at the reverse proffer
```

1    neither did his counsel.

2              THE COURT:  Okay.

3              MS. EL-AMAMY:  So it's a cooperating witness,

4    which the Court's order is not discoverable.

5              THE COURT:  All right.

6              MR. CEPHAS:  And, Your Honor, to be accurate, I

7    told her my client wasn't coming.  I would show up for

8    the reverse proffer, and she said there was no point in

9    it because it was for him.

10             THE COURT:  Okay.

11             MR. CEPHAS:  I was there for the discovery.

12   She did not want to give it to me.  So to say that

13   they've been offering it, that's not true.

14             THE COURT:  This is not for your benefit.  It's

15   for your client's benefit.  If your client's not

16   interested, your client's not interested.

17             Okay.  Let's move on.

18             So 1582 is denied.

19             Next, the motion to preclude the Government's

20   use of evidence produced after April 30th of 2012.  This

21   is also yours, sir.  This is Docket No. 1632.  What

22   troubles me about this one is the failure to initiating

23   a meet and confer to attempt to resolve this -- this

24   discovery issue without the need for judicial

25   intervention.

24

```
 1          MR. CEPHAS:  And, Your Honor, I e-mailed
 2   Ms. El-Amamy all the time.  When she wants to responds,
 3   she responds.  When she doesn't, she doesn't respond.  I
 4   e-mailed her.  She didn't respond.  I filed the motion
 5   as I indicated.
 6          THE COURT:  You did.  You did.  I understand.
 7   I read it.  You sent her an e-mail 7:00 P.M., and I
 8   guess you didn't get a response after 7:00 P.M., and the
 9   next morning you filed a motion.  Right.  Okay.  I don't
10   consider that a good faith attempt to meet and confer in
11   an effort to resolve the motion without bringing it to
12   court.  On that basis alone, your motion is denied.
13          Lastly --
14          MR. EISNER:  Excuse me, Your Honor.  I did join
15   in that, and I did want to be heard.
16          THE COURT:  Yes, you did, you joined in it, and
17   so you ride that, and you're subjected to that unless
18   you can tell me that you had a separate meet and confer
19   with the Government on this.  Did you?  Did you?  Yes or
20   no?
21          MR. EISNER:  I did not, Your Honor.
22          THE COURT:  All right.  Then you counted on
23   Mr. Cephas to do that.  You just simply joined his
24   motion.  He didn't do what was necessary in order to
25   really bring that thing to the Court's attention.  You
```

25

1    don't send something, a letter or an e-mail at

2    7:00 P.M., not get a response, and then file your motion

3    the next morning.

4            MR. EISNER:  Can I clarify, Your Honor.

5    Perhaps, it's my mistake.  I thought that you were

6    addressing the preclusion of evidence that was tendered

7    after the April 30th date.

8            THE COURT:  That's right.  The entire motion.

9            MR. EISNER:  All right.  I -- I -- that

10   April 30th date occurred months ago, and our motion --

11   or Mr. Cephas's motion and my joinder is to hopefully

12   respectfully call Your Honor's attention to the length

13   and the breadth of discovery that we've seen since

14   April 30th and --

15           THE COURT:  Didn't I just finish telling you

16   that I think it's a good thing that the Government

17   continues to unearth documents and provide you with that

18   discovery?

19           MR. EISNER:  Not if it violates the previous

20   Court's order about that discovery.

21           THE COURT:  No.  I think there's a bigger

22   violation when the Government fails to produce and to

23   turn over to Defense Counsel relevant, perhaps,

24   exculpatory evidence.  I think that's a bigger crime

25   than worrying whether or not it violates Judge Yuen's

26

1    order.  Okay.  All right.  Listen.  I've ruled.  Let's

2    move on.  I've got a lot of things to do this morning.

3              MR. HARRIS:  Your Honor, just briefly, may I be

4    heard on 1632.

5              THE COURT:  Yes.

6              MR. HARRIS:  I would ask the Court, in light of

7    your ruling, that this be denied without prejudice so

8    that we can do the meet and confer.

9              THE COURT:  Yes, done.

10             MR. HARRIS:  Thank you.

11             THE COURT:  Done.  Denied without prejudice.

12             All right.  Let's go to the motion to suppress

13   the wiretap evidence from Target Telephone No. 9.

14             MR. WALSH:  Yes, Your Honor.  Joseph Walsh for

15   Jessica Medina, and I was going to reserve part of my

16   time for Mr. Cephas to argue also since he joined in it

17   and he has provided the Court with some extensive

18   briefing on the subject.

19             THE COURT:  One second.  This is Docket

20   No. 1590.  Okay.

21             Go ahead, sir.  My understanding now is that

22   the real thrust is, well, lack of necessity, and I

23   believe you also raised the argument that one of the

24   individuals named did not appear on the DOJ

25   authorization letter.

27

1          MR. WALSH:  Yes, Your Honor.  I'll submit that

2   second argument and focus just on the necessity.  I

3   think that the necessity issue is the main issue on the

4   wiretap.

5          THE COURT:  You understand, when I read these

6   things, then the balance of your argument is -- is

7   shaded by everything you've said, and I'm thinking to

8   myself, if you would raise that kind of frivolous

9   argument, then what's the rest of this?  But go ahead.

10         MR. WALSH:  Well, I didn't think it was a

11  frivolous argument, Your Honor.

12         THE COURT:  Really.  This is a wiretap.

13  Authorization is for what?  Locations, for -- for tele

14  communications, for facilities, and your objection is

15  that this individual's name was -- it's not even your

16  client -- that this individual's name wasn't mentioned

17  and the authorization letter from the Department of

18  Justice.

19         Okay.  Go ahead.

20         MR. WALSH:  All right.  Well, I'll proceed,

21  then, to the necessity issue because I think that's the

22  stronger argument.

23         THE COURT:  Yes, it is.

24         MR. WALSH:  And the main argument in the motion

25  and the basis of the argument that I think the

28

1    Government has overlooked in their response is that this

2    is a spin-off wiretap on Telephone No. 9 based upon an

3    earlier investigation of David Navarro in Target

4    Telephone No. 5.

5              THE COURT:  Okay.

6              MR. WALSH:  And to obtain a wiretap on a

7    spin-off, they have to conduct a necessity investigation

8    directed to the person who's using the spin-off

9    telephone.  In this case it would have been Carlos

10   Rivera, and my client has standing in this motion

11   because, once Target Telephone No. 9 was wiretapped, my

12   client was overheard and intercepted on the telephone.

13             THE COURT:  And we do have your client's signed

14   Declaration at best.

15             MR. WALSH:  Yes.  And necessity requires that

16   other investigative procedures have been tried and

17   failed or appear to be unlikely to succeed if tried or

18   to be too dangerous, and then the Ninth Circuit case in

19   *United States vs. Gonzalez, Inc.*, makes two very

20   important points, and that is that each application for

21   a new phone, a spin-off phone, must have the necessity

22   requirement established as to that suspect and that

23   phone, and the Government -- and the second principle is

24   that the Government cannot transfer the necessity from

25   one application to another even -- even though this is

1    the same investigation, and in this case, the wiretap

2    application for Target Telephone No. 9, which was the

3    Carlos Rivera, has too little information to establish

4    necessity for that telephone.  Essentially, what I

5    argued in my papers was that the agents conducted one

6    day of surveillance and examined three days of telephone

7    records, but in reviewing the application, it doesn't

8    even appear that the one day of surveillance was even

9    targeted towards Carlos Rivera.  This was a surveillance

10   that was conducted of David Navarro, who was the person

11   on Target Telephone No. 5, and it through that one day

12   of surveillance of David Navarro that they saw a second

13   suspect, and they later identified him as Carlos Rivera.

14   So I may have conceded too much that there was a

15   necessity investigation surveilling Carlos Rivera

16   because that wasn't the purpose of the investigation.

17   He just happened to be there as a happenstance during

18   the course of their targeting David Navarro for

19   surveillance on that day, and then once they identified

20   Carlos Rivera as the person that they -- they saw

21   talking to David Navarro, then they examined three weeks

22   of toll records on his telephone, Target Telephone No.

23   9, and that's not really three weeks worth of a

24   necessity investigation.  It's really an investigation

25   that took, perhaps, maybe one hour.  They examined the

1   records, and they -- and they looked at who he was

2   calling and who was calling him over a three-day -- over

3   a three-week period, and that was the end of it.  And

4   then from the e-mail exchange of the -- between the

5   Government Counsel and Mr. Cephas, it turns out that the

6   actual date on which the wiretap application for Target

7   Telephone No. 9 was submitted by the Government in its

8   99 percent finished form to the Department of Justice in

9   order to get the DOJ authorization that was done on

10  July 8th, which was only five days after they identified

11  Carlos Rivera from this -- from this happenstance and

12  locating him talking to David Navarro on the one day of

13  surveillance, and it was only one day after they had

14  examined his telephone records for a three-week period

15  to see who -- who was -- who Carlos Rivera was calling

16  and who was calling him.  And so -- and then so that's

17  clearly insufficient based upon the case law of the

18  Ninth Circuit, and then added to that is in the

19  application, we not only have a lack of any traditional

20  investigation conducted towards Carlos Rivera, but we

21  have in one of the areas of the wiretap application

22  where they're trying to explain that further

23  investigations could not be conducted in this case

24  concerning trash searches, the agent falsely states that

25  he could not conduct a trash search of the user of

1    Target Telephone No. 9 because law enforcement doesn't

2    know his residence.  Now, in the Government's response,

3    they -- they admit that that's a false statement from

4    what the affiant states this his Declaration, that he

5    failed to update it, and I pointed out in the reply that

6    a failure to update a wiretap application is the same

7    thing as saying that it was a cut and paste of a prior

8    application to put in the application for the spin-off

9    wiretap, and that's the type of conduct that was

10   criticized by the Ninth Circuit in *United States vs.*

11   *Blackman*.  They said that, when you cut and paste

12   earlier wiretap applications on the issue of necessity

13   and then you incorporate them on the subsequent

14   application, it leads to the inclusion of misstatements

15   and false statements and material omissions, which is

16   what has occurred in this case.

17        And so, essentially, the cases that we're

18   relying on is *United States vs. Gonzalez, Inc.*, and

19   that's the case of the wiretap investigation where there

20   was six months of a traditional investigation of a bus

21   company in -- in the state of Arizona, and then they got

22   a wiretap on the offices in two cities in Arizona of

23   this bus company, and during the course of this wiretap

24   investigation, they learned that there was further

25   investigation needed to be done of the owner of the

1    company who had an office in Los Angeles.  And the

2    Ninth Circuit held that, just conducting a very brief

3    investigation -- let's see.  I think -- the

4    Ninth Circuit said that the -- the wiretap tradition --

5    or the traditional investigation conducted at the

6    Los Angeles office consisted of collecting five days of

7    pen registers on the office, five days of trap and

8    trace.  In other words, they were just analyzing who

9    this person was calling over a five-day period, and

10   there was limited surveillance.  The Court wasn't clear

11   as to how many days, but the impression was it was one

12   or two days of surveillance of the Los Angeles office,

13   and then there was a preliminary discussion of whether

14   there was a possibility of introducing an undercover

15   agent, which they decided not to do, and the

16   Ninth Circuit clearly held that, as a matter of law on

17   those facts, that this was an insufficient traditional

18   investigation, and so necessity was not shown as a

19   matter of law to allow for the wiretap on the offices in

20   Los Angeles, and I think this case falls clearly within

21   *Gonzalez*, and it also falls clearly within the holding

22   of *United States vs. Carneiro*, and in the *Carneiro* case,

23   it was a similar situation involving a drug conspiracy,

24   and the original investigation was towards a suspect by

25   the name of McNeil, and before obtaining a wiretap on

33

1    McNeil, they conducted their normal traditional

2    investigation of McNeil.  They obtained the wiretap, and

3    then during the course of listening into the wiretap of

4    Mr. McNeil, they overheard two additional suspects,

5    Mr. Hardy and Mr. Boyd, but did not conduct further

6    traditional investigations of Hardy and Boyd before

7    obtaining a wiretap order for -- for those two

8    individuals, and the Ninth Circuit held that the

9    wiretaps on Hardy and Boyd, that the spin-off wiretap

10   applications were in violation of Title 3 because there

11   was in traditional investigation conducted of Hardy and

12   Boyd, and the Court held there must be a showing of

13   necessity with respect to each telephone and

14   conspirator, and there wasn't.  That wasn't done in

15   *Carneiro*, and the Ninth Circuit suppressed the evidence,

16   and I think what these cases basically show or hold is

17   that they have ordered suppression of wiretap evidence

18   in cases of spin-off wiretaps where the Government fails

19   traditional investigation of the person using the

20   spin-off telephone, and I think, under the facts of this

21   case, we not only have the insufficiency of the agents

22   doing -- doing nothing more, once identifying Carlos

23   Rivera, other than reviewing three weeks of his

24   telephone records, and -- and then immediately

25   thereafter, one day later, applying for a wiretap.  And

1    in the course of applying for that wiretap, they make

2    this false representation within the necessity

3    application concerning trash searches where they falsely

4    represent, well, we can't do a trash search of the user

5    of Target Telephone No. 9 because we don't know his --

6    his address.  And, in fact, the --

7              THE COURT:  I have a question.  Tell me about

8    the trash search.  Do you have any estimate of how

9    valuable a trash search would be in this type of case?

10             MR. WALSH:  Well, every case is different.

11             THE COURT:  This kind of case.

12             MR. WALSH:  Well, sometimes you're able to

13   locate co-conspirators, you're able to locate drug

14   pay-and-owes that have been discarded, you're able to

15   locate packing material from drugs when the drugs are

16   taken out of the packing material and thrown out.

17   There's a possibility of locating the names and

18   addresses of co-conspirators that may have been on -- on

19   notation papers and thrown into the trash, but that --

20   but the point of our argument is that the wiretap

21   application in good faith has to truthfully set forth

22   the reasons in the -- in the four corners of the

23   application as to why trash searches would not be useful

24   in this particular case, and they didn't do that here.

25   What they did was they give a paragraph that was

1    completely false as to the reason they can't conduct a

2    trash search, and the inclusion of that false statement,

3    I think, taints -- taints the warrant and puts it on a

4    different class of case than merely reviewing the

5    decision to grant or deny a wiretap under an abuse of

6    discretion standard.  When you have the inclusion of a

7    false statement, then the -- the Court has to basically

8    use de novo review and grant the motion to suppress if

9    it's possible that the motion would have been denied by

10   the -- by the magistrate if the -- if the false

11   statement didn't appear in the -- in the warrant

12   application, but we're not relying entirely on that.

13   We're relying mainly on the language in *United States*

14   *vs. Gonzalez, Inc.*, where they -- they reviewed five

15   days of trap and trace, a couple of days of

16   surveillance, and merely discussing the possibility of

17   having an undercover agent as being insufficient

18   traditional investigation as a matter of law, and I

19   think that the amount of traditional investigation

20   concerning Target Telephone No. 9 and Carlos Rivera in

21   this case is even less than in the *Gonzalez, Inc.* case

22   and would require the Court to grant the motion to

23   suppress the evidence.

24            THE COURT:  Okay.  All right.  Thank you,

25   Counsel.

36

1          MR. WALSH:  And I think Mr. Cephas wanted to

2     make a brief argument.

3          THE COURT:  Mr. Cephas, quickly please.

4          MR. CEPHAS:  Thank you, Your Honor.  First,

5     with respect to the DOJ authorization, although the

6     Court has indicated it's a frivolous argument, I don't

7     believe it is, and the reason I don't believe it is is

8     because 18, U.S.C., 25-18-1 says that each application

9     for an order authorizing or approving the interception

10    of a wire shall -- shall include the following

11    information:  The identity the person if known

12    committing the offense and who's communications are to

13    be intercepted.  Here, they --

14          THE COURT:  Which application?  We're not

15    talking about the application.  We're talking about the

16    DOJ authorization letter.

17          MR. CEPHAS:  That is right, Your Honor.  And

18    the cases and interpreting it have all concluded that

19    the DOJ authorization letter is part of the application,

20    and cases have also said that, if the DOJ did not

21    authorize an individual, then the application fails.

22    This is a case where the evidence suggests the DOJ had

23    no notice.  The Government has had an opportunity to

24    prove, otherwise, that the Government -- that the DOJ

25    had notice.  There is none.  Nothing was presented to

1    the reviewing judge showing that DOJ was ever told that

2    they knew the phone was going to be used -- was used by

3    Carlos Rivera; therefore, the application should never

4    have been authorized with respect to Rivera.

5         Moving on to the necessity, 25-18,

6    Subsection C, states that, in order to show necessity,

7    there has to be a full and complete statement as to

8    whether or not investigative procedures have been tried

9    and failed or why they reasonably appear to be unlikely

10   to succeed if tried or to be too dangerous.  The

11   Government cited those three prongs in their opposition;

12   one, have been tried and failed; two, reasonable

13   appeared to be unlikely to succeed if tried; or, three,

14   were too dangerous to attempt, and they cited *Gonzalez*

15   for that.  Nowhere in the application do they say it's

16   too dangerous.  Nowhere in the application do they

17   demonstrate that they tried and failed, and nowhere in

18   the affidavit or application have they pointed out that

19   these traditional methods would be reasonably unlikely

20   to succeed if tried.  All that the agents said over and

21   over again is, well, we've had some success at this.

22   We've had some success at that.  We've had some success

23   at the other things, but it would be so much better if

24   we had a wiretap.  So what they were doing was,

25   actually, successful, but they were given a wiretap

38

```
 1    based on the claim that it would be even better if we
 2    had a wiretap.  Well, that goes without saying in any
 3    case.  Their -- their affidavit -- and even their
 4    opposition fails to demonstrate any of those three
 5    prongs, and for that reason, the wiretap should have
 6    never been granted and it should be suppressed.
 7              Thank you, Your Honor.
 8              THE COURT:  Thank you, sir.
 9              Ms. El-Amamy.
10              MS. EL-AMAMY:  Yes, Your Honor, starting first
11    with necessity, I think the Defendants' argument needs
12    to be examined first from a factual basis.  What they
13    would like the Court to believe is the Government's
14    investigation of Carlos Rivera began on a date that he
15    was identified.  However, in the affidavit, at
16    USA 000593, at least by May 16th, 2009, although Carlos
17    Rivera was not identified, he was identified as a person
18    who was relevant to the investigation.  The first of his
19    calls listed in the affidavit was May 16th, 2009, then
20    May 26th 2009, June 26th, 2009, and then a call on
21    July 8th, 2009.  Prior to July 3rd, 2009, he was not
22    identified by the affiant.  However, the affidavit lists
23    surveillances that took place on June 23rd, 2009,
24    targeting the gang; June 24th, 2009, targeting the gang;
25    and again June 25th, 2009, targeting the gang.  The
```

1    prior affidavit, which is incorporates by reference at

2    USA 000450, also lists a surveillance on May 24th, 2009,

3    which targets the gang.  So it's not accurate to say

4    that we just learned of Carlos Rivera on July 3rd, 2009,

5    and submitted his affidavit to the -- to DOJ.  That's

6    not what happened in this case, and that's what the

7    Defendants are basing their argument on.

8           Now, even with all these instances of

9    surveillance, law enforcement were not able to identify

10   Carlos Rivera until July 3rd, 2009.  What the Defendants

11   are arguing is that somehow there was some investigative

12   technique, and they've conceded that there were no

13   confidential sources, there were no witnesses who were

14   prepared to testify before the Grand Jury.  They failed

15   to acknowledge that the Government did conduct a check

16   to see if there were any jail calls to Target

17   Telephone 9 prior to submitting the affidavit.  That

18   didn't assist in the investigation.  Surveillance

19   activities, while, perhaps, after he was identified,

20   would have tracked this Defendant, it does not indicate

21   how it would identify his co-conspirators, including

22   Defendant Medina and Defendant Prieto, who were not

23   identified as being co-conspirators until after the

24   phone was being intercepted.

25           What they're claiming is that in this case a

40

1    trash search, a pen register, and GPS and a parole

2    search would have been useful in assisting in the

3    investigation.  In this affidavit, as well as in the

4    previous affidavits which are incorporated by reference,

5    the affiant set out a trash search would not be

6    useful -- would likely not be useful to the

7    investigation.  That's in the four corners of the

8    affidavit.  A parole search at some unidentified time

9    who, perhaps, Carlos Rivera, would have had materials at

10   his home.  Perhaps, he wouldn't at that date and time.

11   It, certainly, wouldn't help law enforcement officers

12   identify his source of supply or Defendant Medina

13   Defendant Prieto's role in the conspiracy.

14          GPS, again, would be useful, perhaps, in

15   assisting law enforcement officers to learn about where

16   Carlos Rivera was located at a particular time.

17   However, we wouldn't be able to know what he was doing

18   at a particular time, whether or not that meeting was

19   useful to send law enforcement resources there; and,

20   again, law enforcement officers would not be able to

21   learn about the co-conspirators' role including

22   defendant Medina and Defendant Rivera.

23          Now, the Defendants argue, too, that the

24   Government's made no showing that it was too dangerous

25   to employ law enforcement resources.  However, the very

1    nature of the calls that are listed in the affidavit

2    display on its face why it's dangerous to conduct law

3    enforcement activities.  For example, in one call, this

4    Defendant and his co-conspirator are discussing getting

5    a gun.  In another call, they're discussing in quotes

6    "fucking with law enforcement," who is behind Carlos

7    Rivera.  In another call, Carlos Rivera is talking about

8    getting at an individual, a female individual who owes

9    money to a co-conspirator.  The very nature of the

10   Government's affidavit demonstrates dangerousness.

11        It's also just simply not true --

12   Defendant Prieto has argued that the Government

13   somehow -- the Department of Justice was not aware that

14   Carlos Rivera was the user of the phone.  The

15   application, affidavit, and proposed order were all

16   submitted to the Department of Justice.  All those

17   clearly state that Defendant Carlos Rivera was a primary

18   user of the telephone.  It just makes no sense that now

19   the Department of Justice wouldn't be aware of who the

20   primary user of the telephone is.

21        This is not a spin-off wiretap application.

22   The Defendants would like to tie this to *Blackman*, which

23   was essentially related to a different investigation,

24   and the Government took great lengths in its opposition

25   to distinguish *Blackman* from this under case.

42

1          Although the Defendants throw out various

2     investigative techniques, none of them and the

3     Government submits it isn't aware either how those

4     investigative techniques would have furthered the goals

5     of the investigation, which is not just targeted to

6     Carlos Rivera as the Defendants would like the Court to

7     believe but was targeted to him and members of his

8     conspiracy.

9          THE COURT:  I know.  I -- actually, I think

10    *Blackman* probably helps you for reasons that are

11    irrelevant.  I'm familiar with the Jordon Downs Housing

12    Project.  I cannot imagine police conducting some sort

13    of covert investigation in there.  I think a great deal

14    of deference or at least some deference needs to be

15    accorded to law enforcement when they make an assessment

16    as to what will or will not probably work or what will

17    or will not probably be very dangerous.

18          Yes, Mr. Cephas.

19          MR. CEPHAS:  Your Honor, there has to be some

20    deference to law enforcement when they say something,

21    but they didn't say anything here.  They didn't say

22    surveillance wouldn't work.  In fact, as I pointed out,

23    they surveilled Navarro, and that's how they found out

24    who Rivera was by surveilling Navarro.  Ms. El-Amamy

25    claimed surveillance wouldn't have done anything.  Well,

43

1    if they had surveilled Rivera, he would have -- he would

2    have shown them Mr. Prieto because he goes to Prieto's

3    house a lot, and they know that, and so surveillance

4    would have worked.  Surveillance of Mr. Rivera would

5    have revealed his girlfriend, Jessica Medina, because

6    she's his girlfriend.  So to say that surveillance

7    wouldn't have led to co-conspirators is just flat wrong

8    and disproven by the evidence, and it's another one of

9    the conclusory statements that has no case-specific

10   facts.

11           THE COURT:  All right.  Mr. Cephas, I'm going

12   to -- what I'm going to do is go back and read it again

13   based on your representation that it's just not there.

14   Okay.

15           MR. WALSH:  Your Honor.

16           THE COURT:  Even considering the fact that some

17   of your earlier representations to the Court have not

18   been totally accurate.

19           MR. CEPHAS:  Well, Your Honor --

20           THE COURT:  Why don't you just sit down.

21           Yes, sir.

22           MR. WALSH:  May I make a brief response?  Much

23   of the references that the Government was making to the

24   wiretap applications strike me as gathering information

25   on the issue of probable cause, and I think the Court

1    has to make a distinction between the necessity

2    investigation and investigation developing probable

3    cause because you can gather a lot of probable cause in

4    listening to the earlier wiretap Target Telephone No. 5,

5    and you can hear Mr. Rivera calling and making

6    conversations, drug-related conversations over the

7    telephone, but that's not a necessity investigation.

8              THE COURT:  I understand that, and I want to

9    take a look at -- at the affidavit with an eye towards

10   whether or not it's established all of those prongs that

11   are required.  So I want to take a look at that.  Okay.

12             MR. WALSH:  And you're focusing only on the

13   necessity.

14             THE COURT:  On necessity only.  Okay.  All

15   right.

16             You're on your feet.

17             MR. CEPHAS:  Your Honor, I thought we were done

18   with this --

19             THE COURT:  We are.

20             MR. CEPHAS:  -- and I wanted to raise a

21   separate issue.

22             THE COURT:  Okay.  We are done.

23             MR. CEPHAS:  Thank you.  The issue is related

24   to expert witnesses, and it -- it's sort of part of what

25   was addressed in the motion to preclude, but it was --

1    it was raised anew by the status conference report that

2    we received yesterday, and then last night, I received

3    expert notice of a new government expert.

4         THE COURT:  Okay.  What's -- what's your

5    concern because you have to understand that this is

6    inevitable?  If you make someone disclose your witnesses

7    a year in advance, there's going to be changes.  You

8    understand that?

9         MR. CEPHAS:  I understand that, Your Honor, and

10   I also understand that, when you give me an order or the

11   Court gives me an order, I'm going to assume I have to

12   follow it.

13        THE COURT:  I read all of that.  Don't do it

14   again.  Okay.

15        MR. CEPHAS:  Well, Your Honor --

16        THE COURT:  You're going to do it, aren't you?

17        MR. CEPHAS:  No, I'm not.  I'm not.

18        THE COURT:  I read your papers.

19        MR. CEPHAS:  Okay.  What I'm going to address

20   is what happened last night, an exchange last night

21   where -- and what you didn't read in my papers hasn't

22   been presented because I didn't know they were going

23   to -- they were going to present an expert witness in

24   their status conference report and then in the notice

25   last night.  Two weeks ago, we got an e-mail saying

```
 1    that, because they're past the expert deadline
 2    destination, they were going to move ex parte to seek
 3    the Court's permission to designate an expert.  I then
 4    sent an e-mail back saying that I didn't believe an
 5    ex parte was justified.  Please do it by noticed motion.
 6    I got no response.  Then the status conference report
 7    yesterday was filed saying we intend to designate
 8    another expert.
 9              THE COURT:  Is this the gang expert?
10              MR. CEPHAS:  No this is a drug expert.
11              THE COURT:  Drug expert.  Okay.
12              MR. CEPHAS:  And the problem that happened with
13    the gang expert is the gang expert was designated on
14    time, February 9th, I believe was the date, but there
15    was no meat to it.  There were no opinions.  There's
16    were no bases for the opinions.  There were none of the
17    facts that were required.  And over the next four
18    months, we spent thousands and thousands of dollars of
19    CJA money trying to get the Government to flesh out
20    information on -- on the expert, to try to get the
21    opinions, we never did, and then finally on June 15th,
22    the Government said never mind.  So yesterday, we got an
23    expert designation, same thing, even though we have been
24    through all this before, it's got no -- it's got no
25    opinions.  It just lists topics.  It's not an expert
```

```
1    designation.  We're now going to have to go through the
2    same fight and spend thousands more dollars of CJA money
3    because they didn't designate an expert on time, a drug
4    expert who works for the Government who could have been
5    designated at any time, and instead now we're going to
6    have to start this fight all over again.  And it should
7    have been done by noticed motion so that we could have
8    responded to it, and instead the Government sends me an
9    e-mail last night saying, well, if you intend to
10   challenge this, let me know if you're going to do it by
11   ex parte or noticed motion because they don't have to
12   file the Court's -- follow the Court's rules apparently,
13   and I do, and I don't think it's appropriate.  I think
14   that they should not be allowed to designate a drug
15   expert at this time and, especially, in light of the way
16   they failed to designate properly months ago, costing us
17   thousands of dollars unnecessarily.
18            THE COURT:  What are you asking for?
19            MR. CEPHAS:  Well, my --
20            THE COURT:  Since we're talking about following
21   the rules, what are you asking for because I don't have
22   any paper in front of me?
23            MR. CEPHAS:  Well, you have the Government's
24   status report --
25            THE COURT:  Yes, I do.
```

```
 1            MR. CEPHAS:  -- which indicates that they are
 2    going to designate an expert.  I would like the Court to
 3    rule that they cannot designate any more experts.
 4    There's no basis for a designation at this point.  It
 5    was the relief that I requested in the motion that you
 6    earlier denied, but you denied it on -- because you
 7    think getting more is better.  Well, I agree getting
 8    more is better, too, but I have a history in this
 9    district that Prosecutors always give us more on the eve
10    of trial and not because it's better but because it's
11    better for them to wait until the last minute, and I
12    understand that.  I would like to wait until the last
13    minute and sandbag them if I had the ability to do that
14    as well, but it's not fair.  The order was set.  There
15    was no basis and to slip it in the back door through a
16    status conference report and then put the burden on the
17    Defendants to enforce a prior order is unfair.
18            THE COURT:  All right.  I'm -- I'm curious.  I
19    understand a replacement expert but a drug expert?
20            MS. EL-AMAMY:  Correct.  Well, this isn't --
21    this isn't a replacement expert.
22            THE COURT:  Right.  That's what troubles me.
23            MS. EL-AMAMY:  Right.  What happened was the
24    way this case was -- the Defendants were interested in
25    knowing what the gang expert was going to be so that
```

49

1    they could challenge whatever opinions he or she may

2    offer.  The Government had no idea a year in advance of

3    trial whether or not it was going to call a gang expert.

4    However, setting the expert notice deadline was set so

5    far that that could be litigated.  The Government sent

6    out an expert notice at the deadline because it was

7    forced to make a decision at that time.

8              THE COURT:  Uh-huh.

9              MS. EL-AMAMY:  It realized because it

10   investigated it more after the deadline had passed, but

11   because the deadline was so early that it really wasn't

12   going to be helpful to the case, that everybody wasted a

13   bunch of time designating an expert that it wasn't going

14   to call and then people investigating it and then not

15   calling the expert.

16             The narcotics expert is just a basic narcotics

17   expert that is called in any type of drug non-complex

18   trial.

19             THE COURT:  Uh-huh.

20             MS. EL-AMAMY:  It doesn't replace anybody, and

21   it is -- and it is a late disclosure if that is

22   troubling to the Court.

23             THE COURT:  Well, and that's what's troubling

24   to Mr. Cephas.

25             MS. EL-AMAMY:  Right.

```
 1              THE COURT:  And in this particular case --
 2    well, I would imagine everyone knew that a drug expert
 3    was going to be called, but I guess Mr. Cephas's point
 4    is he didn't know what this expert's going to testify to
 5    and I don't know the nature of his expertise.  I don't
 6    know if he's a chemist or not.
 7              MS. EL-AMAMY:  He's -- he's.
 8              THE COURT:  Is he going to talk about street
 9    sales and that sort of thing?
10              MS. EL-AMAMY:  He's not, Your Honor.  Mr. Dore,
11    actually, drafted the expert notice, which was very
12    lengthy.
13              MR. DORE:  May I address that briefly,
14    Your Honor?
15              THE COURT:  Yes.
16              MR. DORE:  Your Honor, I can give the Court a
17    copy.
18              THE COURT:  Please.  If we're not going to
19    follow the rules, let's not really follow them.
20                   (Brief interruption.)
21              THE COURT:  Okay.
22              MR. DORE:  Your Honor, that expert notice you
23    have was provided by the Government to Defense Counsel
24    last night.  It was two experts, one of which is DEA
25    Special Agent (Phonetic) Steve Harris, and the other,
```

```
 1   which is a Spanish linguist specialist, (Phonetic)

 2   Mr. Jesus Dimas.  The form of the notice was modeled off

 3   of a notice provided to Defense Counsel in a separate

 4   case, which was upheld by Judge Feess in an order in a

 5   case, United States vs. Albero Vargas, CR 11-50.  I have

 6   copies of that case if Your Honor -- that order, rather,

 7   if Your Honor would be interested in seeing it.  In that

 8   order -- may I approach, Your Honor?

 9          THE COURT:  No, I don't need that.  I don't

10   need that.  I've looked at what you've submitted.  I've

11   never seen this format before, but I was looking at the

12   content, and I'll find out in a moment why Mr. Cephas --

13   in fact, let's find out now.

14          What is your complaint with respect to this

15   when he gives you the categories that this expert

16   intends to testify regarding the --

17          MR. CEPHAS:  Your Honor, my complaint is

18   Rule 16 doesn't require the Government disclosure to

19   show categories and topics.  It requires the Government

20   disclosure to identify opinions.  And there are no

21   opinions in here.  For example, it claims that he's

22   going to take about the use of code words.  Well, I can

23   also cite to several judges in this district who have

24   issued orders saying that the agent has to identify the

25   code words and his opinion as to what those code words
```

1    are.  And if the expert is going to get on the stand and

2    say this is what that word means, that's an opinion.

3              THE COURT:  Uh-huh.

4              MR. CEPHAS:  And I need that opinion.  I might

5    agree with it; I might disagree with it.

6              THE COURT:  Okay.

7              MR. CEPHAS:  I might need an expert -- a

8    rebuttal expert to say he's dead wrong, and -- and we

9    don't get that.

10             THE COURT:  Okay.  No.  No, that's fine.

11             MR. CEPHAS:  Well --

12             THE COURT:  Anything else?

13             MR. CEPHAS:  Well, throughout the entire

14    designation, that's all we get is topics.  These are the

15    topics that he's going to testify to, and I agree --

16             THE COURT:  Okay.  Here's what I want you to

17    do.  Not that this is a noticed motion that we're

18    dealing with, but what I would like you to do and since

19    everyone's here maybe this would be productive.  I would

20    like you to, without a lot of hyperbole and chest

21    thumping, just please send a short and concise request

22    to Mr. Dore and tell him just what you just said now

23    with respect to the opinions that you would like.

24             And then, Mr. Dore, I would then like you to

25    respond and tell him that that's what -- I don't know.

1    Mechalina, what it really means is half a pound of meth.

2    All right.  Just can you do that?  Do you understand

3    what I'm saying?

4         MR. DORE:  I understand what you're saying.

5    The only question I have is in regards to time.  We,

6    certainly, have different Defendants who are in or going

7    to be out of the case.  At this point, the Government is

8    marshalling its resources to determine exactly what

9    exhibits would be used, what transcripts would be used,

10   and for us to specify exactly -- exact interpretations

11   as to exact terms, in effect, is a determination of what

12   exhibits would be used at trial.

13         THE COURT:  True.

14         MR. DORE:  And so rather than simply having an

15   over-inclusive list would be construed as a dump on

16   Defense Counsel because that, in fact, was not

17   inherently used at trial, the Government would need time

18   to determine that level of specificity if it was

19   required by the Court.  Now, certainly, the Government

20   doesn't oppose providing that to Defense Counsel to the

21   extent the Court thinks it's necessary and warranted,

22   but to do it in the immediate term, at this point, would

23   simply just not be that practical.

24         THE COURT:  I don't -- I don't think Mr. Cephas

25   is asking for it right now.  He just needs it in advance

54

1    of trial.

2            Now, Mr. Cephas, do you need this in order to

3    make a determination as to whether or not you're going

4    to hire your own expert to say that, no, that is not

5    what this word means in that context?

6            MR. CEPHAS:  Correct.

7            THE COURT:  Why don't you go ahead and hire

8    your expert.

9            MR. CEPHAS:  Well, Your Honor, I will seek CJA

10   authorization to do it.

11           THE COURT:  Okay.

12           MR. CEPHAS:  But also I need to know what their

13   opinions are so that I may challenge some of the

14   designation as being non-expert testimony.

15           THE COURT:  You're there.  All right.  We're

16   talking about timing now.  That's what I'm talking

17   about, is get your expert on board, and my question to

18   you is how far in advance of trial do you think you need

19   this information to give to your expert?

20           MR. CEPHAS:  Well --

21           THE COURT:  Actually, I know the answer to

22   that.  You sit down at Starbucks with your expert and

23   give him a list, and he says yes, yes, yes, no, no, no;

24   right?  I mean, if he's an expert, if he knows what

25   these words mean, he can tell you immediately, can't he?

 1              MR. CEPHAS:  Yes.

 2              THE COURT:  Shouldn't he?

 3              MR. CEPHAS:  Yes.  I -- I expect he could.

 4              THE COURT:  All right.  So give me a date.

 5              MR. CEPHAS:  Excuse me?

 6              THE COURT:  Give me a date by which you would

 7    like to have this information from the Government.

 8              MR. CEPHAS:  September 24th.

 9              THE COURT:  The trial's November 6th?

10              MR. CEPHAS:  Correct, your Honor.  Okay.  I

11    gave you a shot at it.  Now I'll take my own shot.

12              Give me a date in mid to late October.  Any

13    date.  Okay.  17th of October.

14              MR. CEPHAS:  Okay.

15              THE COURT:  Mr. Dore, 17th of October.

16              MR. DORE:  Yes, Your Honor.

17              MR. CEPHAS:  The problem with that, Your Honor.

18    It doesn't provide adequate notice to bring a noticed

19    motion to challenge the expert information, and that --

20    that was the point I was trying to make, that I need to

21    file a noticed motion challenging information in the

22    expert designation, and now I'm going to have to do it

23    by ex parte, which is not -- is not appropriate for

24    that.

25              THE COURT:  Look what you've done today.

56

1              MR. CEPHAS:  Well, what I've done today --

2              THE COURT:  What you've done today is stand up

3       and make an oral motion.

4              MR. CEPHAS:  I've made an oral motion --

5              THE COURT:  Okay.  You've gotten what you're

6       going to get, Mr. Cephas.

7              MR. CEPHAS:  Thank you, Your Honor.

8              THE COURT:  All right.  Anybody have anything?

9              MR. EISNER:  Yes, Your Honor.  I just wanted to

10      bring up one of Mr. Cephas's comments regarding that

11      gang expert, and I realize Your Honor discussed the

12      admission of that gang expert.  We were talking about

13      foundation.

14             THE COURT:  Wait a minute.

15             MR. EISNER:  I'm sorry.  The drug expert, but I

16      do want to call Your Honor's attention to the fact that

17      what -- what brought us here is Mr. Cephas's motion to

18      preclude the Government from bringing in witnesses late,

19      and that, Your Honor, was it stems from Judge Yuen's

20      order of October 13th, and in in her order, she says

21      that by January 23rd, 2012; and, again, last night on

22      the 10th of November is when we got this narcotics

23      expert, but Judge Yuen's order back in October of '11

24      says that by January 23rd, the Government shall disclose

25      all experts.  That wasn't the first cut-off date,

1  Your Honor.  Previous to that -- and that date was only

2  given on condition of the Defendants' speedy trial

3  waiver.  We continued the case about eight months in

4  order to have those dates to be placed, but the initial

5  date for expert witness disclosure was October 24th of

6  2011, and that was in an earlier motion to continue the

7  trial.  I don't want to belabor the point, Your Honor.

8          THE COURT:  But you are.  What -- what are you

9  asking?

10          MR. EISNER:  Well, I'm -- I'm just reiterating

11  my objection to the Government being allowed to disclose

12  at this late date additional experts.  We have two new

13  experts as of the last two weeks, one is a language

14  expert and one is a narcotics expert.

15          THE COURT:  Okay.

16          MR. EISNER:  And -- and I just wanted to

17  reiterate my objection to that and just call

18  Your Honor's attention to the previous due dates that

19  had come and gone prior to what's being heard today.

20  Thank you.

21          THE COURT:  All right.  Thank you.

22          MR. DORE:  Your Honor, may I just note one

23  thing for the record?  There is Ninth Circuit authority

24  for expert disclosures happing within twelve days of

25  trial, and so we believe two months is not an

1    exceedingly late date, particularly, given that

2    Agent Steve Harris was noticed in that Judge Feess case

3    I referenced earlier in which two Defense Counsel in

4    this case were, actually, Defense Counsel.  So they had

5    an opportunity to -- at least some of the Defense

6    Counsel had an opportunity to hear him in that case, but

7    just as a more general matter, obviously, we know that

8    two months is not an exceedingly long period.  That

9    said, the operative -- the date in Judge Yuen's order

10   did say February 29th, 2012, to disclose expert

11   testimony or expert witnesses.  We believe that that is

12   too early a date given that it's nine months ahead, and

13   we don't know the shape of the case then when it had

14   over 49 Defendants versus now when it's down to ten.

15   And, thus, at this point, it might expedite things and

16   save time if we resolve with the Court whether or not

17   there's another date that would be appropriate, whether

18   the date is today or some date in the past, whereby, the

19   Government can disclose the exert witnesses including

20   the two last night.

21        THE COURT:  I don't like -- I really don't like

22   this -- this practice or policy of making disclosures

23   eight, nine months in advance, except in this case with

24   respect to gangs and drugs.  I think everyone in the

25   room anticipated that there would be a gang expert and a

```
 1   drug expert.  So neither of those, I think, would come
 2   as a surprise to anyone.  However, Mr. Cephas raises a
 3   point.  Even though you have provided -- even at this
 4   date you have provided categories that this expert is
 5   testifying regarding there are no opinions.  So with
 6   respect to interpretation of some of the words that were
 7   picked up on these telephone conversations, let's get a
 8   glossary together and provide it -- is it
 9   October 17th? -- to Defense Counsel.
10            Now, with respect to any additional experts,
11   other than having to replace an expert who is now
12   unavailable, does the Government seriously anticipate
13   identifying any additional experts?
14            MS. EL-AMAMY:  Not to its knowledge.
15            THE COURT:  Okay.  Mr. Dore, you were going to
16   exercise caution?
17            MR. DORE:  Yes, Your Honor.  If anyone came to
18   mind immediately, we would have done it, but the fact of
19   the matter is now that we are basically on the eve of
20   trial and two-month period where we basically know where
21   we're going, the Government will be putting its exhibits
22   together, and it's finalizing its witness list.  We do
23   not expect there to be any additional experts, but it is
24   conceivable in finalizing that list and determine
25   exactly what terms, for example, Agent Harris can
```

60

```
 1    interpret that there would be another one that would be
 2    necessary.  We, certainly, don't expect to do it.  We
 3    have no desire to drop any witnesses on the Defense at
 4    the last minute, who, obviously, themselves do not
 5    apparently have a deadline to disclose their own experts
 6    in response.  To this is not meant to be an exercise for
 7    the Court by any means.  It was simply to set out so
 8    that we're all on the same page if something does come
 9    up and the Government does provide notice of that, but
10    we are not looking to do that or planning to.
11              THE COURT:  Sure.  All right.  The 28th of this
12    month, but extraordinary good cause would have to be
13    shown.  All right.  That's to add any additional
14    experts.  It's not going to replace.  If you replace an
15    already designated expert, that's a different thing and
16    then provide Mr. -- not just Mr. Cephas but all Defense
17    Counsel by August 17th with a list of the opinions that
18    your gang expert is going to offer.
19              All right.  We are adjourned.
20              MR. BAKMAN:  Your Honor, I had one other
21    matter.  Your Honor, briefly.  Since you've indicated
22    that there was a severance and we have two groupings, I
23    would be in the second grouping with Mr. Vega, do we
24    have any idea as to when to expect the trial date?
25              THE COURT:  No.
```

61

 1          MR. BAKMAN:  All right.  So I can rely upon the

 2   fact that I would not be present November 5th for trial

 3   in this matter; is that correct, Your Honor?

 4          THE COURT:  Maybe we ought to use the 17th as

 5   also a final pretrial conference, an all-hands final

 6   pretrial conference, and at that time, we need to

 7   discuss this, really finalize it so that everyone knows,

 8   and then we'll also set a date for the second trial.

 9          MR. BAKMAN:  All right.  And the reason I ask,

10   Your Honor, clearly, I start trial with Judge Real in

11   about a week and a half.  I would not be able to prepare

12   this by November 5th.  So I really want to make sure I

13   don't have to go to trial November 5th.

14          THE COURT:  Well, remember.  The November date

15   was set by Defense Counsel; remember?

16          MR. BAKMAN:  I -- I understand, and if I have

17   to go on the 5th, I'll do -- you know as well as I do

18   what I need to do to be ready on November 5th, but I

19   would prefer to know now that I don't have to go there

20   at this point in time in terms of trial prep, final

21   trial prep.

22          THE COURT:  Right now, right this minute, I

23   intend to adopt the only written proposal I have with

24   respect to the grouping; and, coincidentally, I get that

25   proposal from, perhaps, the one who would know best, the

```
 1   Government who is the one who is going to be putting on

 2   this evidence.

 3          Once, again, your client?

 4          MR. BAKMAN:  Steven Vega, Your Honor.

 5          THE COURT:  Vega.  As it stands right now, Vega

 6   would be in the second group; yes, sir.

 7          MR. PEREZ:  Your Honor, I'm on the first group

 8   with Salvador Martinez.

 9          THE COURT:  All right.

10          MR. PEREZ:  I also want to add that that group

11   should be broken down into two groups, and the reason

12   is, Your Honor, as far as my client is concerned,

13   No. 45 --

14          THE COURT:  Uh-huh.

15          MR. PEREZ:  -- Salvador Martinez, he is not

16   charged in the RICO conspiracy.  He is not charged in

17   the RICO crime.

18          THE COURT:  Uh-huh.

19          MR. PEREZ:  He's merely in the charge drug

20   conspiracy.

21          THE COURT:  Uh-huh.  Listen.  Everyone of you,

22   as I suppose, is in a different position and everyone

23   can stand and voice an opinion.  That is why a month ago

24   I asked you to get together.  Okay.  It would have been

25   nice if I could have ad just a postcard-sized submission
```

63

1    from each of you saying this is why this grouping makes

2    sense, okay, in terms of evidence.  I do not know the

3    specific acts that each of your respective clients are

4    going to have to defend against.  In terms of someone in

5    the room who is capable of, actually, making an

6    intelligent decision regarding grouping, I am the last

7    person on the list.  I needed input from all of you.  I

8    got input from Ms. El-Amamy.

9         MR. PEREZ:  Yes, that's the only reason I spoke

10   up because in her input she omitted to mention that my

11   client was not charged in the RICO conspiracy or the

12   RICO crimes, Your Honor.

13        THE COURT:  That would have been good to read.

14   People are handing me things this morning.  I got

15   submissions this morning.  Okay.  It's nice to get these

16   things in writing.

17        Okay.  Anyway, we are --

18        MR. CEPHAS:  I have some housekeeping issues.

19   With respect to the Declaration or the motion to

20   suppress, I submitted an electronic signature.  The

21   Government didn't object to it.  I have -- I have signed

22   versions if the Court wants --

23        THE COURT:  No, I took it at your word.  I

24   didn't think you were --

25        MR. CEPHAS:  Well, I just wanted to make sure

64

1    because the Court had said something at the last hearing

2    that made me unclear as to whether you would permit the

3    electronic signature.

4         THE COURT:  No, Mr. Cephas, we wouldn't have

5    entertained your argument if it hadn't been established

6    that your client had standing.

7         MR. CEPHAS:  Thank you.

8         THE COURT:  All right.  We're done.  We are

9    done.

10        (Proceedings concluded at 11:31 A.M.)

11

12                    --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**C E R T I F I C A T E**

2

3          I hereby certify that, pursuant to Title 28,

4   Section 753, United States Code, the foregoing is a true

5   and correct transcript of the stenographically reported

6   proceedings held in the above-entitled matter and that

7   the transcript page format is in conformance with the

8   regulations of the Judicial Conference of the

9   United States.

10          Certified on June 6, 2013.

11

12

13

14                              /s/ Katherine M. Stride
                                KATHERINE M. STRIDE, CSR, RPR
15                              Official Court Reporter
                                License No. 11773
16

17

18

19

20

21

22

23

24

25

1            UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE OTIS D. WRIGHT

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                   – – –

6
United States of America,          )
7                      PLAINTIFF,   )
                                    )
8  VS.                              )   NO. CR 10-351 ODW ODW
                                    )
9  Jessica Medina,                  )
                      DEFENDANT,    )
10 _____)

11

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14             LOS ANGELES, CALIFORNIA

15             MONDAY, APRIL 8, 2013

16

17

18      _____

19            KATIE E. THIBODEAUX, CSR 9858
              U.S. Official Court Reporter
20            312 North Spring Street, #436
              Los Angeles, California 90012

21

22

23

24

25

       UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFF:

 4         U.S. DEPARTMENT OF JUSTICE
           U.S. ATTORNEY'S OFFICE
 5         BY: REEMA EL-AMAMY, AUSA
           -and- MICHAEL DORE, AUSA
 6         312 North Spring Street
           Twelfth Floor
 7         Los Angeles, CA  90012

 8

 9    FOR DEFENDANT MEDINA:

10         JOSEPH F. WALSH LAW OFFICES
           BY:  JOSEPH F. WALSH
11         205 South Broadway
           Suite 606
12         Los Angeles, CA  90012

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1          LOS ANGELES, CALIFORNIA; MONDAY, APRIL 8, 2013

2                          10:06 A.M.

3                          - - - - -

4

5

6          THE CLERK:  Calling Item 1, CR 10-351, United

7   States of America versus Jessica Medina.

8              Counsel, may I have your appearances, please.

9          MS. EL-AMAMY:  Morning, your Honor.  Reema

10  El-Amamy and Michael Dore on behalf of the United States.

11         THE COURT:  Counsel, good morning.

12         MR. WALSH:  Joseph Walsh appearing with Jessica

13  Medina who is present.

14         THE COURT:  Mr. Walsh, Ms. Medina.

15         MR. WALSH:  And I apologize about the late

16  letters, your Honor.  They were just delivered to me this

17  morning.  I know that court procedure requires they be

18  electronically filed two weeks before the sentencing, but

19  I felt obligated, I had to submit them to the court.

20         THE COURT:  Okay.  Thank you.

21             All right.  Well, we are here for sentencing

22  in this matter.  Now, you can both stand there if you

23  wish, or you can be seated and make yourselves

24  comfortable.

25             All right.  On December the 12th of last year,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    2012, Ms. Medina was found guilty following a jury trial

2    on Counts 1, 25 and 10 of the, I believe it is a 30-count

3    indictment.

4         Count 1 charges a violation of Title 18,

5    United States Code, Section 1962(d), as in David, RICO

6    conspiracy.  Count 2 charges a violation of Title 18,

7    United States Code, Section 1962(c).  This is the

8    substantive RICO offense.  Count 5 charges a violation of

9    Title 21, United States Code, Section 846, conspiracy to

10   distribute and possession with intent to distribute

11   methamphetamine and heroin.  Count 10 charges a violation

12   of Title 21, United States Code, Section 841(a)(1) and

13   []B1B8, possession with intent to distribute 219-grams of

14   actual methamphetamine.

15        I believe the initial presentence

16   investigation report began with a base offense level of

17   28.  The government filed its objections pointing out to

18   probation that the weight was actual methamphetamine.

19   The probation officer subsequently revised his report and

20   filed an addendum to the presentence report making that

21   correction.  Now, the base offense level is 34, and the

22   court concurs with that.  There are no adjustments.

23   Ms. Medina falls within criminal history category 1.  She

24   has no criminal history points, and the suggested range,

25   then, is 151 to 188 months.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          Now, Ms. Medina, have you seen the presentence

2     investigation report prepared by probation and disclosed

3     to the parties on March 19 and March 27th of this year?

4     Looks like this.

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.  Excellent.  All right.

7          And the court has read the presentence report,

8     the addendum to that report and its revision in addition

9     to the revision to the sentencing recommendations.  The

10    court has also reviewed the government's sentencing

11    position papers.  The government recommends a sentence at

12    the low end of the range, five years of supervised

13    release and, of course, the statutory assessments.

14          And the court has received Ms. Medina's

15    sentencing position papers.  That was followed up by

16    supplemental letters regarding sentencing, and, then, of

17    course, this morning, I was handed yet additional letters

18    and photographs of Ms. Medina at play.

19          Okay.  Before we get into a discussion of

20    3553(a), I will let the parties know -- well, first of

21    all, I want to know whether or not there is any objection

22    to the guidelines range as determined by probation, a

23    guidelines based upon offense level of 34 and criminal

24    history category of 1.

25          Any objection to that from the government?

```
 1              MS. EL-AMAMY:  No, your Honor.

 2              THE COURT:  From the defense?

 3              MR. WALSH:  Yes, your Honor.  In my sentencing

 4     memorandum, I filed a request that the court grant a

 5     downward reduction for minor role.

 6              THE COURT:  As far as we have gone so far, is

 7     there any objection?

 8              MR. WALSH:  As to the numbers up to that point in

 9     time, as long as they are not the final numbers.

10              THE COURT:  No.  They are not the final numbers.

11     I just want to know.

12              MR. WALSH:  Yes, your Honor.  And I, as to whether

13     the guideline is 28 or 34, I think that there was --

14              THE COURT:  That is where we are.

15              MR. WALSH:  I think there was evidence introduced

16     during the course of the trial by way of stipulation that

17     the 219-grams was actual methamphetamine.  So I think

18     that was a fact proven during the trial.  So I have no

19     way of contesting that.

20              THE COURT:  Okay.  Now, let's talk about

21     objections -- I'm sorry -- adjustments which you believe

22     should have been applied which were not.  I have read

23     your papers, and you raise a number of points, all of

24     which culminate in a recommendation for a sentence of no

25     more than 63 months.  And I am not sure what we do about
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the statutory minimum of 120, but I will let you go ahead

2    and make your arguments for the record.

3         MR. WALSH:  Yes, your Honor.

4              I think that this is an appropriate case for

5    an adjustment of two levels for minor role.  The court

6    heard all of the evidence during the course of the trial,

7    and I think it was pretty clear that Carlos Rivera was

8    the primary person conducting the drug trafficking at the

9    location.  And on the day that the 219-grams were brought

10   to the house, they were brought by Carlos Rivera who

11   picked them up for another codefendant in the case, drove

12   them to the house.

13             And when he got to the house and Ms. Medina

14   found out that he had brought drugs into the house, she

15   told him -- and these were from the wiretap calls later

16   where she was telling other people that she told Carlos

17   Rivera to get that stuff out of the house.  She didn't

18   want it in the house where her children were.

19             And there was also a later wiretap where she

20   was telling other people that when the police came and

21   found the drugs and arrested Carlos Rivera that she

22   didn't even know how much the amount of drugs was.

23             And so I think in determining whether a minor

24   role is appropriate, you look at the defendant's access

25   and participation in the crime.  And her participation at

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    most would be to acquiesce to the drug trafficking

2    activity of her husband as to that 219-grams.  And that

3    is the one that really drives up the guideline range.

4             And I think that the court should focus on did

5    she have a minor role in relation to that because it is

6    true that the government did offer other transcripts of

7    telephone calls from days later after Carlos Rivera was

8    under arrest and in custody where those calls indicated

9    that Ms. Medina attempted to collect money and to

10   continue on the operation of some of the drug trafficking

11   that her husband had begun before he had been placed in

12   custody.

13            But none of those telephone calls really could

14   fix the amount of the drugs as to whether we were talking

15   a large amount or a small amount.  The one clear thing we

16   have is the 219 grams.  Then, if you look at Ms. Medina's

17   participation in that, it is very, very little, merely

18   acquiescence to allowing her husband to continue in that

19   business without too large of an objection.  She did

20   object to it coming into the house, and then he put it

21   out in the trunk of the car.

22            So I think that in comparing the roles of the

23   defendants, I think that she has a minor role.  If the

24   court does grant a minor role, it would not only reduce

25   the offense level by two levels for minor role, there

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    would also be adjustment under the 2D1.1 section.  When a

2    defendant has a minor role and the guideline offense is

3    34, then you reduce it another three.  So that is a five

4    level reduction that we are asking for that would bring

5    it down from a level 34 to a level 29.  And at a level

6    29, the guideline range is below the mandatory minimum

7    120.  It is 87 to 108.

8         THE COURT:  So what do we do about the mandatory

9    minimum?

10        MR. WALSH:  And then the mandatory minimum, while

11   the case was pending, the best that I could come up with

12   was that a bill has been introduced by Congress by

13   Senators Paul and Leahy to essentially eliminate the

14   mandatory minimum and return it back to the old

15   sentencing procedures where the judge has total

16   discretion under 3553 to grant a sentence under the

17   mandatory minimum.  I agree that is not the law right

18   now.

19        But I wanted to clearly object to the

20   mandatory minimum so that if at some later point in time

21   this does become law and it becomes retroactive, I would

22   be on record that there is an objection to the court

23   following the mandatory minimum in this case.  And we are

24   asking the court to use the 3553 factors.

25        I don't know whether the bill has -- I don't

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    know whether it will be retroactive.

2        THE COURT:  They haven't done anything in DC yet.

3    Why should they start working now?

4        MR. WALSH:  If we do, I want to be on record that

5    we object to the mandatory minimum.  And we would like to

6    get the benefit of any change in the law because based

7    upon this justice safety valve act --

8        THE COURT:  You weren't suggesting that the court

9    has any discretion?

10        MR. WALSH:  No.  But I think it is important for

11    the court to -- that if the guidelines are below the

12    mandatory minimum, the court -- I am asking the court to

13    put it on the record that her guidelines should be below

14    the mandatory minimum.  She should be granted a minor

15    role, and the final offense level should be 29 and the

16    guideline range should be 87 to 108.  And if the court

17    would make that finding then if there was a later change

18    in the law, then the change would be very material to a

19    possible resentencing at some future date.

20        THE COURT:  Okay, Mr. Walsh.

21        MS. EL-AMAMY:  In terms of the minor role

22    argument, defendant's argument doesn't address the fact

23    that defendant Medina was the one that hid the keys from

24    law enforcement.  She clearly knew that there was

25    methamphetamine in the vehicle for which she was hiding

1    the keys, and she took it upon herself to hide the key.

2    She was not directed  by defendant Rivera to do so.

3          That argument also overlooks the fact that

4    defendant Medina knew that defendant Rubio had $3,000 in

5    cash in his pocket.  It is the government's position that

6    defendant Medina played a substantial role in the

7    methamphetamine trafficking activity.  She was not

8    one that was merely standing by, but she was one who was

9    taking active actions to lie to law enforcement and

10   prevent them from seizing methamphetamine, seizing drug

11   distribution proceeds that would support her and her

12   family.

13         And she was ready, willing and extremely

14   capable of running the methamphetamine operation once her

15   husband was taken into custody.  It is the government's

16   position that no minor role should be given for this

17   defendant, and the government submits on its papers.

18       THE COURT:  All right.  Thank you.  All right.

19   The court's recollection of the evidence at trial more

20   closely aligns with the position taken by the government.

21   So the court is not inclined to grant a minor role

22   reduction.

23         Aside from that, Mr. Walsh, let me tell you

24   this.  Right this moment, the court is tentatively

25   incline to impose a low end sentence, but we haven't yet

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    discussed 3553(a).  So let's turn our attention to those

2    factors.  Okay.

3         MR. WALSH:  Yes, your Honor.

4              There are several good things that can be said

5    about Ms. Medina.  Number one, she has no prior criminal

6    record at all.

7         THE COURT:  Okay.

8         MR. WALSH:  And she is the mother of

9    four children.  The probation report indicates that she

10   was working at Rite-Aid on the day of her arrest

11   three years ago, and while she was on pretrial

12   supervision, while on bail, she participated in a

13   training program to be trained as a dental assistant.  So

14   she was attempting to get educational skills to move on

15   with her life in the future.

16              And the fact remains that for the three years

17   that she was on bail, it wasn't a perfect record.  There

18   was one lapse about six months ago where she tested

19   positive for the use of drugs, and she was associated

20   with someone who was associated with the gang.  And the

21   court had a hearing on that, but that was just the

22   one hearing in three years.  So she had one relapse, but,

23   essentially --

24         THE COURT:  Here is the thing.  Things that

25   finally get brought to our attention don't mean that is

```
 1   all that has happened.  Do you believe that?  I don't
 2   believe that.  I just want you to know.  I don't think
 3   that every misstep finds it way in court.  I think there
 4   are lots of missteps before it finally comes to the
 5   court's attention.  I just want you to know that.  Okay.
 6   That is my view.  So I know your argument is three years,
 7   you know, on pretrial release, and she has been an angel
 8   except that one misstep.  I am not buying that at all.
 9        MR. WALSH:  Well, she wasn't arrested.  I think
10   that is a pretty good indication when someone is
11   reverting back to criminal conduct or not.
12        THE COURT:  No.  It is not.  That is a function of
13   how careless you are.  That is all that is.  But go
14   ahead.  You make your argument.  I simply don't buy the
15   fact that you don't get arrested, you have been a model
16   citizen, no.
17        MR. WALSH:  I won't use that argument again in the
18   future, your Honor.
19        THE COURT:  Okay.
20        MR. WALSH:  Then, finally, this is an additional
21   argument concerning her role in the offense, and I think
22   that -- I think even if the court isn't inclined to say
23   she had a minor role, I think it is pretty clear that her
24   involvement was due to her association with Carlos Rivera
25   who is much more active in drug trafficking than she was.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1            And her association, really, revolves around a

2   family association.  She has had two children with Carlos

3   Rivera so she had a close relationship with him, and it

4   was that association which I think led her to be involved

5   in criminal activity.  And it wasn't something that she

6   thought up on her own.  And I think that that may be a

7   mitigating factor that the court could consider.

8            But, most importantly, I think that she has no

9   prior criminal record.  I think that is an important

10  point that the court should consider.

11           THE COURT:  Okay, Mr. Walsh.

12           All right.  Anything from the government?

13           MS. EL-AMAMY:  No, your Honor.

14           THE COURT:  All right.  Ms. Medina, this is also

15  an opportunity for you, ma'am, if you wish to exercise

16  it, to address the court on the issue of your sentence.

17  Matter of fact, let me also tell you this.  Yours is the

18  most important voice.  Not the lawyers.  I know what the

19  lawyers are already going to say.  It is you I need to

20  hear from.

21           (Pause in proceedings.)

22           THE DEFENDANT:  I just want to apologize to my

23  family that, for everything that I put them through and

24  just ask for little bit of lenience on my sentence.  That

25  is about it.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Okay.  Having considered both the
 2   sentencing factors enumerated at Title 18, United States
 3   Code, Section 3553(a) and under the U.S. Sentencing
 4   Guidelines Section 5G1.1B, the advisory guidelines range
 5   of 151 to 188 months based upon an offense level of 34
 6   and a criminal history category of 1, it is ordered that
 7   the defendant shall pay to the United States a special
 8   assessment of $400 which is due immediately.  All fines
 9   are waived as it is found that such a sanction would
10   place an undue burden on defendant's dependents.
11          Pursuant to the Sentencing Reform Act of 1984,
12   it is the judgment of the court that defendant Jessica
13   Medina is hereby committed on Counts 1, 2, 5 and 10 of
14   the indictment to the custody of the Bureau of Prisons to
15   be imprisoned for a term of 151 months.  This term
16   consists of 120 months each on Counts 1 and 2 and 151
17   months on Counts 5 and 10, all to be served concurrently.
18          Upon release from imprisonment, defendant
19   shall be placed on supervised release for a term of
20   five years.  This term consists of three years on each of
21   Counts 1 and 2 and five years on each of Counts 5 and 10,
22   all such terms to run concurrently under the following
23   terms and conditions:
24          One, defendant shall comply with the rules and
25   regulations of the U.S. Probation Office and General
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Order 05-02.

2            Two, during the period of community

3    supervision, defendant shall pay the special assessment

4    in accordance with this judgment's orders pertaining to

5    such payment.

6            Three, defendant shall refrain from any

7    unlawful use of a controlled substance.  Defendant shall

8    submit to one drug test within 15 days of release from

9    imprisonment and at least two periodic drug tests

10   thereafter not to exceed eight tests per month as

11   directed by the probation officer.

12           Four, defendant shall participate in an

13   outpatient substance abuse treatment and counseling

14   program that includes urinalysis, breath and/or sweat

15   patch testing as directed by the probation officer.

16   Defendant shall abstain from using illicit drugs and

17   alcohol and abusing prescription medications during the

18   period of supervision.

19           Five, during the course of supervision, the

20   probation officer with the agreement of the defendant and

21   defense counsel may place the defendant in a residential

22   drug treatment program approved by the U.S. Probation

23   Office for the treatment of narcotic addiction or drug

24   dependency.

25           Six, as directed by the probation officer,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    defendant shall pay all or part of the cost of treating

2    her drug dependency to the after care contractor during

3    the period of community supervision.  Defendant shall

4    provide payment and proof of payment as directed by the

5    probation officer.

6            Seven, defendant may not associate with anyone

7    known to her to be a Black Angels gang member and others

8    known to her to be participants in the Black Angels

9    gang's criminal activities with the exception of family

10   members.  She may not wear, display, use or possess any

11   gang insignia, emblems, badges, buttons, caps, hats,

12   jackets or vests or any other clothing that defendant

13   knows evidence affiliation with the Black Angels gang.

14   She may not knowingly display any Black Angels signs or

15   gestures.

16           Eight, as directed by the probation officer,

17   defendant shall not be present in any area known to her

18   to be a location where members of the Black Angels gang

19   meet and/or assemble.

20           Nine, defendant shall cooperate in the

21   collection of a DNA sample from herself.

22           The court authorizes the probation office to

23   disclose the presentence report to the substance abuse

24   treatment provider to facilitate defendant's treatment

25   for narcotic addiction or drug dependency.  Further

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    redisclosure of the presentence report by the treatment

2    provider is prohibited without the consent of this court.

3        It is ordered that the defendant surrender

4    herself to the institution designated by the Bureau of

5    Prisons on or before 12:00 noon, May 10 of 2013.  In the

6    absence of such designation, defendant shall report on or

7    before the same date and time to the United States

8    Marshal located at the Roybal Federal Building, 255 East

9    Temple Street, Los Angeles, California.  The court has

10    concluded that the defendant does not pose a flight risk

11    or pose a danger to the community.

12        It should also be noted that the court has

13    selected a sentence at the low end of the range for many

14    of the same reasons articulated by defense counsel with

15    respect to this defendant's relative involvement in this

16    Rico scheme.

17        The court is also mindful that under 18 U.S.C.

18    Section 3553(a), the sentence imposed should be

19    sufficient but not greater than necessary to accomplish

20    the purposes of 3553(a)(2).

21        The court has considered the nature and

22    circumstances of the offense, the history and

23    characteristics of the defendant.  The court has

24    recognized the need for the sentence imposed to reflect

25    the seriousness of the offense, that it should promote

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  respect for the law, that it should provide just

2  punishment for the offense.  It should afford adequate

3  deterrence to future criminal conduct and protect the

4  public from further crimes of the defendant.

5        The court has assessed the various kinds of

6  sentences available as well as the guidelines sentencing

7  range.  The court has also examined the sentences handed

8  down on other defendants in this matter so as to avoid

9  unwarranted sentence disparities among defendants with

10 similar records who have been found guilty of similar

11 conduct.

12       Now, before the court is a 27-year-old who is

13 facing her first criminal conviction for RICO conspiracy,

14 RICO and conspiracy to possess with intent to distribute

15 219-grams of methamphetamine.

16       It appears that the defendant's involvement

17 with the Black Angels was fueled by her intimate

18 relationship of nine years with a Black Angels gang

19 member, codefendant Carlos Rivera.  Nonetheless, there is

20 no information received by the court that would suggest

21 that she was coerced by Rivera to associate with other

22 gang members or to assist him in the possession of

23 219-grams of actual methamphetamine.

24       Further, as they were living together, it

25 could be argued that she was privy to Mr. Rivera's

1    conversations and transactions involving his possession

2    of heroin, additional amounts of methamphetamine and

3    firearms.

4            In aggravation, her known involvement with the

5    Black Angels enterprise by its very nature heightens the

6    propensity for harm to others.  In addition, the

7    defendant's behavior in the instant offenses indicates

8    that she poses a threat to the community in light of the

9    dangers associated with methamphetamine.

10           In mitigation, notwithstanding the instant

11   offenses, it appears that the defendant has led a

12   relatively law abiding lifestyle.  She has a supportive

13   family and four dependent children.  The defendant's

14   mother advises that she and the defendant's sister will

15   take care of the children while the defendant is

16   incarcerated.

17           As previously noted, the defendant's

18   involvement in the instant offense was fueled by her

19   relationship with the father of her two youngest

20   children.  It is apparently based on the above that she

21   does not appear heavily entrenched in criminal activity

22   but, rather, is on the fringes because of her

23   relationship with Rivera.

24           You have the right to appeal your conviction

25   and your sentence.  With few exceptions, your notice of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   appeal must be filed within 14 days of judgment being

2   entered.

3            Do you understand that, ma'am?

4       THE DEFENDANT:  Yes.

5       THE COURT:  If you are unable to afford a

6   transcript of the record in this case, one will be

7   provided at government expense.  If you are unable to pay

8   the cost of an appeal or the filing fee, you may apply

9   within 14 days for a waiver.  If you do not have an

10  attorney to act on your behalf and if you request it, the

11  clerk of the court will prepare and file a notice of

12  appeal on your behalf.

13           Again, you must make the request within 14

14  days.  The notice of appeal must designate the judgment

15  or order appealed from and the fact that you are

16  appealing to the court of appeals.  It should also

17  designate that portion of the proceedings not already on

18  file that you deem necessary for the reporter to include.

19           Also, in its consideration, the court has

20  evaluated the sentencing guidelines as required by Title

21  18, United States Code, Section 3553(a)(4) and finds the

22  calculations of suggested sentence therein for this

23  defendant under the present circumstances to be

24  reasonable.  The court therefore sentences the defendant

25  as previously stated.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Any objection from the government to the
 2   defendant remaining free on bond on the same terms and
 3   conditions until her surrender date on May 10th?
 4         MS. EL-AMAMY:  The government takes no position.
 5         THE COURT:  All right.  Thank you.
 6              Is there anything further from the government?
 7         MS. EL-AMAMY:  No, your Honor.
 8         THE COURT:  All right.  Anything further,
 9   Mr. Walsh?
10         MR. WALSH:  Yes, your Honor.
11         THE COURT:  Wait a minute.  I neglected to mention
12   two things, recommendations that the court intends to
13   make to the Bureau of Prisons.  One is the 500-hour
14   residential drug treatment program offered by the Bureau
15   of Prisons.  And the other is a recommendation for a
16   Southern California placement to facilitate visitation
17   with her children.
18              Was there anything else?
19         MR. WALSH:  Yes.  There was one other thing, your
20   Honor.  My client's daughter, one of her four children,
21   is graduating on May 21, and she wanted to know if she
22   could have a surrender date of May 24.
23         THE COURT:  Graduating from what?
24         THE DEFENDANT:  Sixth grade.
25         THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    MR. WALSH:  So the request is that her surrender
2  date be changed from May 10 to May 24.
3    THE COURT:  All right.  Done.
4    MR. WALSH:  She also mentioned that she is under
5  house arrest and now that she is going into custody, I
6  guess there is some things that have to be put in
7  storage, and she wanted to help with getting those
8  preparations.  And she wanted to know it was possible to
9  have her house arrest changed to curfew during this last
10  period of time?
11    THE COURT:  I don't want to get involved with
12  that.  She can deal with probation on that.  All right.
13    MR. WALSH:  All right.
14    THE COURT:  All right.  We are done.
15    (Proceedings concluded.)
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3

 4   I hereby certify that pursuant to Section 753, Title 28,

 5   United States Code, the foregoing is a true and correct

 6   transcript of the stenographically reported proceedings held

 7   in the above-entitled matter and that the transcript page

 8   format is in conformance with the regulations of the

 9   Judicial Conference of the United States.

10   Date:  June 13, 2013

11

12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on September 4, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system.

      I certify that all participants in the case are register CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>/s/ Joseph F. Walsh</u>
JOSEPH F. WALSH