NO. 13-50156

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT


| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff and Appellee, | ) |
| | ) |
| vs. | ) |
| | ) |
| JESSICA MEDINA | ) |
| | ) |
| Defendant and Appellant. | ) |
| ———————————————— | ) |


APPELLANT'S EXCERPT OF RECORD

VOLUME II

APPEAL FROM THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE OTIS D. WRIGHT
UNITED STATES DISTRICT JUDGE


JOSEPH  F. WALSH
California Bar No.  67930
Attorney at Law
205 S. Broadway, Ste 606
Los Angeles, CA 90012
(213) 627-1793
Email: Attyjoewalsh@aol.com

Attorney for Appellant
JESSICA MEDINA

# TOPICAL INDEX

**VOLUME I**

ORDER DENYING MOTION TO SUPPRESS WIRETAP EVIDENCE
DATED OCTOBER 16, 2012 (DOC 1830)   . . . . . . . . . . . 1

REPORTER'S TRANSCRIPT OF HEARING ON MOTION TO
SUPPRESS WIRETAP EVIDENCE
DATED September 11, 2012  . . . . . . . . . . . . . . . . 2

REPORTER'S TRANSCRIPT OF SENTENCING HEARING
DATED APRIL 8, 2013   . . . . . . . . . . . . . . . . . . 67

**VOLUME II**

INDICTMENT (DOC 1)
DATED APRIL 7, 2010 . . . . . . . . . . . . . . . . . . . 91

MOTION TO SUPPRESS WIRETAP EVIDENCE (DOC 1590)
DATED JULY 13, 2012 . . . . . . . . . . . . . . . . . . . 172

GOVERNMENT OPPOSITION TO MOTION TO SUPPRESS WIRETAP
EVIDENCE AND DECLARATION OF KRIS LAVOIE (DOC 1668)
DATED AUGUST 27, 2012 . . . . . . . . . . . . . . . . . . 174

APPLICATION FOR WIRETAP ON TARGET TELEPHONE #9
(DOC 1574-5)
DATED JULY 17, 2009 . . . . . . . . . . . . . . . . . . . 179

**VOLUME III**

APPLICATION FOR WIRETAP ON TARGET TELEPHONE #5
(DOC 1574-4)
DATED JUNE 17, 2009 . . . . . . . . . . . . . . . . . . . 366

JUDGMENT AND SENTENCE (DOC 2114)
DATED APRIL 8, 2013 . . . . . . . . . . . . . . . . . . . 501

NOTICE OF APPEAL (DOC 2123)
DATED APRIL 8, 2013 . . . . . . . . . . . . . . . . . . . 507

DOCKET  . . . . . . . . . . . . . . . . . . . . . . . . . 508

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2009 Grand Jury

| UNITED STATES OF AMERICA, | ) | CR No. 10-_____ **CR 10 00351** |
|---|---|---|
| Plaintiff, | ) | |
| | ) | I N D I C T M E N T |
| v. | ) | |
| | ) | [18 U.S.C. § 1962(d): |
| ARMANDO BARAJAS, | ) | Racketeer Influenced and |
| aka "Mando," | ) | Corrupt Organizations |
| JUAN GIL, | ) | Conspiracy; 18 U.S.C. |
| aka "Nito," | ) | § 1962(c): Racketeer |
| DAVID NAVARRO, | ) | Influenced and Corrupt |
| aka "Plucky," | ) | Organizations; 18 U.S.C. |
| JOSE HURTADO, | ) | § 1959: Violent Crime in Aid |
| aka "Lonely," | ) | of Racketeering; 21 U.S.C. |
| aka "Solo," | ) | § 846: Conspiracy to |
| FRANK ALCALA, | ) | Distribute and to Possess with |
| ENRIQUE JIMENEZ, | ) | Intent to Distribute |
| aka "Cisco," | ) | Methamphetamine and Heroin; 21 |
| CARLOS RIVERA, | ) | U.S.C. §§ 841(a)(1), |
| aka "Chino," | ) | 841(b)(1)(A), (B), and (C): |
| RIGO PORTILLO, | ) | Possession with Intent to |
| aka "Lost Boy," | ) | Distribute and Distribution of |
| JUAN DIAZ, | ) | Methamphetamine; 18 U.S.C. |
| aka "Swifty," | ) | § 922(g)(1): Felon in |
| CARLOS VASQUEZ, | ) | Possession of a Firearm; 18 |
| aka "Lil' Lazy," | ) | U.S.C. § 922(d)(1): Sale of a |
| ADOLPH MORAGA, | ) | Firearm to a Prohibited |
| aka "Fito," | ) | Person; 18 U.S.C. |
| STEVEN ESPINOZA, | ) | §§ 924(c)(1)(A)(i), |
| aka "Little Loki," | ) | (c)(1)(A)(ii), (c)(1)(A)(iii): |
| RAFAEL ALVAREZ, | ) | Use, Carrying, Brandishing, |
| aka "Lil' Pokie," | ) | and Discharging of a Firearm |
| DANIEL REYES, | ) | in Furtherance of a Crime of |
| aka "Sugar," | ) | Violence or Drug-Trafficking |
| | ) | Crime; 18 U.S.C. § 2: |

| | |
|---|---|
| ZACARIAS ARTEAGA,<br>    aka "Drew,"<br>HUGO QUIROZ,<br>ROBERT DEWESTER,<br>    aka "Lucci,"<br>MARLON JIRON,<br>    aka "Bow Easy,"<br>FERNANDO MORALES,<br>    aka "Sicko,"<br>ALEX CASTRO,<br>    aka "Sniper,"<br>ALBERT MORENO,<br>    aka "Pelon,"<br>MICHAEL SANCHEZ,<br>    aka "Dropper,"<br>MANUEL CALDERON,<br>    aka "Toro,"<br>VIRGINIA GIL,<br>REBECCA ESTRADA,<br>MARIA LOPEZ,<br>JESSICA MEDINA,<br>JESSICA PEREZ,<br>RAUL PRIETO,<br>    aka "Crook,"<br>DAVID HERNANDEZ,<br>FRANCISCO VENEGAS,<br>STEVEN VEGA,<br>    aka "Widget,"<br>ROBERT PEREZ,<br>ROSE MARIE MAGALLANES,<br>JAMES KISSLING,<br>    aka "Casper,"<br>JESSTINE LUCERO,<br>BIANCA LAGUNA,<br>ANDREA RICHARDS,<br>SANTACRUZ SILVA,<br>    aka "Jose,"<br>JOSE ROMERO,<br>MARCO ANTONIO TORRES-CRUZ,<br>    aka "Alex,"<br>INEZ MEZA,<br>    aka "Gordo,"<br>AGUSTIN ANDALON,<br>ANGEL ARANDA,<br>    aka "Bandit,"<br>SALVADOR MARTINEZ,<br>    aka "Flaco,"<br>LUPE GONZALES,<br>ROGELIO PERALTA,<br>ROBERT TOLSON,<br>SANTIAGO MENDEZ, and<br>CARL COOK,<br><br>          Defendants. | Aiding and Abetting and<br>Causing an Act to be Done; 21<br>U.S.C. § 843: Use of a<br>Communication Facility to<br>Commit a Drug Trafficking<br>Crime] |

1  The Grand Jury charges:

2  <u>GENERAL ALLEGATIONS</u>

3  1. At all relevant times, defendants ARMANDO BARAJAS, also

4 known as ("aka") "Mando" ("BARAJAS"), JUAN GIL, aka "Nito" ("J.

5 GIL"), DAVID NAVARRO, aka "Plucky" ("NAVARRO"), JOSE HURTADO, aka

6 "Lonely," aka "Solo" ("HURTADO"), FRANK ALCALA ("ALCALA"),

7 ENRIQUE JIMENEZ, aka "Cisco" ("JIMENEZ"), CARLOS RIVERA, aka

8 "Chino" ("RIVERA"), RIGO PORTILLO, aka "Lost Boy" ("PORTILLO"),

9 JUAN DIAZ, aka "Swifty" ("DIAZ"), CARLOS VASQUEZ, aka "Lil' Lazy"

10 ("C. VASQUEZ"), ADOLPH MORAGA, aka "Fito" ("MORAGA"), STEVEN

11 ESPINOZA, aka "Little Loki" ("ESPINOZA"), RAFAEL ALVAREZ, aka

12 "Lil' Pokie" ("ALVAREZ"), DANIEL REYES, aka "Sugar" ("REYES"),

13 ZACARIAS ARTEAGA, aka "Drew" ("ARTEAGA"), HUGO QUIROZ ("QUIROZ"),

14 ROBERT DEWESTER, aka "Lucci" ("DEWESTER"), MARLON JIRON, aka "Bow

15 Easy" ("JIRON"), FERNANDO MORALES, aka "Sicko" ("MORALES"), ALEX

16 CASTRO, aka "Sniper" ("A. CASTRO"), ALBERT MORENO, aka "Pelon"

17 ("MORENO"), MICHAEL SANCHEZ, aka "Dropper" ("SANCHEZ"), MANUEL

18 CALDERON, aka "Toro" ("CALDERON"), VIRGINIA GIL ("V. GIL"),

19 REBECCA ESTRADA ("ESTRADA"), MARIA LOPEZ ("LOPEZ"), JESSICA

20 MEDINA ("MEDINA"), JESSICA PEREZ ("J. PEREZ"), RAUL PRIETO, aka

21 "Crook" ("PRIETO"), DAVID HERNANDEZ ("HERNANDEZ"), FRANCISCO

22 VENEGAS, aka "Cisco" ("VENEGAS"), STEVEN VEGA, aka "Widget"

23 ("VEGA"), ROBERT PEREZ ("ROBERT PEREZ"), ROSE MARIE MAGALLANES

24 ("MAGALLANES"), JESSTINE LUCERO ("LUCERO"), LUPE GONZALES

25 ("GONZALES"), and others known and unknown to the Grand Jury,

26 were members and associates of an organization engaged in, among

27 other things, murder, conspiracy to commit murder, attempted

28 murder, conspiracy to traffic in narcotics, narcotics-

1

trafficking, robbery, and extortion.  At all relevant times, this organization, known as the Ontario Black Angels criminal street gang (the "Black Angels"), operated in the Central District of California and elsewhere.

<u>GENERAL BACKGROUND OF THE GANG</u>

2.   The Black Angels gang is a multi-generational street gang that was formed in the 1950's as an automobile enthusiasts club.  In its early days, the Black Angels car club attended police-sponsored road rallies in Ontario, California.  By the mid-1960's, however, the Black Angels had evolved into a criminal street gang.

3.   The Black Angels gang claims as its territory the entire city of Ontario, California, although the gang's members also live and commit crimes in other cities within San Bernardino County and the greater Los Angeles area.  Over the years, members and associates of the Black Angels have been involved in extensive criminal activity and acts of violence, including, but not limited to, murders, attempted murders, the illegal distribution and transportation of firearms, vandalism, the transportation and sales of narcotics, and the smuggling of contraband into correctional facilities.

4.   The Black Angels gang maintains two sub-cliques made up of younger members working their way up through the gang.  The first sub-clique, "Ontario Varrio Sur" ("OVS"), is the traditional starting point for young members of the gang.  OVS members often commit minor crimes, including "tagging" or leaving graffiti of the gang's symbols in the neighborhoods that the gang controls, bicycle theft, and the extortion of vendors in city

parks.  Defendants QUIROZ and ROBERT PEREZ are OVS members.
Eventually, some members of OVS are elevated into the "Angelitos
Negros" or "Junior Black Angels."  The Junior Black Angels are
called upon by leaders of the Black Angels to commit crimes for
the gang, including robberies and the distribution of narcotics.
Defendant SANCHEZ is a Junior Black Angel.  Some Junior Black
Angels are "blessed," and "get their wings," thereby becoming
full members of the Black Angels gang.  Defendants BARAJAS, GIL,
NAVARRO, HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C.
VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, DEWESTER,
JIRON, MORALES, A. CASTRO, MORENO, and VEGA are full members of
the Black Angels gang.  Presently, defendant BARAJAS maintains
the authority to "bless" individuals and elevate them in status
to full membership in the Black Angels gang.  At present, there
are a total of approximately 250 OVS, Junior Black Angels, and
Black Angels members living in and around Ontario, California,
with another approximately 200 individuals in state or federal
prison.

    5.  The progression through the ranks of the Black Angels
gang is not age-specific, and members gain respect and advance
based on the crimes they commit on behalf of the gang.  It is
possible to become a Black Angels gang member without first
becoming an OVS or "Junior Black Angel," but it is rare.  Some
individuals are admitted to the Black Angels gang based upon an
older relative's position within the gang or through their long-
time association with senior Black Angels gang members.  Other
members are admitted based on their family connections to Mexico
and/or their willingness to help bring narcotics across the

3

border into the United States.  However, membership in the Black
Angels gang typically depends upon whether the person has
participated in a significant number of criminal acts on behalf
of the Black Angels gang and particularly if the person has
served time in prison as a result.  This often is referred to as
whether the person has "put in" enough "work" for the gang.

6.   Black Angels gang members generally identify themselves
by their gang name or moniker.  Members refer to one another as
"homies," and frequently wear clothing that identifies them as
members of the gang.  In particular, Black Angels gang members
wear items displaying versions of the "A" symbol commonly
associated with the Anaheim Angels baseball team.  Some gang
members also wear the number "21" on their clothes, with "2"
representing the second letter of the alphabet, "B," and "1"
representing the first letter of the alphabet, "A," to reflect
the initials of the Black Angels.

7.   Another important aspect of Black Angels gang
membership is the display of gang tattoos.  A common tattoo among
all cliques of the Black Angels is "Onterio," "Ontario," or
"Onta," representing the city from which the gang originated.
OVS members often tattoo "OVS" on their bodies, while Junior
Black Angels have "Angelito Negros," or simply "AN," tattooed in
prominent places on their bodies.  Once a member achieves full
status in the Black Angels, he will often "get his wings," and he
will tattoo an image of a devil with a pitchfork and wings
somewhere on his body to symbolize his status as a member of the
Black Angels gang.  Only Black Angels members are allowed to have
such tattoos, and non-members displaying similar tattoos may be

4

1   attacked or killed.

2       8.  The Black Angels gang also uses spray-painted "tagging"

3   to demonstrate its control of its neighborhood to rival gang

4   members and the local community.  Gang "tagging" frequently

5   appears on street signs, walls, and buildings in the area

6   controlled by the gang.  "Tagging" is a public demonstration of

7   the authority of the gang.  It not only identifies the territory

8   claimed by the Black Angels gang, but also serves as a warning or

9   means to terrorize members of the public and law-abiding

10  residents of neighborhoods with threats that the neighborhood is

11  under the control of the gang.

12      9.  The Black Angels gang is aligned with an organization

13  known as the "Mexican Mafia," or "La Eme."  The Mexican Mafia is

14  an organized group of individuals that controls the distribution

15  of narcotics and other criminal activities within California's

16  state prisons and within some federal prisons.  The Black Angels,

17  like many criminal street gangs in Southern California, report to

18  leaders in the Mexican Mafia, sometimes known as "brothers" or

19  "big homies."  The Black Angels gang gained strength and

20  recognition in the 1990's, when Black Angels member and Mexican

21  Mafia brother Ruben "Tupie" Hernandez assumed overall control of

22  the Mexican Mafia from within Pelican Bay State Prison.

23  Currently, there are at least four Mexican Mafia members in the

24  Black Angels, including defendants BARAJAS and J. GIL.

25      10.  Members of the Black Angels gang and its associates

26  are continuously engaged in the distribution of narcotics,

27  specifically methamphetamine and heroin.  Black Angels gang

28  leaders, including defendants BARAJAS and NAVARRO, collect

5

extortion payments, referred to as "taxes," from persons
distributing narcotics in the areas controlled by the gang. The
authority of an individual member, such as defendant NAVARRO, to
collect "taxes" represents an elevated position within the Black
Angels gang. These drug distributors included SANTACRUZ SILVA,
aka "Jose" ("SILVA"), JOSE ROMERO ("ROMERO"), MARCO ANTONIO
TORRES-CRUZ, aka "Alex" ("TORRES-CRUZ"), SALVADOR MARTINEZ, aka
"Flaco" ("MARTINEZ"), SANTIAGO MENDEZ ("MENDEZ"), JAMES KISSLING,
aka "Casper" ("KISSLING"), and ANDREA RICHARDS ("RICHARDS").

11. The Black Angels gang maintains a supply of firearms in
order to enforce the authority of the gang. Many of these
weapons are stolen or unregistered so that they cannot be readily
connected to a gang member who either uses the weapon or
maintains it. Weapons often are discarded or destroyed after
having been used to commit acts of violence on behalf of the
organization. Therefore, gang leaders frequently need to
maintain a source of supply for additional unregistered or
non-traceable firearms.

12. The communication of gang orders and directives is
passed on by gang leaders to other members. For instance, Black
Angels gang members send prison notes (known as "kites" or
"wilas") into and out of detention facilities so that members of
the gang who are in custody can communicate with Black Angels
members who are out of custody. Additionally, Mexican Mafia
"secretaries," such as unindicted co-conspirator #11, communicate
with leaders of the Black Angels gang, and then personally convey
information to incarcerated Mexican Mafia leaders. Black Angels
gang members on the streets use cellular telephones to coordinate

6

their activities, often changing telephones on a regular basis in an effort to avoid detection by law enforcement. Often, members of the Black Angels gang will meet in person to discuss the criminal activities of the gang in an attempt to prevent law enforcement officers from monitoring a telephone conversation involving the gang's criminal activity.

13. Leaders of the Black Angels gang recruit and initiate juveniles to join the gang, including visiting local high schools in search of young recruits. After a period of time committing minor crimes, new members may be "jumped in" to the gang. This initiation process ordinarily requires that the new member be physically beaten by senior, established members of the gang and demonstrate his resilience during the beating.

14. Female friends, girlfriends, and wives of gang members play an important role in the operation of the Black Angels gang. They are often called upon to send information to and from incarcerated members, or to arrange three-way telephone calls from inmates to other gang members. In addition, female associates drive getaway cars from crime scenes and hide contraband on their persons when gang members are stopped in vehicles or when search warrants are executed, with the assumption being that the officer will be less likely to search the female associate. Female associates are also asked to deliver "tax" proceeds to gang leaders and to put money "on the books" of an incarcerated member.

ER000099

COUNT ONE

[18 U.S.C. § 1962(d)]

1. Paragraphs One through Fourteen of the General Allegations are realleged and incorporated by reference as though fully set forth herein.

2. The Black Angels, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise engaged in, and its activities affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

PURPOSES OF THE ENTERPRISE

3. The purposes of the Black Angels criminal enterprise, including its members and associates, include, but are not limited to, the following:

a. Enriching members and associates of the Black Angels gang through, among other things, control and participation in the distribution of narcotics in the Black Angels gang territory and elsewhere.

b. Maintaining control over all Black Angels gang territory.

c. Preserving, protecting, and expanding the power of the Black Angels gang through the use of intimidation, violence, threats of violence, assaults, and murders.

d. Promoting and enhancing the Black Angels gang and the activities of its members and associates.

8

e.   Controlling the illegal activities that generate income by "taxing" drug dealers and legitimate businesses in the territory controlled by the Black Angels gang.

<u>THE MEANS AND METHODS OF THE ENTERPRISE</u>

4.   The means and methods by which defendants and other members and associates of the Black Angels gang conduct and participate in the conduct of the affairs of the Black Angels gang include:

a.   Members and associates of the Black Angels gang use the Black Angels criminal enterprise to commit, attempt, and threaten to commit, acts of violence, including murder, to protect and expand the enterprise's criminal operations and to promote discipline and enforce the rules of the Black Angels criminal enterprise.

b.   Members and associates of the Black Angels gang use the Black Angels criminal enterprise to promote a climate of fear through violence and threats of violence.

c.   Members of the Black Angels gang are entitled to conduct, and, in fact, conduct, illegal activities under the protection of the Black Angels criminal enterprise in order to generate income.

d.   Members and associates of the Black Angels gang engage in the trafficking of controlled substances in order to generate income.

e.   Members and associates of the Black Angels criminal enterprise, with the permission of Black Angels gang leaders, "tax" illicit activities, including drug trafficking, in order to generate income and control the illegal activity

9

undertaken in territories controlled by the Black Angels gang.

<u>The RICO CONSPIRACY CHARGE</u>

5.   Beginning on a date unknown, and continuing to on or about April 7, 2010, in Riverside, San Bernardino, and Los Angeles Counties, within the Central District of California and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER, JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, CALDERON, V. GIL, ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ, VENEGAS, VEGA, ROBERT PEREZ, LUCERO, SILVA, ROMERO, TORRES-CRUZ, GONZALES, and others known and unknown to the Grand Jury, being persons employed by and associated with the Black Angels criminal enterprise described in Paragraphs One through Fourteen of the General Allegations of this indictment, and Paragraphs Two through Four of this Count, which constitutes an "enterprise," as defined in Title 18, United States Code, Section 1961(4), which enterprise affected interstate and foreign commerce, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts involving extortion, in violation of California Penal Code Sections 31, 182 and 518-20; distribution of controlled substances, and conspiracy to distribute controlled substances, including methamphetamine and

heroin, in violation of Title 21, United States Code, Sections
841(a)(1), 843(b), and 846; and robbery in violation of
California Penal Code Sections 31, 664, 211, and 213. It was
further a part of the conspiracy that each defendant agreed that
a conspirator would commit at least two acts of racketeering in
the conduct of the affairs of the enterprise.

A. MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
ACCOMPLISHED

The objects of the conspiracy were to be accomplished in
substance as follows:

1. Defendants BARAJAS, J. GIL, and NAVARRO, and others,
would direct the activities of the Black Angels gang and its
associates, specifically insofar as those activities involved the
distribution of narcotics, the collection and distribution of
"taxed" drug proceeds, and the commission of crimes of violence.

2. Defendants BARAJAS and NAVARRO, and others, would meet
with Mexican Mafia leaders and associates to report on the
activities of the gang, receive instructions from the Mexican
Mafia, and provide narcotics and money to the Mexican Mafia
arising from the gang's extortion, narcotics distribution, and
violent criminal activities.

3. Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ,
C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER, CALDERON,
V. GIL, ROBERT PEREZ, and GONZALES, and others, would permit
narcotics traffickers to distribute narcotics in the geographic
area controlled by the Black Angels gang in return for a
percentage of the narcotics proceeds that were sold in the areas
controlled by the Black Angels gang.

11

1       4.   Defendants J. GIL, NAVARRO, ALCALA, JIMENEZ, RIVERA, C.

2   VASQUEZ, ALVAREZ, REYES, ARTEAGA, JIRON, MORALES, MORENO,

3   SANCHEZ, PRIETO, HERNANDEZ, and VEGA, and others, would obtain

4   firearms and other dangerous weapons for Black Angels gang

5   members, to be used to enforce the authority of the Black Angels

6   gang, to maintain the Black Angels members and associates'

7   ability to engage in drug trafficking within the neighborhoods

8   controlled by the gang, and to exclude others from drug

9   trafficking in the neighborhoods controlled by the Black Angels

10  gang.

11      5.   Defendants BARAJAS, NAVARRO, JIMENEZ, RIVERA, C.

12  VASQUEZ, ESPINOZA, MORALES, SANCHEZ, CALDERON, and VEGA, and

13  others, would engage in acts of violence in order to enforce the

14  authority of the Black Angels gang, as well as maintain the

15  gang's ability to control the drug trafficking activity in the

16  territory controlled by the Black Angels gang.

17      6.   Defendants RIVERA, MEDINA, ROBERT PEREZ, SILVA, ROMERO,

18  and TORRES-CRUZ, and other narcotics suppliers, would obtain

19  narcotics that were then distributed to members and associates of

20  the Black Angels gang.

21      7.   Defendants BARAJAS, J. GIL, NAVARRO, JIMENEZ, HURTADO,

22  JIMENEZ, RIVERA, PORTILLO, MORAGA, REYES, ARTEAGA, QUIROZ,

23  MORALES, A. CASTRO, CALDERON, V. GIL, ESTRADA, MEDINA, PRIETO,

24  HERNANDEZ, VENEGAS, LUCERO, SILVA, ROMERO, TORRES-CRUZ, and

25  GONZALES, and others, would distribute narcotics in prison and in

26  the territory controlled by the Black Angels gang.

27      8.   Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, RIVERA,

28  PORTILLO, ALVAREZ, REYES, JIRON, A. CASTRO, V. GIL, ESTRADA,

1 | LOPEZ, MEDINA, J. PEREZ, PRIETO, ROBERT PEREZ, VENEGAS, and
2 | LUCERO, and others, would assist Black Angels gang members and
3 | associates in the commission of violent crimes and narcotics
4 | trafficking by providing access to telephones to be used for
5 | criminal activity, conveying information regarding the criminal
6 | activities of the Black Angels gang to incarcerated Black Angels
7 | gang members and members of the Mexican Mafia, and concealing
8 | contraband held by the gang to avoid the contraband's detection
9 | by law enforcement.

10 |     9.   Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, RIVERA,
11 | PORTILLO, ALVAREZ, REYES, QUIROZ, A. CASTRO, V. GIL, ESTRADA,
12 | LOPEZ, MEDINA, ROBERT PEREZ, SILVA, TORRES-CRUZ, and GONZALES,
13 | and others, would communicate with members of the Black Angels
14 | gang and their associates to notify them of the presence of law
15 | enforcement in the area controlled by the gang and report on
16 | recent arrests, search warrants, and other law enforcement
17 | activity conducted against members of the Black Angels gang, or
18 | narcotics traffickers making extortion payments to the gang.

19 | B.   <u>OVERT ACTS</u>

20 |     In furtherance of the conspiracy, and to accomplish the
21 | objects of the conspiracy, defendants BARAJAS, J. GIL, NAVARRO,
22 | HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ,
23 | MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER,
24 | JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, CALDERON, V. GIL,
25 | ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ, VENEGAS,
26 | VEGA, ROBERT PEREZ, LUCERO, SILVA, ROMERO, TORRES-CRUZ, GONZALES,
27 | and co-conspirators Victor Felix ("Felix"), Teresa Castro ("T.
28 | Castro"), Patrick Orozco ("Orozco"), Fernando Vasquez ("F.

13

Vasquez"), Richard Castorena ("Castorena"), and others known and
unknown to the Grand Jury, including those defendants named in
the narcotics conspiracy count, committed various overt acts, on
or about the following times and dates, within the Central
District of California, and elsewhere, including but not limited
to the following:

1.    On August 8, 2002, defendant DEWESTER possessed a 12-
gauge shotgun and four shotgun shells.

2.    On April 17, 2003, defendant VEGA possessed a loaded
.380 caliber pistol as he fled from the police in a vehicle
pursuit with victim I.A. and her small child in the car.

3.    On May 9, 2004, defendant MAGALLENES possessed
methamphetamine and $1,129.07 in cash in a vehicle that she was
driving.

4.    On December 8, 2004, defendant MORENO possessed a
stolen, loaded .40 caliber semi-automatic firearm, bearing serial
number 2165002.

5.    On February 13, 2005, defendant MORALES possessed gang
paraphernalia, one pound of methamphetamine, and six rounds of
.380 caliber ammunition at his residence in Upland, California.

6.    On February 17, 2005, defendant ROBERT PEREZ possessed
approximately 12.7 grams of methamphetamine.

7.    On April 27, 2005, defendant ALCALA and unindicted co-
conspirator #1, a member of OVS, possessed methamphetamine and a
loaded firearm.

8.    On July 20, 2005, defendant ALCALA possessed a semi-
automatic firearm.

9.    On July 20, 2005, defendant ALCALA gathered other Black

14

1   Angels gang members to approach victim D.L.'s residence, and
2   pounded on D.L.'s door fifteen minutes after D.L. had confronted
3   ALCALA.

4       10.  On September 17, 2005, defendant VEGA drove a stolen
5   vehicle and possessed three rounds of ammunition,
6   methamphetamine, and a knife.

7       11.  On October 26, 2005, defendant SANCHEZ possessed eight
8   firearms, including a 9mm Luger handgun and a Tech-9 rifle,
9   multiple rounds of ammunition, and Black Angels gang
10  paraphernalia.

11      12.  On March 31, 2006, defendant DEWESTER possessed a
12  stolen .25 caliber handgun and six rounds of ammunition.

13      13.  On December 9, 2006, defendant VEGA possessed a firearm
14  and two rounds of ammunition as he fled from police in a vehicle
15  pursuit.

16      14.  On January 30, 2007, defendant PORTILLO possessed three
17  rounds of .44 caliber ammunition, a Walther automatic handgun,
18  and Black Angels paraphernalia.

19      15.  On March 10, 2007, defendant J. GIL, an inmate at the
20  United States Penitentiary in Victorville, California, received
21  multiple balloons containing approximately 3.8 grams of heroin
22  from defendant V. GIL that J. GIL then swallowed in an attempt to
23  conceal the narcotics from prison officials.

24      16.  On July 10, 2007, defendants SANCHEZ and DIAZ drove in
25  a vehicle with a video camera attached to the rear license plate
26  so that SANCHEZ could see when law enforcement officers
27  approached the vehicle.

28      17.  On April 24, 2008, defendant J. GIL requested that

15

1  defendant DIAZ broker a firearms transaction on J. GIL's behalf

2  while J. GIL was in custody.

3      18.  On May 3, 2008, defendant DIAZ reported to defendant J.

4  GIL that DIAZ had obtained firearms, including a .45 caliber

5  handgun, a .22 caliber handgun, and a semi-automatic rifle known

6  as a "mini-14," and stated that DIAZ would send J. GIL the

7  proceeds from the firearms sales.

8      19.  On June 30, 2008, defendant J. GIL, who was

9  incarcerated, instructed defendant DIAZ to place money on J.

10  GIL's books, and to give some money to defendant V. GIL.

11      20.  On November 10, 2008, defendant VEGA discharged a

12  firearm at a police officer who was following VEGA during a high-

13  speed vehicle pursuit.

14      21.  On November 10, 2008, defendant VEGA possessed seven

15  rounds of live ammunition; multiple firearm cartridges, including

16  an AK47 cartridge; and Black Angel gang paraphernalia.

17      22.  On March 7, 2009, defendant DIAZ brandished and used a

18  knife in a fight at a bar in Colton, California.

19      23.  On March 18, 2009, T. Castro delivered a portion of

20  defendant TORRES-CRUZ and T. Castro's narcotics trafficking

21  profits for the week to defendant NAVARRO as a tax in exchange

22  for the ability to distribute narcotics in the territory

23  controlled by the Black Angels gang.

24      24.  On March 20, 2009, defendant TORRES-CRUZ asked T.

25  Castro if she had any money or narcotics left, and T. Castro

26  stated that she had over $300 but only one balloon of heroin

27  remaining and no cocaine.

28      25.  On March 23, 2009, defendant TORRES-CRUZ informed

16

1  Orozco that TORRES-CRUZ had provided an additional 28 balloons of

2  heroin for Orozco to distribute.

3      26.  On March 30, 2009, defendant TORRES-CRUZ instructed

4  Orozco to provide T. Castro with 25 balloons of heroin and five

5  or six balloons of cocaine, for a total of 30 balloons filled

6  with narcotics to distribute in the territory controlled by the

7  Black Angel gang.

8      27.  On March 31, 2009, Castorena told defendant TORRES-CRUZ

9  that Castorena had a customer interested in purchasing $140 worth

10  of heroin from TORRES-CRUZ and Castorena.

11      28.  On April 14, 2009, Felix made arrangements with

12  defendant TORRES-CRUZ to deliver heroin to TORRES-CRUZ later that

13  day.

14      29.  On April 15, 2009, Castorena told defendant TORRES-CRUZ

15  that Castorena was ready to begin distributing narcotics, and

16  Castorena stated that he already had customers lined up to

17  purchase specific quantities of narcotics each day.

18      30.  On April 30, 2009, defendant MORALES stole a 9mm

19  Beretta 92FS handgun, a 30.06 caliber rifle, a 30/30 Winchester

20  rifle, a .22 caliber rifle, and a 52-inch flat screen televison

21  from a residence in Pinon Hills.

22      31.  On May 5, 2009, F. Vasquez told defendant TORRES-CRUZ

23  that F. Vasquez had 20 or 30 balloons of heroin left to

24  distribute, but that F. Vasquez no longer had any cocaine for

25  distribution.

26      32.  On May 6, 2009, defendant NAVARRO told defendant

27  TORRES-CRUZ that defendant JIMENEZ would collect a $200 payment

28  from TORRES-CRUZ' narcotics trafficking profits for the week.

17

33.   On May 15, 2009, defendant NAVARRO discussed with defendant MARTINEZ a time and place to meet so that NAVARRO could collect a portion of MARTINEZ' narcotics trafficking profits for the week in exchange for MARTINEZ' ability to distribute narcotics in the territory controlled by the Black Angels gang.

34.   On May 21, 2009, defendants NAVARRO, C. VASQUEZ, and HURTADO collected a $200 payment from defendant TORRES-CRUZ and T. Castro that was a portion of the proceeds of TORRES-CRUZ and T. Castro's narcotics trafficking profits for the week.

35.   On May 22, 2009, defendant TORRES-CRUZ instructed Orozco to deliver a portion of their narcotics trafficking profits for the week to defendant NAVARRO.

36.   On May 23, 2009, defendants NAVARRO and HURTADO agreed to meet the following day with other members of the Black Angels gang, and NAVARRO warned HURTADO not to say anything or give signals over the telephone that could be understood by law enforcement.

37.   On May 28, 2009, defendants NAVARRO, JIMENEZ, REYES, ESPINOZA, and another member of the Black Angels gang armed themselves and went to the residence of a rival Chino Sinners gang member to extort money from the rival gang member.

38.   On June 12, 2009, a Black Angels gang member killed P.R. by shooting P.R. approximately four times with a stolen, 9mm handgun.

39.   On June 14, 2009, defendant MORALES brandished a firearm, and carried a concealed dagger as MORALES fled from law enforcement.

40.   On June 14, 2009, defendant MORALES attempted to hide

18

from law enforcement in defendant JIRON's residence.

41.  On June 20, 2009, defendant J. PEREZ picked up assorted ammunition and the 9mm handgun used to murder P.R. from defendant MORALES' residence, and J. PEREZ took the firearm and ammunition to defendant JIRON's residence to conceal them from the police.

42.  On June 22, 2009, defendants ALVAREZ and NAVARRO discussed the location of the firearm that was used to murder P.R., and NAVARRO instructed ALVAREZ to put the firearm in a safe location, and warned ALVAREZ to avoid being detected by law enforcement when moving the firearm.

43.  On June 23, 2009, defendant JIRON possessed a stolen 9mm Beretta handgun, model 92FS, bearing serial # DS007056, that was used to murder P.R, as well as ammunition for the firearm.

44.  On June 23, 2009, defendant ALVAREZ told defendant NAVARRO that defendant JIRON's residence had been searched, that the police had found the firearm that had been used to murder P.R., and that law enforcement officers were interviewing Black Angels gang members and associates in connection with the murder investigation.

45.  On June 23, 2009, defendants ALVAREZ and NAVARRO agreed to meet in person to discuss the information law enforcement had obtained regarding the murder of P.R.

46.  On June 23, 2009, defendant TORRES-CRUZ told defendant NAVARRO that unindicted co-conspirator #2 would meet NAVARRO to deliver a $200 payment to defendant NAVARRO that constituted a portion of TORRES-CRUZ' narcotics trafficking profits for the week, and TORRES-CRUZ told NAVARRO that TORRES-CRUZ would provide NAVARRO with an additional payment the next day.

19

47. On June 24, 2009, defendant NAVARRO delivered a payment to defendant V. GIL from the Black Angels' extortion proceeds.

48. On June 28, 2009, defendant MARTINEZ told defendant NAVARRO that MARTINEZ was collecting money in order to make an extortion payment to NAVARRO in connection with MARTINEZ' narcotics trafficking activities, but that MARTINEZ did not presently have enough money, and NAVARRO told MARTINEZ that NAVARRO would meet with MARTINEZ and see how much money MARTINEZ had.

49. On June 30, 2009, defendants HURTADO and NAVARRO discussed the location of several police checkpoints in the City of Ontario.

50. On June 30, 2009, defendant NAVARRO collected narcotics trafficking proceeds from defendant ESTRADA.

51. On July 2, 2009, defendant SILVA advised defendant NAVARRO that M.C. robbed defendant MARTINEZ of narcotics and money, and NAVARRO advised SILVA that NAVARRO and other members of the Black Angels gang would confront M.C.

52. On July 2, 2009, defendants NAVARRO and JIMENEZ, and another member of the Black Angels gang, met at a residence where M.C. was located.

53. On July 2, 2009, defendant NAVARRO told defendant SILVA that M.C. had received a "good beating."

54. On July 3, 2009, defendant DEWESTER and defendant NAVARRO had a conversation in which DEWESTER told NAVARRO that DEWESTER knew of a narcotics trafficker in the territory controlled by the Black Angels gang from whom NAVARRO could collect extortion payments, and DEWESTER gave NAVARRO directions

1  to locate the narcotics trafficker.

2      55.  On July 4, 2009, defendant J. GIL instructed defendant

3  NAVARRO to send $200 to J. GIL by Western Union or MoneyGram.

4      56.  On July 7, 2009, defendants BARAJAS and NAVARRO

5  discussed the collection of portions of the proceeds from

6  defendant SILVA's narcotics sales, and BARAJAS told NAVARRO that

7  it would be in SILVA's "best interest" to do BARAJAS a "favor"

8  and give narcotics to an individual distributing narcotics in the

9  Black Angel gang's territory.

10      57.  On July 15, 2009, defendant MARTINEZ possessed high

11  purity methamphetamine in his vehicle.

12      58.  On July 17, 2009, defendant SILVA told defendant

13  NAVARRO that defendant MARTINEZ had been arrested, and SILVA

14  asked NAVARRO if SILVA could provide NAVARRO with proceeds from

15  narcotics trafficking at a later time, as SILVA was not presently

16  distributing narcotics because of the presence of law enforcement

17  in the area.

18      59.  On July 18, 2009, defendant SILVA told defendant

19  RICHARDS to meet SILVA at a fast food restaurant and that SILVA

20  would provide RICHARDS with narcotics for distribution.

21      60.  On July 18, 2009, defendant HURTADO attempted to evade

22  law enforcement officers who were pursuing HURTADO's vehicle with

23  full lights and sirens.

24      61.  On July 18, 2009, defendant HURTADO told defendant

25  NAVARRO that HURTADO had sent one of his friends to pick up the

26  narcotics that HURTADO had dropped earlier during the police

27  pursuit.

28      62.  On July 20, 2009, defendant RICHARDS told defendant

1     SILVA that RICHARDS wanted to meet with SILVA to obtain

2     additional narcotics, and RICHARDS told SILVA that the new

3     narcotics SILVA had provided were good and that RICHARDS'

4     customers liked them.

5        63.   On July 20, 2009, defendant MARTINEZ told defendant

6     NAVARRO that, after MARTINEZ was released from custody, MARTINEZ

7     would resume distributing narcotics in the territory controlled

8     by the Black Angels gang and would pay NAVARRO a portion of his

9     narcotics trafficking profits.

10       64.   On July 21, 2009, defendants NAVARRO and RICHARDS

11    discussed a time and place to meet so that NAVARRO could collect

12    a portion of RICHARDS' narcotics trafficking profits for the

13    week.

14       65.   On July 21, 2009, defendant RIVERA ordered

15    methamphetamine from defendant VENEGAS.

16       66.   On July 21, 2009, defendant REYES warned defendant

17    QUIROZ about police activity in the area.

18       67.   On July 21, 2009, defendant RIVERA negotiated the

19    purchase of a loaded .38 caliber handgun for $250 from defendant

20    HERNANDEZ.

21       68.   On July 22, 2009, defendant HERNANDEZ delivered a .38

22    caliber handgun to defendant RIVERA.

23       69.   On July 22, 2009, defendant RIVERA attempted to conceal

24    a loaded .38 caliber handgun from law enforcement officers.

25       70.   On July 22, 2009, defendant RIVERA told defendant

26    NAVARRO that the loaded .38 caliber handgun had been seized by

27    law enforcement, and RIVERA apologized to NAVARRO for not

28    obtaining the firearm that was meant to be used by the Black

1   Angels gang, and further told NAVARRO that RIVERA would attempt

2   to obtain another firearm for the gang.

3       71. On July 22, 2009, defendants REYES and QUIROZ discussed

4   a time to meet when REYES could provide narcotics to QUIROZ for

5   distribution.

6       72. On July 23, 2009, defendant MAGALLANES ordered $400

7   worth of narcotics from defendant SILVA.

8       73. On July 23, 2009, defendant NAVARRO asked defendant

9   RICHARDS if he could meet with her, and RICHARDS told NAVARRO

10   that RICHARDS was available and that RICHARDS had money to give

11   NAVARRO in connection with RICHARDS' narcotics trafficking

12   activities in the territory controlled by the Black Angels gang.

13       74. On July 24, 2009, defendant MAGALLANES informed

14   defendant SILVA that MAGALLANES had money for SILVA, and

15   MAGALLANES discussed a place to meet so that MAGALLANES could

16   obtain narcotics from SILVA.

17       75. On July 24, 2009, defendant REYES discussed a time to

18   meet with defendant QUIROZ to collect the proceeds from QUIROZ'

19   narcotics sales.

20       76. On July 24, 2009, defendant KISSLING spoke to defendant

21   NAVARRO and apologized that he had not yet been able to make the

22   extortion payment to NAVARRO in connection with KISSLING's

23   narcotics trafficking activities, and KISSLING told NAVARRO that

24   KISSLING was going to try to collect money owed to him by other

25   people and would call NAVARRO back later.

26       77. On July 25, 2009, defendant RIVERA instructed defendant

27   VENEGAS to meet defendant J. PEREZ and provide her with

28   narcotics.

78. On July 27, 2009, defendant RIVERA asked defendant VENEGAS to prepare methamphetamine for distribution.

79. On July 28, 2009, defendants ROBERT PEREZ and NAVARRO discussed the collection of taxes from individuals distributing narcotics in the territory controlled by the Black Angels gang.

80. On July 28, 2009, defendant ROBERT PEREZ attempted to inform defendant NAVARRO about the presence of law enforcement officers in the area.

81. On July 29, 2009, defendants C. VASQUEZ, SANCHEZ, and ESPINOZA robbed a market in the City of Upland.

82. On July 29, 2009, defendants NAVARRO and KISSLING discussed a time and place to meet so KISSLING could provide NAVARRO with a portion of KISSLING's narcotics trafficking proceeds for the week.

83. On July 29, 2009, defendant RIVERA instructed defendant VENEGAS to sell some methamphetamine, but to keep $400 worth of methamphetamine for RIVERA to distribute.

84. On July 29, 2009, defendant REYES contacted defendant MORAGA to obtain a telephone number for a third party who was involved in the distribution of narcotics.

85. On July 30, 2009, defendant V. GIL directed defendant NAVARRO to deliver a $100 payment consisting of Black Angels' extortion proceeds to V. GIL.

86. On July 30, 2009, defendant J. GIL instructed defendant NAVARRO to send $200 to J. GIL via Western Union.

87. On July 31, 2009, defendant TOLSON ordered a quarter ounce of methamphetamine from defendant RIVERA, and TOLSON and RIVERA discussed the possibility of TOLSON buying methamphetamine

24

1 | from RIVERA on a regular basis in the future.

2 |     88. On July 31, 2009, defendant RIVERA delivered

3 | approximately 4.4 grams of methamphetamine to defendants TOLSON

4 | and COOK.

5 |     89. On July 31, 2009, defendant TOLSON told defendant

6 | RIVERA that TOLSON had been stopped by the police after

7 | purchasing narcotics from RIVERA and that defendant COOK had been

8 | arrested.

9 |     90. On July 31, 2009, defendant QUIROZ told defendant REYES

10 | that QUIROZ had $450 to give to REYES, and QUIROZ asked if REYES

11 | could provide QUIROZ with additional narcotics to distribute.

12 |     91. On July 31, 2009, defendant QUIROZ warned defendant

13 | REYES about the presence of law enforcement officers.

14 |     92. On July 31, 2009, defendant ROBERT PEREZ told defendant

15 | NAVARRO that ROBERT PEREZ was receiving narcotics from Mexico and

16 | that he would let NAVARRO know when "the eagle landed."

17 |     93. On August 1, 2009, defendant REYES discussed a time and

18 | place to meet with defendant SANCHEZ so that REYES could recover

19 | a firearm from SANCHEZ.

20 |     94. On August 1, 2009, defendant REYES possessed a

21 | sawed-off .22 caliber rifle with an obliterated serial number, as

22 | well as Black Angels paraphernalia.

23 |     95. On August 1, 2009, defendant NAVARRO discussed a time

24 | and place to meet with defendant KISSLING to collect a portion of

25 | KISSLING's narcotics trafficking profits.

26 |     96. On August 3, 2009, defendants RIVERA and HERNANDEZ

27 | discussed the price and quality of narcotics, and RIVERA advised

28 | HERNANDEZ that if a narcotics transaction occurred, then

1 │ HERNANDEZ would receive a payment of money.

2 │     97. On August 6, 2009, defendant RIVERA called unindicted

3 │ co-conspirator #3 to purchase methamphetamine, and unindicted

4 │ co-conspirator #3 instructed defendant MEZA to deliver the

5 │ methamphetamine to RIVERA.

6 │     98. On August 6, 2009, defendant RIVERA told defendant

7 │ HERNANDEZ that RIVERA was going to obtain narcotics from a new

8 │ source of supply, and RIVERA advised HERNANDEZ that if a

9 │ narcotics transaction occurred, then HERNANDEZ would receive a

10 │ payment of money.

11 │     99. On August 6, 2009, defendant PRIETO told defendant

12 │ RIVERA that PRIETO would not complete a robbery that PRIETO had

13 │ planned because RIVERA was going to supply PRIETO with a one-half

14 │ ounce quantity of methamphetamine to distribute instead.

15 │     100. On August 6, 2009, defendant MEZA delivered

16 │ approximately 219 grams of methamphetamine to defendants RIVERA

17 │ and MEDINA, which defendant RIVERA hid in a hollowed-out battery

18 │ in the trunk of a vehicle.

19 │     101. On August 6, 2009, defendant RIVERA possessed $3,385

20 │ in United States currency.

21 │     102. On August 6, 2009, defendant MEZA possessed

22 │ approximately 27.8 grams of methamphetamine.

23 │     103. On August 7, 2009, MEDINA told unindicted co-

24 │ conspirator #4 that defendant RIVERA had instructed her to call

25 │ unindicted co-conspirator #4 and another third party to collect

26 │ money that they owed to RIVERA for narcotics debts.

27 │     104. On August 7, 2009, defendant MEDINA told the owner of

28 │ the vehicle from which narcotics were seized on August 6, 2009

ER000118

1   that MEDINA had told the police that the car had been stolen many
2   times and thus she did not know how the narcotics had ended up in
3   the car, and MEDINA told the owner to repeat the same information
4   if the police asked him about the status of the car.

5       105.  On August 7, 2009, J. GIL, who was incarcerated at the
6   time, told V. GIL to tell other members of the Black Angels and
7   its associates that they should not communicate about gang
8   business over the telephone, as J. GIL had just read about
9   another case about law enforcement building a prosecution based
10  on recorded telephone calls.

11      106.  On August 8, 2009, defendants MEDINA and NAVARRO spoke
12  about the fact that on August 6, 2009, law enforcement officers
13  had seized a large quantity of methamphetamine from defendants
14  MEDINA and RIVERA, and MEDINA and NAVARRO discussed whether
15  defendant MEZA was cooperating with law enforcement.

16      107.  On August 13, 2009, defendant RICHARDS told defendant
17  SILVA that her customers had been complaining about the quality
18  of the narcotics that SILVA had provided, and RICHARDS made
19  arrangements to purchase additional narcotics from SILVA at a
20  price of $1150.

21      108.  On August 20, 2009, defendant PERALTA negotiated a
22  purchase of narcotics from defendant SILVA.

23      109.  On August 22, 2009, defendant V. GIL told defendant J.
24  GIL, who was incarcerated at the time, that V. GIL had been at a
25  party and had been assaulted by an 18 year-old male, and J. GIL
26  instructed V. GIL to assemble some of the younger members or
27  associates of the Black Angels gang to take care of the problem.

28      110.  On August 25, 2009, defendants NAVARRO and RICHARDS

ER000119

discussed a time and place to meet for NAVARRO to collect a portion of defendant RICHARDS' narcotics trafficking proceeds for the week.

111.  On August 25, 2009, defendant SILVA delivered approximately 72.6 grams of methamphetamine to defendant ANDALON, who placed the methamphetamine in the console of the vehicle he was driving.

112.  On August 25, 2009, defendants SILVA and PERALTA discussed meeting at a sandwich shop so that SILVA could deliver narcotics to PERALTA.

113.  On August 25, 2009, defendant PERALTA possessed approximately 3.4 grams of methamphetamine in the car in which he was traveling.

114.  On August 25, 2009, defendant BARAJAS told defendant NAVARRO that defendant REYES had been apprehended by law enforcement with a firearm that belonged to the Black Angels gang.

115.  On August 25, 2009, defendants BARAJAS and NAVARRO discussed the July 29, 2009 robbery of a market, and BARAJAS told NAVARRO that members of the Black Angels gang should steal from houses rather than robbing stores that have surveillance cameras.

116.  On August 26, 2009, Andalon told defendant SILVA that Andalon had been arrested with narcotics in his vehicle, and Andalon told SILVA that he had not disclosed SILVA's name to the arresting officer.

117.  On August 26, 2009, defendants NAVARRO and KISSLING discussed a time and place to meet for NAVARRO to collect a portion of KISSLING's narcotics trafficking profits for the week.

ER000120

1    118.  On August 28, 2009, defendants SILVA and ROMERO

2    possessed approximately 93.6 grams of methamphetamine in a

3    vehicle ROMERO was driving.

4    119.  On August 28, 2009, defendants SILVA and ROMERO

5    possessed approximately 2.35 kilograms of methamphetamine,

6    digital scales, empty plastic baggies, a bill counter, and

7    $63,894 in United States currency.

8    120.  On August 30, 2009, unindicted co-conspirator #5 told

9    defendant NAVARRO of the recent arrests of defendants SILVA and

10   ROMERO, and unindicted co-conspirator #5 stated that she wanted

11   NAVARRO to know about the arrests because they would affect

12   NAVARRO's income as a result of the decreased narcotics sales in

13   the territory controlled by the Black Angels gang.

14   121.  On September 2, 2009, defendant NAVARRO warned

15   defendant KISSLING that there were many police in the

16   neighborhood, and NAVARRO instructed KISSLING to be careful in

17   connection with KISSLING's narcotics distribution activities.

18   122.  On September 4, 2009, defendant KISSLING possessed a

19   loaded RG Industries .22 caliber revolver in the house where

20   KISSLING was residing.

21   123.  On September 4, 2009, unindicted co-conspirator #6

22   told defendant NAVARRO that police had just raided defendant

23   KISSLING's house, and unindicted co-conspirator #6 warned NAVARRO

24   that there was a heavy law enforcement presence in the area.

25   124.  On September 8, 2009, defendants NAVARRO and RICHARDS

26   discussed a time and place to meet for NAVARRO to collect a

27   portion of RICHARDS' narcotics trafficking profits for the week.

28   125.  On September 9, 2009, defendant NAVARRO spoke with

1  defendant LAGUNA who told NAVARRO that defendant KISSLING had

2  been arrested, and NAVARRO asked LAGUNA to determine who would

3  assume the role of selling narcotics that had previously been

4  performed by KISSLING.

5      126.  On September 10, 2009, defendant ESTRADA, driving a

6  stolen vehicle, possessed checks stolen from victims R.S. and

7  V.C.

8      127.  On September 11, 2009, defendant NAVARRO met with

9  defendant LAGUNA so that LAGUNA could inform NAVARRO who would

10  assume the sales of narcotics that had previously been performed

11  by defendant KISSLING.

12      128.  On September 11, 2009, defendant NAVARRO told

13  unindicted co-conspirator #7 that NAVARRO was a "Black Angel,"

14  that a particular area was his "varrio," and that NAVARRO and

15  other members of the Black Angels gang were the only ones

16  authorized to tax narcotics traffickers in the territory

17  controlled by the Black Angels gang.

18      129.  On September 12, 2009, defendants NAVARRO and MARTINEZ

19  discussed the distribution of narcotics.

20      130.  On September 14, 2009, unindicted co-conspirator #7

21  told defendant NAVARRO that unindicted co-conspirator #7 and

22  defendant MENDEZ had been paying taxes in connection with their

23  narcotics trafficking activities to defendant ALVAREZ, and

24  NAVARRO instructed unindicted co-conspirator #7 to pay the taxes

25  directly to NAVARRO.

26      131.  On September 17, 2009, defendants NAVARRO and MARTINEZ

27  discussed a time and place to meet so that NAVARRO could provide

28  MARTINEZ with narcotics.

30

132. On September 17, 2009, defendant ESTRADA possessed a magnetic credit card strip reader and writer; numerous credit cards; three driver's licenses belonging to individuals other than herself, including victims M.E. and J.J.; and a social security card belonging to J.J.

133. On September 17, 2009, defendant ESTRADA possessed correspondence between herself and a member of the Black Angels gang who was incarcerated in Tehachapi state prison regarding ESTRADA depositing money in his jail account.

134. On September 17, 2009, defendant CALDERON punched victim F.A. in the face and demanded that victim F.A. pay CALDERON $100 per month for "protection."

135. On September 18, 2009, defendant CALDERON sent text messages to victim F.A. demanding money and indicating that CALDERON was going to "tax" victim F.A.

136. On September 26, 2009, defendant PORTILLO described to defendant HURTADO how to swallow narcotics-filled balloons so that they could be smuggled into prison, and PORTILLO and HURTADO discussed having HURTADO prepare $400 worth of narcotics for such a smuggling operation.

137. On September 26, 2009, defendant HURTADO told defendant BARAJAS about the plan to smuggle narcotics to other members of the Black Angels gang in prison.

138. On September 27, 2009, defendant PORTILLO told defendant HURTADO that narcotics-filled balloons had been successfully smuggled into prison, but that one of the balloons had burst.

139. On September 27, 2009, defendant BARAJAS told

31

1  defendant ALVAREZ that BARAJAS needed a new telephone because

2  BARAJAS had to keep changing his phone numbers in case law

3  enforcement was listening to his calls, and ALVAREZ told BARAJAS

4  that ALVAREZ would obtain a new telephone for BARAJAS.

5      140.  On September 28, 2009, defendant BARAJAS asked

6  defendant CALDERON if CALDERON had any money for BARAJAS, and

7  CALDERON indicated that he had $50 and would get BARAJAS the

8  remainder of the money the following day.

9      141.  On September 28, 2009, unindicted co-conspirator #8,

10  who was, at the time, in custody at the California Correctional

11  Institution in Tehachapi, California, provided defendant A.

12  CASTRO with a list of inmates at the institution and the

13  quantities of narcotics that defendant A. CASTRO should arrange

14  to have delivered to them.

15      142.  On September 28, 2009, defendant ARANDA offered to

16  obtain a cellular telephone for defendant BARAJAS, and ARANDA

17  told BARAJAS that it was better to spend $60.00 on a new

18  telephone that the police would not monitor than to keep using

19  the same phone and possibly spend 60 years in prison.

20      143.  On September 28, 2009, defendant BARAJAS instructed

21  defendant MAGALLANES to purchase narcotics from him rather than

22  from defendant ARTEAGA, and BARAJAS told MAGALLANES that ARTEAGA

23  only supplies the neighborhood with narcotics because ARTEAGA was

24  given permission to do so by BARAJAS.

25      144.  On September 29, 2009, defendants NAVARRO and RICHARDS

26  discussed a time and place to meet for NAVARRO to collect a

27  portion of RICHARDS' narcotics trafficking profits for the week.

28      145.  On September 30, 2009, defendant GONZALES warned

defendant BARAJAS about a police checkpoint in Ontario, California.

146.  On September 30, 2009, defendant BARAJAS instructed defendant GONZALES to collect $200 each week from an individual who was trafficking narcotics in the territory controlled by the Black Angels gang, and GONZALES stated that she would tax the narcotics dealer immediately and deliver the payment to BARAJAS.

147.  On September 30, 2009, defendant BARAJAS instructed defendant LOPEZ to put away the narcotics and money because there was a police officer two houses away from their residence, and LOPEZ agreed to report law enforcement's actions to BARAJAS.

148.  On September 30, 2009, defendant A. CASTRO asked to meet defendant BARAJAS to discuss gang business relating to incarcerated members of the Black Angels gang, and the two agreed to meet in person to avoid discussing the information over the telephone.

149.  On September 30, 2009, defendant CALDERON asked defendant BARAJAS if CALDERON could pay BARAJAS a portion of the money CALDERON owed the following day, and BARAJAS agreed and told CALDERON that CALDERON owed BARAJAS $400.

150.  On October 1, 2009, defendant PRIETO possessed three rifles, ammunition magazines, and assorted ammunition in his residence in Ontario, California.

151.  On October 1, 2009, defendant A. CASTRO told defendant BARAJAS that A. CASTRO had obtained a telephone for BARAJAS and that they could talk the next day about meeting to deliver the telephone.

152.  On October 2, 2009, defendant A. CASTRO was in

33

possession of three cellular telephones.

153. On October 2, 2009, defendant A. CASTRO apologized to defendant BARAJAS for getting arrested and stated that BARAJAS and A. CASTRO needed to change their cellular telephones because the police had seized the telephones A. CASTRO possessed at the time of his arrest.

154. On October 3, 2009, defendant A. CASTRO told defendant BARAJAS that A. CASTRO had a new telephone for BARAJAS.

155. On October 6, 2009, defendant BARAJAS told defendant LOPEZ that BARAJAS would stop by defendant MORAGA's residence to collect money related to the Black Angels gang's extortion activities.

156. On October 6, 2009, defendants BARAJAS and MORAGA discussed the collection of money, and BARAJAS stated he would stop by MORAGA's location.

157. On October 6, 2009, defendants NAVARRO and RICHARDS discussed a time and place to meet for NAVARRO to collect a portion of RICHARDS' narcotics trafficking profits for the week.

158. On October 6, 2009, defendant BARAJAS told defendant HURTADO that he and defendant ALCALA were going to meet with unindicted co-conspirator #9, who was "hooked up with the Cartel," and that ALCALA was going to pretend that ALCALA was armed with a "sub-machine gun" during the meeting.

159. On October 6, 2009, defendant BARAJAS spoke to defendant LOPEZ and reported on the meeting with unindicted co-conspirator #9.

160. On October 8, 2009, defendant A. CASTRO and unindicted co-conspirator #10 attempted to smuggle approximately six grams

34

1  of methamphetamine into the California Correctional Institution

2  in Tehachapi, California.

3      161.  On October 9, 2009, defendant BARAJAS made

4  arrangements to collect a payment from defendant CALDERON in

5  connection with CALDERON's narcotics trafficking activity.

6      162.  On October 9, 2009, defendant BARAJAS told defendant

7  HURTADO that BARAJAS would be traveling to defendant CALDERON's

8  house to collect money from CALDERON, and HURTADO asked BARAJAS

9  if BARAJAS needed HURTADO to assist with the collection.

10     163.  On October 11, 2009, defendant BARAJAS told defendant

11  CALDERON that BARAJAS wanted to collect additional money related

12  to CALDERON's narcotics trafficking before BARAJAS provided

13  CALDERON with additional narcotics to sell.

14     164.  On October 12, 2009, unindicted co-conspirator #11

15  identified herself as a "secretary" of the Mexican Mafia, and

16  unindicted co-conspirator #11 and defendant BARAJAS discussed the

17  extortion payments BARAJAS collected from narcotics traffickers

18  in the territory controlled by the Black Angels gang.

19     165.  On October 13, 2009, defendants NAVARRO and RICHARDS

20  discussed a time and place to meet for NAVARRO to collect a

21  portion of RICHARDS' narcotics trafficking profits for the week.

22     166.  On October 15, 2009, defendants BARAJAS and HURTADO

23  discussed meeting that day to conduct a narcotics transaction.

24     167.  On October 15, 2009, defendant BARAJAS provided

25  approximately 32.2 grams of methamphetamine to defendants HURTADO

26  and LUCERO to distribute.

27     168.  On October 15, 2009, defendants HURTADO and LUCERO

28  possessed approximately 32.2 grams of methamphetamine that they

ER000127

1 intended to distribute, and LUCERO hid the methamphetamine inside

2 her body cavities in an attempt to conceal the narcotics from law

3 enforcement.

4     169. On October 15, 2009, defendant HURTADO told defendant

5 NAVARRO that HURTADO had to bail defendant LUCERO out of jail

6 before the police discovered that LUCERO had methamphetamine

7 concealed on her person.

8     170. On October 15, 2009, defendant BARAJAS possessed gang

9 paraphernalia and communications from incarcerated gang members

10 in a residence in Pomona, California.

11     171. On October 16, 2009, defendant BARAJAS and unindicted

12 co-conspirator #11 discussed unindicted co-conspirator #11's

13 responsibilities as a "secretary" to the Mexican Mafia; and

14 unindicted co-conspirator #11 told BARAJAS that unindicted co-

15 conspirator #11 participated in Mexican Mafia meetings in prison,

16 memorized everything that was said, and later wrote it down so

17 that she could convey the information to BARAJAS and other gang

18 members.

19     172. On October 18, 2009, defendant CALDERON asked

20 defendant BARAJAS if BARAJAS had any narcotics to provide to

21 CALDERON for distribution, and BARAJAS stated that BARAJAS would

22 contact CALDERON when there were more narcotics available.

23     173. On October 20, 2009, defendants NAVARRO and RICHARDS

24 discussed a time and place to meet for NAVARRO to collect a

25 portion of RICHARDS' narcotics trafficking profits for the week.

26     174. On October 20, 2009, defendant MENDEZ paid an

27 extortion payment to defendant NAVARRO so that MENDEZ could

28 continue to sell narcotics within the territory controlled by the

Black Angel gang.

175.   On October 21, 2009, defendant GONZALES possessed approximately 8.2 grams of methamphetamine, digital scales, and plastic baggies used for packaging narcotics at a residence in Ontario, California.

176.   On October 21, 2009, defendant GONZALES told defendant BARAJAS that GONZALES' home had been searched by the police and that law enforcement had found methamphetamine, but that GONZALES' daughter was going to take responsibility for the drugs.

177.   On October 22, 2009, defendant CALDERON made arrangements to obtain narcotics from defendant BARAJAS to distribute.

178.   On October 23, 2009, defendant BARAJAS possessed Black Angels paraphernalia, a prison letter containing gang information, and multiple "kites" from inmates seeking BARAJAS's guidance as leader of the Black Angels gang.

179.   On December 1, 2009, defendant MENDEZ possessed 3.9 grams of methamphetamine, $1,753 in cash, heroin, a .25 caliber pistol, and six rounds of ammunition.

180.   On December 9, 2009, unindicted co-conspirator #12 asked defendant PORTILLO to tell defendant HURTADO that law enforcement had conducted a search of HURTADO's residence.

181.   On December 9, 2009, defendant PORTILLO possessed Black Angels paraphernalia inside his residence.

182.   On December 9, 2009, defendant MORENO possessed a stolen, loaded Ruger 9mm semi-automatic handgun, along with Black Angels gang clothing and paraphernalia.

37

183.  On December 29, 2009, defendant ESTRADA possessed approximately 3.8 grams of methamphetamine, a scale, and a large number of unused clear plastic baggies.

184.  On January 4, 2010, defendant JIMENEZ sold approximately 3.6 grams of methamphetamine to an undercover law enforcement officer in exchange for $220.

185.  On February 23, 2010, defendant ARTEAGA possessed approximately 24.9 grams of methamphetamine, drug distribution paraphernalia, $1,050 in cash, and a magazine for a .45 caliber handgun at his residence in Ontario, California.

186.  On February 24, 2010, defendant MAGALLANES possessed approximately 49.1 grams of methamphetamine, 93.5 grams of marijuana, and three scales.

THE GRAND JURY FURTHER ALLEGES THAT:

1.  Beginning on a date unknown and continuing to on or about April 7, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER, JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, CALDERON, V. GIL, ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ, VENEGAS, VEGA, ROBERT PEREZ, LUCERO, SILVA, ROMERO, TORRES-CRUZ, and GONZALES, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

a.  To distribute at least 50 grams of

38

ER000130

methamphetamine, or at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

        b.   To distribute at least five grams of methamphetamine, or at least 50 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii);

        c.   To distribute at least one kilogram of a mixture or substance containing a detectable amount of heroin, a schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(i); and

        d.   To distribute at least 100 grams of a mixture or substance containing a detectable amount of heroin, a schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i).

39

COUNT TWO

[18 U.S.C. § 1962(c)]

1.   Paragraphs One through Fourteen of the General Allegations, and Paragraphs Two through Four of Count One, and Six through Fourteen of Count One, Part A, are realleged and incorporated by reference as though fully set forth herein.

THE RACKETEERING OFFENSE

2.   Beginning on a date unknown and continuing to on or about April 7, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ, RIVERA, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, DEWESTER, V. GIL, MEDINA, ROBERT PEREZ, LUCERO, and GONZALES, and others known and unknown to the Grand Jury, being persons employed by and associated with the Black Angels criminal enterprise, which was an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly did conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise, through a pattern of racketeering activity, that is, through the commission of the acts set forth below.

THE PATTERN OF RACKETEERING ACTIVITY

3.   The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

Racketeering Act One

Conspiracy to Distribute Narcotics

1.   Beginning on a date unknown to the Grand Jury and

40

ER000132

1  continuing to on or about April 7, 2010, in Los Angeles,

2  Riverside, and San Bernardino Counties, within the Central

3  District of California, and elsewhere, defendants BARAJAS, J.

4  GIL, NAVARRO, HURTADO, JIMENEZ, RIVERA, C. VASQUEZ, MORAGA,

5  ESPINOZA, ALVAREZ, REYES, ARTEAGA, DEWESTER, CALDERON, V. GIL,

6  MEDINA, ROBERT PEREZ, LUCERO, and GONZALES, and others known and

7  unknown to the Grand Jury, conspired and agreed with each other

8  to knowingly and intentionally commit the following offenses:

9       a.   To distribute at least 50 grams of

10  methamphetamine, or at least 500 grams of a mixture or substance

11  containing a detectable amount of methamphetamine, a schedule II

12  controlled substance, in violation of Title 21, United States

13  Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

14       b.   To distribute at least five grams of

15  methamphetamine, or at least 50 grams of a mixture or substance

16  containing a detectable amount of methamphetamine, a schedule II

17  controlled substance, in violation of Title 21, United States

18  Code, Sections 841(a)(1) and 841(b)(1)(B)(viii);

19       c.   To distribute at least one kilogram of a mixture

20  or substance containing a detectable amount of heroin, a schedule

21  I narcotic drug controlled substance, in violation of Title 21,

22  United States Code, Sections 841(a)(1) and 841(b)(1)(A)(i); and

23       d.   To distribute at least 100 grams of a mixture or

24  substance containing a detectable amount of heroin, a schedule I

25  narcotic drug controlled substance, in violation of Title 21,

26  United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i).

27

28

41

1 | Racketeering Act Two

2 | Conspiracy to Commit Extortion

3 |     2. Beginning on an unknown date and continuing until on or

4 | about April 7, 2010, in Los Angeles, Riverside, and San

5 | Bernardino Counties, within the Central District of California,

6 | and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO,

7 | JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER,

8 | CALDERON, V. GIL, ROBERT PEREZ, and GONZALES, and others known

9 | and unknown to the Grand Jury, knowingly and intentionally

10 | conspired and agreed with each other to unlawfully obstruct,

11 | delay, and affect, and attempt to obstruct, delay, and affect,

12 | commerce as that term is defined in Title 18, United States Code,

13 | Section 1951, and the movement of articles and commodities in

14 | such commerce, by extortion, as that term is defined in Title 18,

15 | United States Code, Section 1951, in that defendants BARAJAS, J.

16 | GIL, NAVARRO, HURTADO, JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA,

17 | ALVAREZ, REYES, DEWESTER, CALDERON, V. GIL, ROBERT PEREZ, and

18 | GONZALES did obtain and attempt to obtain the property of

19 | narcotics distributors in Ontario, California, with their consent

20 | having been induced by the wrongful use of actual and threatened

21 | force, violence, and fear, in that defendants BARAJAS, J. GIL,

22 | NAVARRO, HURTADO, JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ,

23 | REYES, DEWESTER, CALDERON, V. GIL, ROBERT PEREZ, and GONZALES

24 | threatened physical violence unless the narcotics distributors

25 | paid portions of their narcotics proceeds to defendants BARAJAS,

26 | J. GIL, NAVARRO, HURTADO, JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA,

27 | ALVAREZ, REYES, DEWESTER, CALDERON, V. GIL, ROBERT PEREZ, and

28 | GONZALES, all in violation of Title 18, United States Code,

ER000134

1  Section 1951.

2  Racketeering Act Three

3  Extortion

4      3.   On or about June 30, 2009, in San Bernardino County,

5  within the Central District of California, defendant NAVARRO

6  knowingly and intentionally extorted money from defendant

7  ESTRADA, in violation of California Penal Code Sections 518, 519,

8  and 520.

9  Racketeering Act Four

10 Extortion

11     4.   On or about September 17, 2009, in San Bernardino

12 County, within the Central District of California, defendant

13 CALDERON knowingly and intentionally extorted money from F.A., in

14 violation of California Penal Code Sections 518, 519, and 520.

15 Racketeering Act Five

16 Armed Robbery

17     5.   On or about July 29, 2009, in San Bernardino County,

18 within the Central District of California, defendants C. VASQUEZ,

19 SANCHEZ, and ESPINOZA, each aiding and abetting the other, used a

20 firearm to rob a convenience store in Upland, California, in

21 violation of California Penal Code Sections 211 and 213.

22 Racketeering Act Six

23 Distribution Methamphetamine

24     6.   On or about July 31, 2009, in San Bernardino County,

25 within the Central District of California, defendant RIVERA

26 knowingly and intentionally distributed 4.4 grams of

27 methamphetamine, a schedule II controlled substance, in violation

28 of Title 21, United States Code, Section 841(a)(1).

1   Racketeering Act Seven

2   Possession with Intent to Distribute Methamphetamine

3       7.    On or about August 6, 2009, in San Bernardino County,

4   within the Central District of California, defendants RIVERA and

5   MEDINA knowingly and intentionally possessed with the intent to

6   distribute at least 50 grams, that is, approximately 219 grams,

7   of methamphetamine, a schedule II controlled substance, in

8   violation of Title 21, United States Code, Sections 841(a)(1) and

9   841(b)(1)(A)(viii).

10  Racketeering Act Eight

11  Extortion

12      8.    On or about September 30, 2009, in San Bernardino

13  County, within the Central District of California, defendants

14  BARAJAS and GONZALES knowingly and intentionally extorted money

15  from a narcotics distributor, in violation of California Penal

16  Code Sections 518, 519, and 520.

17  Racketeering Act Nine

18  Distribution of Methamphetamine

19      9.    On or about October 15, 2009, in San Bernardino County,

20  within the Central District of California, defendant BARAJAS

21  knowingly and intentionally distributed at least five grams, that

22  is, approximately 32.2 grams, of methamphetamine, a schedule II

23  controlled substance, in violation of Title 21, United States

24  Code, Sections 841(a)(1) and 841(b)(1)(B)(viii).

25  Racketeering Act Ten

26  Possession with Intent to Distribute Methamphetamine

27      10.   On or about October 15, 2009, in San Bernardino

28  County, within the Central District of California, defendants

44

ER000136

1  HURTADO and LUCERO knowingly and intentionally possessed with the
2  intent to distribute at least five grams, that is, approximately
3  32.2 grams, of methamphetamine, a schedule II controlled
4  substance, in violation of Title 21, United States Code, Sections
5  841(a)(1) and 841(b)(1)(B)(viii).

6  Racketeering Act Eleven

7  Extortion

8  　　　11.　　On or about October 20, 2009, in San Bernardino
9  County, within the Central District of California, defendant
10 NAVARRO knowingly and intentionally extorted money from defendant
11 MENDEZ in violation of California Penal Code Sections 518, 519,
12 and 520.

13 Racketeering Act Twelve

14 Possession with Intent to Distribute Methamphetamine

15 　　　12.　　On or about October 21, 2009, in San Bernardino
16 County, within the Central District of California, defendant
17 GONZALES knowingly and intentionally possessed with the intent to
18 distribute at least five grams, that is, approximately 8.2 grams,
19 of methamphetamine, a schedule II controlled substance, in
20 violation of Title 21, United States Code, Sections 841(a)(1) and
21 841(b)(1)(B)(viii).

22 Racketeering Act Thirteen

23 Possession with Intent to Distribute Methamphetamine

24 　　　13.　　On or about February 23, 2010, in San Bernardino
25 County, within the Central District of California, defendant
26 ARTEAGA knowingly and intentionally possessed with the intent to
27 distribute at least five grams, that is, approximately 24.9
28 grams, of methamphetamine, a schedule II controlled substance, in

45

1   violation of Title 21, United States Code, Sections 841(a)(1) and
2   841(b)(1)(B)(viii).

ER000138

COUNT THREE

[18 U.S.C. § 1959(a)(3)]

1.   At all times relevant to this Indictment, the Black Angels criminal enterprise, as described more particularly in Paragraphs One through Fourteen of the General Allegations, and Paragraphs Two through Four of Count One, and One through Nine of Count One, Part A, which paragraphs are incorporated and realleged herein as if set forth fully herein, constituted an enterprise as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact which was engaged in, and the activities of which affected, interstate and foreign commerce.   The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2.   At all times relevant to this Indictment, the Black Angels criminal enterprise, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, robbery, and extortion, in violation of the California Penal Code; and the distribution of controlled substances, including methamphetamine and heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

3.   On or about March 7, 2009, in San Bernardino County, within the Central District of California, for the purpose of maintaining and increasing his position in the Black Angels gang, an enterprise engaged in racketeering activity, defendant JUAN DIAZ, also known as "Swifty," assaulted persons with dangerous

47

1   weapons at a bar in Colton, California, in violation of
2   California Penal Code, Sections 240 and 245(a)(1), all in
3   violation of Title 18, United States Code, Section 1959(a)(3).

48

COUNT FOUR

[18 U.S.C. §§ 1959(a)(3), 2]

1.    Paragraphs One and Two of Count Three are hereby incorporated and realleged herein as if set forth in full.

2.    On or about July 29, 2009, in San Bernardino County, within the Central District of California, for the purpose of maintaining and increasing their position in the Ontario Black Angels gang, an enterprise engaged in racketeering activity, defendants CARLOS VASQUEZ, also known as ("aka") "Lil' Lazy," STEVEN ESPINOZA, aka "Little Loki," and MICHAEL SANCHEZ, aka "Dropper," each aiding and abetting the other, assaulted victim G.S. with a deadly weapon in a convenience store, located in Upland, California, in violation of California Penal Code Sections 240 and 245(a)(2), all in violation of Title 18, United States Code, Sections 1959(a)(3), and 2.

49

COUNT FIVE

[21 U.S.C. § 846]

1. Paragraphs One through Fourteen of the General Allegations are re-alleged and incorporated herein by reference as though fully set forth herein.

A. **OBJECTS OF THE CONSPIRACY**

Beginning on a date unknown, and continuing to on or about April 7, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER, JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, CALDERON, V. GIL, ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ, VENEGAS, VEGA, ROBERT PEREZ, MAGALLANES, KISSLING, LUCERO, LAGUNA, RICHARDS, SILVA, ROMERO, TORRES-CRUZ, MEZA, ARANDA, MARTINEZ, GONZALES, TOLSON, MENDEZ, and COOK, and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed with each other to commit the following offenses:

1. To distribute at least 50 grams of methamphetamine, or at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

2. To distribute at least five grams of methamphetamine, or at least 50 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections

ER000142

841(a)(1) and 841(b)(1)(B)(viii);

    3.    To distribute at least one kilogram of a mixture or substance containing a detectable amount of heroin, a schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(i); and

    4.    To distribute at least 100 grams of a mixture or substance containing a detectable amount of heroin, a schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i).

B.   <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED</u>

    The objects of the conspiracy were to be accomplished in substance as follows:

    1.    Defendants BARAJAS, J. GIL, and NAVARRO, and others, would direct the activities of the Black Angels gang and its associates, specifically insofar as those activities involved the distribution of narcotics, the collection and distribution of "taxed" drug proceeds, and the commission of crimes of violence.

    2.    Defendants BARAJAS and NAVARRO, and others, would meet with Mexican Mafia leaders and associates to report on the activities of the gang, receive instructions from the Mexican Mafia, and provide narcotics and money to the Mexican Mafia arising from the gang's extortion, narcotics distribution, and violent criminal activities.

    3.    Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER, CALDERON, V. GIL, ROBERT PEREZ, and GONZALES, and others, would permit narcotics traffickers to distribute narcotics in the geographic

ER000143

1  area controlled by the Black Angels gang in return for a

2  percentage of the narcotics proceeds that were sold in the areas

3  controlled by the Black Angels gang.

4      4.   Defendants J. GIL, NAVARRO, ALCALA, JIMENEZ, RIVERA,

5  DIAZ, C. VASQUEZ, ALVAREZ, REYES, ARTEAGA, JIRON, MORALES,

6  MORENO, SANCHEZ, PRIETO, HERNANDEZ, and VEGA, and others, would

7  obtain firearms and other dangerous weapons for Black Angels gang

8  members to be used to enforce the authority of the Black Angels

9  gang, to maintain the Black Angels members and associates'

10 ability to engage in drug trafficking within the neighborhoods

11 controlled by the gang, and to exclude others from drug

12 trafficking in the neighborhoods controlled by the Black Angels

13 gang.

14     5.   Defendants BARAJAS, NAVARRO, JIMENEZ, RIVERA, DIAZ, C.

15 VASQUEZ, ESPINOZA, MORALES, SANCHEZ, CALDERON, and VEGA, and

16 others, would engage in acts of violence in order to enforce the

17 authority of the Black Angels gang, as well as maintain the

18 gang's ability to control the drug trafficking activity in the

19 territory controlled by the Black Angels gang.

20     6.   Defendants RIVERA, MEDINA, ROBERT PEREZ, SILVA, ROMERO,

21 TORRES-CRUZ, and MEZA, and other narcotics suppliers, would

22 obtain narcotics that were then distributed to members and

23 associates of the Black Angels gang.

24     7.   Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ,

25 RIVERA, PORTILLO, MORAGA, REYES, ARTEAGA, QUIROZ, MORALES, A.

26 CASTRO, CALDERON, V. GIL, ESTRADA, MEDINA, PRIETO, HERNANDEZ,

27 VENEGAS, VEGA, MAGALLANES, KISSLING, LUCERO, LAGUNA, RICHARDS,

28 SILVA, ROMERO, TORRES-CRUZ, MARTINEZ, GONZALES, TOLSON, MENDEZ,

52

1 and COOK, and others, would distribute narcotics in prison and in
2 the territory controlled by the Black Angels gang.

3     8. Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, RIVERA,
4 PORTILLO, ALVAREZ, DIAZ, REYES, JIRON, A. CASTRO, V. GIL,
5 ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, VENEGAS, LUCERO, and
6 ARABDA, and others, would assist Black Angels gang members and
7 associates in the commission of violent crimes and narcotics
8 trafficking by providing access to telephones to be used for
9 criminal activity, conveying information regarding the criminal
10 activities of the Black Angels gang to incarcerated Black Angels
11 gang members and members of the Mexican Mafia, smuggling
12 narcotics into and out of jails and prisons, and concealing
13 contraband held by the gang to avoid the contraband's detection
14 by law enforcement.

15     9. Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, RIVERA,
16 PORTILLO, ALVAREZ, REYES, A. CASTRO, V. GIL, LOPEZ, MEDINA,
17 ROBERT PEREZ, LAGUNA, SILVA, TORRES-CRUZ, GONZALES, and TOLSON,
18 and others, would communicate with members of the Black Angels
19 gang and their associates to notify them of the presence of law
20 enforcement in the area controlled by the gang and report on
21 recent arrests, search warrants, and other law enforcement
22 activity conducted against members of the Black Angels gang or
23 narcotics traffickers making extortion payments to the gang.

24 C.   <u>OVERT ACTS</u>

25     In furtherance of the conspiracy, and to accomplish the
26 objects of the conspiracy, defendants BARAJAS, J. GIL, NAVARRO,
27 HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ,
28 MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER,

ER000145

1 JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, ARANDA, CALDERON, V.

2 GIL, ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ,

3 VENEGAS, VEGA, ROBERT PEREZ, MAGALLANES, KISSLING, LUCERO,

4 LAGUNA, RICHARDS, SILVA, ROMERO, TORRES-CRUZ, MEZA, MARTINEZ,

5 GONZALES, PERALTA, TOLSON, MENDEZ, and COOK, and others known and

6 unknown to the Grand Jury, committed various overt acts, within

7 the Central District of California, and elsewhere, including the

8 overt acts numbered one through 186 as set forth in Count One of

9 this Indictment, which are hereby incorporated by reference, on

10 or about the dates specified therein.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

54

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about July 31, 2009, in San Bernardino County, within the Central District of California, defendant CARLOS RIVERA, also known as "Chino," knowingly and intentionally distributed approximately 4.4 grams of methamphetamine, a schedule II controlled substance.

55

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about July 31, 2009, in San Bernardino County, within the Central District of California, defendants ROBERT TOLSON and CARL COOK knowingly and intentionally possessed with the intent to distribute approximately 4.4 grams of methamphetamine, a schedule II controlled substance.

56

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about August 6, 2009, in San Bernardino County, within the Central District of California, defendant INEZ MEZA, also known as "Gordo," knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 27.8 grams, of methamphetamine, a schedule II controlled substance.

ER000149

COUNT NINE

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii)]

On or about August 6, 2009, in San Bernardino County, within the Central District of California, defendant INEZ MEZA, also known as "Gordo," knowingly and intentionally distributed at least 50 grams, that is, approximately 219 grams, of methamphetamine, a schedule II controlled substance.

## COUNT TEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii)]

On or about August 6, 2009, in San Bernardino County, within the Central District of California, defendants CARLOS RIVERA, also known as "Chino," and JESSICA MEDINA knowingly and intentionally possessed with the intent to distribute at least 50 grams, that is, approximately 219 grams, of methamphetamine, a schedule II controlled substance.

59

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii)]

On or about August 25, 2009, in San Bernardino County, within the Central District of California, defendant SANTACRUZ SILVA, also known as "Jose," knowingly and intentionally distributed at least 50 grams, that is, approximately 72.6 grams, of methamphetamine, a schedule II controlled substance.

60

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii)]

On or about August 25, 2009, in San Bernardino County, within the Central District of California, defendant AGUSTIN ANDALON knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 72.6 grams, of methamphetamine, a schedule II controlled substance.

61

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)]

On or about August 25, 2009, in San Bernardino County, within the Central District of California, defendant SANTACRUZ SILVA, also known as ("aka") "Jose," and JOSE ROMERO knowingly and intentionally distributed approximately 3.4 grams of methamphetamine, a schedule II controlled substance.

62

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)]

On or about August 25, 2009, in San Bernardino County, within the Central District of California, defendant ROGELIO PERALTA possessed with intent to distribute approximately 3.4 grams of methamphetamine, a schedule II controlled substance.

63

1
2
3
4
5
6
7
8

                              COUNT FIFTEEN

                [21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

     On or about October 15, 2009, in San Bernardino County,
within the Central District of California, defendant ARMANDO
BARAJAS, also known as "Mando," knowingly and intentionally
distributed at least five grams, that is, approximately 32.2
grams, of methamphetamine, a schedule II controlled substance.

64

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about October 15, 2009, in San Bernardino County, within the Central District of California, defendants JOSE HURTADO, also known as "Solo," and JESSTINE LUCERO knowingly and intentionally possessed with the intent to distribute at least five grams, that is, approximately 32.2 grams, of methamphetamine, a schedule II controlled substance.

65

## COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about October 21, 2009, in San Bernardino County, within the Central District of California, defendant LUPE GONZALES knowingly and intentionally possessed with the intent to distribute at least five grams, that is, approximately 8.2 grams, of methamphetamine, a schedule II controlled substance.

66

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)]

On or about December 1, 2009, in San Bernardino County, within the Central District of California, defendant SANTIAGO MENDEZ possessed with intent to distribute approximately 3.9 grams of methamphetamine, a schedule II controlled substance.

67

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about February 24, 2010, in San Bernardino County, within the Central District of California, defendant ROSE MARIE MAGALLANES knowingly and intentionally possessed with the intent to distribute at least five grams, that is, approximately 49.1 grams, of methamphetamine, a schedule II controlled substance.

68

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about February 23, 2010, in San Bernardino County, within the Central District of California, defendant ZACARIAS ARTEAGA, also known as "Drew," knowingly and intentionally possessed with the intent to distribute at least five grams, that is, approximately 24.9 grams, of methamphetamine, a schedule II controlled substance.

69

COUNT TWENTY-ONE

[18 U.S.C. §§ 924(c)(1)(A)(i), (c)(1)(A)(ii), (c)(1)(A)(iii)]

On or about June 12, 2009, in San Bernardino County, within the Central District of California, defendant FERNANDO MORALES, also known as "Sicko" ("MORALES"), knowingly used, carried, brandished, and discharged a firearm, namely, a 9mm Beretta handgun, model 92FS, bearing serial number DS007056, during and in relation to, and in furtherance of, a crime of violence, namely, the racketeering conspiracy set forth in Count One of this Indictment, a violation of Title 18, United States Code, Section 1962(d).

70

COUNT TWENTY-TWO

[18 U.S.C. § 922(g)(1)]

On or about June 23, 2009, in San Bernardino County, within the Central District of California, defendant MARLON JIRON, also known as "Bow Easy" ("JIRON"), knowingly possessed a firearm, namely, a 9 mm Beretta semi-automatic handgun, serial number DS007056, in and affecting interstate and foreign commerce.

Such possession occurred after defendant JIRON had been convicted of at least one of the following crimes punishable by imprisonment for a term exceeding one year:

1. Assault With a Firearm, in violation of California Penal Code Section 245, in the Superior Court of the State of California, County of San Bernardino, Case Number FWV16469, on or about October 29, 1998;

2. Possession of Narcotic Controlled Substance, in violation of California Health and Safety Code Section 11377, in the Superior Court of the State of California, County of San Bernardino, Case Number FWV701984, on or about August 27, 2008.

71

## COUNT TWENTY-THREE

### [18 U.S.C. § 922(g)(1)]

On or about July 22, 2009, in San Bernardino County, within the Central District of California, defendant CARLOS RIVERA, also known as "Chino" ("RIVERA"), knowingly possessed a firearm, namely, a Colt model Agent, .38 Special caliber revolver, bearing serial number H98877, and ammunition, namely six rounds of .38 Special caliber ammunition, bearing the head stamp of "W-W SUPER," in and affecting interstate and foreign commerce.

Such possession occurred after defendant RIVERA had been convicted of the following crime punishable by imprisonment for a term exceeding one year: Assault with a Deadly Weapon, in violation of California Penal Code Section 245, in the Superior Court for the State of California, County of San Bernardino, Case Number FWV800678, on or about April 25, 2008.

ER000164

COUNT TWENTY-FOUR

[18 U.S.C. § 922(d)(1)]

On or about July 22, 2009, in San Bernardino County, within the Central District of California, defendant DAVID HERNANDEZ, knowingly sold a firearm, namely, a Colt model Agent, .38 Special caliber revolver, bearing serial number H98877, and ammunition, namely six rounds of .38 Special caliber ammunition, bearing the head stamp of "W-W SUPER," in and affecting interstate and foreign commerce, to defendant CARLOS RIVERA, also known as "Chino" ("RIVERA"), knowing and having reasonable cause to believe that RIVERA had been convicted of a crime punishable by imprisonment for a term exceeding one year.

73

COUNT TWENTY-FIVE

[18 U.S.C. § 924(c)]

On or about September 4, 2009, in San Bernardino County, within the Central District of California, defendant JAMES KISSLING, also known as "Casper," knowingly possessed a firearm, namely, a loaded RG Industries model RG14, .22 Long Rifle caliber revolver, bearing serial number L825887, during and in relation to, and in furtherance of, a drug trafficking crime, namely, the conspiracy to distribute narcotics set forth in Count Five of this Indictment, a violation of Title 21, United States Code, Section 846.

74

COUNT TWENTY-SIX

[18 U.S.C. § 924(c)]

On or about December 1, 2009, in San Bernardino County, within the Central District of California, defendant SANTIAGO MENDEZ knowingly possessed a firearm, namely, a Raven Arms model MP-25, .25 caliber handgun, bearing serial number 1454308, during and in relation to, and in furtherance of, a drug trafficking crime, namely, the conspiracy to distribute narcotics set forth in Count Five of this Indictment, a violation of Title 21, United States Code, Section 846.

ER000167

COUNT TWENTY-SEVEN

[18 U.S.C. § 922(g)(1)]

On or about December 9, 2009, in San Bernardino County, within the Central District of California, defendant ALBERT MORENO, also known as "Pelon" ("MORENO"), knowingly possessed a firearm, namely, a Ruger model P89 9mm caliber semi-automatic pistol, bearing serial number 304-42711, and ammunition, namely eleven rounds of 9mm Luger ammunition, bearing the head stamp of "WIN," and one round of 9mm Luger ammunition, bearing the head stamp of "FC," in and affecting interstate and foreign commerce.

Such possession occurred after defendant MORENO had been convicted of at least one of the following crimes punishable by imprisonment for a term exceeding one year:

1. Willful Discharge of a Firearm, in violation of California Penal Code Section 246.3, in the Superior Court of the State of California, County of San Bernardino, Case Number FWV021853, on or about February 14, 2001;

2. Felon in Possession of a Firearm, in violation of California Penal Code Section 12021, in the Superior Court of the State of California, County of San Bernardino, Case Number FWV033085, on or about March 18, 2005;

3. Possession of a Controlled Substance for Sale, in violation of California Health and Safety Code Section 11378, in the Superior Court of the State of California, County of Riverside, Case Number RIF126798, on or about April 11, 2008.

76

COUNT TWENTY-EIGHT

[21 U.S.C. § 843(b)]

On or about August 13, 2009, in San Bernardino County, within the Central District of California, defendant ANDREA RICHARDS knowingly used a communication facility, that is, a telephone, in committing and causing and facilitating the commission of a felony drug offense, namely, a conspiracy to distribute at least five grams of methamphetamine, a schedule II narcotic drug controlled substance, a violation of Title 21, United States Code, Section 846.

77

1

2

3      COUNT TWENTY-NINE

4      [21 U.S.C. § 843(b)]

     On or about September 9, 2009, in San Bernardino County,
within the Central District of California, defendant BIANCA
LAGUNA knowingly used a communication facility, that is, a
telephone, in committing and causing and facilitating the
commission of a felony drug offense, namely, a conspiracy to
distribute at least five grams of methamphetamine, a schedule II
narcotic drug controlled substance, a violation of Title 21,
United States Code, Section 846.

78

COUNT THIRTY

[21 U.S.C. § 843(b)]

On or about September 28, 2009, in San Bernardino County, within the Central District of California, defendant ANGEL ARANDA knowingly used a communication facility, that is, a telephone, in committing and causing and facilitating the commission of a felony drug offense, namely, a conspiracy to distribute at least five grams methamphetamine, a schedule II narcotic drug controlled substance, a violation of Title 21, United States Code, Section 846.

A TRUE BILL

"/s/"

Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

*David A. Goodman, Asst. U.S. Atty*
*Deputy Chief, Criminal Division, FOR:*

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Violent and Organized Crimes Section

CHRISTOPHER BRUNWIN
Assistant United States Attorney
Deputy Chief, Violent and Organized Crimes Section

REEMA M. EL-AMAMY
Assistant United States Attorney
Violent and Organized Crimes Section

JUSTIN R. RHOADES
Assistant United States Attorney
Violent and Organized Crimes Section

ER000171

2   California Bar No. 67930
    205 ...
3   Los Angeles, CA 90012
    Tel: (213)627-1793
4   Fax: (213)627-1711
    Email: Attyjoewalsh@aol.com
5
    Attorney for Defendant
6   JESSICA MEDINA
    Deft. No. 27
7

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,    )    Case No. CR-10-351-ODW-27
                                 )
12          Plaintiff,           )    **NOTICE OF MOTION AND MOTION**
                                 )    **TO SUPPRESS WIRETAP**
13          v.                   )    **EVIDENCE; DECLARATION OF**
                                 )    **JESSICA MEDINA; MEMORANDUM**
14  JESSICA MEDINA,              )    **OF POINTS AND AUTHORITIES**
                                 )
15          Defendant.           )    Date: August 13, 2012
                                 )    Time: 10:00 a.m.
16                               )    Ctrm: Hon. Otis D. Wright II
                                 )
17  ─────────────────────────── )

18

19

20  TO THE UNITED STATES ATTORNEY:

21          PLEASE TAKE NOTICE that on August 13, 2012, or as soon

22  thereafter as counsel  may be heard, the defendant JESSICA MEDINA

23  will move this Court for an order suppressing all evidence seized

24  as a result of unlawful electronic surveillance, and all derivative

25  evidence  obtained  as  a  result  of  those  unlawful  seizures.

26  Alternatively, the defendant requests a hearing pursuant to <u>Franks</u>

27  <u>v. Delaware</u>, 483 U.S. 154 (1978).

28          This motion is based on the attached memorandum of points

    and  authorities,  declaration,  exhibits,  any  and  all  files  and

1 | records in this case, and such additional evidence and argument as
2 | may be presented to the Court at or before a hearing on this
3 | matter.

4 |

5 | Dated: July 13, 2012         /s/ Joseph F. Walsh

6 |                            JOSEPH F. WALSH
7 |                            Attorney for Defendant
                           JESSICA MEDINA
8 |                            Deft. No. 27

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

ER000173

1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   REEMA M. EL-AMAMY (California State Bar Number 237743)
4  Assistant United States Attorney
   Violent and Organized Crime Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone:  (213) 894-0552
7       Facsimile:  (213) 894-3713
        E-mail: reema.el-amamy@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,  )  CR No. 10-351-ODW
                               )
13              Plaintiff,     )  **GOVERNMENT'S OPPOSITION TO DEFENDANT**
                               )  **JESSICA MEDINA'S MOTION TO SUPPRESS**
14              v.             )  **WIRETAP EVIDENCE; EXHIBITS**
                               )
15  ARMANDO BARAJAS, et al.,   )
                               )
16              Defendants.    )
                               )
17  _____)

18

19      Plaintiff United States of America, through its counsel of

20  record Assistant United States Attorney Reema M. El-Amamy, hereby

21  files its Opposition to Defendant Jessica Medina's Motion to

22  Suppress Wiretap Evidence.

23  //

24  //

25  //

26

27

28

1    The Government's Opposition is based on the attached

2 memorandum of points and authorities, the files and records in

3 this case, and any additional argument or evidence that it may

4 present at any hearing on this matter.

5

6 DATED: August 27, 2012

7
                                    Respectfully submitted,
8
                                    ANDRÉ BIROTTE JR.
9                                   United States Attorney

10                                  ROBERT E. DUGDALE
                                    Assistant United States Attorney
11                                  Chief, Criminal Division

12

13                                  _____/s/_____
                                    REEMA M. EL-AMAMY
14                                  Assistant United States Attorney

15
                                    Attorneys for Plaintiff
16                                  United States of America

17

18

19

20

21

22

23

24

25

26

27

28
                                    2

<u>DECLARATION OF KRIS LAVOIE</u>

1      I, KRIS LAVOIE, declare as follows:

2      1.   I am a Corporal with the Ontario Police Department. I am the affiant for the investigation described in wiretap applications CR Misc. No. 09-0038-R through CR Misc. No. 09-0038(F)-R.

     2.   I drafted the initial draft of the affidavit for CR Misc. No. 09-0038(D)-R prior to the date that law enforcement officers identified Carlos Rivera as the primary user of Target Telephone 9. This initial draft included the portion of the affidavit that discussed my ability to conduct a trash search of the residence of the user of Target Telephone 9.

     3.   After I identified Carlos Rivera, I updated my affidavit to include him as a target subject, and also included in that description the residence that was associated with his driver's license at that time - 815 North Vineyard Avenue, Apartment B.

     4.   Based on my training and experience, I am aware that individuals who are engaged in criminal activity sometimes do not list the address that they actually live at on their driver's license, and sometimes give an address to their parole agent that they do not actually live at in order to conceal their criminal activity from law enforcement. By July 17, 2009, I had not personally confirmed that Carlos Rivera actually resided at the Vineyard address. However, I was aware that law enforcement officers did see Carlos Rivera in the area near the Vineyard address when they conducted surveillance on July 3, 2009, as described in my affidavit.

1      5.   At the same time, while I reviewed my affidavit more

2 than a dozen times and made numerous revisions to it prior to

3 submitting it to the Court, I inadvertently failed to update the

4 section related to trash searches to reflect the Vineyard address

5 that was associated with Carlos Rivera.  The paragraph should

6 state that I was aware that 815 North Vineyard Avenue, Apartment

7 B is an address where Carlos Rivera possibly resides.

8      6.   815 North Vineyard Avenue is a multi-unit location

9 where multiple residents live.  On August 27, 2012, I conducted

10 an aerial flyover of the address.  I was able to observe that,

11 behind the residence, there is more than one dumpster in the

12 alley where residents from 815 North Vineyard Avenue and other

13 nearby apartments can throw out their trash.  What is not visible

14 from the street is that, in the alley behind the location, there

15 is a wrought-iron fence, and, behind the fence, there are

16 approximately four individual trash cans believed to be

17 associated with the units in 815 North Vineyard.  There are also

18 another approximately four trash cans outside in the alley that

19 are believed to be associated with the neighboring apartment

20 complex.  Based on my observation, the four trash cans behind

21 the fence would not be visible from the street or accessible to

22 law enforcement unless it was a trash collection day and, only

23 then, if someone moved the trash cans out from behind the fences.

24 Based on my observation, an individual living at 815 North

25 Vineyard, at least as of August 27, 2012, could throw trash away

26 in any one of the approximately eight individual trash cans as

27 well as more than one nearby dumpster in the alley.

28

2

1     7.   On August 26, 2012, I consulted with another law

2 enforcement officer and learned that Parole LEADS, a computer

3 system utilized to access parolee records, contains information

4 related to individuals who on active parole as well as

5 individuals who have been discharged from parole.

6     I declare under penalty of perjury under the laws of the

7 United States that the foregoing is true and correct to the best

8 of my knowledge and belief.

9

10 Executed at _OPD AirSupport_, California on August <u>27</u>, 2012.

11

12 

13        KRIS LAVOIE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT E

ER000179

```
 1  THOMAS P. O'BRIEN
    United States Attorney
 2  CHRISTINE C. EWELL
    Assistant United States Attorney
 3  Chief, Criminal Division
    REEMA M. EL-AMAMY(SBN: 237743)
 4  Assistant United States Attorney
    Violent and Organized Crime Section
 5       1500 United States Courthouse
         312 North Spring Street
 6       Los Angeles, California 90012
         Telephone: (213) 894-0552
 7       Facsimile: (213) 894-3713
         E-mail:    Reema.El-Amamy@usdoj.gov
 8
    Attorneys for Plaintiff
    United States of America
10
12
13  IN THE MATTER OF THE        )   CR Misc. No. 09-0038(D)-R
    APPLICATION OF THE UNITED    )
14  STATES OF AMERICA FOR AN     )
    ORDER AUTHORIZING (1) THE    )   APPLICATION
15  INTERCEPTION OF WIRE         )
    COMMUNICATIONS; (2) THE      )
16  INSTALLATION AND USE OF A    )   (UNDER SEAL PURSUANT TO
    PEN REGISTER AND A TRAP AND )   18 U.S.C. § 2518(8))
17  TRACE DEVICE AND (3) THE     )
    RELEASE OF SUBSCRIBER        )
18  INFORMATION AND CELL SITE    )
    INFORMATION                  )
19  _____)
```

CLERK U.S. DISTRICT COURT

JUL 17 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

```
20       I, Reema M. El-Amamy, an attorney for the United States

21  Department of Justice, declare and state:

22  Authority to Make Application

23       1.  I am an "investigative or law enforcement officer of the

24  United States" within the meaning of Section 2510(7) of Title 18,

25  United States Code, that is, an attorney authorized by law to

26  prosecute or participate in the prosecution of offenses

27  enumerated in Section 2516 of Title 18, United States Code.  I am

28  also an attorney for the government as defined in Rule 1 of the
```

1  Federal Rules of Criminal Procedure, and, therefore, pursuant to

2  18 U.S.C. § 2516(3), I may apply to a federal judge of competent

3  jurisdiction for an order authorizing and approving the

4  interception of wire communications and for orders authorizing

5  the installation and use of pen registers and trap and trace

6  devices, and disclosure of subscriber information.

7     2.  Pursuant to Section 2516 of Title 18, United States

8  Code, an appropriate official of the Criminal Division, United

9  States Department of Justice, specifically Kenneth A. Blanco,

10  Deputy Assistant Attorney General, Criminal Division, having been

11  specially designated by the Attorney General pursuant to Order

12  Number 3055-2009, dated February 26, 2009, has approved this

13  application for an order authorizing the interception of wire

14  communications.  Attached to this application as Exhibit A, and

15  incorporated by reference herein, is a copy of that order and the

16  memorandum of authorization approving this application.

17  **Identification of Target Telephones**

18     3.  This application seeks an Order pursuant to 18 U.S.C.

19  § 2518 authorizing the interception of wire communications,

20  including push-to-talk (digital dispatch/ direct connect)

21  communications and contemporaneously received or retrieved voice

22  mail, to and from, and any background conversations intercepted

23  in the vicinity of, the following telephone number:

24         a.  the continued interception of a Sprint/Nextel

25            cellular telephone subscribed to Whaterver, Crazt Legs,

26            at 1925 Eloise Way, Upland, CA 91784, with a telephone

27            number of 909-489-8277, IMSI # 000009097178960, and

28

2

believed to be used primarily by DAVID NAVARRO (**"Target Telephone #5"**) or any subsequently changed telephone number assigned to the same ESN with the same subscriber information, and/or any subsequently changed ESN assigned to the same telephone number with the same subscriber information;

b.   the initial interception of a Metro PCS cellular telephone, with unknown subscriber information, with a telephone number of 909-545-1313, an unknown IMSI/ESN number  and believed to be used primarily by Daniel REYES   (**"Target Telephone #7"**);

c.   the initial interception of a pre-paid T-Mobile cellular telephone, subscribed to Jose Silba, without an address, with a telephone number of 909-319-2187, IMSI #310260493015199, and believed to be used primarily by Jose LNU (**"Target Telephone #8"**); and

d.   the initial interception of a Sprint/Nextel cellular telephone, subscribed to Jessica Medina at P.O. Box 54988, Irvine, CA, with a telephone number of 909-419-9937, UFMI 126*295*2097, IMSI #316010154431162, and believed to be used primarily by Carlos RIVERA (**"Target Telephone #9"** and collectively with **Target Telephone #5, Target Telephone #7** and **Target Telephone #8**, the **"Target Telephones"**) or any subsequently

3

USA000522

1           changed telephone number assigned to the same ISMI or

2           ESN with the same subscriber information, and/or any

3           subsequently changed ISMI or ESN assigned to the same

4           telephone number with the same subscriber information.

5

6 **Statement of Application**

7     4.   I have discussed the circumstances of the current

8 investigation and this application with Task Force Officer Kris

9 Lavoie of the Drug Enforcement Administration ("DEA") who has

10 assisted in conducting that investigation. I have examined the

11 affidavit of TFO Lavoie, attached to the application as Exhibit B

12 and incorporated by reference herein, and determined that it

13 alleges a full and complete statement of facts which (i)

14 justifies our belief that the orders requested below should be

15 issued and (ii) states the following:

16       a.   The DEA is conducting an investigation into

17 possible violations of offenses enumerated in 18 U.S.C. § 2516,

18 to include the following: Racketeer Influenced and Corrupt

19 Organizations ("RICO") offenses, in violation of Title 18, United

20 States Code, Sections 1962 and 1963; violent crimes in aid of a

21 racketeering enterprise, in violation of Title 18, United States

22 Code, Section 1959; manufacture, distribution, and possession

23 with intent to distribute a controlled substance, in violation of

24 Title 21, United States Code, Section 841(a)(1); conspiracy to

25 distribute a controlled substance, in violation of Title 21,

26 United States Code, Sections 846 and 841(a)(1); use of a

27 communication facility in committing or in causing or

28 facilitating the commission of a felony narcotics offense, in

           USA000523

1  violation of Title 21, United States Code, Section 843(b);
2  laundering of monetary instruments, in violation of Title 18,
3  United States Code, Section 1956; engaging in monetary
4  transactions in property derived from specified unlawful
5  activity, in violation of Title 18, United States Code, Section
6  1957; felon in possession of a firearm, in violation of Title 18,
7  United States Code, Section 922(g)[1] (the "Target Offenses") by
8  persons including FNU LNU, also known as "Alex," ("ALEX"), David
9  Navarro ("NAVARRO"), Steve Osker Hoyos ("HOYOS"), Sara Leticia
10 Misquez ("MISQUEZ"), FNU LNU, also known as Chipo ("CHIPO"),
11 Steven Hernandez ("HERNANDEZ"), Larry Cuevas ("CUEVAS"), Patrick
12 Orosco ("OROSCO"), Armando Venegas ("VENEGAS"), Richard Castorena
13 ("CASTORENA"), Mario LNU ("MARIO"), Lucio Gallardo Diaz ("DIAZ"),
14 Ray Perez ("PEREZ"), Shawn Young ("YOUNG"), Carmela LNU
15 ("CARMELA"), FNU LNU, also known as "Cabezon" ("CABEZON"),
16 Gabriel Macias ("MACIAS"), Paul Onsurez ("ONSUREZ"), Juan Diaz
17 ("DIAZ"), FNU LNU ("SOS"),   Victor Carrasco Felix ("FELIX"), FNU
18 LNU ("JOSE LNU"), Gilberto Gutierrez ("G. GUTIERREZ"), Jose
19 Gutierrez ("J. GUTIERREZ"), Teresa Castro ("CASTRO"), Deborah
20 Cortez ("CORTEZ"), Roberto Sosa ("SOSA"), Enrique Jimenez
21 ("JIMENEZ"), Salvador Martinez ("MARTINEZ"), Daniel Reyes
22 ("REYES"), FNU LNU, also known as "M," ("M"), Juan Gil ("GIL"),
23 Armando Barajas ("BARAJAS"), "Red Eye,"  Marlon Jiron ("JIRON"),
24 Fernando Morales ("MORALES"), Carlos Vasquez ("VASQUEZ"), Steven
25

26     [1] Although not a predicate offense for wire interception
   under 18 U.S.C. § 2516 and thus not listed as a Target Offense,
27 law enforcement is also investigating the Target Subjects for
   violation of 18 U.S.C. § 2, aiding and abetting the substantive
28 offenses.

5

USA000524

1  Espinoza ("ESPINOZA"), Ernest Castillo ("CASTILLO"), Monica
2  Cornejo ("CORNEJO"), Fernando Lopez ("LOPEZ") "Rude Boy",
3  "Boxer", "El Oso", Rebecca Estrada ("ESTRADA") also known as
4  "Becky", Octavio Pena ("PENA") and others yet unknown("the Target
5  Subjects").

6        b.   The communications of the Target Subjects and
7  others known, unknown, or unidentified are to be intercepted.
8  Wire communications concerning the Target Offenses will be
9  obtained through the interceptions of the Target Telephones.  In
10 particular, the communications to be intercepted will concern,
11 and will provide evidence pertaining to, the goals of this
12 investigation, including the following: (i) the precise nature,
13 extent, and methods of operation of the illegal activities
14 (including the Target Offenses) of the Target Subjects and others
15 known, unknown or unidentified, including the dates, times, and
16 places for the commission of the drug trafficking activities;
17 (ii)  the acquisition and distribution of controlled substances
18 and money by the Target Subjects and others known, unknown or
19 unidentified; (iii) the identities and roles of accomplices,
20 aiders and abettors, co-conspirators and other participants in
21 the drug trafficking organization including any the known and
22 unknown suppliers, distributors and purchasers of controlled
23 substances and the individuals involved in laundering or
24 transporting drug trafficking proceeds; (iv) the locations at
25 which controlled substances, records, money and contraband are
26 stored; (v) the administration, control, management and
27 disposition of proceeds of drug trafficking, including the manner
28 in which any drug proceeds are laundered; and (vi) the existence,

6

USA000525

1  location and source of resources used to finance their illegal

2  activities ("the goals of the investigation");

3          c.   The Target Telephones are being used, or are about

4  to be used in connection with the commission of one or more the

5  Target Offenses as detailed in Exhibit B; and

6          d.   Because of the nature of the investigation,

7  additional communications concerning the Target Offenses will

8  occur after the first has been intercepted.  Therefore, the

9  authorization for interception should not automatically terminate

10  after the first interception but should continue until

11  communications are intercepted which fully achieve the goals of

12  the investigation or for a period of 30 days (defined as 24 hour

13  periods), whichever occurs first.

14          e.   Normal investigative procedures have been tried

15  and have failed, reasonably appear unlikely to succeed if

16  continued, reasonably appear unlikely to succeed if tried, or are

17  too dangerous.

18          f.   The relevant facts concerning all previous

19  applications known to me and TFO Lavoie which were made to any

20  judge for authorization to intercept wire, oral, or electronic

21  communications involving any of the Target Subjects or facilities

22  or places specified in the affidavit, and the action taken by the

23  judge on each such application.

24          g.   Pursuant to 18 U.S.C. §§ 3122 and 3123, I certify

25  that the information likely to be obtained from the pen register

26  (defined in 18 U.S.C. § 3127(3)) and trap and trace device

27  (defined in 18 U.S.C. § 3127(4)) on the Target Telephones is

28  relevant to the ongoing criminal investigation being conducted by

1  the DEA in connection with possible violations of the Target

2  Offenses, as detailed in Exhibit B.[2]

3          h.    Pursuant to 18 U.S.C. §§ 2703(d) and 3123, the

4  attached affidavit demonstrates specific and articulable facts

5  exist to show that there are reasonable grounds to believe that

6  the information likely to be obtained from Target Telephones'

7  cell site information and any other requested records or other

8  non-content information pertaining to a telephone subscriber or

9  customer, are relevant and material to the ongoing criminal

10  investigation of the Target Subjects that is being conducted by

11  the DEA as detailed in Exhibit B.

12  **Requested Orders: Interception and Pen Register/ Trap and Trace**

13      5.    On the basis of the allegations contained in this

14  application, on the basis of the affidavit of TFO Lavoie, and

15  pursuant to the power conferred on this court by 18 U.S.C. §§

16  2518, 2703, 3122 and 3123, I request this Court issue the

17  following orders:

18          a.    the DEA and all other law enforcement agencies

19  investigating this matter, and individuals operating under a

20  contract with the government and acting under the supervision of

21  these law enforcement agencies are authorized to intercept wire

22  communications, including push-to-talk (digital dispatch/ direct

23

24      [2]  _See, e.g._, _Brown v. Waddell_, 50 F.3d 285, 290 (4th Cir.
1995) (Section 3122 does not require the government to establish
25  probable cause to obtain a pen register or trap and trace
device); _United States v. Fregoso_, 60 F.3d 1314, 1320 (8th Cir.
26  1995) (holding that the judicial role under Section 3123(a) is
ministerial in nature because a proper application under Section
27  3122 mandates entry of the order); _See_ _Smith v. Maryland_, 442
U.S. 735, 742-44 (1979) ("a person has no legitimate expectation
28  of privacy in information he voluntarily turns over to third
parties.").

USA000527

1  connect) communications and contemporaneously received or
2  retrieved voice mail, to and from, and any background
3  conversations intercepted in the vicinity of, the Target
4  Telephones.

5         b.    The communications of the Target Subjects and
6  others known, unknown, or unidentified are to be intercepted.

7         c.    Such interception shall not automatically
8  terminate upon the first interception of the described types of
9  communication, but shall continue until communications are
10 intercepted which fully achieve the goals of the investigation or
11 for a period of 30 days (defined as 24 hour periods), whichever
12 occurs first (the "Interception Period").

13        d.    Pursuant to Title 18, United States Code, Section
14 2518(5), such Interception Period is authorized to begin for
15 **Target Telephone #5** on the date of this Court's Order authorizing
16 the interception, and on the earlier of the day on which the
17 investigative or law enforcement officers first begin to conduct
18 an interception under this Court's order or ten days after the
19 date of the Court order for **Target Telephone #7**, **Target Telephone
20 #8**, and **Target Telephone #9**.

21        e.    Such interception is authorized to and from any
22 changed telephone numbers subsequently assigned to any instrument
23 bearing the same ESN/MEID or IMSI as the Target Telephones, or
24 any changed ESN/MEID or IMSI subsequently assigned to the same
25 telephone number as the Target Telephones.

26        f.    Pursuant to Title 18, United States Code, Section
27 2518(3), in the event the Target Telephones are transferred
28 outside the territorial jurisdiction of the Court, the act of

USA000528

interception may take place in, or using cellular tower equipment located in, any other jurisdiction within the United States.

g. Pursuant to 18 U.S.C. §§ 3122 and 3123, agents of the DEA: (1) may install, or cause to be installed, and use a pen register anywhere in the United States to record or decode dialing, routing, addressing, or signaling information for the Target Telephones, including "post-cut-through dialed digits"[3] and dialing, routing, addressing, or signaling information transmitted over the Service Provider's (defined below) network by a two-way radio feature transmitted from the Target Telephones, to record the date and time of such dialings or transmissions, and to record the length of time the telephone receiver in question is "off the hook" for incoming or outgoing calls; and (2) may install, or cause to be installed, and use a trap and trace device anywhere in the United States to capture and record the incoming electronic or other impulses for the Target Telephones which identify the originating numbers or other dialing, routing, addressing, or signaling information reasonably

---

[3] "Post-cut-through dialed digits," also called "dialed digit extraction features," are any digits that are dialed from the Target Telephones after the initial call setup is completed. Some post-cut-through dialed digits are numbers that are necessary to route the call to the intended party, identify the place or party to which the call is being made, and therefore are the type of information specifically authorized for capture by pen register. Post-cut-through dialed digits also can represent electronic content in the form of an electronic message, such as when subjects call automated banking services and enter account numbers, or call voicemail systems and enter passwords, or call pagers and dial call-back telephone numbers. While interception of wire content is sought and supported by this application, the government is not seeking authorization to intercept the electronic communications of the Target Telephones. Accordingly, to the extent that additional digits that are electronic content are received, the government will not use such information for any investigative purposes.

ER000189

USA000529

1 likely to identify the source of a wire or electronic
2 communication, and to record the date, time, and duration of
3 calls created by such incoming impulses; both for a period of
4 sixty days from the date this order is filed by the court. The
5 tracing operations and use of the caller identification feature
6 shall be without geographical limits.

7 **Requested Orders: Service Providers**

8       6.    In addition, on the basis of the allegations contained
9 in this application, on the basis of the affidavit of TFO Lavoie,
10 and pursuant to the power conferred on this court by 18 U.S.C. §§
11 2518, 2703, 3122, 3123, and 3127, and, to the extent it applies,
12 Federal Rule of Criminal Procedure 41, I request this Court order
13 SBC Communications, Inc. or any subsidiary thereof, Ameritech,
14 Southern New England Telephone Company, Verizon California, Inc.,
15 XO Communications, Comcast Cable Communications Inc./AT&T
16 Corporation, Verizon, Verizon New York, Inc., Verizon California,
17 Inc., General Telephone Company, MPower Communications, Verizon
18 New Jersey Inc., Bell South Telephone Company, Allegiance
19 Telecom, Cox Communications and Qwest Communications, AT&T, U.S.
20 Sprint, WorldCom, Pacific Bell Telephone Company, Pacific Bell
21 Wireless, Cellco Partnership, dba Verizon Wireless, AT&T Wireless
22 Services, AirTouch Cellular Telephone Company, U.S. Cellular,
23 MetroPCS, Cingular Wireless, Nextel of California, Inc., Boost
24 Mobile LLC, Cricket Communications, Sprint Communications, T-
25 Mobile USA, Inc., Virgin Mobile USA, AT&T Broadband, Nextel
26 Communications and Western Wireless Corp., and any other
27 telephone companies, and local long distance or wireless carriers
28 who are providers of wire and electronic communications services

1  as defined in 18 U.S.C. § 2510(15), including any subsequent
2  service provider which provides such defined service to the
3  Target Telephones, ("the Service Providers") to do the following:

4          a.   Provide the DEA and other law enforcement agencies
5  involved in this investigation with 24-hour-a-day, seven-days-a-
6  week information, facilities, and technical assistance necessary
7  to accomplish the interception over the Target Telephones
8  unobtrusively, expeditiously, and with a minimum of interference
9  to the services that the Service Providers are providing to the
10  persons whose communications are to be intercepted.  The switch
11  mechanisms which allow law enforcement to receive audio shall be
12  programmed within four business hours of receipt of the court's
13  Order.

14          b.   Provide the DEA with such 24-hour-a-day
15  information and services for the Target Telephones as the
16  following: rotary numbers associated with the Target Telephones,
17  call forwarding, speed dialing, call waiting, cell site and real-
18  time locations/ Global Positioning Satellite (GPS) information
19  (including User Name(s), Pass Code(s), and historical and on-
20  going activity related to the physical location of the Target
21  Telephones), pen register data, toll data, trap and trace
22  extended digit dialed data, Direct Connect/Digital Dispatch
23  ("Push to Talk") services, three-way calling, and all other
24  services.  In addition, the Service Providers shall (if
25  available) initiate a signal to determine the location of the
26  Target Telephones on the Service Provider's network or with such
27  other reference points as may be reasonably available and at such
28  intervals and times as directed by the DEA.

USA000531

1          c.    Within 48 hours of a oral or written demand of the
2    DEA or other law enforcement agencies involved in the
3    investigation, disclose to same: all non-content account
4    information and records in their files for the Target Telephones
5    and the telephones calling to or from the Target Telephones
6    (based on the DEA's written representation of same), including
7    but not limited to subscriber names and addresses whether
8    published or unpublished, listed or unlisted, and any changes
9    (defined here to include additions, deletions, and transfers)
10   thereto; MEIDs, ESNs, IMSIs, IMFIs, SIMs or other identifying
11   information and any changes thereto; subscriber date of birth,
12   driver's licenses (state and number), social security number,
13   contact names and numbers, and employment information and any
14   changes thereto; all telephone numbers listed to subscribers
15   under the same or different account; method of payment; length of
16   service, periods of telephone activation, and type of service
17   utilized; applications, account and billing information; and
18   incoming and outgoing toll information (both historical and
19   ongoing), including Direct Connect/Digital Dispatch ("Push to
20   Talk") services and call detail.

21          d.    Disclose on a real-time or near real-time basis
22   when requested to do so by the DEA the geographic analysis
23   information (including the physical address of the cell
24   site/sector) regarding cell sites used and corresponding antenna
25   information to identify the location of the Target Telephones, to
26   include configuration (omni directional or sectorized, sector
27   orientation) control channels used, address and latitude/
28   longitude of antennas.

1        e.   Enter the telephone numbers of the Target
2   Telephones into the pen register system and supply originating
3   and terminating cell site information during the Interception
4   Period.

5        f.   Authorize the installation and/or use of "dialed
6   number recorders" to detect and record all numbers dialed or
7   pulsed by the Target Telephones.

8        g.   Execute the Court's Order as soon as practicable
9   after it is signed.  If a copy of the Order is given to any
10  Service Provider, the copy may be redacted to exclude the Target
11  Subjects and a description of the Target Offenses under
12  investigation.

13       h.   To avoid prejudice to this criminal investigation,
14  the Service Providers and their agents and employees shall not
15  disclose or cause a disclosure of this Court's order or the
16  request for information, assistance, and facilities by the DEA or
17  other law enforcement agencies involved in the investigation or
18  the existence of this investigation to any person other than
19  those of their agents and employees who require said information
20  to accomplish the services herein requested.  In particular, the
21  Service Providers and their agents and employees should be
22  ordered not to make such disclosure to the lessee, telephone
23  subscribers or any interceptee or participant in the intercepted
24  communications.

25       i.   In the event that the Service Providers (currently
26  MetroPCS, T-Mobile and Sprint/Nextel) changes during the course
27  of the Interception Period, interception may continue with the
28  new Service Provider without further order of this court.  Both

USA000533

1 the previous and the new Service Provider shall inform the DEA
2 immediately if the Service Provider changes during the
3 Interception Period, or if the ESN or IMSI telephone number for
4 the Target Telephones are supplied to another Service Provider.

5      j.   The Service Providers furnishing such facilities,
6 service, or technical assistance shall be compensated for
7 reasonable expenses incurred in doing so.

8 **Requested Orders: Progress Reports, Monitoring, and Sealing**

9      7.   I further request this Court issue the following
10 orders:

11      a.   Pursuant to 18 U.S.C. § 2518(6), an Assistant
12 United States Attorney familiar with the facts of this case,
13 shall provide the Court with a report after about the fifteenth
14 day of the Interception Period showing what progress has been
15 made toward achievement of the authorized objectives of the
16 investigation and the need for continued interception.  In the
17 event that the DEA is made aware that the Service Provider has
18 changed during the course of the interception, the periodic
19 progress report will include that information.

20      b.   Pursuant to 18 U.S.C. § 2518(5), the interception
21 may be conducted in whole or in part by government personnel
22 (full or part-time), or by an individual operating under a
23 contract with the government, acting under the supervision of
24 investigative or law enforcement officers authorized to conduct
25 the interception.

26      c.   All intercepted communications will be minimized
27 in accordance with Chapter 119 of Title 18 U.S.C.  In the event
28 the intercepted language is in a code or foreign language (other

1  than English), and foreign language-speaking monitoring personnel
2  or an expert in that foreign language or code is not reasonably
3  available during the interception period, the entirety of the
4  foreign language conversations may be intercepted and recorded
5  and minimization shall be accomplished as soon as practicable
6  after the interception.

7          d.    As set forth in more detail in the attached
8  affidavit, the interception shall be conducted in such a way as
9  to minimize the interception of communications not otherwise
10 subject to interception pursuant to the Order.  Monitoring will
11 be discontinued if a monitor determines that the conversation is
12 not criminal in nature, is privileged, or is not subject to
13 interception pursuant to the Order.  If monitoring is
14 discontinued, monitoring agents may spot check the conversation
15 in order to determine whether the conversation has become
16 criminal in nature or otherwise is now subject to interception
17 pursuant to the Order.  A memorandum outlining the guidelines for
18 minimization and application of privileges, as well as a copy of
19 the application and Order, will be provided to all monitors.

20         e.    This application with attached affidavit, any
21 resulting Order and all interim reports filed with the Court
22 shall be sealed until further order of this Court.  Copies of the
23 ///
24 ///
25
26
27
28

USA000535

1  Order may be given by the DEA to any other law enforcement

2  officer involved in the investigation and to the Service

3  Providers as is necessary to implement the Order.

4

5

6     I declare under penalty of perjury that the foregoing is

7  true and correct to the best of my knowledge and belief.

8     EXECUTED at Los Angeles, California on July 16, 2009

9

10    _____

      REEMA M. EL-AMAMY

11    Assistant United States Attorney
      Violent & Organized Crime Section

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USA000536



**U.S. Department of Justice**

Criminal Division

*Washington, D.C.  20530*

JUL 15 2009

<u>MEMORANDUM</u>

TO:        Janet D. Webb, Acting Director
           Office of Enforcement Operations
           Criminal Division

ATTN:      Reema El-Amamy

FROM:      Lanny A. Breuer
           Assistant Attorney General
           Criminal Division

SUBJECT:   Authorization for Interception Order Application


        This is with regard to your recommendation that
an appropriately designated official of the Criminal Division
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period the
continued interception of wire communications occurring to and
from the cellular telephone bearing the number (909) 489-8277,
subscribed to by Whaterver, Crazt Legs, 1925 Eloise Way, Upland,
California, and the initial interception of wire communications
occurring to and from the cellular telephones bearing the numbers
(909) 545-1313, with no subscriber information; (909) 319-2187,
subscribed to by Jose Silba, with no listed address, and accessed
through International Mobile Subscriber Identification ("IMSI")
number 310260493015199; and, (909) 419-9937, subscribed to by
Jessica Medina, P.O. Box 54988, Irvine, California, and accessed
through IMSI number 316010154431162, in connection with an
investigation into possible violations of Title 18, United States
Code, Sections 2, 922, 1956, 1957, 1959, 1962, and 1963, and
Title 21, United States Code, Sections 841, 843, and 846, by
"Alex," David Navarro, Steve Osker Hoyos, Sara Leticia Misquez,
"Chipo," Steven Hernandez, Larry Cuevas, Patrick Orosco, Armando
Venegas, Richard Castorena, Mario LNU, Lucio Gallardo Diaz, Ray
Perez, Shawn Young, Carmela LNU, "Cabezon," Gabriel Macias, Paul
Onsurez, Juan Diaz, "SOS," Victor Carrasco Felix, "Jose LNU,"
Gilberto Gutierrez, Jose Gutierrez, Teresa Castro, Deborah
Cortez, Roberto Sosa, Enrique Jimenez, Salvador Martinez, Daniel

Reyes, "M," Juan Gil, Armando Barajas, "Red Eye," Marlon Jiron, Fernando Morales, Carlos Vasquez, Steven Espinoza, Ernest Castillo, Monica Cornejo, Fernando Lopez, "Rude Boy," "Boxer," "El Oso," Rebecca Estrada, Octavio Pena, and others as yet unknown.

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 3055-2009, dated February 26, 2009, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is exercisable by the undersigned. WHEREFORE, acting under this delegated power, the appropriately designated official hereby authorizes the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through those target telephone numbers referenced above, and to any other telephone number subsequently assigned to or used by the instrument bearing the same electronic serial number used by the other target telephone, within the thirty (30) day period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

Lanny A. Breuer
Assistant Attorney General
Criminal Division

JUL 15 2009
Date

Kenneth A. Blanco
Deputy Assistant Attorney General
Criminal Division

 USA000538

# TABLE OF CONTENTS

DESCRIPTION                                                       PAGE(S)

I.    INTRODUCTION .................................................................................1

II.   PURPOSE OF AFFIDAVIT ..................................................................3

III.  BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT ...............12

IV.  TARGET SUBJECTS ..........................................................................13

V.   FACTS ESTABLISHING PROBABLE CAUSE .................................25

     A.   Overview of the Investigation to Date .....................................25

     B.   Intercepted Communications on Target Telephone #5 .............31

     C.   Intercepted Communications on Target Telephone #7 .............39

     D.   Toll Analysis for Target Telephone #7 .....................................44

     E.   Intercepted Communications on Target Telephone #8 .............46

     F.   Toll Analysis for Target Telephone #8 .....................................51

     G.  Intercepted Communications on Target Telephone #9 .............52

     H.  Toll Analysis for Target Telephone #9 .....................................60

VI.  PRIOR APPLICATIONS FOR WIRE INTERCEPTIONS .................62

VII. NEED FOR INTERCEPTION ............................................................62

     A.   Physical Surveillance ................................................................63

     B.   Interviews of Witnesses and Confidential Sources, Grand Jury Subpoenas, Grants of Immunity, and Financial Investigation / Mail Covers ............74

     C.   Undercover Agents ...................................................................76

     D.   Search Warrants/Seizures .........................................................76

     E.   Pen Register/Toll Records ........................................................80

     F.   Trash Searches .........................................................................81

i

TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                                PAGE(S)

     G.    Other Investigative Methods..................................................................... 83

VIII.   MINIMIZATION ........................................................................................ 86

IX.    DURATION OF INTERCEPTION ............................................................ 87

X.     CONCLUSION ........................................................................................... 88

APPENDIX A........................................................................................................ 89

ER000200                                          USA000540

I, KRIS LAVOIE, being duly sworn, depose and state:

## I. INTRODUCTION

1.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. I am empowered to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.     I have been a Police Officer for the Ontario Police Department for approximately 8 years. I am currently assigned to the High Intensity Drug Trafficking Area, Group 50 (hereinafter referred to as "HIDTA 50").

3.     I am a full-time sworn peace officer, and have been employed in such capacity since March 2001. From March 2001 to June 2006, I was assigned to the Patrol Division, and from June 2006 to the present, I have been assigned to HIDTA 50 as a Task Force Officer ("TFO"). HIDTA 50 is a multi-agency task force, which conducts a variety of narcotics investigations, from mid-level narcotics traffickers to major narcotics trafficking organizations. HIDTA 50 is comprised of various special agents from the Drug Enforcement Administration ("DEA"), Immigration and Customs Enforcement ("ICE"), Internal Revenue Service ("IRS"), and local law enforcement personnel designated as TFO's from the Riverside Police Department ("RPD"), the Riverside Sheriff's Office ("RSO"), the Ontario Police Department ("OPD"), and San Bernardino Sheriff's Department ("SBSD").

4.     I first received training in narcotics and controlled substances laws and investigations at the San Bernardino Sheriff's Academy in 2000. Since that time, I have attended over 200 hours of specific training in the investigation of narcotics and controlled substances

1

USA000541

offenses, some of which were provided by the California Narcotics Officers' Association, California Department of Justice, and the Federal Law Enforcement Training Center.

5.    I have participated in over 100 narcotics investigations involving the unlawful importation, possession with intent to distribute and distribution of controlled substances (including heroin), as well as the investigative activity directed at monetary transactions involving the proceeds of specified unlawful activities and conspiracies, associated with criminal narcotics offenses in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952(a), and 963; Title 18, United States Code, Section 924; and California Health and Safety Code Sections 11351, 11352, 11378, 11379, 11379.6(a) and conspiracy to commit those crimes in violation of California Penal Code Section 182. During these investigations, I have conducted physical surveillance, executed search warrants, arrested narcotics traffickers and monitored conversations, pursuant to Section 629.50 et seq. of the California Penal Code and Title 18, United States Code, Section 2518. On numerous occasions, I have spoken with informants, suspects, defendants, and experienced narcotics investigators concerning the methods and practices of narcotics traffickers. Through these investigations, my training, experience, and conversations with experienced agents, other narcotics investigators, and law enforcement personnel, I have become familiar with the methods employed by narcotics traffickers in general, and large Mexican narcotics trafficking organizations in particular, to smuggle, safeguard, distribute narcotics and to collect and launder narcotics-related proceeds. These methods include the use of debit calling cards, public telephones, wireless communications technology, such as paging devices and cellular telephones, counter-surveillance, elaborately-planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications in

2

          USA000542

an attempt to avoid detection by law enforcement and circumvent narcotics investigations.

6.      I have been the affiant on Federal and California State issued wiretap affidavits and have assisted other law enforcement agents in several state and federal wiretap investigations during the past three years.

## II.  PURPOSE OF AFFIDAVIT

7.      On February 13, 2009, the Honorable Manuel L. Real of the United States District Court for the Central District of California issued an order in CR Misc 09-38-R, authorizing the interception of wire communications of FNU LNU, also known as "Alex," ("ALEX"), David Navarro ("NAVARRO"), Steve Osker Hoyos ("HOYOS"), Sara Leticia Misquez ("MISQUEZ"), FNU LNU, also known as Chipo ("CHIPO"), Steven Hernandez ("HERNANDEZ"), Larry Cuevas ("CUEVAS"), Patrick Orosco ("OROSCO"), Armando Venegas ("VENEGAS"), Richard Castorena ("CASTORENA"), Mario LNU ("MARIO"), Lucio Gallardo Diaz ("DIAZ"), Ray Perez ("PEREZ"), Shawn Young ("YOUNG"), Carmela LNU ("CARMELA"), FNU LNU, also known as "Cabezon" ("CABEZON"), Gabriel Macias ("MACIAS"), Paul Onsurez ("ONSUREZ"), Juan Diaz ("DIAZ"), FNU LNU ("SOS"),   Victor Carrasco Felix ("FELIX"), FNU LNU ("JOSE LNU"), Gilberto Gutierrez ("G. GUTIERREZ"), Jose Gutierrez ("J. GUTIERREZ"), Teresa Castro ("CASTRO"), Deborah Cortez ("CORTEZ"), Roberto Sosa ("SOSA"), Enrique Jimenez ("JIMENEZ"), Salvador Martinez ("MARTINEZ"), Daniel Reyes ("REYES"), FNU LNU, also known as "M," ("M"), Juan Gil ("GIL"), Armando Barajas ("BARAJAS"), "Red Eye," Marlon Jiron ("JIRON"), Fernando Morales ("MORALES"), Carlos Vasquez ("VASQUEZ"), Steven Espinoza ("ESPINOZA"), Ernest Castillo ("CASTILLO"), Monica Cornejo ("CORNEJO"), Fernando Lopez ("LOPEZ") "Rude Boy," "Boxer," "El Oso,"

3

Rebecca Estrada ("ESTRADA") also known as "Becky," Octavio Pena ("PENA"), and others yet unknown (the **Target Subjects**) [1] taking place to or from:

> a Sprint/Nextel cellular telephone subscribed to Ramon Ponce, at 10351 Central Avenue, Montclair, CA 91763, with a telephone number of 909-631-8843, IMSI[2] # 000009096368023, and believed to be used primarily by FNU LNU, also known as "ALEX," (**Target Telephone #1**), or any subsequently changed telephone number assigned to the same IMSI with the same subscriber information, and/or any subsequently changed IMSI assigned to the same telephone number with the same subscriber information; and

> a Sprint/Nextel cellular telephone subscribed to Jose Lopez, at 13020 Francisquito Suite 17, Baldwin Park, CA 91706, with a telephone number of 626-736-0066, IMSI # 000006262083542, and believed to be used by ALEX's narcotics source of supply

---

[1] Manuel Vega ("VEGA") was a known and admitted member of the Ontario Black Angels criminal street gang, who used the gang alias of "Limpy." Vega either personally collected extortion money from ALEX's organization, or he was assisted by **Target Subject** David NAVARRO. VEGA was a Hispanic Male, born on September 8, 1979. His California Driver's License Number was B8725308. VEGA resided at 372 Stillman St. Apt. D, Upland, California, 91786, and was the victim of a homicide near his home in Upland on January 13, 2009. As such, he is no longer considered a **Target Subject**.

[2] IMSI is an acronym for "International Mobile Subscriber Identity." The IMSI is a unique non-dialable number allocated to each subscriber that identifies subscriber account information (as opposed to the physical telephone equipment) for certain cellular telephones. The IMSI number is unique to that subscriber, and is never re-assigned. Thus, if the target exchanges his cellular telephone for an updated model and also changes his telephone number, the IMSI will remain the same.

ER000204                                                    USA000544

who has yet to be identified ("**Target Telephone #2**") or any subsequently changed telephone number assigned to the same IMSI with the same subscriber information, and/or any subsequently changed IMSI assigned to the same telephone number with the same subscriber information.

8.  On March 17, 2009 the Honorable Manuel L. Real of the United States District Court for the Central District of California issued an order in CR Misc 09-38(A)-R, authorizing the interception of wire communications of the **Target Subjects** taking place to or from:

a MetroPCS cellular telephone, subscribed to Armando Gonzales at 15576 Merrill Ave., Fontana, California, 92335, with a telephone number of 909-251-1663, MEID[3] # 268435457101363157, and believed to be used primarily by FNU LNU "ALEX," ("**Target Telephone #3**"), or any subsequently changed telephone number assigned to the same MEID with the same subscriber information, and/or any subsequently changed MEID assigned to the same telephone number with the same subscriber information; and

a Verizon Wireless cellular telephone subscribed to Gabriela Meza, at 1560 Otterbein Avenue, Space 18, Rowland Heights, CA 91748, with a telephone number of 909-261-9412, ESN/MEID # A0-00000E-57811B, and believed to be used primarily by David NAVARRO ("**Target Telephone #4**") or any

---

[3] ESN is an acronym for "Electronic Serial Number." The ESN uniquely identifies certain cellular telephones. MEID is an acronym for "Mobile Equipment Identifier." The MEID uniquely identifies certain cellular telephones, and is being used by Verizon Wireless on new phones to replace the ESN.

USA000545

subsequently changed telephone number assigned to the same ESN/MEID with the same subscriber information, and/or any subsequently changed ESN/MEID assigned to the same telephone number with the same subscriber information.

9.     The interception of **Target Telephone #3** ended on April 16, 2009. I discontinued interception of Target **Telephone #4** on April 1, 2009 because I determined that the level of wire communications over **Target Telephone #4** that were pertinent to this investigation was low.

10.     On May 1, 2009 the Honorable Manuel L. Real of the United States District Court for the Central District of California issued an order in CR Misc 09-38(B)-R, authorizing the interception of wire communications of the **Target Subjects** taking place to or from **Target Telephone #3** as well as from:

a Sprint/Nextel cellular telephone subscribed to Whaterver, Crazt Legs, at 1925 Eloise Way, Upland, CA 91784, with a telephone number of 909-489-8277, IMSI 000009097178960, and believed to be used primarily by David NAVARRO ("**Target Telephone #5**").

11.     The interception of **Target Telephone #3** and **Target Telephone #5** ended on May 30, 2009.

12.     On June 17, 2009 the Honorable Manuel L. Real of the United States District Court for the Central District of California issued an order in CR Misc. 09-0038(C)-R, authorizing the interception of wire communications of the **Target Subjects** taking place to or from **Target Telephone #3, Target Telephone #5** as well as from:

a Sprint/Nextel cellular telephone subscribed to Raul Gonzalez, at PO Box 54988, Irvine, CA 92619, with a telephone number of 951-368-4804, ESN#

6

          USA000546

364YGL332J, and believed to be a second telephone used primarily by ALEX ("**Target Telephone #6**").

13.   Interception of **Target Telephone #5**, and **Target Telephone #6**, began on June 20, 2009, and interception of **Target Telephone #5** is ongoing.  Interception of **Target Telephone #6** was discontinued on July 8, 2009 after ALEX discontinued using this telephone number.  Interception of **Target Telephone #3** did not begin as, after the Court signed the Order authorizing the interception of **Target Telephone #3**, I learned that ALEX had discontinued using **Target Telephone #3**, and that the telephone was inactive.

14.   During the course of this investigation, I previously obtained California state orders authorizing the interception of wire and electronic communications of various telephone numbers including **Target Telephone #1**.  Specifically:

a.   On October 14, 2008, the Honorable Judge Kenneth Barr issued San Bernardino County Intercept Order 2008-83 authorizing the interception of wire and electronic communications to and from telephone number 909-717-5752;

b.   On November 12, 2008, the Honorable Judge Kenneth Barr issued San Bernardino County Intercept Order 2008-83 Extension #1, authorizing the continued interception of wire and electronic communications to and from telephone number 909-717-5752;

c.   On November 12, 2008, the Honorable Judge Kenneth Barr issued San Bernardino County Intercept Order 2008-93 authorizing the interception of wire and electronic communications to and from **Target Telephone #1**;

d.   On December 11, 2008, the Honorable Judge Kenneth Barr issued San Bernardino County Intercept Order 2008-93 Extension #1, authorizing the continued interception of wire and electronic communications to and from **Target Telephone #1**; and

USA000547

e.      On December 12, 2008, the Honorable Judge Helios Hernandez issued Riverside County Intercept Order 08-62, authorizing the interception of wire and electronic communications to and from telephone number 714-457-7770.

15.    I incorporate by reference my February 13, 2009 affidavit in support of the interception of wire communications to and from **Target Telephone #1** and **Target Telephone #2**, my March 17, 2009 affidavit in support of the interception of wire communications to and from **Target Telephone #3** and **Target Telephone #4**, my May 1, 2009 affidavit in support of the interception of wire communications to and from **Target Telephone #3** and **Target Telephone #5**, and my June 17, 2009 affidavit in support of the interception of wire communications to and from **Target Telephone #3, Target Telephone #5**, and **Target Telephone #6** as though fully set forth herein.

16.    I make this affidavit in support of the continued interception of wire communications to and from **Target Telephone #5,** as well as the original interception of wire communications to and from:

a.      a Metro PCS cellular telephone, with unknown subscriber information, with a telephone number of 909-545-1313, an unknown IMSI/ESN number[4] and believed to be used primarily by Daniel REYES ("**Target**

---

[4] I have attempted to contact Metro PCS numerous times by telephone and email to obtain the results of the court ordered request for ESN/IMSI information on this telephone.  As the investigation has previously experienced, MetroPCS representatives have not responded to my requests.  In prior experience, requests for this information typically comes back from MetroPCS at a minimum of 3 to 6 weeks for subscribers and tolls.  Investigators will continue to seek this information, however there is a concern that REYES will

8

Telephone #7");

b.  a pre-paid T-Mobile cellular telephone, subscribed to Jose Silba, without
an address, with a telephone number of 909-319-2187, IMSI
#310260493015199, and believed to be used primarily by Jose LNU
("**Target Telephone #8**"); and

c.  a Sprint/Nextel cellular telephone, subscribed to Jessica Medina at P.O.
Box 54988, Irvine, CA, with a telephone number of 909-419-9937, UFMI
126*295*2097, IMSI #316010154431162, and believed to be used
primarily by Carlos RIVERA ("**Target Telephone #9**" and collectively
with **Target Telephone #5, Target Telephone #7** and **Target Telephone
#8**, the "**Target Telephones**") or any subsequently changed telephone
number assigned to the same ISMI or ESN with the same subscriber
information, and/or any subsequently changed ISMI or ESN assigned to
the same telephone number with the same subscriber information.

17.  Based on the facts set forth in this affidavit, there is probable cause to believe that
the **Target Subjects** have committed, are committing, and will continue to commit the federal
offenses enumerated in Title 18, United States Code, Section 2516, namely:

a.  Racketeer Influenced and Corrupt Organizations ("RICO") offenses, in
violation of Title 18, United States Code, Sections 1962 and 1963;[5]

---

change telephones before the subscriber information is returned from the service
provider.
[5] There is probable cause that the subject individuals and their conspirators constitute an
enterprise, that is, a group of individuals associated in fact. Members and associates of

9

b.      Violent crimes in aid of a racketeering enterprise, in violation of Title 18, United States Code, Section 1959;

c.      Manufacture, distribution, and possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

d.      Conspiracy to distribute a controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1);

e.      Use of a communication facility in committing or in causing or facilitating the commission of a felony narcotics offense, in violation of Title 21, United States Code, Section 843(b);

f.      Laundering of monetary instruments, in violation of Title 18, United States Code, Section 1956;

g.      Engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957;

h.      Possession of a firearm by a prohibited person, in violation of Title 18, United States Code, Section 922 (hereinafter referred to as the "**Target Offenses**").[6]

---

this enterprise are believed to have violated 18 U.S.C. § 1962(c) (RICO Substantive) and § 1962(d)(RICO conspiracy), which is punishable by 18 U.S.C. § 1963, by conducting and conspiring to conduct the affairs of an association-in-fact enterprise, which enterprise engaged in, and the activities of which affect, interstate or foreign commerce, through a pattern of racketeering activity consisting of acts involving narcotics trafficking in violation of Title 21, United States Code, Sections 841 and 846, and acts indictable under Title 18, United States Code, Section 1952. The subject individuals use the target phone to arrange and coordinate the activities of this enterprise.

[6]      Although not a predicate offense under 18 U.S.C. § 2516 and thus not listed as a **Target Offense**, law enforcement agents are also investigating the **Target Subjects** for violation of 18 U.S.C. § 2, aiding and abetting the substantive offenses.

10

18.     This affidavit also seeks authorization to intercept any such wire communications, not only over **Target Telephones**, but also over any changed telephone numbers subsequently assigned to the instruments bearing the same ESN/MEID or ISMI, and any changed ESN/MEID or ISMI subsequently assigned to the **Target Telephones**. This affidavit further seeks authorization to record background conversations in the vicinity of **Target Telephones** while the telephones are off the hook or otherwise in use.

19.     Based upon my training and experience, and based on my knowledge of this investigation, there is probable cause to believe the wire communications concerning the **Target Subjects** and others yet unknown concerning the aforementioned offenses will be obtained through the requested wire interception of the **Target Telephones**. In particular, these communications are expected to reveal:

        a.      The nature, extent, and methods that the **Target Telephones** are used to facilitate the possession with intent to distribute and distribution of controlled substances and listed chemicals;

        b.      The nature, extent, and methods of operation of the **Target Subjects**;

        c.      The identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities;

        d.      The distribution and transfer of the contraband and money involved in these activities;

        e.      The location and source of resources used to finance the criminal activities;

        f.      The location and disposition of the proceeds from those activities; and

ER000211                                                    USA000551

g.    The locations and items used in furtherance of those activities.

20.    These communications are expected to constitute admissible evidence of the above-described offenses.

21.    Normal investigative procedures have been tried and have failed to achieve the goals of this investigation, appear unlikely to achieve the goals of the investigation if tried, or are too dangerous to employ.

22.    The information set forth in this affidavit is submitted for the limited purpose of supplying the legal requirements for an order granting authorization for the interception of wire communications on the **Target Telephones**. It does not contain all of the facts known to this investigation. Information not set forth herein is not relied on for the purpose of establishing probable cause for the interception of the wire communications on the **Target Telephones**.

## III.    BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

23.    This affidavit is based on personal knowledge I have gained from my participation in this investigation as well as information from the following sources:

a.    Oral and written reports about this and other investigations, which I have received from other law enforcement officers;

b.    Physical surveillance conducted by law enforcement officers, which has been reported to me either directly or indirectly;

c.    A review of telephone air time and call records;

d.    A review of public records, and police reports;

e.    Debriefings of confidential informants;

f.    Review of intercepted telephone calls with one or more of the **Target**

12

                                    USA000552

**Subjects** pursuant to my California state wiretap investigation; and

> g.    Review of intercepted telephone communications on **Target Telephone #3, Target Telephone #4, Target Telephone #5, and Target Telephone #6**.

24.    Unless otherwise noted, when I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law enforcement officer, either directly or in a written report. The officer providing me with the information may have received the information by way of personal knowledge or from another source.

25.    Because this affidavit is being submitted for the limited purpose of seeking authorization for the interception of wire communications, I have not set forth every fact known to this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that an order should be issued.

## IV.    TARGET SUBJECTS

26.    I have obtained information concerning the background of the **Target Subjects** from the following sources and criminal indices: California Department of Motor Vehicle ("DMV"); National Law Enforcement Telecommunications System ("NLETS"); National Crime Information Center ("NCIC"); conversations with other law enforcement officers participating in this investigation; and my own participation in this investigation. To date, the identifying information that I have ascertained regarding the **Target Subjects** is as follows

> a.    FNU LNU, also known as "Alex" ("ALEX"), is the leader of a drug trafficking organization. ALEX is a mid-level heroin and cocaine dealer who distributes narcotics using street level dealers. ALEX previously paid extortion money to recently deceased

ER000213                    USA000553

Manuel VEGA, who, in return, allowed ALEX's organization to distribute narcotics in the Ontario, California area. VEGA was the victim of a homicide near his home in Upland on January 13, 2009, however, based on calls previously intercepted on **Target Telephone #1**, **Target Telephone #3**, and **Target Telephone #6**, I believe that ALEX continues to make extortion payments to VEGA's associate, NAVARRO. ALEX is a Hispanic male, born on April 16, 1979. He does not possess a California Driver's License and he is believed to reside at 15544 Prairie Way, Riverside, California.[7]

      b.    David Navarro ("NAVARRO") is a known and admitted member of the Ontario Black Angels criminal street gang, who uses the gang alias of "Plucky." Based on intercepted calls to and from **Target Telephone #1, Target Telephone #3, Target Telephone #5,** and **Target Telephone #6**, I am aware that NAVARRO contacts ALEX and other narcotics dealers in Ontario to collect extortion payments. NAVARRO is a Hispanic male, born on October 22, 1979. His California Driver's License Number is B6405236. NAVARRO is believed to reside at 1560 S. Otterbein Avenue #18, Rowland Heights, California, 91748.

      c.    Steve Osker Hoyos ("HOYOS") is a former street-level dealer that distributed narcotics for ALEX. HOYOS is a Hispanic male, born on September 9, 1964. His California Driver's License Number is C5980365. HOYOS is believed to reside at 1254 W. J St. Apt. B, Ontario, California, 91762.

---

[7] On October 23, 2008, law enforcement initiated a traffic stop on ALEX. ALEX provided a Mexican identification card bearing the name Marco Antonio TORRES-CRUZ, and provided an address of 15576 Merrill Avenue in the city of Fontana, California. However, based on my training and experience, I do not consider ALEX positively identified at this time. Additionally, law enforcement conducted a fingerprint check using a field identification unit of ALEX. The check revealed that ALEX had previously used the name Jose Luis Arreola during a prior contact with law enforcement.

USA000554

d.　·Sara Leticia Misquez ("MISQUEZ"), aka Sara Holguin, aka Sara Delvalle, was a previous courier for ALEX. MISQUEZ is a Hispanic female, born on August 25, 1959. Her California Driver's License Number is C0903027. MISQUEZ previously resided at 1830 E. Tam O'Shanter St. Ontario, California, but is presently in custody.

e.　FNU LNU, also known as Chipo ("CHIPO"), has acted as a source of supply of heroin for ALEX. Based on intercepted calls on **Target Telephone #1**, I am aware that either CHIPO, or an associate of CHIPO, was arrested on November 20, 2008 with approximately 332 gross grams of heroin after leaving ALEX'S residence. CHIPO or his associate identified himself to law enforcement with a Mexican Driver's License as Kevin Alejandro Martinez-Gonzalez, born on December 11, 1985, and provided an address of 2054 Atlin St. Duarte, California at the time of his arrest. Based on my training and experience, I do not consider a Mexican Driver's License a valid form of identification and CHIPO (or his associate) is not positively identified at this time.[8] To my knowledge, CHIPO has not been a source of supply for ALEX since the beginning of the federal investigation in February 2009.

f.　Steven Hernandez ("HERNANDEZ"), also known as, Oscar Rangel, has, in the past, acted as a cocaine source of supply for ALEX. HERNANDEZ is a Hispanic male, born on May 28, 1972. His California Driver's License Number is B8258753. HERNANDEZ is believed to reside at 404 Seventh St., Norco, California.

g.　Larry Cuevas ("CUEVAS"), also known as "China Man," was a previous customer and has acted as a courier for ALEX's narcotics trafficking organization. CUEVAS is

---

[8] I am also aware that CHIPO is presently being investigated by DEA TFO Timothy Harrington in an ongoing unrelated federal wiretap investigation. Additionally, I am aware that TFO Harrington believes that CHIPO's moniker is "CHEPO."

15

USA000555

a Hispanic male, born on June 27, 1977. His California Driver's License Number is B8143821.
CUEVAS previously resided at 5206 Phillips Blvd., Chino, CA, but is currently in custody.

        h.     Patrick Orosco ("OROSCO"), is, based on intercepted calls on **Target
Telephone #3**, and **Target Telephone #6**, and surveillance during this investigation, believed to
be a narcotics courier for ALEX's organization. OROSCO is a Hispanic male, born on March
21, 1967. His California Driver's License Number is C4133871. OROSCO is believed to reside
at 10382 Ramona Avenue Apt. F, Montclair, California.

        i.     Armando Venegas ("VENEGAS"), is ALEX's brother-in- law. Based on
intercepted calls on **Target Telephone #1**, I am aware that VENEGAS has distributed narcotics
in the Northern California area as part of ALEX's narcotics distribution organization.
VENEGAS is a Hispanic male, born on April 22, 1983. His California Index Number is
X7786172. VENEGAS is believed to reside at 793 E. Lewelling Bl., Hayward, California. To
my knowledge, VENEGAS has not been intercepted on **Target Telephone #3** or **Target
Telephone #6**, and I do not believe he is currently distributing narcotics as part of ALEX's
organization.

        j.     Richard Castorena ("CASTORENA"), is a former customer of ALEX's
narcotics trafficking organization, and formerly assisted OROSCO and CASTRO as a street-
level courier. CASTORENA is a Hispanic male, born on November 4, 1952.

        k.     Mario LNU ("MARIO"), is a customer of ALEX's narcotics trafficking
organization that has been intercepted on **Target Telephone #3**, and **Target Telephone #6**, and
has yet to be positively identified.

        l.     Lucio Gallardo Diaz ("DIAZ"), is a Hispanic male, California Driver's

USA000556

License Number D8475908, who is believed to reside at 4950 E. Balch Ave. #202, Fresno, California. Intercepted calls on **Target Telephone #1** indicate that DIAZ was a source of supply of marijuana for ALEX's organization.[9]

m.     Ray Perez ("PEREZ") is a former customer of ALEX's organization, and a former narcotics distributor for ALEX in the Colton and San Bernardino area. PEREZ has a date of birth of November 23, 1972 and a California Driver's License Number A4706786, and is believed to reside at 864 Jackson St., Colton, California.[10]

n.     Shawn Young ("YOUNG"), also known as "Speedy," is a Hispanic male, born on July 4, 1972. Based on intercepted calls on **Target Telephone #1**, I believe that YOUNG has acted as a street level narcotics courier for ALEX's organization. His California Driver's License Number is A9307919. YOUNG's residence is unknown.

o.     Carmela LNU ("CARMELA"), is ALEX's wife and has yet to be positively identified. She is believed to reside with ALEX at 15544 Prairie Way, Riverside, California. Based on intercepted calls on **Target Telephone #1, Target Telephone #3, and Target Telephone #6,** I believe that CARMELA assists ALEX with his narcotics distribution activities.

p.     FNU LNU, also known as Cabezon ("CABEZON") is ALEX's brother-in-law, and has yet to be positively identified. Based on intercepted calls on **Target Telephone #1, Target Telephone #3, and Target Telephone #6,** I believe that CABEZON assists ALEX with

---

[9] It is unknown at this time whether DIAZ is still a source of supply for ALEX.

[10] PEREZ was previously misidentified with a date of birth of January 14, 1971 and a California Driver's License Number A5412600, through analysis of telephone subscriber information and public records databases.

USA000557

his narcotics distribution activities.

q. Gabriel Macias ("MACIAS") has acted as a street level courier for ALEX's organization. MACIAS is a Hispanic male born on April 16, 1989. His California Driver's License Number is D7907488, and his residence is unknown.

r. Paul Onsurez ("ONSUREZ") has acted as a street level courier for ALEX's organization. ONSUREZ is a Hispanic male born on October 10, 1963. His California Driver's License Number is C0503421, and his residence is unknown

s. Juan DIAZ ("J. DIAZ") is a known and admitted member of the Ontario Black Angels criminal street gang, who uses the gang alias of "Swifty." Based on my review of previous toll information on **Target Telephone #4**, I believed that J. DIAZ was communicating with NAVARRO regarding the criminal activity of the Ontario Black Angels street gang. J. DIAZ's telephone number has not been identified on **Target Telephone #5**, however, I believe that he may be communicating with NAVARRO on a new, yet-to-be-identified telephone number since J. DIAZ was recently arrested and the released for his suspected involvement in a homicide case.

t. FNU LNU ("SOS") is a heroin and cocaine "source of supply" for ALEX's narcotics trafficking organization. He is a Hispanic male with an unknown date of birth, who as a result of court authorized GPS precision location information is believed to reside at 3855 Fox Tail Lane, Riverside, California.

u. Victor Carrasco Felix ("FELIX") is a former heroin source of supply for ALEX's narcotics trafficking organization. He is a Hispanic male born on July 30, 1983, with an address of 8661 Spohn St., Fontana, California.

        USA000558

v.      Jose LNU ("JOSE LNU") is believed to be an extortion victim of
NAVARRO.  Based on intercepted communications over **Target Telephone #5**, I am aware that
JOSE LNU is presently in contact with NAVARRO, and, based on my training, experience, and
knowledge of the investigation, as well as intercepted communications over **Target Telephone
#5**, I believe that NAVARRO is presently extorting JOSE LNU in connection with JOSE LNU's
narcotics trafficking.

w.      FNU LNU, also known as Gilberto Gutierrez ("G. GUTIERREZ") is
believed to be a narcotics source of supply for ALEX's narcotics trafficking organization.  On
March 31, 2009, G. GUTIERREZ drove to ALEX's residence.[11]  Shortly after leaving ALEX's
residence on that date, G. GUTIERREZ and Jose GUTIERREZ were together found to possess
more than $10,000 in cash.  G. GUTIERREZ is a Hispanic male, believed to have a date of birth
February 13, 1959.  G. GUTIERREZ did not have a California Driver's License on this date and,
based on my training and experience, I do not consider him positively identified at this time.

x.      FNU LNU, also known as Jose Gutierrez ("J. GUTIERREZ")[12] is believed
to be a narcotics source of supply for ALEX's narcotics trafficking organization.  On March 31,
2009, JOSE GUTIERREZ was a passenger in a car that arrived at ALEX's residence.  Shortly
after leaving ALEX's residence on that date, J. GUTIERREZ and G. GUTIERREZ were together
found to possess more than $10,000 in cash.  J. GUTIERREZ is a Hispanic male, believed to
have a date of birth February 2, 1967.

---

[11] The vehicle was registered to Hugo OLIVO at 1608 Cleveland St. San Bernardino, California.

[12] J. GUTIERREZ is also known as Daniel Quezada, with a date of birth of December 12, 1967.
I do not consider J. GUTIERREZ positively identified at this time.

y.      Teresa Castro ("CASTRO"), also known as "Osita," is a street level dealer for ALEX. She is a Hispanic female, with a date of birth of July 28, 1961, and California Driver's License Number C0362731. While the address on her Driver's License is 1985 Looking Glass Way, Upland, California, I believe she is presently a transient.

z.      Deborah Cortez ("CORTEZ"), also known as "Cookie," is a former street level dealer employed by ALEX. CORTEZ works with **Target Subject** Roberto SOSA, and is possibly SOSA's common-law wife. CORTEZ is a Hispanic female born on January 22, 1964. Her present address is unknown, but her California Driver's License provides an address of 746 W. 8th Street, Apt. 5, San Bernardino, California. Cortez was previously in custody but has been released. To our knowledge, she has not been in contact with ALEX on **Target Telephone #6.**

aa.     Roberto Sosa ("SOSA") is a street level dealer employed by ALEX, who works with **Target subject** CORTEZ. SOSA is a Hispanic male, born on October 31, 1959. His present address is unknown, but his California Driver's License provides an address of 746 W. 8th Street, Apt. 2, San Bernardino, California. SOSA was previously in custody but has been released. To my knowledge, he has not been in contact with ALEX on **Target Telephone #6.**

bb.     Enrique Jimenez ("JIMENEZ"), also known as "Cisco," is an Ontario Black Angel gang member. Based on intercepted communications over **Target Telephone #5** and surveillance, I believe that JIMENEZ presently takes direction from NAVARRO to collect extortion payments from street level narcotics dealers on NAVARRO's behalf. JIMENEZ is a Hispanic male, born on August 17, 1980, with an address of 260 N. Benson Ave., Ontario, California.

cc.     Salvador Martinez ("MARTINEZ"), also known as "Flaco." Based on

USA000560

intercepted communications over **Target Telephone #5** and surveillance, I believe that

MARTINEZ is a street level narcotics dealer who pays extortion payments to NAVARRO.

MARTINEZ is a Hispanic male born on February 10, 1967, with an address of 410 W. Ralston

St., Ontario, California.

        dd.    Daniel Reyes ("REYES"), also known as "Sugar," is an Ontario Varrio

Sur ("OVS") gang member who is the nephew of Ontario Black Angel and Mexican Mafia

member Darryl Castrejon. Based on intercepted communications over **Target Telephone #5**, I

believe that REYES presently takes direction from NAVARRO to contact other gang members

and possibly conducts extortion activities on behalf of the gang. REYES is a Hispanic male born

on June 20, 1986, and his address is believed to be 7895 Blanchard Avenue, Fontana, California.

        ee.    FNU LNU, also known as "M," ("M"), is believed to be an individual

incarcerated in an unknown facility that communicates with NAVARRO on **Target Telephone**

**#5** with telephone number (213) 446-9862. During the latest interception period for **Target**

**Telephone #5**, FNU LNU and NAVARRO discussed a possible "luz"[13] ordered by **Target**

**Subject** GIL, on an unknown individual that they referred to as Tejano. In the event law

enforcement is able to identify "Tejano" and he is in custody, I will notify personnel at the

institution at which he is incarcerated regarding possible threats to his life. If he is not in

custody, law enforcement will notify him personally of the possible threats to his life.

        ff.    Juan Gil ("GIL"), also known as "Nito," is a member of the Ontario Black

Angel criminal street gang as well as the Mexican Mafia, and is currently incarcerated at

---

[13] Based on my training and experience, I am aware that a "luz," or "green light," is a term used
by gang members to refer to homicide ordered by a gang's hierarchy.

USA000561

Hazleton United States Penitentiary. Based on intercepted calls over **Target Telephone #5,** I

believe that NAVARRO presently collects extortion payments on behalf of the Mexican Mafia to

pay to **Target Subject** GIL and that NAVARRO makes these payments to GIL's wife, Virginia

Gil.

gg.     Armando Barajas ("BARAJAS"), is a member of both the Ontario Black

Angels criminal street gang and the Mexican Mafia. BARAJAS is believed to reside at an

unknown address in Pomona. Based on my knowledge of the investigation, I believe that

BARAJAS also collects extortion payments from narcotics traffickers that distribute narcotics in

the area controlled by the Ontario Black Angels criminal street gang. During the prior

interception period for **Target Telephone #5,** BARAJAS is believed to have directed

NAVARRO to collect extortion payments to pay for attorneys fees for an unknown member of

the Ontario Black Angels criminal street gang.

hh.     FNU LNU, also known as "Red Eye," ("RED EYE") is currently a

customer of ALEX's narcotics trafficking organization. **Target Subject** RED EYE is not

positively identified at this time and his address is unknown.

ii.     Marlon Jiron ("JIRON") also known as "Bowser" or "Bow Easy," is a

member of the Ontario Black Angels criminal street gang. Based upon intercepted conversations

over **Target Telephone #5,** it was suspected JIRON may have been storing in his residence a

9mm handgun used in the June 13, 2009 homicide of Ontario Black Angel gang member Paul

Angel Rodriguez. A search warrant was served at the residence, and a 9mm handgun was

recovered. Ballistic laboratory tests on the weapon are pending. JIRON was released from

custody, and charges have not been filed. JIRON is a Hispanic male born on February 10, 1980,

22

USA000562

and resides at 1528 N. Marin Avenue, Ontario, California.

jj.     Fernando Morales ("MORALES") also known as "Sicko" is an Ontario Black Angel gang member, currently suspected of murdering Ontario Black Angel gang member Paul Angel Rodriguez. MORALES is a Hispanic male born on December 27, 1981, and is in custody for leading police on a vehicle pursuit, and homicide charges have not yet been filed. The San Bernardino County Sheriff's investigation is currently in progress.

kk.     Carlos Rivera ("RIVERA") also known as "Chino" is an Ontario Black Angel gang member using **Target Telephone #9** who, based on intercepted conversations over **Target Telephone #5**, is involved in collecting extortion payments, dealing narcotics, and possibly brokering transactions to obtain firearms for the gang. RIVERA is a Hispanic male born on December 3, 1985, believed to reside at 815 North Vineyard Avenue Apartment B.

ll.     Carlos Vasquez ("VASQUEZ") also known as "Little Lazy" is an Ontario Black Angels gang member who, based on intercepted conversations over **Target Telephone #5**, is possibly storing a firearm at his residence. During a parole search at his residence following the call, a firearm was not located however. I do believe the firearm was in the residence although it was not found. VASQUEZ is a gang member regularly in contact with NAVARRO, and has been observed by surveillance to be present with NAVARRO when extortion payments were being collected. VASQUEZ is a Hispanic male born on October 4, 1983, and is believed to reside at 1430 West Stoneridge Street Apartment #3, Ontario, California.

mm.     Steven Espinoza ("ESPINOZA") also known as "Little Loki" is an Ontario Black Angels gang member who I believe, based on intercepted conversations over **Target Telephone #5**, and surveillance observations, assists NAVARRO in collecting extortion

ER000223                                    USA000563

payments. ESPINOZA is a Hispanic male born on December 12, 1988, is on active parole, and is believed to reside at 227 West Sunkist Street, Ontario, California.

nn.     Ernest Castillo ("CASTILLO"), is not a documented gang member to date. However, I believe, based on intercepted conversations over **Target Telephone #5**, that CASTILLO had knowledge of the weapon seized at JIRON's residence as a result of the search warrant, and possibly had possession of it prior to JIRON. CASTILLO is a Hispanic male born on December 2, 1986, and is believed to reside at 1009 East Deodar Street, Apartment F, Ontario, California.

oo.     Monica Cornejo ("CORNEJO"), is the niece of Armando BARAJAS, and according to information provided by an anonymous informant, is possibly dealing, selling multi-pound quantities of methamphetamine for BARAJAS. CORNEJO is a Hispanic female born on November 2, 1978, and her residence is unknown.

pp.     Fernando Lopez ("LOPEZ") also known as "Little Nite Owl" is an Ontario Black Angels gang member who I believe, based on intercepted conversations over **Target Telephone #5**, and surveillance observations, possibly sells narcotics, and assists NAVARRO in collecting extortion payments. LOPEZ is a Hispanic male born on January 6, 1976, and his residence is unknown.

qq.     Rebecca Estrada ("ESTRADA"), also known as "Becky." I believe, based on intercepted conversations over **Target Telephone #5**, that ESTRADA sells narcotics and pays extortion payments to NAVARRO. ESTRADA is a Hispanic female born on May 16, 1975, and is believed to reside at 627 East Elm Street, Ontario, California.

rr.     Virginia Gil ("VIRGINIA GIL"), is the wife of Ontario Black Angel gang

USA000564

member, and Mexican Mafia gang member Juan GIL, also known as "Nito." VIRGINIA GIL
has been regularly intercepted on **Target Telephone #5**, and observed during surveillance
meeting with NAVARRO. Based on my training, experience, and knowledge of the
investigation, I believe that she receives weekly payments from NAVARRO on behalf of her
husband and the Mexican Mafia. She is a Hispanic female born on January 13, 1982, and is
believed to reside with Juan GIL's mother at 713 North Campus Avenue, Upland, California.

ss.     Octavio Pena ("PENA") is a suspected source of supply for ALEX, and
has been intercepted on **Target Telephone #6.** PENA is a Hispanic male with a date of birth of
November 18, 1979. Per court authorized GPS precision location information, PENA is believed
to reside at 5352 El Rio Avenue, Riverside, California.

## V.     FACTS ESTABLISHING PROBABLE CAUSE

### A.     Overview of the Investigation to Date

27.     Based on my training, experience, and in speaking with Sgt. Keith Volm, Det.
Paul Berdnik, and Cpl. Chris Martinez of the Ontario Police Department, the Ontario Black
Angels criminal street gang was formed in the 1940's as a car club in the City of Ontario. The
car club evolved into a criminal street gang after warring with other car clubs, and the expansion
of the gang is tracked through police contacts and graffiti in the area.

28.     Based on my training and experience and my conversations with Sgt. Keith Volm,
Det. Paul Berdnik, and Cpl. Chris Martinez of the Ontario Police Department, I am aware that
presently, the Ontario Black Angels are the most violent gang in the City of Ontario, and are
involved in narcotics trafficking, extortion, hate crimes, and other violent activity including
assault and murder. I am, on those bases, also aware that these crimes are committed in

USA000565

furtherance of the gang, and certain crimes are only committed if authorized by the Mexican Mafia.

29.     This investigation initially targeted ALEX's narcotics trafficking organization. Based on my training, experience, and knowledge of the investigation, I believe that ALEX is a mid-level narcotics trafficker that makes extortion payments to NAVARRO in exchange for the ability to distribute narcotics in the area controlled by the Ontario Black Angel criminal street gang.

30.     The investigation of ALEX's narcotics trafficking organization began in June of 2008, when Officer Ramiro Martinez of the Ontario/Upland Narcotics Task Force (OUNTF) obtained information from a Confidential Source ("CS#1"). CS#1 had agreed to provide information on a narcotics trafficking organization in exchange for consideration in the prosecution of a pending criminal court case.[14]

31.     CS#1 told Officer Martinez that MISQUEZ resided at 1830 E. Tam O'Shanter St. in Ontario, California, and was responsible for dealing heroin in Ontario and neighboring cities. CS#1 stated MISQUEZ received a daily shipment of narcotics from a source of supply she knew as "Alex," and MISQUEZ employed two runners known as "Linda" and "Weasel."[15] CS#1 told Officer Martinez that both of these runners drove a green Ford Thunderbird.

---

[14] CS#1 has a criminal history which includes narcotics offenses. However, the information provided by CS#1 has been corroborated by other investigative means, including surveillance on the target subjects, and the information provided by CS#1 is therefore considered reliable.

[15] Through the use of the local Ontario Police Department database, Officer Martinez was able to learn that HOYOS used the moniker "Weasel."

ER000226                    USA000566

32.     CS#1 also told Officer Martinez that s/he was aware of two telephone numbers used by MISQUEZ. The first telephone number, (909) 636-9695 was primarily used by the runners, and the second number, (909) 717-5752 was used by MISQUEZ to conduct business. CS#1 knew MISQUEZ on a personal level, had knowledge of an arrest involving MISQUEZ and a large quantity of narcotics, and while s/he did not admit to using narcotics, s/he did know people who conducted narcotics transactions with MISQUEZ. In July 2008, CS#1 told Officer Martinez that MISQUEZ suspected that she was being followed and, as a result, MISQUEZ was taking a hands-off approach and had changed the vehicle that the "runners" use. CS#1 told Officer Martinez that MISQUEZ's runners were now driving a black Kia that was previously driven by ALEX's runners, and that ALEX was driving the green Ford Thunderbird.

33.     During July and August 2008, members of the OUNTF had established surveillance on numerous occasions at MISQUEZ's residence, 1830 E. Tam O'Shanter St., in Ontario. While observing MISQUEZ's activities, surveillance units were able to observe individuals later identified as ALEX, a suspected source of supply of narcotics for MISQUEZ, and HOYOS, aka "Weasel," a suspected street level courier for the organization.

34.     On July 31, 2008, an examination of the discarded garbage at MISQUEZ's residence revealed mail belonging to Sara MISQUEZ, as well as pieces of balloons and foil consistent with the packaging of narcotics. Additionally, a review of electronic law enforcement records indicated that MISQUEZ has a 1984 felony conviction in Pomona for violations of California Health and Safety Code Section 11378, Possession of a Controlled Substance for Sales, and Health and Safety Code Section 11351, Possession of a Narcotic Controlled Substance for Sales. MISQUEZ also has a 1989 felony conviction in Pomona for a violation of California

27

USA000567

Penal Code Section 211, Robbery. In August 2008, Officer Martinez spoke with Detective

Stringer of the San Bernardino Sheriff's Department, and learned that Detective Stringer had

arrested MISQUEZ in March 2008 for a violation of California Health and Safety Code Section

11351, Possession for Sales of a Narcotic Controlled Substance. MISQUEZ originally agreed to

cooperate with law enforcement in return for consideration on her case, but she did not remain in

contact with officers, or supply any information. Criminal charges were subsequently filed

against MISQUEZ, and she accepted a plea agreement. MISQUEZ is presently in custody.

35.      On August 8, 2008, surveillance units observed HOYOS briefly meet with two

subjects in a parking lot in the 1200 block of W. 4th Street, in Ontario. HOYOS was seen

walking toward the two subjects, one in a vehicle and one on foot, and quickly walk away.

Based on the surveillance officer's training and experience, it appeared HOYOS had completed

two narcotics transactions.

36.      On September 17, 2008, during a parole search, San Bernardino County Sheriff's

Deputy Bannes and members of the SMASH Unit received information that a heroin dealer

resided at 1254 W. J St., Apt. B, in Ontario. Deputy Bannes contacted HOYOS at the

residence, and was able to enter and search the location. No narcotics were located, but $325.00

in U.S. currency was found with handwritten notes, which based on training and experience,

appeared to be pay/owe sheets. HOYOS told Deputy Bannes the money was for "Alex," a

source of supply for narcotics, and HOYOS agreed to call Deputy Bannes when he was going to

meet with Alex.[16]

---

[16] Ontario Police Officer Ramiro Martinez coincidentally drove through the neighborhood and
noticed the police vehicle near HOYOS' residence. Officer Martinez spoke with Deputy Bannes

28

USA000568

37.     On September 18, 2008, Deputy Bannes spoke with Officer Martinez to inform him HOYOS had contacted him. HOYOS called Deputy Bannes to say he (HOYOS) had met with ALEX to give ALEX the $325.00 US currency and HOYOS had received 75 balloons of heroin in return.

38.     On September 26, 2008, members of OUNTF established surveillance at HOYOS' residence. HOYOS was observed driving a green Dodge Caravan, California License Plate 5VLX697. Officers saw HOYOS meet with several subjects and engage in hand-to-hand transactions, which they believed, based on their training and experience, to be narcotics transactions.

39.     On October 14, 2008, the Honorable Judge Kenneth Barr of the San Bernardino County Superior Court, State of California, granted and issued San Bernardino County Intercept Order 2008-83, authorizing interception of wire and electronic communications on (909) 717-5752. On October 17, 2008, an intercepted conversation between HOYOS using (909) 717-5752, and "Limpy" using (909) 373-9361 indicated that "Limpy" received weekly extortion payments from ALEX's narcotics trafficking organization. After speaking with Ontario Police Gang Suppression Unit's Sergeant Volm, and Detective Berdnik, I learned "Limpy" was the moniker of self-admitted Ontario Black Angel gang member Manuel VEGA.

40.     On January, 13, 2009, I was contacted by Officer Ramiro Martinez, who informed me that Manuel VEGA, aka "Limpy," had been murdered near his residence in Upland, California. VEGA had been shot in the back of the head one time, his assailant was unknown, and the investigation is in progress. Since VEGA's murder, based on intercepted

___

and advised him of the ongoing investigation involving HOYOS.

USA000569

communications on **Target Telephone #1**, **Target Telephone #3**, **Target Telephone #5**, and **Target Telephone #6**, and surveillance conducted during the interception periods for these telephones, I continue to believe that NAVARRO has taken over the responsibilities of collecting extortion payments in the area controlled by the Ontario Black Angels criminal street gang, and is now responsible for sending the funds to the members of the Mexican Mafia, including **Target Subject** GIL.

41.     Since January of 2009, several of ALEX's present and former street level narcotics couriers have been arrested, as well as three of his sources of supply, FELIX and Gilberto and Jose GUTIERREZ.

a. On March 20, 2009, Richard CASTORENA was arrested with approximately 2.1 gross grams of cocaine individually packaged in 10 foil bindles, and 6 balloons, along with 1 balloon of heroin. The packaging was consistent with street level sales.

b. On March 22, 2009, Steve HOYOS was arrested at the United States / Mexico border with approximately 31 kilograms of marijuana after intercepted conversation on **Target Telephone #3** between HOYOS and ALEX indicated HOYOS would be transporting a load of marijuana into the United States.

c. On March 31, 2009, a traffic stop of a vehicle which had left ALEX's residence resulted in the arrest of Gilberto and Jose GUTIERREZ and the seizure of $11,890 US Currency. Intercepted conversations on **Target Telephone #3** indicated these subjects had delivered narcotics to ALEX's residence.

d. On April 14, 2009, Victor FELIX was arrested with approximately 1 ounce of heroin as a result of a traffic stop after intercepted conversation on **Target Telephone #3**

USA000570

between ALEX and FELIX indicated he would deliver a load of narcotics to ALEX's residence.

e. On May 21, 2009, Ray PEREZ was arrested at his residence with two scales, a bag of water balloons, and narcotics paraphernalia consistent with the packaging and sales of narcotics. PEREZ also had several rounds of ammunition, for which he is currently awaiting state charges, since he was a felon in possession of ammunition.

f. On May 28, 2009, Deborah CORTEZ and Roberto SOSA were arrested with approximately 228 balloons of suspected heroin, weighing approximately 49.4 gross grams. Intercepted conversations on **Target Telephone #3** indicated ALEX had just met with CORTEZ and SOSA to supply them with the narcotics seized from CORTEZ.

42.     Beginning on July 6, 2009, ALEX stopped utilizing his new telephone line, **Target Telephone #6**, I believe, as a result of the traffic stop of one of his sources of supply, Octavio PENA. Narcotics were not seized as a result of this traffic stop, and numerous attempts to further the investigation of ALEX's organization have not been productive. Thus, this period of interception will focus on investigating the extortion and other criminal activities of the Ontario Black Angels criminal street gang, and identifying the criminal activities of other narcotics distributors that the gang collects extortion payments from, including Jose LNU, who is presently using **Target Telephone #8**.

## B.  Intercepted Communications on Target Telephone #5

43.     **Target Telephone #5** has been identified as a cellular telephone used primarily by David NAVARRO. Communications during the interception period for **Target Telephone #5** have continued to demonstrate that the **Target Subjects** continue to actively use **Target Telephone #5**, to commit the **Target Offenses**. Discussion of the intercepted communications

31

USA000571

obtained during the continued period of interception is discussed herein.

### June 22, 2009

44.     On June 22, 2009, at 4:03 PM, NAVARRO received an incoming call on **Target Telephone #5** from Ernest CASTILLO, who was using (909)-664-8542. During this conversation, CASTILLO asked NAVARRO if he "remembered" about the "illegal fireworks." NAVARRO said "yes" and that "one of the "hynas" was going to "kick it somewhere." The term "hyna" is commonly used for a female, but, based on my training, experience, and knowledge of the investigation, I believe NAVARRO and other Ontario Black Angel gang members use the term "hyna" as coded language to refer to a firearm.

45.     NAVARRO asked who "she" was "kicking it with." CASTILLO said he heard that a third party had "taken it all apart." CASTILLO said his "cousin" had "shot it next door" and that was where "Ernie had gotten it." CASTILLO said he would call "Bow Easy." CASTILO asked NAVARRO if he should "go get it." NAVARRO said, "Yes" and asked if it was "apart." CASTILLO said he did not know how many "parts" it was in. NAVARRO told Castillo, "If you want to go ahead and get it then get it, but to be very careful with it, you know what's up." NAVARRO suggested that CASTILLO put it in a "safe spot" and then DAVID would hook up with CASTILLO.

        a.      Based on my training, experience and knowledge of the investigation, I believe this conversation related to a firearm that was used in the murder of Ontario Black Angel gang member Paul Angel Rodriguez, which had been moved from CASTILLO's "cousin," to "next door" where "Ernie" had taken possession of it, and finally to "Bow Easy."

i.      On June 14, 2009, I spoke with Detective Berdnik, who informed me of the June 13, 2009 homicide of Ontario Black Angel gang member Paul Angel Rodriguez, who was found with multiple gunshot wounds in the area of Route 66 and Cajon Boulevard in San Bernardino County. San Bernardino County Sheriff's Detective Radeleff investigated the case, and learned Fernando MORALES, also known as "Sicko" was one of the last subjects to be seen with Rodriguez prior to the homicide. MORALES led Ontario Police Officers on a vehicle pursuit on June 14, 2009, which terminated at Marlon JIRON's residence at 1528 North Marin Avenue, Ontario, California, where MORALES was taken into custody. MORALES was taken into custody without the 9mm handgun that was used in the murder.

ii.      Detective Berdnik knew Marlon JIRON from previous contacts, was also known as "Bowser" or "Bow Easy," who resides at 1528 North Marin Avenue in Ontario, California, which is the address on his California Driver's License.

iii.      Detective Radeleff of the San Bernardino County Sheriff's Department, who is investigating the Paul Angel Rodriguez homicide was informed of the intercepted call, by Detective Berdnik, and prepared a search warrant for JIRON's residence. Detective Radeleff, who is investigating the Paul Angel Rodriguez homicide was informed of the intercepted call, and prepared a search warrant for JIRON's residence. During the execution of the search warrant on June 23, 2009, a stolen Beretta 9mm handgun was located, along with the same type of ammunition found at the scene of the homicide. Ballistic Laboratory tests on the firearm are pending.

iv.      Following the search warrant, five subjects were taken from the residence to Ontario Police Department to be interviewed by Detective Radeleff. Marlon JIRON

ER000233        USA000573

and his girlfriend Jessica Perez made statements, confirming they had knowledge of the firearm. JIRON stated on June 13, 2009, he received a call from Ernesto Marez, who resides at 1009 East Deodar Street Apartment #A. Marez told JIRON that Det. Radeleff had just interviewed him while Fernando Morales was in the backyard of his residence burying the gun. Marez asked JIRON to pick up the gun, and on June 15, 2009, JIRON and his girlfriend Jessica Perez went to Marez's residence, and Marez gave them a bag containing clothing, 30-30 ammunition, and a gun which had been taken apart. JIRON said he took the gun to his residence, put it back together, and placed it in a shed in the rear yard of the residence, where it was recovered by officers during the execution of the search warrant. None of the other subjects had pertinent information, and all subjects were released after giving statements.

**June 23, 2009**

46.     On June 23, 2009, at 6:53 PM, NAVARRO received an incoming call on **Target Telephone #5** from CASTILLO, who was using telephone number (909) 664-8542. During this conversation, CASTILLO said that "homie Bow Easy," "they hit his pad." NAVARRO asked if CASTILLO was "serious." CASTILLO said they "got bombed," six "seres." CASTILLO said "they found the thing" and they had "them" "at the station." CASTILLO said he would "find out more" and call NAVARRO back.

a.     Based on my training, experience, and knowledge of the investigation, I believe this conversation relates to the search warrant served at Marlon JIRON's residence on June 23, 2009. I believe that when CASTILLO informed NAVARRO they "hit" or "bombed" JIRON's "pad," and found the "thing," CASTILLO was informing NAVARRO that law

enforcement served a warrant at the residence, and seized the 9mm handgun referred to above. I also believe that CASTILLO agreed to find out more information and call NAVARRO back.

      b.    Surveillance attempted to locate NAVARRO, when intercepted conversations indicated he would be meeting with Armando BARAJAS at B's Bar located on Holt Boulevard and Benson Avenue in Ontario, California. Surveillance officers observed NAVARRO and BARAJAS entering the bar together. This surveillance was occurring at the time of the above call, and demonstrates that NAVARRO was meeting with a Mexican Mafia member and is also relevant because later NAVARRO had CASTILLO meet him at this same location.

      c.    At 7:34 p.m., NAVARRO received an incoming call on **Target Telephone #5** from CASTILLO, who was using telephone number (909) 664-8542. CASTILLO asked what NAVARRO was "doing." NAVARRO said he was "hanging out." CASTILLO said he wanted to "touch bases in a little bit" with NAVARRO. CASTILLO said it was "important" as the "other hyna just got out from that." NAVARRO asked for CASTILLO to meet NAVARRO on "Benson and Holt." CASTILLO said okay and he would "leave now." Based on my training, experience, and knowledge of the investigation, I believe CASTILLO needed to meet with NAVARRO to supply the information he previously said he would find about the search warrant. NAVARRO told CASTILLO to meet him at Benson Avenue and Holt Boulevard, where he was meeting with Armando BARAJAS.

      d.    At approximately 7:49 p.m., a blue-green Honda Accord arrived at B's Bar, at approximately the same time CASTILLO attempted to call NAVARRO on **Target Telephone #5.** Surveillance units observed CASTILLO, and recognized him as the subject seen

35

    —    

earlier at 1009 E. Deodar Street. Ontario Gang Officer Gabe Gutierrez later identified CASTILLO from a DMV photograph.

### July 7, 2009

47.     On July 7, 2009, at 9:05 PM, NAVARRO made an outgoing call on **Target Telephone #5** to Armando BARAJAS using (909) 282-5934. NAVARRO said he talked to "the paisa" (Jose LNU per next call) and "it was cool." The term "paisa" is a slang and/or derogatory term commonly used to describe a person of Mexican national dissent. NAVARRO said that he (Jose) said "he would get with B." BARAJAS said that was "good." NAVARRO said he would get with "the girls' mom." BARAJAS said he had "warned her not to do anymore business with him." NAVARRO said that "he only shot what he shot because that was what she had come with." NAVARRO said "that was why it was not the whole thing." BARAJAS said "it was the whole thing and all the money." NAVARRO said that "what she shot was not that." NAVARRO said "the girl's mom only came with what B had given her according to him (Jose)." BARAJAS said that she "had been doing that for B for a long time." NAVARRO told BARAJAS that "he (Jose) wanted to talk to B because he did not want any problems." BARAJAS said "someone was not telling the truth." BARAJAS said "she was not scandalous." BARAJAS said "he (Jose) did not want to give her the whole thing until she came up with $300 more for the other half." NAVARRO said "she only came with that" and then "she was backed up from the other." NAVARRO stated "he (Jose) was an honest paisa," but he "could not make a call on this." BARAJAS asked if he (Jose) was going to "give her the whole one." BARAJAS added that there was "still a half an ounce missing" and he (Jose) had "gotten the money." BARAJAS said he "talked to her to verify the story." BARAJAS said "the paisa was lying" and that he had "gotten the money." NAVARRO said he should have told him (Jose) "the whole."

36

                    USA000576

BARAJAS said he "just wanted to resolve this." NAVARRO said he had "misunderstood" BARAJAS and had "told Jose only the 3." NAVARRO remembered BARAJAS saying "the whole," but then Jose told NAVARRO what "they had come with." BARAJAS said "he only gave them half to try to pay his debt" and then said that "Lisa owed him (Jose) $400." BARAJAS added that "until she brought 300 he (Jose) was not going to give her the other half." NAVARRO said he would "call him (Jose) now" and for BARAJAS not to "worry." BARAJAS told NAVARRO to "tell Jose to give them the other half." BARAJAS said it was in "Jose's best interest" to do BARAJAS "the favor." BARAJAS said "it was not that she was not going to pay," it was that "she could not pay at this time." NAVARRO said alright and that he would call Jose.

       e.      Based on my training, experience, and knowledge of the investigation, I believe this call pertains to a narcotics transaction between Jose LNU and Rebecca ESTRADA, also known as "Becky" or "B" as she is referred to in this call. According to BARAJAS, Jose LNU only supplied ESTRADA with a "half" as opposed to a "whole," which I believe is in reference to a quantity of narcotics. When NAVARRO explains that "he only shot what he shot because that is what she had come with," I believe he is referring to Jose LNU only delivering the "half" amount of narcotics, because that was the amount of narcotics paid for. NAVARRO explains to BARAJAS that "what she shot was not that" and that ESTRADA "only came with that" referring to the amount of money to pay for a half quantity of narcotics as opposed to a whole, and that she was "backed up from the other" meaning she still possibly owed money from a previous narcotics transaction. When BARAJAS tells NAVARRO it was in "Jose's best interest" to do him "the favor," I believe this is a possible threat of violence against Jose LNU if he does not comply with BARAJAS demand to supply the remainder of the narcotics.

37

USA000577

48.     At 9:12 p.m., NAVARRO made an outgoing call on **Target Telephone #5** to Jose LNU using **Target Telephone #8.**  During this Spanish language conversation, Jose LNU asked NAVARRO "what happened." NAVARRO said he "talked with the guy" (BARAJAS) right now and told him about "the situation."[17] NAVARRO said that "possibly the lady just came" "with what JOSE gave her." JOSE asked if he would "give the other half to the lady," "she would pay him or what." NAVARRO said "no," and said like JOSE said the "L." NAVARRO asked if JOSE knew "what the L was." JOSE said "yes." NAVARRO said that "B gave everything to L" and "when L got there she only gave" "what she gave" to JOSE. JOSE said it was the way it happened.  NAVARRO said JOSE giving the other half to the lady.  JOSE asked if she would "give" him "any money or what." NAVARRO said "no she would not give" JOSE anything.  NAVARRO said "that was what he (BARAJAS) was asking for." JOSE said he would "lose 450 plus other 30 she owed to him." NAVARRO said he would "lose 750." JOSE said he would be "losing a lot of money there."  Later in the conversation, NAVARRO said they (NAVARRO and JOSE) were in "good terms." NAVARRO said that "was what he (BARAJAS) asked" NAVARRO, and that was "basically what he (BARAJAS) wanted." NAVARRO said "he (BARAJAS) knows that JOSE was working good and been with them for a while in good terms." NAVARRO said he (BARAJAS) wanted JOSE to help them, "otherwise he (BARAJAS) would expect more." NAVARRO said he "could not ask him (BARAJAS) or he would say to send this guy (JOSE) to hell." NAVARRO said to "avoid all that," "that was the way he (BARAJAS) put it." NAVARRO said he was "just telling" JOSE. NAVARRO said it

---

17 **Error! Main Document Only.**The words contained in quotation marks in Spanish language conversations throughout the affidavit are translations made by the certified Spanish language interpreters monitoring the intercepted calls.

was not his "personal decision." NAVARRO said he was "just serving as a messenger." JOSE said he would see what happened in the morning. JOSE said he would call NAVARRO in the morning to let him know what happened. NAVARRO said to "call her (B) and get together with her (B) and the L." JOSE said he would see what happened tomorrow. NAVARRO said he would tell him (BARAJAS) then. JOSE said okay.

        a.     Based on my training, experience, and knowledge of the investigation, I believe this call is a follow-up to the previous conversation with BARAJAS reference a narcotics transaction. NAVARRO instructs Jose LNU to give the other "half" of narcotics to "Becky" or "B" from the previous call, who I believe to be Rebecca ESTRADA from previously intercepted conversations. JOSE asked if he were to "give the other half to the lady," "she would pay him or what," asking NAVARRO if he would receive payment for the narcotics, and NAVARRO explained to Jose that he would not, and said that was what BARAJAS wanted. Jose asked if NAVARRO could ask for "at least half," so he would not lose as much money, and NAVARRO explains to Jose that it was not his "personal decision," and he was "just serving as a messenger." This substantiates my belief that NAVARRO takes direction from BARAJAS, and establishes a hierarchy within the criminal enterprise. Furthermore, based on my training, experience, and knowledge of the investigation, I believe that when NAVARRO explains to Jose LNU that he has been "working good" and "in good terms," he is referring to Jose LNU's consistent extortion payments to the gang.

## C. Intercepted Communications on Target Telephone #7

49.    **Target Telephone #7** has been identified as a cellular telephone used by Daniel REYES, also known as "Sugar." REYES previously used telephone numbers (909) 258-6867, and (909) 545-0503 and he was previously identified by explaining his arrest on May 14, 2009 to

USA000579

NAVARRO on a call intercepted on **Target Telephone #5**, which corresponded to an arrest on REYES' criminal history report. Court certified interpreters have identified REYES using **Target Telephone #7** though voice comparison of calls intercepted on **Target Telephone #5**. Communications during the interception period for **Target Telephone #5** have demonstrated that the **Target Subjects** actively use **Target Telephone #7**, to commit the **Target Offenses**. Discussion of the intercepted communications obtained during the initial period of interception is discussed herein.

**June 22, 2009**

50.    On June 22, 2009, at 4:52 p.m., NAVARRO received an incoming call on **Target Telephone #5** from REYES, who was using his previous telephone **(909) 545-0503**. During the conversation, REYES asked if NAVARRO had "talked to Alex." NAVARRO said he got "something" from "last week." NAVARRO said he "tried calling him earlier and he (ALEX) did not answer his phone." REYES said that was "bullshit." NAVARRO agreed. REYES said he was just seeing what was "up" and would "catch" NAVARRO "later." NAVARRO asked if REYES was going to "P.A. service tomorrow." REYES said "yes," and asked if NAVARRO was going. NAVARRO said he would be "working since it was in the morning." NAVARRO "thought it was going to be at night." NAVARRO said to "tell the homies that whoever could go should go." REYES said he would "let them know."

a.    Based on my training, experience, and knowledge of the investigation, I believe REYES is asking NAVARRO if he had talked to ALEX to collect the weekly extortion payment, since NAVARRO stated ALEX had not answered his phone, which is consistent with intercepted attempts to contact ALEX on **Target Telephone #6**. NAVARRO then asked if REYES was going to "P.A. service tomorrow," which I believe refers to the funeral for homicide

40

                    USA000580

victim and Ontario Black Angel gang member Paul Angel Rodriguez. According to intercepted

conversations the following day over **Target Telephone #5**, Rodriguez's funeral took place on

June 23, 2009. REYES said he was going, and NAVARRO instructs REYES to "tell the homies

that whoever could go should go," which is consistent with my belief that REYES takes direction

from NAVARRO to pass instructions to fellow gang members.

### June 23, 2009

51. On June 23, 2009, at 10:19 p.m., NAVARRO made an outgoing call on **Target

Telephone #5** to REYES using his previous telephone **(909) 545-0503**. During the conversation,

NAVARRO asked what REYES was doing and REYES said he was "taking care of something

quick" to (Unintelligible). NAVARRO asked if REYES "knew" and REYES said "yes."

NAVARRO said he "got with the paisa today." NAVARRO said he was "in the O" right now.

NAVARRO asked if REYES would be "a minute." REYES said if NAVARRO wanted to

"swing by," he (REYES) was at his "cousin's pad." REYES said the "homeboy" that

NAVARRO called earlier had "just left" from there. REYES said NAVARRO could "swing by"

but to stay off of Euclid because his "hyna" was "around there" and then she would not see

NAVARRO. REYES said he was at his "cousin's." NAVARRO said he was at "the bar."

REYES said he would go there.

a. Based on my training, experience, and knowledge of the investigation, I

believe when NAVARRO asked REYES if he "knew," he was referring to the search warrant

served that day at JIRON's residence, and he wanted to confirm whether or not REYES had been

informed. When REYES answered "yes," I believe NAVARRO changed the subject because he

did not want to further discuss the search warrant over the telephone. NAVARRO then told

REYES he "got with the paisa today" which is a term NAVARRO commonly uses for ALEX. I

41

USA000581

believe he was informing REYES an extortion payment was collected from ALEX, since they had spoken about a pending extortion payment from ALEX during the intercepted conversation the previous day. REYES told NAVARRO he could "swing by" his "cousin's" pad but agreed to meet NAVARRO at "the bar" when he learned NAVARRO was there.

**July 1, 2009**

52.     On July 1, 2009 at 3:34 p.m., NAVARRO made on outgoing call on **Target Telephone #5** to REYES using his previous telephone number, **(909) 545-0503**. During this conversation, REYES said the "area code" was "909-753-9986." REYES said "what" NAVARRO "asked about the other day, REYES knew what NAVARRO was talking about. REYES said he did know "Chato." NAVARRO asked if "Chato" "got busted." REYES said "yes." NAVARRO said "ALEX said that." NAVARRO said he did not know if ALEX was just trying to use that as "leniency" or as something else. NAVARRO asked what REYES was doing right now. REYES said he just got to the "O." NAVARRO said he was at "Mitch's." NAVARRO asked if REYES got "the number," and REYES said "yes."

        a.      Based on my training, experience, and knowledge of the investigation, I believe this call relates to an unidentified narcotics trafficker referred to as "Chato" being "busted" or arrested by law enforcement. REYES stated he "knew" Chato, which I believe means REYES was receiving extortion payments from "Chato" prior to his arrest, since the collection of extortion payments is a main reason for these gang members to "know" as many narcotics traffickers operating in their areas as possible. NAVARRO explains to REYES that ALEX may have been using the arrest of "Chato" in an attempt to gain "leniency" in paying extortion payments himself, due to a heavy law enforcement presence, narcotics traffickers getting arrested, and not making enough money to pay to the gang.

USA000582

**July 2, 2009**

53.     On July 2, 2009, at 9:27 p.m., NAVARRO received an incoming call on **Target Telephone #5** from REYES using his previous telephone **(909) 545-0503**. NAVARRO asked what REYES was "doing." REYES said he was "driving to Mountain" and then would be "seeing a guy down the street." NAVARRO asked if REYES was with his "cousin" or "down the street." REYES said he was going to "check with the fool," the one they were "talking about earlier." NAVARRO said "okay." NAVARRO asked if REYES had talked to his "cousin." REYES said "no." NAVARRO asked if REYES wanted to "play pool." REYES said "whatever." NAVARRO told REYES to "take care" of his "business" and then call his "cousin to see if he wanted to go." NAVARRO said he was "taking homeboy to take care of something" and asked for REYES to "call" him "back." REYES asked if they were going to drive from "there" because REYES did not want to drive "the truck." REYES said he was probably going to "stay at Reef's tonight." NAVARRO asked REYES to hold. (Pause) NAVARRO said they would "not all fit" in NAVARRO's car. REYES said he might be able to use his "sister's Altima" which was "low profile." NAVARRO asked for a call back.

        a.     Based on my training, experience, and knowledge of the investigation, I believe this call relates to gang business, and possibly the collection of an extortion payment when REYES states he is "seeing a guy down the street," and was going to "check with the fool" REYES and NAVARRO had "talked about earlier." This belief is substantiated when REYES states he will use his "sisters Altima" because it is "low profile" and not likely to attract the attention of law enforcement.

43

### July 3, 2009

54.    On July 3, 2009, NAVARRO received an incoming call on **Target Telephone #5** from REYES using **Target Telephone #7**. NAVARRO said he was "driving around." REYES said he "just got back around" and if NAVARRO "needed anything." this was his "new number." NAVARRO asked if the "other number" was "gone." REYES said "yes." NAVARRO said he would "call" REYES if "anything" came "up."

       a.    Based on my training, experience, and knowledge of the investigation, this call substantiates the belief that REYES changes telephones, and/or telephone numbers on nearly a monthly basis. I have attempted to obtain authorization to intercept REYES' telephone in the past, as well as a pen register, and have failed in doing so because of he has changed his telephone, I believe, in an attempt to keep law enforcement from intercepting his conversations regarding his and his co-conspirators' illegal activities.

### D. Toll Analysis for Target Telephone #7

55.    On or about July 6, 2009, I reviewed the telephone toll data information from June 15, 2009 to July 5, 2009 for Armando BARAJAS' telephone number of (909) 282-5934. Because MetroPCS, the telephone service provider for **Target Telephone #7**, is unable to provide toll data within the time constraints needed for the submission of this application for wire interception, I have based the toll data for **Target Telephone #7** on the toll analysis between that telephone number and other numbers for which we are able to collect toll information, such as Armando BARAJAS's telephone mentioned above. Based on my training, experience, and knowledge of the facts set forth herein, I believe that **Target Telephone #7** is in contact with BARAJAS' telephone, and these contacts are being made in order to facilitate the **Target Offenses**. Moreover, these conversations are not the same conversations that will be

44

USA000584

intercepted on Target **Telephone #5**, **Target Telephone #8** and **Target Telephone #9**, therefore, monitoring is needed on **Target Telephone #7** in order to obtain evidence about REYES' extortion and other criminal activity in connection with the Ontario Black Angel criminal street gang.

56.     The following chart summarizes the frequency of those calls between June 15, 2009 and July 5, 2009 between **Target Telephone #7** and the telephone number used by **Target Subject** BARAJAS:

| Telephone # | Number of contacts | Date of Last Call | Significance |
|---|---|---|---|
| 909-282-5934 | 2 | 7/5/09 | <u>See</u> ¶ 57 |

57.     During this period, there were 2 calls to and/or from telephone number 909-282-5934, a telephone subscribed to CM, CM, at 13910 Peyton Drive, Chino Hills California, which is used by Armando BARAJAS.  BARAJAS has been intercepted using telephone number 909-282-5934 to communicate with NAVARRO on **Target Telephone #5**.  I am aware that BARAJAS is an Ontario Black Angel, and Mexican Mafia member, and, based upon intercepted conversations of BARAJAS and REYES over **Target Telephone #5,** I believe that REYES and BARAJAS are discussing criminal activities including the collection of extortion payments on behalf of the Ontario Black Angels criminal street gang and possibly narcotics trafficking. Intercepted conversations between NAVARRO and BARAJAS have been pertinent to the activities of the Ontario Black Angel criminal street gang, and I believe REYES, because he is a family relative of Darryl CASTREJON, a Mexican Mafia / Ontario Black Angel gang member who is currently a fugitive in an unrelated investigation, may be relaying information from

45

USA000585

CASTREJON to BARAJAS.

### E. Intercepted Communications on Target Telephone #8

58.    **Target Telephone #8** has been identified as a cellular telephone used by Jose LNU. Communications during the interception period for **Target Telephone #5** have demonstrated that the **Target Subjects** actively use **Target Telephone #8**, to commit the **Target Offenses**. Discussion of the intercepted communications obtained during the initial period of interception is discussed herein.

#### May 29, 2009

59.    On May 29, 2009 at 11:09 AM, NAVARRO made an outgoing call on **Target Telephone #5** to Jose LNU using **Target Telephone #8**. During this Spanish language conversation, NAVARRO asked what JOSE was doing. JOSE said he was "working." NAVARRO asked if JOSE was going to have "a chance earlier." JOSE said it was "too slow," and for NAVARRO to give JOSE "a chance for the afternoon/evening." NAVARRO said "okay," he would call JOSE "later." JOSE said "yes in the afternoon/evening and maybe they" would "wake up" and call so that he (JOSE) "could complete." JOSE said it was "Friday" and "they" had to "wake up" and would "start calling around noon." NAVARRO said "okay" and would call JOSE then. JOSE said he did not have "any." JOSE said that if he "had it" he would have given "it" to NAVARRO "right now." NAVARRO said "okay" and would call JOSE "later on." JOSE said he thought he could get "some" "after 12 p.m." NAVARRO said "okay" and would then call JOSE.

a.    Based on my training, experience, and knowledge of the investigation, I believe when Jose LNU stated he was "working," and it was "too slow" he was referring to the sales of narcotics, and asked NAVARRO for "a chance in the afternoon/evening" to pay his

46

USA000586

extortion payment because of a lack of customers. Jose LNU continued to explain to
NAVARRO if he "had it," referring to the payment, he would have "given it" to NAVARRO at
that time. Based on my training, experience, and knowledge of the investigation, I am aware that
NAVARRO meets with Jose LNU on a weekly basis, and his conversations intercepted on
**Target Telephone #5** are consistent with those conversations with ALEX and other narcotics
dealers from whom NAVARRO collects extortion payments.

**July 2, 2009**

60.     On July 2, 2009, at 3:42 p.m., NAVARRO received an incoming call on **Target
Telephone #5** from Jose LNU using **Target Telephone #8.** During this Spanish language
conversation, JOSE asked if NAVARRO was home. NAVARRO said he just got off work.
JOSE said he wanted a "favor done." NAVARRO said "yes." JOSE asked if NAVARRO knew
who "Flaco" was. NAVARRO said "yes." JOSE said "Flaco needed some money because some
guy name Mingo took his." NAVARRO said with his "paisa Flaco." JOSE said he (JOSE) did
him (Flaco) "a favor" and this guy (Mingo) came and "knocked him down and took his stuff."
JOSE asked if maybe NAVARRO could "help out." NAVARRO said "the guy" "had just gone
out" and NAVARRO "did not know his number or where he stayed." NAVARRO stated he
knew where "his" (Mingo's) "sister stayed though." JOSE told NAVARRO he was staying by
"mainland." JOSE said NAVARRO "could call Flaco and hear the whole story." NAVARRO
said he would call him (Flaco). JOSE said that "even if it was just a little bit that guy (Flaco)
was always making something." NAVARRO established with JOSE that Flaco did not
"disrespect him." JOSE said "no." NAVARRO said that "these things happened where one guy
got beat up and then when the other guy is talked to it turns out to be crap." JOSE said
NAVARRO knew that he (JOSE) had "never asked for a favor." NAVARRO said "it would not

47

USA000587

be a problem." JOSE said he "never lied" to NAVARRO and was "always straight up."
NAVARRO said he knew JOSE would not lie, but he was "not really sure about Flaco."
NAVARRO said he would "talk to him" (Flaco) "and get back to" JOSE. JOSE asked if
NAVARRO had "Flaco's number." NAVARRO said "yes." NAVARRO asked if he was "the
one from Ralston." JOSE said "yes." JOSE asked for a call back.

        a.    Based on my training, experience, and knowledge of the investigation, I
believe this call substantiates the belief that Jose LNU is a source of supply for Salvador
MARTINEZ, also known as "Flaco," who also is a narcotics trafficker who pays extortion
payments to NAVARRO according to intercepted conversations on **Target Telephone #5**.
When Jose LNU asked NAVARRO for a "favor," he was asking NAVARRO to handle a
situation where "Mingo," knocked Flaco down and "took his stuff," which I believe to be
narcotics and / or money. Based on my knowledge of the investigation, I also believe that
NAVARRO and Jose LNU were referring to the moniker "Lingo, " as Detective Berdnik knows
"Lingo" from previous contacts to be a moniker for Manuel CASTREJON, a brother of Mexican
Mafia member and Ontario Black Angel Darryl CASTREJON, a fugitive in an unrelated
investigation. NAVARRO tells Jose LNU that the individual believed to be CASTREJON had
"just gone out" meaning he was recently released from custody, and NAVARRO was unaware of
his phone number or where he was residing. Jose LNU informs NAVARRO that CASTREJON
lived by "mainland," which I believe to mean Maitland, a street in Ontario. NAVARRO tells
Jose LNU "it would not be a problem" meaning he would contact MARTINEZ get the "whole
story" and attempt to get Jose LNU's money back.

      61.    At 5:37 p.m., NAVARRO made an outgoing call on **Target Telephone #5** to Jose
LNU using **Target Telephone #8.**

a.     During this Spanish language conversation, NAVARRO told JOSE that he "talked to Flaco earlier," but he tried calling "Flaco" now and "he was not answering." NAVARRO thought maybe he had his phone "turned off." NAVARRO asked if JOSE knew "how much" was "taken" from Flaco. JOSE said "una corita" and "two eighths." NAVARRO said "okay" and asked if JOSE was "sure." JOSE said "yes" because Flaco had "just gotten that" and had said "he did not have enough money to pay the bills." JOSE said he "did Flaco the favor" and "he was supposed to pay" JOSE "in the afternoon."

b.     NAVARRO said he was going to "that guy's" (possibly Lingo) "area" because he knew where he was now. NAVARRO said he was "trying to call" him "to see what he had lost" and confirmed that it was just the "corita." JOSE said "yes because it had not been that long" that JOSE had "given it" to Flaco. JOSE said he was "painting" over there. NAVARRO said he would call JOSE back.

c.     Based on my training, experience, and knowledge of the investigation, I believe this call is related to the previous conversation between NAVARRO and JOSE about the narcotics and /or money taken from "Flaco." NAVARRO confirms what was taken from "Flaco," which was "una corita" and "two eighths," which an "eighth" is a term commonly used for an eighth of an ounce of narcotics. NAVARRO told JOSE he was going to "that guy's area," possibly to recover what was taken by CASTREJON.

62.     At 9:23 p.m., NAVARRO made an outgoing call on **Target Telephone #5** to JOSE LNU using **Target Telephone #8**.

a.     During this Spanish language conversation, NAVARRO said he "talked to the guy" (Lingo). NAVARRO explained that he "denied everything," so they "gave him a good beating." NAVARRO said "he (Lingo) said it was only 2-20's" and he (NAVARRO) "took his

49

USA000589

watch and about 28 bucks," but "the watch broke in the scuffle."

      b.    NAVARRO said he talked to Flaco and "the guy only took 60 in cash." NAVARRO asked if FLACO told him "it was only that amount." JOSE said FLACO told him that "the work was taken" or maybe he "lost it" but he (Flaco) claimed that he (Lingo) "beat" him up.

      c.    JOSE said that he (Flaco) was in the "Fontana area." NAVARRO said "the guy (Flaco) was afraid," and then stated that "the dude (Lingo) was a buddy" but he "was older, 42-43 years old and was an addict." NAVARRO said this was the "second beating he (Lingo) had gotten" from them (NAVARRO and others) for doing "that shit." NAVARRO said he "cannot get the shit back because he (Lingo) was a user and never had anything of value." NAVARRO said that "even if it was a big thing that he took he would not have had it."

      d.    NAVARRO said he "talked to him" and "gave him a beating." NAVARRO said "the dude was homeless and he (Lingo) would end up doing the same shit again." NAVARRO said he "denied that he even touched Flaco." NAVARRO said he "knows the guy (Lingo)." JOSE said he would "tell him (Flaco) to go back (home)." NAVARRO said he "told Flaco to go back home." NAVARRO said he "told him (Lingo) not to get near that (Flaco) area." JOSE said "he (Lingo) does not let him (Flaco) work." NAVARRO said "the guy (Lingo) is always in the neighborhood but he (Lingo) already knows not to do anything to him (Flaco)."

      e.    JOSE said he would "call him" because "he was trying to call now." NAVARRO said "FLACO was scared." JOSE said he would "let him know to go back because he had nothing for tomorrow" and he would "help him out" with something. JOSE asked that NAVARRO calls him back tomorrow to "see what was up." NAVARRO said okay.

USA000590

f.    Based on my training, experience, and knowledge of the investigation, I believe NAVARRO is informing Jose LNU that he visited CASTREJON and "gave him a beating" for taking the narcotics and / or currency from Flaco. Per NAVARRO, CASTREJON told him the only thing taken from Flaco was "2-20's" which I believe to be two, twenty dollar quantities of narcotics. NAVARRO admits to taking CASTREJON's " watch and about 28 bucks" on behalf of Jose LNU and Flaco, which substantiates my belief that NAVARRO's responsibilities include retaliation for thefts committed against those who pay extortion payments to him and the Ontario Black Angels.

### F. Toll Analysis for Target Telephone #8

63.    On or about July 1, 2009, I reviewed the telephone toll data information from June 15, 2009 to June 29, 2009 for **Target Telephone #8**. Based on my training, experience, and knowledge of the facts set forth herein, I believe that these contacts are being made in order to facilitate the **Target Offenses**. Moreover, these conversations are not the same conversations that will be intercepted on Target **Telephone #5, Target Telephone #7, and Target Telephone #9** and, therefore, monitoring is needed on **Target Telephone #8** in order to obtain evidence about Jose LNU's narcotics distribution activities. Some of the identified contacts are discussed herein in the following paragraphs.

64.    The following chart summarizes the frequency of those calls between June 15, 2009 and June 29, 2009:

| Telephone # | Number of contacts | Date of Last Call | Significance |
|---|---|---|---|
| 909-969-6051 | 84 | 6/29/2009 | See ¶ 65 |

USA000591

65.     During this period, there were 84 calls to and/or from telephone number 909-969-6051, a telephone subscribed to Salvador MARTINEZ, 410 West Ralston Street, Ontario, California, which, based upon intercepted conversations on **Target Telephone #5** and surveillance observations, is used by Salvador MARTINEZ, also known as "Flaco." In addition, law enforcement has intercepted approximately 79 calls between NAVARRO on **Target Telephone #5** and Salvador MARTINEZ and during some of those calls MARTINEZ has referred to paying his "contribution," which I believe, based on my training, experience, and knowledge of the investigation, to be a reference to extortion payments. During some of those calls, MARTINEZ has also discussed paying dollar amounts between $200 and $400 per week. Based on my knowledge of this investigation, I am aware that MARTINEZ is presently a street level narcotics dealer who pays extortion payments to NAVARRO, and I believe based on intercepted conversations, and the volume of calls, that Jose LNU is a possible source of supply of narcotics for MARTINEZ.

### G. Intercepted Communications on Target Telephone #9

66.     **Target Telephone #9** has been identified as a cellular telephone used by Ontario Black Angel gang member Carlos RIVERA, also known as "Chino." He has been observed by surveillance with NAVARRO collecting extortion payments, and intercepted conversations indicate he may be assisting with obtaining firearms for the gang. Communications during the interception period for **Target Telephone #5** have demonstrated that the **Target Subjects** actively use **Target Telephone #9**, to commit the **Target Offenses**. Discussion of the intercepted communications obtained during the initial period of interception is discussed herein.

ER000252            USA000592

**May 16, 2009**

67. On May 16, 2009, at 5:45 p.m., NAVARRO made an outgoing call on **Target Telephone #5** to RIVERA using **Target Telephone #9**.

      a. During the conversation, NAVARRO said he had seen his "missed call" earlier but he was at "the car wash." RIVERA said he "forgot about that." NAVARRO said they were going to be at the "indoor swapmeet" tomorrow in Upland. NAVARRO said they were going to be there at "ten on Grove and Foothill." RIVERA said he forgot until he called "Mitch" and he told him that he was "at the car wash."

      b. NAVARRO asked what RIVERA was "doing right now." NAVARRO told RIVERA to hold "because there was a cop" behind him. RIVERA told NAVARRO not to "trip." RIVERA said he was going to try to "fuck" with him. Long pause.

      c. NAVARRO said he thought that he was going to "pull" him "over." RIVERA asked if NAVARRO did not have "nothing" on him.

      d. NAVARRO said he was in "Pomona" and the "mother fucker got right behind" him and then asked what RIVERA was going to "do today." RIVERA said he was "going to eat" and then go to his house and wait for his "cousin" to pick him up so they could "leave." NAVARRO said he was going to the "citizen's arena to see the fights" and would call RIVERA when he gets out to see what is "up."

      e. RIVERA asked if NAVARRO knew the "problem with the fool Rafita, Ralphy." NAVARRO said "yeah." RIVERA said "on the money that he (Rafita) owed." RIVERA said they had an "agreement that he (Rafita) was going to be giving" him "little by little" and that he (RIVERA) was going to be "cool." RIVERA said "he (Rafita) turned off his phone since two weeks ago" and he did not know what to... RIVERA said he was "starting to

USA000593

trip" and wanted to "get at that fool." NAVARRO said "he (Rafita) always changes his numbers" and mentioned that he (Rafita) had "done that" to him as well. NAVARRO said he "saw him earlier" and most likely he (Rafita) was going to "be there tomorrow because he was the one that got them the spot at the indoor" because he was the one that "had the shop right there." RIVERA said it was "not right because that fool (3rd party) did him a favor and it was not like a little bit of money." NAVARRO said "yeah." RIVERA said "he (possibly Rafita) just got out and was doing bad." RIVERA said he "got at him" (Rafita) and he had said that "in a week." NAVARRO said he would call RIVERA later once he gets out so they could "talk." RIVERA said okay.

      f.     Based on my training, experience, and knowledge of the investigation, I believe that during this call, RIVERA and NAVARRO discuss a "problem with Rafita" and "money that he owed" possibly relating to an extortion payment. Based on my training, experience, and knowledge of the investigation, I believe that when RIVERA refers to "Rafita" "just" getting "out and was doing bad," I believe he is referring to "Rafita" recently being released from custody, and possibly not fulfilling his obligations, namely, making extortion payments on behalf of the gang.

**May 26, 2009**

    68.    On May 26, 2009, at 7:36 PM, NAVARRO received an incoming call on **Target Telephone #5** from RIVERA using **Target Telephone #9.**

    a.    During the conversation, RIVERA asked if NAVARRO was at "the pad." NAVARRO said he was at "Holt and Vineyard." NAVARRO asked if RIVERA wanted (U/I) with "some grain." RIVERA said "yes." NAVARRO asked if he could get "a gram" from RIVERA. RIVERA told NAVARRO to go over "quickly." NAVARRO said he would be

54

USA000594

"there in two minutes." RIVERA said he would "make it out" and would be "out there." RIVERA told NAVARRO to "park in the front." NAVARRO said "alright."

      b.     Based on my training, experience, and knowledge of the investigation, I believe this call relates to a narcotics transaction. I believe when NAVARRO mentions "some grain" he is using coded language to refer to narcotics, possibly methamphetamine, and when he asks if he could get "a gram" he is referring to a quantity of narcotics.

      c.     Law enforcement attempted to establish surveillance on NAVARRO at the time of the intercepted conversation. I submitted a court authorized GPS precision location request of **Target Telephone #5**, which located the telephone in the area of the apartment complex east of Imperial Avenue, between Nocta Street and Elma Street. This location is a multi-unit apartment complex, and I was unable to determine exactly which apartment building NAVARRO met with RIVERA.

### June 26, 2009

69.     On June 26, 2009 at 3:00 p.m., NAVARRO received an incoming call on **Target Telephone #5** from RIVERA using **Target Telephone #9**.

      a.     During the conversation, RIVERA asked what NAVARRO would be "doing today." NAVARRO said he just got "out of work in Orange County.' RIVERA asked if NAVARRO was going to "come over later on today." NAVARRO asked if RIVERA needed NAVARRO to. RIVERA asked if NAVARRO remembered when they "sent Ricky for those things." NAVARRO said "yes." RIVERA said somebody "has it on hand" and it was "brand new." RIVERA said it was "a little one." RIVERA said it was a "for sure thing" and is asking for "2," but is "pretty sure" they could "talk" third party "down." NAVARRO asked "how long" third party was going to have "it." RIVERA said he did not know and that is why RIVERA "got

at" NAVARRO as soon as possible. NAVARRO asked if it was "a 2." RIVERA said "2.5."

RIVERA said he was just letting NAVARRO know. NAVARRO said he would be "down there

tomorrow" and would call RIVERA up. RIVERA said if NAVARRO did not have "everything,"

then RIVERA would "put in." NAVARRO said "yes." RIVERA said he would try to "hold out"

until tomorrow and make sure RIVERA and NAVARRO were "interested." NAVARRO said he

would call RIVERA "tomorrow."

      b.    Based on my training, experience, and knowledge of the investigation, I

believe this call relates to a possible pending firearms transaction. When RIVERA refers to

"Ricky" bringing "those things" and that it is "brand new" and a "little one," I believe RIVERA

is referring to a firearm. RIVERA tells NAVARRO the deal is a "for sure thing" and the third

party, possibly "Ricky," wants "2," I believe the price of $200.00 is being discussed. When

NAVARRO asks RIVERA if "it" is a "2," and RIVERA replies "2.5," I believe they are

referring to the caliber of firearm being a .25 as opposed to a .22, which substantiates the

previous statement made in the conversation of "it" being a "little one," or a small caliber

firearm. I am aware that RIVERA and NAVARRO are both convicted felons, and I believe they

are conspiring to obtain the firearm to benefit the gang.

**July 8, 2009**

70.    On July 8, 2009, at 12:54 p.m., NAVARRO made an outgoing call on **Target

Telephone #5** to RIVERA using **Target Telephone #9**.

      a.    During the conversation, RIVERA asked what NAVARRO was "doing."

NAVARRO said he was "getting off from work." RIVERA asked if he knew "a guy named

Flaco." NAVARRO asked if it was "a paisa." RIVERA said "not that one down there."

NAVARRO asked if "the other one." RIVERA said "he (possibly Flaco) was one of them."

ER000256    USA000596

NAVARRO said he "did not know him." RIVERA said he (possibly Flaco) "wanted to scare a girl there at Nocta" (ph). RIVERA said "he would always go and talk to her." RIVERA said it would be "little things." NAVARRO asked for the girl's name. RIVERA said her name was "Liz." NAVARRO said it was "not that one and asked what happened." RIVERA said "the guy (possilby Flaco) came over and told her (possibly Liz) that he (possibly Flaco) had better prices and he scared her." NAVARRO asked if she (possibly Liz) "had his phone number." RIVERA said "no" and stated that "the guy (possibly Flaco) went to her (possibly Liz) house and he told her..." RIVERA said "he (possibly Flaco) wanted to tell her that he was like him" (RIVERA), "the same thing." RIVERA said "she told him (possibly Flaco) that she did not want to fuck with him because she was cool and she was going to stay where she was at." RIVERA said he (possibly Flaco) was telling her that "what if homeboy (possibly RIVERA) was saying he was but he was not."

      b.      NAVARRO asked if RIVERA had "talked to him" (possibly Flaco). RIVERA said he had "not talked to that fool" but he would get at him. NAVARRO asked if the guy (possibly Flaco) was "supposed to go back to her or was he going to call her" (possibly Liz). NAVARRO asked if she (possibly Liz) "got his number or how was he going to go about that." RIVERA said he told her (possibly Liz) that "as soon as the guy (possibly Flaco) was there for her to call" him (RIVERA). RIVERA said for Liz to call him and he would "go and get at that fool" (possibly Flaco). NAVARRO said for RIVERA to tell her that "if he was to go for her to tell him (possibly Flaco) that it was all good and that she was going to give him something and for him (possibly Flaco) to wait a little bit." RIVERA said "he (possibly Flaco) did not want to take anything from her (possibly Liz)." RIVERA asked if NAVARRO had "understood." RIVERA said "he (possibly Flaco) wanted to bring someone (third party) else who would give

USA000597

her some." RIVERA said that was why he (RIVERA) was asking "who he was (possibly Flaco)." RIVERA said "he (possibly Flaco) tried to bring someone (third party) else saying that he had better prices." NAVARRO asked what did he "mean," who he (possibly Flaco) "tried to bring." RIVERA said "he (possibly Flaco) tried to bring merchandise." NAVARRO said he knows but....NAVARRO asked if she had "no way of getting a hold of the guy (possibly Flaco)." RIVERA said he was going to "try to give her (possibly Liz) a call right now" and "see if she could try to get a hold of him (possibly Flaco)." RIVERA said he "wanted to know who he (possibly Flaco) was." RIVERA asked if he knows who he was. NAVARRO said "no." RIVERA said "that fool was running around like he was one of them (possibly Black Angels gang)." NAVARRO asked "how long ago did she get with him (possibly Flaco)." RIVERA said he guess it happened "yesterday or today." RIVERA said "the girl (possibly Liz) was scared because she would talk to him and get little things (possibly narcotics)." RIVERA told her that "he knows what the fuck she was doing." RIVERA said "the girl did not have anything in her house."

    c.    NAVARRO said for RIVERA to "get with her and have her lure him in" and for RIVERA to "get with him (possibly Flaco)." RIVERA said "okay." NAVARRO said for RIVERA to "tell her (possibly Liz) to make it seem like it was all good that way he would come over." NAVARRO said "if she tells him that she talked with somebody he (possibly Flaco) would get scared and not come over." NAVARRO said for RIVERA to tell her (possibly Liz) to "tell him (possibly Flaco) what he wanted to hear that way he would come over." RIVERA said that was what he told her and stated that he did not tell her anything. NAVARRO said for RIVERA to "tell her (possibly Liz) not to let him (third party) know that she was going to call him (possibly RIVERA)." RIVERA said she "did not put" him (RIVERA) "on blast or

ER000258

USA000598

anything." RIVERA said "she told him (possibly Flaco) that she was already going with somebody." NAVARRO said "if he did not leave her a number, then he would be going back to see what was up again or he would not go anymore." NAVARRO asked how he (RIVERA) was going to "get a hold of him (possibly Flaco)." RIVERA said he was "sure he was going to go back because she knows him." RIVERA said he does not know if she had his (possibly Flaco) number and stated that he was going to call her (possibly Liz) right now. NAVARRO asked if the guy was "younger or older." RIVERA said he did not know and stated that she (possibly Liz) only told him "it was a guy named Flaco." NAVARRO said he did not know. RIVERA repeated again that he told her to call him (RIVERA) "once he (possibly Flaco) comes over."

   d.  RIVERA said she was "in court right now and once she gets out she was going to call" him (RIVERA). RIVERA said he would "let her know" what he (NAVARRO) said, "to be cool and shit." RIVERA said to "get his (possibly Flaco) number that way they would get at him." NAVARRO said "yes." RIVERA said "he must be doing or something to get at her like that." NAVARRO said "he should get a beating for saying he was one of them and just go on from there."

   e.  RIVERA said as soon as she calls him out of court he would let NAVARRO know more "details." RIVERA said she did not tell him "a lot" but that "he (possibly Flaco) had been going over and telling her what was up." RIVERA said basically telling her that he (RIVERA) "did not have her back" and RIVERA stated that he knew "exactly what it was." NAVARRO said he does not know any (Flaco) and for RIVERA to go ahead. RIVERA said alright.

   f.  Based on my training, experience, and knowledge of the investigation, this call substantiates the belief that RIVERA is collecting extortion payments from an unidentified

59

female named "Liz," and he is discussing with NAVARRO the situation of an unknown subject by the name of "Flaco" soliciting narcotics to "Liz," and possibly attempting to collect extortion payments from her. I believe this call also establishes a hierarchy within the gang because RIVERA is asking NAVARRO for guidance on the matter, and NAVARRO instructs RIVERA to "lure" Flaco to Liz's residence to "get at him" and possibly give him a "beating for saying he was one of them."

### H. Toll Analysis for Target Telephone #9

71.     On or about July 7, 2009, I reviewed the telephone toll data information from June 15, 2009 to July 6, 2009 for **Target Telephone #9**. Based on my training, experience, and knowledge of the facts set forth herein, I believe that these contacts are being made in order to facilitate the **Target Offenses**. Moreover, these conversations are not the same conversations that will be intercepted on Target **Telephone #5, Target Telephone #7, and Target Telephone #8** and, therefore, monitoring is needed on **Target Telephone #9** in order to obtain evidence about RIVERA and his gang related activity. Some of the identified contacts are discussed herein in the following paragraphs.

72.     The following chart summarizes the frequency of those calls between June 15, 2009 and July 6, 2009:

| Telephone # | Number of contacts | Date of Last Call | Significance |
|---|---|---|---|
| 909-527-9464 | 13 | 7/01/09 | See ¶ 73 |
| 909-634-4184 | 4 | 7/01/09 | See ¶ 74 |

73.     During this period, there were 13 calls to and/or from telephone number 909-527-

USA000600

9464, a telephone subscribed to Guadalupe RODRIGUEZ, 227 West Sunkist Street, Ontario California, which has been intercepted on **Target Telephone #5** and is used by Steven ESPINOZA, also known as "Little Loki." Law enforcement has also intercepted calls between NAVARRO and Steven ESPINOZA. During some of those calls, ESPINOZA has made reference to collecting possible extortion payments, which on May 28, 2009 he referred to as "southsider dues." Based on my knowledge of this investigation, I am aware that ESPINOZA is an Ontario Black Angel gang member who has been observed by surveillance with NAVARRO assisting with the collection of extortion payments, and his conversations with NAVARRO over **Target Telephone #5** also reveal that ESPINOZA assists with the collection of extortion payments. I believe his conversations with RIVERA will include pertinent information relating to Ontario Black Angel criminal activity, including with the collection of extortion payments.

74. During this period, there were 4 calls to and/or from telephone number 909-634-4184, a telephone subscribed to "Jonatha Ramirez." 10350 Central Avenue, Montclair, California, which has been intercepted on **Target Telephone #5** and is used by Enrique JIMENEZ, also known as "Cisco." Law enforcement has intercepted calls between NAVARRO and Enrique JIMENEZ, during which JIMENEZ was directed to collect extortion payments from individuals, including a yet to be identified female referred to as "Brenda." After collecting from "Brenda," JIMENEZ reported back to NAVARRO stating she was "10 short," and she would give it to him tomorrow. Based on my knowledge of this investigation, I am aware that JIMENEZ is an Ontario Black Angel gang member who has been observed collecting extortion payments on behalf of NAVARRO. I believe JIMENEZ's conversations with RIVERA include pertinent information related to Ontario Black Angel criminal activity, including with the collection of extortion payments.

USA000601

## VI.    PRIOR APPLICATIONS FOR WIRE INTERCEPTIONS

75.    On or about July 13, 2009, the DEA Investigative Support Section checked the electronic surveillance indices of DEA, ICE and FBI.  Based upon my personal knowledge and the electronic indices search, I know of no other prior applications to intercept the wire, electronic, or oral communications involving any of the same persons, premises, or facilities named herein, except those set forth in Appendix A.

## VII.   NEED FOR INTERCEPTION

76.    The interception of wire communications to and from **Target Telephone #5, Target Telephone #7, Target Telephone #8,** and  **Target Telephone #9** is necessary to enable the government to achieve the goals of this investigation, namely, to obtain evidence that would convince a jury beyond a reasonable doubt of the following:

a.    The identities of the narcotics distributors, including JOSE LNU, presently being extorted by the Ontario Black Angels criminal street gang;

b.    The stash locations where narcotics are stored prior to distribution;

c.    The management and disposition of proceeds generated by this narcotics trafficking and money laundering organization; and

d.    The nature, scope, places, and methods of operation of JOSE LNU's narcotics distribution network.

77.    In particular, I am seeking to identify:

a.    The co-conspirators and the specific roles of individuals involved in the narcotics distribution networks of the narcotics distributors, including JOSE LNU, being extorted by the Ontario Black Angel criminal street gang;

b.    The current locations being used by those distributors for trafficking

62

                    USA000602

narcotics;

   c. JOSE LNU's sources of supply for heroin, cocaine, and any other narcotics that he is distributing; and

   d. The involvement of NAVARRO and other members of the Ontario Black Angels criminal street gang in narcotics distribution and extortion activities.

  78. I believe interception of **Target Telephone #5, Target Telephone #7, Target Telephone #8,** and **Target Telephone #9** will continue reveal the extortion activities of the Ontario Black Angels criminal street gang, as well as the narcotics distributors that NAVARRO is presently extorting. Interception of **Target Telephone #8** will also provide information regarding JOSE LNU's narcotics distribution network.

  79. The following is a list of the investigative techniques which have been used or which I have considered using to date in this investigation and an explanation of why these techniques are not reasonably likely to succeed in identifying suspects and allowing the government to prove beyond a reasonable doubt the full scope of this conspiracy.

  **A.** <u>**Physical Surveillance**</u>

  80. As I stated in my previous affidavits, law enforcement agents have conducted surveillance at locations identified in connection with the **Target Subjects**. Agents have been able to use surveillance as a means to identify persons identified in the intercepted conversations as engaged in the commission of the **Target Offenses**. In addition to the instances of surveillance described in previous affidavits, law enforcement has continued to conduct additional surveillance activities in an attempt to obtain information regarding ALEX's narcotics distribution activities as well as NAVARRO's activities associated with the Ontario Black Angels criminal street gang. These surveillance activities include what I believe to be instances

USA000603

in which ALEX has met with his sources of supply, as well as instances in which I believe that

NAVARRO has collected extortion payments, and met with other members of the Ontario Black

Angel criminal street gang. In addition to the instances of surveillance described above,

additional instances of surveillance include:

### June 23, 2009

81. On June 23, 2009, an intercepted call on **Target Telephone #5** between

NAVARRO and Enrique JIMENEZ, also known as "Cisco," indicated NAVARRO was "around

the corner" from JIMENEZ brother's residence, and was going to pick JIMENEZ up. I began

requesting GPS locations of NAVARRO's phone in an effort to supply that information to the

Ontario Upland Narcotics Task Force, to establish surveillance. A GPS request revealed **Target**

**Telephone #5** was in the area of Euclid Avenue and B Street in Ontario, and the surveillance

team was able to locate NAVARRO's vehicle behind the Yangtze Restaurant at 126 North

Euclid Avenue.

82. At approximately 5:46 PM, NAVARRO, JIMENEZ, and Fernando LOPEZ, were

identified walking out of the restaurant, and all three subjects got into NAVARRO's vehicle. At

approximately the same time, NAVARRO used **Target Telephone #5** to call Armando

BARAJAS, and during that conversation they agreed to meet at "the bar" at approximately 6:30

PM.

83. At approximately 5:55 PM, NAVARRO arrived at the apartment complex at 1009

E. Deodar Street, Apartment E, and several Hispanic males were seen walking from Apartment E

to Apartment F. It should be noted, Ernest CASTILLO, who was later identified as the subject

living in Apartment F, was the subject who spoke with NAVARRO on **Target Telephone #5**

reference the firearm which was seized during a search warrant on this date.

64

USA000604

84.     At 6:46 PM, NAVARRO received a call on **Target Telephone #5**, from ALEX using **Target Telephone #6**. During this Spanish language conversation, ALEX told NAVARRO to meet his runner at the "Jack in the Box" at "4th and Mountain" in 5-10 minutes. ALEX said he "only had $200." Based upon my training, experience, and knowledge of the investigation, I believe this call relates to an extortion payment to be paid to NAVARRO by ALEX's runner on his behalf. The surveillance team however, lost sight of NAVARRO's vehicle when it left the apartment complex, and when I requested a GPS location for **Target Telephone #5**, it already showed NAVARRO had arrived in the area of 4th Street and Mountain Avenue.

        a.     At 6:53 PM, NAVARRO received an incoming call on **Target Telephone #5** from CASTILLO. During the conversation, CASTILLO told NAVARRO "homie Bow Easy, they hit his pad." CASTILLO continued, stating "they found the thing, and they had them at the station." Based on my training, experience, and knowledge of the investigation, I believe this call relates to the search warrant served at Marlon JIRON's residence, and CASTILLO is informing NAVARRO that the firearm was seized by law enforcement.

        b.     At 6:59 PM, NAVARRO used **Target Telephone #5** to call Armando BARAJAS at 909-282-5934. NAVARRO informed BARAJAS he was on his way to "the bar," and a GPS request of NAVARRO's telephone revealed he was in the area of "B's" Bar located on the northeast corner of Holt Boulevard and Benson Avenue. After meeting with a subject at 1501 West F Street, NAVARRO, JIMENEZ and LOPEZ arrived at B's Bar.

        c.     At approximately 7:35 PM, a white Pontiac Grand Prix arrived in the parking lot of B's Bar, and the Hispanic male driver walked inside. An intercepted conversation between BARAJAS and NAVARRO on **Target Telephone #5** indicated neither had seen the

ER000265          USA000605

other arrive at the location, and they met inside.

        d.     At 7:46 PM, NAVARRO received an incoming call on **Target Telephone #5** from CASTILLO using 909-664-8542. NAVARRO told CASTILLO to meet him at the bar at Holt and Benson. At 7:49 PM, surveillance observed a Honda Accord arrive at the location, and CASTILLO was identified from a DMV photograph, and as being the one of the subjects observed earlier at 1009 East Deodar Street. After Officer Gutierrez saw CASTILLO, he ran subjects at the Deodar address through the DMV computer system and recognized CASTILLO from his DMV photo.

**June 24, 2009**

85.    On June 24, 2009, NAVARRO made an outgoing call on **Target Telephone #5** to Virginia GIL using 909-731-7996. NAVARRO asked GIL if she would be "home," and she stated she would "be there." NAVARRO said he would be "there" in about "a half hour" to "45 minutes." I contacted Corporal Justin Johnson of the Ontario Police Department's Multi-Enforcement Team (MET) in attempt to observe the meeting. At 3:12 p.m., NAVARRO made an outgoing call on **Target Telephone #5** to GIL. GIL asked if NAVARRO was there "already," and NAVARRO said he was "outside." Cpl. Johnson was arriving as NAVARRO arrived at GIL's residence at 613 North Campus Avenue, Upland, California. Cpl. Johnson identified both NAVARRO and GIL from their DMV photographs as they met in the driveway of the residence.

**June 25, 2009**

86.    On June 25, 2009, surveillance was established in the area of 227 West Sunkist Street in Ontario, California after an intercepted conversation between NAVARRO and Steven ESPINOZA also known as "Little Loki" over **Target Telephone #5** indicated "it was going to

USA000606

be tonight for them dudes." Members of the Ontario Upland Narcotics Task Force observed

ESPINOZA get into NAVARRO's vehicle at approximately 12:51 PM. At approximately 1:07

PM, NAVARRO and ESPINOZA arrived at B's Bar at Holt Boulevard and Benson Street. A

previous call between NAVARRO and BARAJAS at 12:44 PM indicated BARAJAS would

meet NAVARRO at the "same spot," and at 1:17 PM, BARAJAS arrived at B's bar.

NAVARRO and ESPINOZA got out of NAVARRO's vehicle, met with BARAJAS, and walked

into the bar together. At 2:48 PM, NAVARRO and ESPINOZA left the location in

NAVARRO's vehicle, and were followed to the Pomona Indoor Swap Meet at Holt Boulevard

and Indian Hill. At approximately 3:30 PM, the subjects left the location, and were followed to

ESPINOZA's residence where he was dropped off. Surveillance remained with ESPINOZA, and

after going to McDonald's on Mountain Avenue and H Street, ESPINOZA went back home. At

approximately 5:37 PM, officers followed ESPINOZA, who was driving a white Scion, to a

Stater Brothers parking lot in Ontario. Surveillance officers also observed Armando BARAJAS

at the Radio Shack, in the same shopping center. At 5:42 PM, NAVARRO made an outgoing

call on **Target Telephone #5** to ESPINOZA using 909-527-9434. ESPINOZA told NAVARRO

that "the fools in the Explorer" were following him for "a cool minute right now." NAVARRO

asked where he saw them, and LIL LOKI said that he was "following right now." NAVARRO

asked if they (3rd party) "ran LIL LOKI's plates," and LIL LOKI said "probably." LIL LOKI

said that he turned into the shopping center at Stater Brothers, and "he (3rd party) did too,"

"every turn, it was a white dude with a goatee, but his tinted windows were down." NAVARRO

said that "they were rolling around." LIL LOKI said that "he (3rd party) followed him from

State Street." NAVARRO said that he (4th party) had to dial "611" and the "pin number" was

"584-616-36-58." NAVARRO said "that was it" and to tell him (4th party) it was "15 bucks."

67

USA000607

LIL LOKI said that he would "text it" to him. LIL LOKI said that later he would also text him (NAVARRO) "the number (for 4th party)." Based on my training, experience, and knowledge of the investigation, I believe this call substantiates the belief that ESPINOZA and the Ontario Black Angels are mindful of surveillance, as he identified one of the surveillance officers and his vehicle. NAVARRO then gave ESPINOZA instructions, I believe, to activate a new telephone at the Radio Shack. Surveillance continued to observe ESPINOZA's activities in an attempt to observe what was "going to be tonight for them dudes." When ESPINOZA left an apartment complex at approximately 8:10 p.m., the surveillance team decided to coordinate a traffic stop on ESPINOZA's vehicle. No narcotics or weapons were located, and ESPINOZA was released. He did not make any statements to the officers.

**July 3, 2009**

87.    On July 3, 2009, at 12:15 PM, NAVARRO made an outgoing call on **Target Telephone #5** to an unidentified male later identified as Carlos RIVERA using **Target Telephone #9**. During the conversation, NAVARRO asked RIVERA to "roll" with him "real quick." In an attempt to identify RIVERA, I contacted the Ontario Police MET Team, who located NAVARRO in the McDonalds parking lot at Euclid Avenue and the 60 Freeway at approximately 2:00 PM after a court authorized GPS precision location request revealed NAVARRO was in the area.

88.    At 2:15 PM, surveillance units followed NAVARRO to the area of Park St. and Palm Ave. where a subject believed to be Enrique JIMENEZ briefly met with NAVARRO. At 2:30 PM, NAVARRO made an outgoing call on **Target Telephone #5** to Carlos RIVERA using **Target Telephone #9**. NAVARRO said he was "around the corner," and the RIVERA said he would be "waiting in the front." NAVARRO said he was going to "go around the block" and

come around. The RIVERA said "alright." At 2:35 PM, NAVARRO parked along the west

curb of North Vineyard Avenue, north of Plaza Serena Street, and the RIVERA got into the

passenger side of NAVARRO's vehicle. He was described as a Hispanic male, with a shaved

head and glasses, wearing a white t-shirt, blue shorts, white shoes, and he had tattoos on his

lower legs. At 2:50 p.m., NAVARRO and RIVERA arrived in the 200 block of W. Maitland St.

and parked along the south curb line. Both subjects exited the vehicle and walked to a house at

226 W. Maitland Ave. They made contact with unidentified subjects who were standing on the

front porch.

89. At 2:53 p.m., NAVARRO and RIVERA walked back to NAVARRO's vehicle

and they drove away eastbound on W. Maitland St. At 2:55 p.m., NAVARRO and RIVERA

arrived in the 400 block of W. Ralston St. and parked along the south curb line. Both subjects

exited the vehicle and walked to a house at 410 W. Ralston St. At 2:57 p.m., NAVARRO

received an incoming call on **Target Telephone #5** from DEWESTER using (909) 243-0272.

DEWESTER said it was the room "right next to the staircases right in the end." DEWESTER

said where he comes "right to the parking lot." DEWESTER said there was some "stairs that

lead to upstairs." NAVARRO said right when he "goes in." DEWESTER said to go "all the

way back to the back" and said "the door would face Mission" and said it was downstairs.

NAVARRO asked if he knew "the number." DEWESTER said he did not know it but it was

"some black fool." DAVID asked if two were staying there. DEWESTER said "the fools were

working with Beto (PH)." DEWESTER asked if DAVID had "talked to Beto." DAVID said

"no," but would call him to talk to him. DEWESTER said he "tried getting him," but the fool

(U/I) and shit. DEWESTER asked if he knew "the white boy in the Jetta," that they tried

"getting that fool" and added they "were gunning for that fool and packed him up with some

69

USA000609

bunk shit."

90.     At 3:05 p.m., NAVARRO and RIVERA walked back to the vehicle and drove

away eastbound on W. Ralston St. At 3:10 p.m., NAVARRO and RIVERA arrived at the Econo

Inn, located at 724 S. San Antonio Ave. Ontario MET Team Officers Shaffer and Kocab had

already established surveillance in the parking lot of the motel in anticipation of NAVARRO's

arrival. Navarro parked his vehicle facing southbound on the far west side of the motel,

approximately 30-40 feet behind the surveillance vehicle. NAVARRO and RIVERA exited the

vehicle and walked into the courtyard of the motel and out of view. At 3:13 p.m., NAVARRO

made an outgoing call on **Target Telephone #5** to DEWESTER using (909) 243-0272.

NAVARRO asked if the "door faces Mission." DEWESTER said if NAVARRO comes "from

the back side it should be on the left hand side," the "first door." NAVARRO asked if

DEWESTER knew "where the laundry was way in the back." DEWESTER said "yes."

NAVARRO asked if he would "go through there." NAVARRO said if DEWESTER had seen

"the Pinto" (African American) before "that one" DEWESTER told NAVARRO about.

DEWESTER said "yes he was dark with clip on glasses." NAVARRO said he saw "a pinto"

(African American) "in the parking lot with curly hair." DEWESTER said he "dressed like

laimbrand (PH) and shit." NAVARRO asked if he "went through the stairs in the back which

room was it." DEWESTER said "the first one on the left hand side." NAVARRO said he knew

where now. NAVARRO asked if it was "the first one that said employees only." DEWESTER

said "yes." NAVARRO said "alright" and would give him a call back. DEWESTER said

"alright."

91.     At 3:14 PM, NAVARRO and the RIVERA walked back to the parking lot and

stood next to NAVARRO's vehicle. At 3:15 PM, NAVARRO and the RIVERA walked back

70

                    USA000610

into the courtyard of the motel and out of view.

92.    At 3:18 p.m., NAVARRO and the RIVERA walked back to the parking lot and got into NAVARRO's vehicle. Officer Shaffer took a photograph of NAVARRO and RIVERA as they approached NAVARRO's vehicle. Based upon their observations, Officer Shaffer and Officer Kocab were able to positively identify RIVERA from photographs obtained in Parole LEADS, a computer system utilized to access parolee records. At 3:20 p.m., NAVARRO and RIVERA drove away from the location and surveillance was terminated.

**July 7, 2009**

93.    On July 7, 2009, at 8:26 PM, NAVARRO made an outgoing call on **Target Telephone #5** to JOSE LNU using **Target Telephone #8.** During this Spanish language conversation, NAVARRO asked if JOSE wanted to "go there." JOSE asked if they could "leave it for tomorrow." NAVARRO said he "preferred to talk" to JOSE "today" so JOSE would "know." NAVARRO said "it would be fast" and he could go to where ever JOSE was. JOSE suggested "Philadelphia and Euclid in front of the Food 4 less." NAVARRO said "okay." JOSE asked "how long." NAVARRO said "soon because he was on Philips and Euclid which was two blocks away." JOSE said "alright." Based upon my training, experience, and knowledge of the investigation I believe this conversation related to a pending meeting between NAVARRO and JOSE LNU reference an extortion payment. As a result, I contacted Corporal Lorenz of the Ontario Police MET Team in an effort to observe the meeting and follow JOSE LNU to his residence.

94.    At 8:34 PM, NAVARRO made an outgoing call on **Target Telephone #5** to JOSE LNU using **Target Telephone #8.** NAVARRO said he was "at the Jack in the Box because Food 4 Less had a lot of people." JOSE said he would "get there." NAVARRO said

71

USA000611

"okay." At approximately 8:40 PM, Cpl. Lorenz was assisted by the Ontario Police Air Unit, and established surveillance at Jack in the Box parking lot at Euclid Avenue and Philadelphia Street. Cpl. Lorenz observed NAVARRO's vehicle, a blue Toyota Camry with California License plate number 5EKJ119, in the parking lot.

95.     At approximately 8:45 PM, a vehicle parked next to NAVARRO's vehicle. A subject got out of the vehicle, and got into the passenger side of NAVARRO's vehicle. At 8:57 PM, the subject got out of the passenger side of NAVARRO's vehicle, and remained at the passenger window. He appeared to be talking to someone inside the vehicle. At 8:58 PM, the subject got back into his vehicle and was followed southbound Euclid Avenue and eastbound on Walnut Street to Campus Avenue. The vehicle was described as a silver KIA, with a California License plate of 5XAH940. The Ontario Air Unit observed the vehicle arrive in the driveway on Skylark Avenue, which Cpl. Lorenz confirmed was an address of 738 Skylark Avenue. Surveillance was terminated at this time.[18]

**July 8, 2009**

96.     On July 8, 2009, at approximately 2:20 PM, Officer Ramiro Martinez and members of the Ontario Upland Narcotics Task Force established surveillance at Daniel REYES' residence at 7895 Blanchard Avenue in Fontana, in an attempt to observe REYES and his activities. At approximately 2:55 PM, REYES was observed getting into a black Dodge

---

18  JOSE LNU was observed on April 7, 2009 by Special Agent Ariya Venin at this same address during surveillance of her target subject in an unrelated investigation discussed in previous affidavits. On that date, her target subject was observed arriving at the Skylark address after he contacted JOSE LNU on **Target Telephone #8,** and discussed picking up "tomatoes," possibly narcotics. Based on S/A Venin's wire intercepts, and toll information on **Target Telephone #8,** JOSE LNU has not been in contact with S/A Venin's target after that date.

USA000612

Durango with California License plate number 6DDU594, registered to Melissa Reyes at 1835 North Calaveras Avenue in Ontario, California. REYES was followed out of the residential area onto Miller Street where surveillance units lost sight of the vehicle. It is unknown if REYES conducted counter-surveillance techniques, but surveillance officers were unable to locate his vehicle on an area check. Officers remained at REYES residence until approximately 3:30 PM, when surveillance was terminated due a subject who walked down the street and looked into one of the surveillance officer's vehicles before walking into REYES' residence.

97. In most instances, absent wire monitoring, law enforcement would not have been able to locate the **Target Subjects** at the location. Nor would they have been able to identify the nature of a meeting. As I stated in previous affidavits, I believe physical surveillance typically cannot be done effectively and efficiently unless the agents know the time and place of an activity. I believe that the continued wire intercept of **Target Telephone #5** as well as the authorized wire intercept of **Target Telephone #7 and Target Telephone #9** will assist in gathering additional information regarding the extortion and other criminal activities of the Ontario Black Angels criminal street gang, I also believe that the authorized wire intercept of **Target Telephone #8** will assist in gathering information regarding Jose LNU's narcotics distribution activities, including a possible source of supply in connection with Armando BARAJAS. This information will increase the likelihood of obtaining evidence of the crimes I believe are being committed by the **Target Subjects**. Use of a wiretap will allow law enforcement to be more selective in its surveillance activities, thus reducing the risk of compromising the investigation. For these reasons, I believe that physical surveillance, without the aid of wire interception of the **Target Telephone #5, Target Telephone #7, Target Telephone #8 and Target Telephone #9** will not achieve the current goals of the investigation.

73

USA000613

**B.** **Interviews of Witnesses and Confidential Sources, Grand Jury Subpoenas, Grants of Immunity, and Financial Investigation / Mail Covers**

98.     As previously discussed, Marlon JIRON and his girlfriend Jessica Perez were interviewed on June 23, 2009, after a search warrant was executed at JIRON's residence, and a 9mm handgun possibly used in the homicide of Paul Angel Rodriguez was seized. JIRON and Perez both made statements implicating themselves as having knowledge of the firearm, and are considered to be cooperating witnesses in the homicide investigation. I do not believe that questioning them beyond the scope of the homicide will benefit this investigation, as it may alert JIRON and other Ontario Black Angel gang members that a more in depth investigation into the gang is in progress.

99.     As I stated in my June 17, 2009 affidavit, at this time, I know of no witnesses that would achieve the objectives of this investigation as outlined above. During the course of this investigation, I have spoken with law enforcement officers who have been assigned to investigate the Ontario Black Angels criminal street gang. Based on my conversations with those officers, I am aware that law enforcement has, in the past, interviewed members of the Ontario Black Angel gang, and those criminal street gang members have yielded limited information due to the fear of retaliation and their allegiance to the gang. Thus, I believe, at this time interviews of gang members will not accomplish the goal of identifying the scope of the extortion activities of the Ontario Black Angels criminal street gang. Moreover, even if I were able to identify a co- conspirator of Jose LNU or a member of the Ontario Black Angels criminal street gang that could provide information that would satisfy the objectives of the investigation, an interview of that individual would jeopardize the investigation as that individual would likely

74

                    USA000614

provide information regarding the investigation to Jose LNU or members of the gang, including NAVARRO.

100.    Furthermore, as I stated in my June 17, 2009 affidavit, there are not any confidential sources that would be able to provide information or testimony that will accomplish the goals of this investigation.

a.    Most recently, Ontario Police Gang Detective Paul Berdnik informed me of a confidential informant who is not an active member of the Ontario Black Angels, however he/she does remain in social contact with Ontario Black Angel members. On or about June 23, 2009 Det. Berdnik asked the informant if he/she had information regarding who was using certain telephone numbers intercepted on **Target Telephone #5** who have yet to be positively identified in the investigation. The informant's information has only been able to be corroborated as being correct one out of two times, thus their information is not yet deemed to be reliable. I will however, continue to contact Det. Berdnik and attempt to obtain further information from the informant in the future.

b.    I have spoken with DEA Special Agent ("SA") Ariya Venin who has advised me that there are presently no individuals that are cooperating in her investigation at this time.

c.    During the week of May 18, 2009, I was contacted by Sgt. Keith Volm, a Sergeant with the Ontario Police Department, who advised me that an anonymous informant who contacted him telephonically to provide information about Ontario Black Angel gang member Armando BARAJAS. Specifically, this informant provided Sergeant Volm with two telephone numbers used by BARAJAS. The identity of the informant is unknown at this time. I have, however, partially corroborated the information that this informant provided, as one of the

75

USA000615

telephone numbers has regularly been intercepted on **Target Telephone #5** and a voice comparison indicated that the individual calling from the telephone number that the informant provided was indeed BARAJAS. The informant continues to contact Sgt. Volm, and has most recently given information pertaining to Armando BARAJAS' niece, Monica CORNEJO, and her possible involvement in trafficking methamphetamine, but information given has not yet been able to be corroborated through the investigation. I continue to remain in contact with Sgt. Volm, and will continue to utilize any information obtained.

101. With the exception of ALEX, to date, no bank accounts, real estate holdings, or other significant assets owned by NAVARRO, or other Target Subjects have been identified. Intercepted communications on **Target Telephone #3** revealed a bank account possible used by ALEX and CARMELA LNU, and a subpoena was issued in an attempt to gain additional information regarding that account. The account had been closed by the time the bank complied with the request for information, and no useful information was gained from the details of the account. Additionally, efforts to fully identify assets and money laundering methods used by the Target Subjects will continue to be made. I have requested from the United States Postal Service, however, a mail cover for Virginia GIL's address at 713 North Campus Avenue, Upland, California, in an effort to obtain information regarding possible bank accounts which I can investigate further into the possible transfer of funds to her husband Juan GIL, and / or any other Mexican Mafia members.

102. For the foregoing reasons, use of interviews, grand jury subpoenas and immunity, and any financial investigation that could be conducted, even in conjunction with conventional investigative techniques, is unlikely to advance, and, in some instances would likely impede, the government's investigative objectives.

76

USA000616

## C.     Undercover Agents

103.     At this time, implanting a law enforcement officer in an undercover capacity is not feasible.  In order to infiltrate ALEX's narcotics distribution organization or the Ontario Black Angels criminal street gang, there would need to be a CS who could facilitate an introduction.  Presently, there is no CS that could facilitate such an introduction.

104.     I know that drug trafficking organizations are often tight-knit and do not often divulge information to outside members.  Moreover, I am aware that it would be difficult for an undercover agent to penetrate the organization and, even if an undercover agent were introduced, it would be highly unlikely that he/she would be privy to such information as to accomplish the goals of this investigation.  However, during the course of this investigation we will continue to investigate the possibility of introducing an undercover agent into the organization if an opportunity arises and if I determine that the danger to the law enforcement officer would not be too great.

## D.     Search Warrants/Seizures

105.     As I stated previously, I have made use of a search warrant as well as a parole search during the latest interception period, each targeting members of the Ontario Black Angels criminal street gang.

        a.     On June 23, 2009, the Ontario Police MET Team assisted San Bernardino County Sheriff's Detective Radeleff in the execution of a search warrant at Marlon JIRON's residence located at 1528 North Marin Avenue, Ontario, California, after an intercepted conversation between NAVARRO and CASTILLO over **Target Telephone #5** indicated a firearm possibly related to the homicide of Paul Angel Rodriguez may be located there.  Pursuant to the warrant, a stolen Beretta 9mm handgun was seized along with a mixture of "Winchester"

ER000277                                             USA000617

and "RP" 9mm ammunition, which is consistent with casings left at the homicide scene. Intercepted conversations over **Target Telephone #5** between NAVARRO and CASTILLO after the warrant indicated knowledge the law enforcement had served the warrant at the residence, and found "the thing," in reference to the firearm.

      b.    On June 24, 2009, NAVARRO spoke with Carlos VASQUEZ, also known as "Little Lazy" on **Target Telephone #5.** NAVARRO asked VASQUEZ if "that pretty hyna was kicking back" with him, which based on my training, experience, and knowledge of the investigation, relates to a firearm. VASQUEZ did not understand at first, but then replied "yeah" he had that "bitch" right there. NAVARRO asked if he was at his "pad," and VASQUEZ answered "yes." NAVARRO said he was "going to go check something out real quick" and would be by to pick him up. Surveillance was established, but prior to NAVARRO arriving at VASQUEZ' residence, NAVARRO used **Target Telephone #5** to call VASQUEZ and tell him to "go ahead and cancel that," which I believe to mean, cancel the trip they had planned where VASQUEZ was to bring the firearm. Because VASQUEZ was on active parole, I asked Detective Berdnik to send gang officers to his residence to conduct a parole search in an effort to locate the firearm mentioned. The officers contacted VASQUEZ, who was alone at his residence at 1430 West Stoneridge Street Apartment #3, Ontario, California, but were unable to locate a firearm.

      106.    Based upon my training and experience, I am aware that use of information received by way of wire interception has been successful in disclosing multiple stash locations associated with an organization that distributes controlled substances or listed chemicals. Additionally, I believe that without the information derived from a wire intercept, investigators will have difficulties identifying when and where to serve search warrants. Further, even if wire

USA000618

information does not reveal the location of stash houses, it often provides substantial assistance in determining when to execute a search warrant on a known address, so as to increase the chance of finding evidence of a crime at the address. This is so because members of the conspiracy often talk to each other about the contraband they have at various locations when they are holding contraband in preparation for a drug delivery or other related activity. However, I believe that even if additional search warrants were obtained, it is unlikely that they would reveal the full scope of ALEX's narcotics trafficking organization or the extortion activities of the Ontario Black Angels criminal street gang.

107. When the investigation is closer to the completion of the stated objectives, the use of search warrants is likely to be a valuable tool, but the use of search warrants at this time would jeopardize the overall investigation by prematurely notifying members of the conspiracy that they are being investigated by law enforcement and compromise the ultimate goals of the investigation. For example, I have presently identified residences for NAVARRO, REYES, RIVERA, Virginia GIL, runners for ALEX's narcotics distribution organization, as well as the residences for other members of the Ontario Black Angels criminal street gang. While I believe that the execution of search warrants at these locations may result in the seizure of narcotics and / or weapons, I believe that the premature execution of warrants will likely alert the **Target Subjects** of the current ongoing investigation, and will potentially cause the **Target Subjects** to discontinue using the **Target Telephones** and alter their methods of operation, thereby making it more difficult to accomplish the goals of the ongoing investigation. Through the use of a wire intercept, investigators can better direct their use of search warrants without jeopardizing the ongoing investigation. I am considering the execution of a search warrant at ALEX's residence, however since he has ceased using **Target Telephone #6,** I am unaware of his most recent

79

USA000619

activities and the times at which he receives deliveries from sources of supply. In the event ALEX contacts NAVARRO on **Target Telephone #5**, I may be able to confirm his current narcotics activities and make a decision based upon that information.

### E.     Pen Register/Toll Records

108.     I anticipate that the investigation will continue to use pen registers, trap and trace devices, and toll record analysis during this investigation. Pen registers and toll information provide frequency and identifying information regarding calls made to and from a particular telephone. This technique, however, will only provide agents with a list of numbers called. The technique will not always establish the identities of the persons called and not reveal the content of the conversations. Again, the circumstances learned during the last several days have not revealed new information or opportunities to use these tactics in a manner that could achieve the goals of the investigation without the requested interception of wire communications.

a.     I am currently utilizing judicially authorized pen register number 09-1332M, signed by United States Magistrate Judge Alicia G. Rosenberg on June 26, 2009 for telephone number 909-218-0602. This telephone number is believed to be used by Monica CORNEJO. Based upon informant information, CORNEJO may be supplying methamphetamine to dealers in and around the Ontario area.

b.     I also obtained pen register number 09-1350M, signed by United States Magistrate Judge Jacqeline Chooljian on June 30, 2009 for telephone number 909-545-0503, formerly used by Daniel REYES, however, it was not activated as Metro PCS personnel stated the telephone was no longer in use on the date of the signing.

c.     Through toll records, I have recently learned that one of the most frequently called numbers on **Target Telephone #8**, is the most frequently called number of

80

USA000620

Armando BARAJAS. I believe this will be useful as the investigation moves forward to identify

the extent to which the Ontario Black Angels are dealing in narcotics as opposed to solely

collecting extortion payments from others selling narcotics in the area.

**F.**     **Trash Searches**

109.     I have made use of two trash searches during the course of this investigation.

a.     In July 2008, members of the OUNTF completed a trash search at

MISQUEZ' residence located at 1830 E. Tam O'Shanter St. Ontario, California. Small pieces of

balloons and foil, consistent with the packaging of narcotics were located, but nothing was found

of evidentiary value that would link MISQUEZ with the ALEX's narcotics distribution

organization.

b.     On May 13, 2009, at approximately 6:15 a.m., Corporal Maynor Arana

and Officer Ramiro Martinez of the Ontario Police Department, with the assistance of the San

Bernardino City Sanitation Department, conducted a trash run at 1023 W. 10th Street in the city

of San Bernardino, California, a possible residence of the SOS. As a result of the trash run

numerous items of ordinary household waste were discovered. Within the trash Officer Martinez

discover one piece of mail addressed to Jose J. Orozco. The mail was subsequently collected,

scanned into a digital file and destroyed. No other items of evidentiary value were discovered.

110.     I do plan on conducting a trash search at Virginia GIL's residence located at 713

North Campus Avenue, Upland, California, but based on my training and experience I do not

believe that trash searches, even in conjunction with other traditional methods of investigation,

would yield information that would meet the objectives of this investigation, including the

development of prosecutable evidence against the **Target Subjects**, the identification of sources

of supply, and methods of operations. Moreover, trash searches are completed in the open in the

                    USA000621

view of the public. Therefore, an associate and/or friend could potentially observe law enforcement conducting a trash search, therefore compromising the investigation.

111.    I am also aware that trash searches may not always be feasible because in some residential neighborhoods law enforcement runs a risk of being detected while conducting these searches.

    a.    For example, a trash search at ALEX's residence at 15544 Prairie Way in Riverside, California, in my opinion, would pose a high risk of law enforcement detection due to its location in a somewhat rural cul-de-sac without any neighbors for a large distance.

    b.    Additionally, NAVARRO is believed to reside in apartment or mobile home complexes where common trash receptacles are utilized by numerous individuals, making the identification of their trash difficult if not impossible.

    c.    I am not able to complete trash searches on the users of **Target Telephone #7**, **Target Telephone #8**, or **Target Telephone #9**, as law enforcement does not have known residences for these individuals identified as of this date.

    d.    Furthermore, based on my training and experience, if a trash search were conducted, any evidence gained would provide only limited assistance in accomplishing the goals of this investigation, which is to identify the full scope of the Ontario Black Angels extortion activities. It is highly unlikely that a list of identified members of the Ontario Black Angels criminal street gang would be casually thrown in the trash.

    e.    Similarly, while I believe that the SOS is associated with Carlos and Saul's Appliances at 888 N. Mount Vernon Street in San Bernardino, California, I do not believe that a trash search of that location would be productive as trash from that location is contained in a full size dumpster that is shared with at least one neighboring business.

ER000282

USA000622

112.    While it is possible that pay-owe sheets or other records of drug transactions could be recovered from the trash of narcotics traffickers, it is unlikely.  Moreover, even if such documents were recovered, they are generally difficult if not impossible to decipher without additional information from another source regarding the parties and transactions involved.  While other evidence may be recovered, narcotic traffickers rarely throw out clear evidence that can prove the Target Offenses beyond a reasonable doubt.  Nevertheless, I will continue to consider utilizing trash searches as an investigative tool.

### G.    Other Investigative Methods

113.    I have considered these additional investigative methods but have determined that they are insufficient at this time to accomplish the goals of the investigation:

a.    **Recorded Jail Calls**:

i.    I used the Los Angeles County Sheriff's jail system which revealed a telephone call on May 7, 2009 between Monica CORNEJO using telephone number 909-218-0602, and an inmate who identified himself as Gerardo Sedano also known as "Huero."  SEDANO asked CORNEJO if she talked to the homie "MONSTER" already.  "MONSTER" was supposed to call her and tell her that SEDANO was going to call her.  "MONSTER" told SEDANO that CORNEJO is out there "doing" her "thing," and SEDANO was thinking they could "meet up in the streets" when he gets out and "talk about it."  SEDANO told CORNEJO he will be getting out in "six months" and "MONSTER" told SEDANO that CORNEJO is "doing" her "thing out there."  SEDANO asked CORNEJO if she understood what he was talking about.  SEDANO told CORNEJO that maybe she could "help" him "out," or maybe he could help CORNEJO out.  CORNEJO asked SEDANO if he was with "DAFFY."  SEDANO confirmed with CORNEJO if she was talking about the "homie from LENNOX," and CORNEJO

83

USA000623

confirmed it's the "same person." SEDANO said he wanted her to come and "pull" him "out for a visit" so they can "meet" and when he "gets out" she will "recognize him." Based on my training, experience, and knowledge of the investigation, I believe SEDANO heard from a subject named "Monster" that CORNEJO was selling narcotics, and would be someone to contact in order to sell narcotics himself. SEDANO asked CORNEJO to visit him so she could recognize him when he got out of jail, and he would not be mistaken for a rival gang member. I am aware that inmates are aware of the fact their jail calls are recorded, and the likelihood of their conversations assisting further in this investigation are slight, but I will continue to pursue this source of information.

      ii.    The Los Angeles County and San Bernardino County Sheriff's jail call system was checked for calls completed to **Target Telephone #5, Target Telephone #7, Target Telephone #8, and Target Telephone #9,** which revealed no further information.

      b.    **Pole Cameras**: I have also considered utilizing pole cameras to assist with this investigation.[19] While I have considered installing a pole camera at ALEX's residence at 15544 Prairie Way, Riverside, California, I have not installed a pole camera as the front of ALEX's residence faces a large area without suitable camera mounting locations. Additionally, I believe that a pole camera will fail to provide evidence of the full scope of ALEX's narcotics distribution network, as it would merely show vehicles and/or subjects arriving and departing from the location. It would not assist in identifying the purpose of the subject's arrival, nor would it assist in identifying whether the visit was or was not criminal in nature I have also

---

19 I am also aware that the Chino Police Department has a pole camera at B's Bar because it is owned by a Chino Sinner gang member, and they are currently investigating the Sinners.

ER000284

USA000624

considered utilizing a pole camera to observe NAVARRO's residence located at 1500 Otterbein Avenue, Space 18, Rowland Heights, CA, 91748. However, I have decided that a pole camera at this location would not further the goals of the investigation because, based on my knowledge of the investigation including intercepted calls to and from **Target Telephone #5**, I am not aware of an instance in which NAVARRO met with members of the Ontario Black Angel criminal street gang at his residence to further criminal activities of the gang. I do not presently have knowledge of a location where a pole camera would benefit the investigation, since I would only be able to see vehicles and or subjects arriving or leaving, which without wire intercepts, I would not have information as to why they are at the location.

        c.    **Tracking Devices**: I have considered the use of mobile tracking devices on NAVARRO and other Target Subjects' vehicles, but many of our targets are seen driving different vehicles, making it difficult to select the proper vehicle to track. For example NAVARRO has been seen in two different Toyota Camrys, one blue and one charcoal grey, California License Plate numbers 5EKJ119, and 6AMT501, respectively. NAVARRO appears to switch off between the two randomly, and we have intercepted calls with REYES talking about using his sister's vehicle because it is more "low profile." As a result, I have reason to believe he utilizes other vehicles as well. In addition, many of the gang members do not have vehicles, and NAVARRO routinely directs people such as REYES to pick up various gang members and transport them to various locations, making selection of the tracked vehicle challenging. Moreover, I have had more success using GPS precision location information on the **Target Telephones**, rather than have a tracking device on a vehicle that the subject may or may not be driving. I will consider the use of such tracking devices in the future, but at this time, I do not believe that they will further the goals of the investigation.

USA000625

## VIII.   MINIMIZATION

114.   All interceptions will be minimized in accordance with Title 18, United States Code, Sections 2510 - 2522.  Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that the **Target Subjects**, or any of their associates in the criminal offenses set forth above, when identified, are not participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  Even if one or more of the interceptees, or their associates, when identified, is a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or otherwise related to the offenses under investigation. Based upon my training and conversations with other monitoring and supervising agents, I believe that many of the narcotics-related conversations will be part of otherwise innocent conversations.  Monitoring agents will use information gained from previous recordings on **Target Telephones** in determining whether a particular call should be minimized as a non-pertinent call.  Conversations that appear to be non-pertinent will be minimized, subject to being periodically monitored to determine if the conversation has become narcotics-related.

115.   Before any interception of communications over **Target Telephones** begins, a meeting will be held for all monitoring agents and the requirements of minimization will be discussed.  A memorandum regarding minimization and a copy of the Court's order will be provided to all monitoring officers and posted at the listening site.  Before an officer begins to intercept communications, he or she will sign a form indicating that the officer has read the affidavit, the Court's order and the minimization memorandum, is familiar with the contents of the documents, and will intercept communications in compliance with the Court's order and the other documents.  If a monitoring agent determines that a conversation is not criminal in nature,

86

                    USA000626

is privileged, does not relate to the investigation, or does not involve the Target Subjects, or other co-conspirators identified through the interception process, the interception will be minimized. Even if a conversation is minimized, "spot" monitoring will be conducted to ascertain whether or not the conversation has become criminal in nature or is no longer privileged. The monitoring location will be kept secure and access will be available only to persons authorized to be involved with this investigation.

116. All intercepted conversations will be recorded and all recordings will be securely preserved. Logs will be prepared noting the date and time of calls, the parties involved, the subject of the call, and if and when minimization occurred. Reports detailing the course of the interception will be filed with the Court after about the fifteenth day following the commencement of interception pursuant to the Court's order. Particular emphasis will be placed on reporting minimization efforts to the Court.

## IX.  DURATION OF INTERCEPTION

117. This affidavit is in support of an application to intercept wire communications for a period not to exceed 30 days. As demonstrated by the facts contained in this affidavit, the narcotics trafficking conspiracy is ongoing in nature and involves the **Target Subjects** and others. It is the goal of this investigation to prove the full scope, membership and methods of operations of the conspiracy. Therefore, I request that interception not be terminated upon the first interception regarding narcotics trafficking, but be allowed to continue until the full scope of the conspiracy, and the persons involved and their respective roles are determined, or, for 30 days, whichever comes first, measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's order or ten days

87

                    USA000627

from the date of the Court order on **Target Telephone #7, Target Telephone #8 and Target Telephone #9**, and measured from the date of the Court's Order for **Target Telephone #5**.

## X.  CONCLUSION

118.    The facts contained in this affidavit demonstrate that there is probable cause to believe that the Target Subjects, and others unknown, have committed, are committing, and are about to commit offenses enumerated in Title 18, United States Code, Section 2516, and that evidence concerning those offenses will be obtained through interception of wire communications over **Target Telephone #5, Target Telephone #7, Target Telephone #8** and **Target Telephone #9**.


_____/S/_____

KRIS LAVOIE
Task Force Officer
Drug Enforcement Administration


Sworn to and subscribed to before me on:
July 17, 2009


**MANUEL L. REAL**
_____
HONORABLE MANUEL L. REAL
UNITED STATES DISTRICT JUDGE

ER000288                                          USA000628

# APPENDIX A

## PRIOR APPLICATIONS

1.      On February 13, 2009 the Honorable Manuel L. Real of the United States District Court for the Central District of California issued an order in CR Misc 09-38-R, authorizing the interception of wire communications of the **Target Subjects** taking place to or from **Target Telephone #1** and **Target Telephone #2.** The interception of **Target Telephone #1** ended on February 19, 2009 as it was determined on this date that ALEX was no longer using **Target Telephone #1.** The interception of **Target Telephone #2** did not begin as, after authorization to intercept **Target Telephone #2** was obtained, it was determined that ALEX's narcotics source of supply was no longer using this telephone.

2.      On March 17, 2009 the Honorable Manuel L. Real of the United States District Court for the Central District of California issued an order in CR Misc 09-38(A)-R, authorizing the interception of wire communications of the **Target Subjects** taking place to or from **Target Telephone #3** and **Target Telephone #4.** The interception of **Target Telephone #3** ended on April 16, 2009.  Interception of **Target Telephone #4** was discontinued on April 1, 2009 because it was determined that the level of wire communications over **Target Telephone #4** that were pertinent to this investigation was low.

3.      On May 1, 2009 the Honorable Manuel L. Real of the United States District Court for the Central District of California issued an order in CR Misc 09-38(B)-R, authorizing the interception of wire communications of the **Target Subjects** taking place to or from **Target Telephone #3** and **Target Telephone #5.** The interception of **Target Telephone #3** and **Target Telephone #5** ended on May 30, 2009.

4.      On June 17, 2009, the Honorable Manuel L. Real of the United States District

ER000289                                    USA000629

Court for the Central District of California issued an order in CR Misc 09-0038(C)-R,

authorizing the interception of wire communications of the **Target Subjects** taking place to or

from **Target Telephone #3** and **Target Telephone #5.** Due to the inclusion of incorrect ESN

numbers for these **Target Telephones**, an amended order was obtained, and interception began

on June 20, 2009 for **Target Telephone #5** and **Target Telephone #6**. Following the receipt of

the court order, law enforcement contacted the service provider for **Target Telephone #3**, who

indicated that the telephone was no longer in use. As a result, no interception was made of

**Target Telephone #3** in the prior period. Interception ended on July 8, 2009 for **Target**

**Telephone #6** when an unidentified female was intercepted giving out the telephone number as

her "new number." Recently, intercepted calls on **Target Telephone #5** between NAVARRO

and ALEX indicate an unidentified subject named "Viejon" may have stolen **Target Telephone**

**#6** from Alex. I am waiting to determine whether NAVARRO will contact "Viejon" to get

**Target Telephone #6** back for ALEX before officially discontinuing interception of the

telephone and will analyze the toll information in an attempt to determine when/if ALEX begins

to use it again.

     5.    I am also aware that:

     a.    On September 4, 2008, the Honorable Otis D. Wright II, United States

District Court Judge for the Central District of California authorized the interception of wire

communications to and from telephone number 626-494-4000 in an investigation in which

CHIPO was a target. Interception began on September 5, 2008, and ended on October 3, 2008.

     b.    On November 5, 2008, the Honorable Otis D. Wright II, United States

District Court Judge for the Central District of California authorized the interception of wire and

electronic communications to and from telephone number 626-494-4000 as well as interception

                          USA000630

of wire communications to and from telephone number 913-704-8085 in an investigation in which CHIPO was a target. The interception of telephone number 626-494-4000 ended on November 25, 2008. The interception of telephone number 913-704-8085 ended on December 4, 2008.

       c.    On November 25, 2008, the Honorable Otis D. Wright II, United States District Court Judge for the Central District of California authorized the interception of wire communications to and from telephone number 626-373-5417 in an investigation in which CHIPO is a target. Interception of telephone number 626-373-5417 began on November 26, 2008, and ended on December 24, 2008.

       d.    On December 10, 2008, the Honorable Otis D. Wright II, United States District Court Judge for the Central District of California authorized the interception of wire communications to and from telephone numbers 913-704-8085 and 213-377-7434 in an investigation in which CHIPO is a target. Interception began on December 10, 2008, and interception of 913-704-8085 ended on December 29, 2008, and interception of 213-377-7434 ended on January 8, 2009.

       e.    On January 28, 2009, the Honorable Otis D. Wright II, United States District Court Judge for the Central District of California authorized the interception of wire communications to and from telephone numbers 213-377-7434, 909-367-9792, 562-217-8585, and 626-373-5417, in an investigation in which CHIPO is a target. Interception began on January 29, 2009 and ended on or about February 26, 2009.

       f.    On April 28, 2009, the Honorable Otis D. Wright II, United States District Court Judge for the Central District of California authorized the interception of wire communications for 626-373-5417 and 714-709-9912, in an investigation in which CHIPO is a

91

USA000631

target. The interception of 626-373-5417 ended on May 27, 2009. The interception of 714-709-9912 ended on May 7, 2009.

        g.     On June 18, 2009, the Honorable Otis D. Wright II, United States District Judge for the Central District of California authorized the continued interception of 626-373-5417 and the original interception of 626-343-1340, in an investigation in which CHIPO is a target. The interception of 626-343-1340 ended on June 22, 2009 and the interception of 626-373-5417 ended on July 1, 2009

        h.     On April 3, 2009, San Bernardino Superior Court Judge Kenneth Barr authorized the interception of wire and electronic communications to and from telephone number 760-235-1835 in an ongoing investigation in which Alfredo Rodriguez and Jose LNU are targets. Interception began on April 3, 2009, and ended on May 3, 2009.

      6.     Additionally, the following is a list of all state wiretap orders in this ongoing investigation:

        a.     On October 14, 2008, the Honorable Judge Kenneth Barr issued San Bernardino County Intercept Order 2008-83 authorizing the interception of wire and electronic communications to and from 909-717-5752, a telephone used by MISQUEZ. MISQUEZ, HOYOS, and MACIAS were identified as target subjects during this period of interception and interception ended on November 13, 2008.

        b.     On November 12, 2008, the Honorable Kenneth Barr issued San Bernardino County Intercept Order 2008-83 Extension #1, authorizing the continued interception of wire and electronic communications to and from 909-717-5752, a telephone used by MISQUEZ. MISQUEZ, HOYOS, MACIAS, MARCO ANTONIO TORRES-CRUZ (also known as ALEX), and ONSUREZ were identified as target subjects and interception ended on

92

December 12, 2008.

c. On November 12, 2008, the Honorable Kenneth Barr issued San Bernardino County Intercept Order 2008-93 authorizing the interception of wire and electronic communications to and from **Target Telephone #1**, a telephone used by ALEX. MISQUEZ, HOYOS, MACIAS, MARCO ANTONIO TORRES-CRUZ (also known as ALEX), ONSUREZ, and VENEGAS were identified as target subjects and interception ended on December 12, 2008.

d. On December 11, 2008, the Honorable Kenneth Barr issued San Bernardino County Intercept Order 2008-93 authorizing the continued interception of wire and electronic communications to and from telephone number **Target Telephone #1**, a telephone used by ALEX. MISQUEZ, HOYOS, MACIAS, MARCO ANTONIO TORRES-CRUZ (also known as ALEX), ONSUREZ, VENEGAS, KEVIN ALEJANDRO MARTINEZ-GONZALEZ, HERNANDEZ, and DIAZ were identified as target subjects and interception ended on January 11, 2009.

e. On December 12, 2008, the Honorable Helios Hernandez issued Riverside County Intercept Order 08-62 authorizing the interception of wire and electronic communications to and from telephone number 714-457-7770, a telephone used by HERANADEZ. MISQUEZ, HOYOS, MACIAS, MARCO ANTONIO TORRES-CRUZ (also known as ALEX), ONSUREZ, VENEGAS, KEVIN ALEJANDRO MARTINEZ-GONZALEZ, HERNANDEZ, and DIAZ were identified as target subjects and interception ended on January 11, 2009.

93

USA000633

7.     The ELSUR query resulted in a match for a target subject known as "Jose Gutierrez," listed without a date of birth[20], in an application to intercept wire communications signed by Judge Zita L. Weinshienk, U.S. District Court Judge for the District of Colorado, on March 21, 2003.  The ELSUR query resulted in a match for a target subject known as "Juan Gil," listed without a date of birth, in an application to intercept wire communications signed by Judge Charles P. Kocoras, U.S. District Court Judge for the Northern District of Illinois, on April 20, 2005.

8.     The ELSUR query resulted in a match for a target subject known as "Salvador Martinez," listed without a date of birth, in an application to intercept wire communications signed by Judge Roger T. Benitez, U.S. District Court Judge for the Southern District of California, on May 27, 2005.

9.     The ELSUR query resulted in a match for a target subject known as "Daniel Reyes," listed without a date of birth, in an application to intercept wire communications signed by Judge Jorge Solis, U.S. District Court Judge for the Northern District of Texas, on June 24, 1998, and July 16, 1998.

10.     The ELSUR query resulted in a match for a target subject known as "Juan Francisco Gil," listed without a date of birth, in an application to intercept wire communications signed by Rudi M. Brewster, U.S. District Court Judge for the Southern District of California, on October 17, 2005, October 31, 2005, and November 15, 2005.

---

[20] Where an ELSUR result appears without a listed date of birth, law enforcement officers are unable to determine whether the identified name is the same subject under review in the other investigation.

94

                    USA000634

11.     The ELSUR query resulted in a match for a target subject known as "Juan Francisco Gil," listed without a date of birth, in an application to intercept wire communications signed by Judge Thomas J. Whelan, U.S. District Court Judge for the Southern District of California, on October 17, 2005, and November 15, 2005.

12.     The ELSUR query resulted in a match for a target subject known as "Juan Francisco Gil," listed without a date of birth, in an application to intercept wire communications signed by Judge Roger T. Benitez, U.S. District Court Judge for the Southern District of California, on October 31, 2005.

13.     The ELSUR query resulted in a match for a target subject known as "Carlos Cruz Rivera," listed without a date of birth, in an application to intercept wire communications signed by Judge Christopher Droney, U.S. District Court Judge for the District of Connecticut, on December 19, 2008.

14.     The ELSUR query resulted in a match for a target subject known as "Carlos M. Benitez Rivera," listed without a date of birth, in an application to intercept wire communications signed by Judge Francisco Besosa, U.S. District Court Judge for the District of Puerto Rico, on July 12, 2008.

ER000295

USA000635

1 THOMAS P. O'BRIEN
  United States Attorney
2 CHRISTINE C. EWELL
  Assistant United States Attorney
3 Chief, Criminal Division
  REEMA M. EL-AMAMY (SBN: 237743)
4 Assistant United States Attorney
  Violent and Organized Crime Section
5     1500 United States Courthouse
      312 North Spring Street
6     Los Angeles, California 90012
      Telephone: (213) 894-0552
7     Facsimile: (213) 894-3713
      E-mail:   Reema.El-Amamy@usdoj.gov
8
  Attorneys for Plaintiff
9 United States of America

```
FILED
CLERK, U.S. DISTRICT COURT

JUL 17 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY
```

10
11
12

                UNITED STATES DISTRICT COURT

          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 IN THE MATTER OF THE           )    CR Misc. No. 09-0038(D)-R
   APPLICATION OF THE UNITED      )
14 STATES OF AMERICA FOR AN       )
   ORDER AUTHORIZING (1) THE      )    ~~[proposed]~~ ORDER
15 INTERCEPTION OF WIRE           )
   COMMUNICATIONS; (2) THE        )
16 INSTALLATION AND USE OF A      )    (UNDER SEAL PURSUANT TO
   PEN REGISTER AND A TRAP AND    )    18 U.S.C. § 2518(8))
17 TRACE DEVICE AND (3) THE       )
   RELEASE OF SUBSCRIBER          )
18 INFORMATION AND CELL SITE      )
   INFORMATION                    )
19 _____)

20      Application under oath has been made before this court by

21 Reema M. El-Amamy, Assistant United States Attorney for the

22 Central District of California, an "investigative or law

23 enforcement officer" as defined in Title 18, United States Code,

24 Section 2510(7) and an attorney for the government as defined in

25 Rule 1 of the Federal Rules of Criminal Procedure, for an order

26 pursuant to 18 U.S.C. § 2518 authorizing and approving the

27 interception of wire communications, including push-to-talk

28 (digital dispatch/ direct connect) communications and

1  contemporaneously received or retrieved voice mail, to and from,
2  and any background conversations intercepted in the vicinity of,
3  the following telephone numbers:

4          a.   the continued interception of a Sprint/Nextel
5               cellular telephone subscribed to Whaterver, Crazt Legs,
6               at 1925 Eloise Way, Upland, CA 91784, with a telephone
7               number of 909-489-8277, IMSI # 000009097178960, and
8               believed to be used primarily by DAVID NAVARRO ("**Target**
9               **Telephone #5**") or any subsequently changed telephone
10              number assigned to the same ESN with the same
11              subscriber information, and/or any subsequently changed
12              ESN assigned to the same telephone number with the same
13              subscriber information;

14

15          b.   the initial interception of a Metro PCS cellular
16              telephone, with unknown subscriber information, with a
17              telephone number of 909-545-1313, an unknown IMSI/ESN
18              number  and believed to be used primarily by Daniel
19              REYES   ("**Target Telephone #7**");

20

21          c.   the initial interception of a pre-paid T-Mobile
22              cellular telephone, subscribed to Jose Silba, without
23              an address, with a telephone number of 909-319-2187,
24              IMSI #310260493015199, and believed to be used
25              primarily by Jose LNU ("**Target Telephone #8**"); and

26

27          d.   the initial interception of a Sprint/Nextel
28              cellular telephone, subscribed to Jessica Medina at

2
    USA000637

1               P.O. Box 54988, Irvine, CA, with a telephone number of

2               909-419-9937, UFMI 126*295*2097, IMSI #316010154431162,

3               and believed to be used primarily by Carlos RIVERA

4               ("**Target Telephone #9**" and collectively with **Target**

5               **Telephone #5, Target Telephone #7** and **Target Telephone**

6               **#8,** the "**Target Telephones**") or any subsequently

7               changed telephone number assigned to the same ISMI or

8               ESN with the same subscriber information, and/or any

9               subsequently changed ISMI or ESN assigned to the same

10              telephone number with the same subscriber information.

11

12     The court has reviewed the application and Exhibits A and B

13 thereto, and following full consideration of the matters set

14 forth therein, **FINDS AS FOLLOWS:**

15     2. The application has been made pursuant to the authority

16 of a specially designated representative of the Attorney General

17 of the United States, specifically in this case Kenneth A.

18 Blanco, Deputy Assistant Attorney General, Criminal Division, and

19 therefore satisfies the dictates of Title 18, United States Code,

20 Section 2516(1). A copy of the memoranda of authorization

21 approving the application was attached as an Exhibit to the

22 application and incorporated by reference therein.

23     3. The application with incorporated affidavit alleges a

24 full and complete statement of facts which demonstrates that the

25 Drug Enforcement Administration ("DEA") is conducting an

26 investigation into possible violations of offenses enumerated in

27 18 U.S.C. § 2516, to include the following: Racketeer Influenced

28 and Corrupt Organizations ("RICO") offenses, in violation of

USA000688

Title 18, United States Code, Sections 1962 and 1963; violent
crimes in aid of a racketeering enterprise, in violation of Title
18, United States Code, Section 1959; manufacture, distribution,
and possession with intent to distribute a controlled substance,
in violation of Title 21, United States Code, Section 841(a)(1);
conspiracy to distribute a controlled substance, in violation of
Title 21, United States Code, Sections 846 and 841(a)(1); use of
a communication facility in committing or in causing or
facilitating the commission of a felony narcotics offense, in
violation of Title 21, United States Code, Section 843(b);
laundering of monetary instruments, in violation of Title 18,
United States Code, Section 1956; engaging in monetary
transactions in property derived from specified unlawful
activity, in violation of Title 18, United States Code, Section
1957; and felon in possession of a firearm in violation of Title
18, United States Code, Section 922(g)[1] (the "Target Offenses")
by persons including FNU LNU, also known as "Alex," ("ALEX"),
David Navarro ("NAVARRO"), Steve Osker Hoyos ("HOYOS"), Sara
Leticia Misquez ("MISQUEZ"), FNU LNU, also known as Chipo
("CHIPO"), Steven Hernandez ("HERNANDEZ"), Larry Cuevas
("CUEVAS"), Patrick Orosco ("OROSCO"), Armando Venegas
("VENEGAS"), Richard Castorena ("CASTORENA"), Mario LNU
("MARIO"), Lucio Gallardo Diaz ("DIAZ"), Ray Perez ("PEREZ"),
Shawn Young ("YOUNG"), Carmela LNU ("CARMELA"), FNU LNU, also

---

[1] Although not a predicate offense for wire interception
under 18 U.S.C. § 2516 and thus not listed as a Target Offense,
law enforcement is also investigating the Target Subjects for
violation of 18 U.S.C. § 2, aiding and abetting the substantive
offenses.

USA000639

1 known as "Cabezon" ("CABEZON"), Gabriel Macias ("MACIAS"), Paul
2 Onsurez ("ONSUREZ"), Juan Diaz ("DIAZ"), FNU LNU ("SOS"),
3 Victor Carrasco Felix ("FELIX"), FNU LNU ("JOSE LNU"), Gilberto
4 Gutierrez ("G. GUTIERREZ"), Jose Gutierrez ("J. GUTIERREZ"),
5 Teresa Castro ("CASTRO"), Deborah Cortez ("CORTEZ"), Roberto Sosa
6 ("SOSA"), Enrique Jimenez ("JIMENEZ"), Salvador Martinez
7 ("MARTINEZ"), Daniel Reyes ("REYES"), FNU LNU, also known as "M,"
8 ("M"), Juan Gil ("GIL"), Armando Barajas ("BARAJAS"), "Red Eye,"
9 Marlon Jiron ("JIRON"), Fernando Morales ("MORALES"), Carlos
10 Vasquez ("VASQUEZ"), Steven Espinoza ("ESPINOZA"), Ernest
11 Castillo ("CASTILLO"), Monica Cornejo ("CORNEJO"), Fernando Lopez
12 ("LOPEZ") "Rude Boy", "Boxer", "El Oso", Rebecca Estrada
13 ("ESTRADA") also known as "Becky", Octavio Pena ("PENA") and
14 others yet unknown("the Target Subjects").

15    4.    There is probable cause to believe that the Target
16 Subjects have committed, are committing, or will commit one or
17 more of the Target Offenses.

18        a.    Wire communications concerning the Target Offenses
19 will be obtained through the interceptions of the Target
20 Telephones.  In particular, the communications to be intercepted
21 will concern, and will provide evidence pertaining to, the goals
22 of this investigation, including the following: (i) the precise
23 nature, extent, and methods of operation of the illegal
24 activities (including the Target Offenses) of the Target Subjects
25 and others known, unknown or unidentified, including the dates,
26 times, and places for the commission of the drug trafficking
27 activities; (ii)  the acquisition and distribution of controlled
28 substances and money by the Target Subjects and others known,

USA000640

1 unknown or unidentified; (iii) the identities and roles of
2 accomplices, aiders and abettors, co-conspirators and other
3 participants in the drug trafficking organization including any
4 the known and unknown suppliers, distributors and purchasers of
5 controlled substances and the individuals involved in laundering
6 or transporting drug trafficking proceeds; (iv) the locations at
7 which controlled substances, records, money and contraband are
8 stored; (v) the administration, control, management and
9 disposition of proceeds of drug trafficking, including the manner
10 in which any drug proceeds are laundered; and (vi) the existence,
11 location and source of resources used to finance their illegal
12 activities ("the goals of the investigation");

13       b.    The Target Telephones are being used, or are about
14 to be used in connection with the commission of one or more the
15 Target Offenses; and

16       c.    Because of the nature of the investigation,
17 additional communications concerning the Target Offenses will
18 occur after the first has been intercepted.

19    5.    It has been adequately demonstrated that normal
20 investigative procedures have been tried and have failed,
21 reasonably appear unlikely to succeed if continued, reasonably
22 appear unlikely to succeed if tried, or are too dangerous.

23    6.    Pursuant to 18 U.S.C. §§ 3122 and 3123, it has been
24 certified that the information likely to be obtained from the pen
25 register (defined in 18 U.S.C. § 3127(3)) and trap and trace
26 device (defined in 18 U.S.C. § 3127(4)) on the Target Telephones
27 is relevant to the ongoing criminal investigation being conducted
28

USA000641

1 by the DEA in connection with possible violations of the Target
2 Offenses.

3     7.  Pursuant to 18 U.S.C. §§ 2703(d) and 3123, specific and
4 articulable facts have been set forth to show that there are
5 reasonable grounds to believe that the information likely to be
6 obtained from Target Telephones, including cell site information
7 and any other requested records or other non-content information
8 pertaining to a telephone subscriber or customer, are relevant
9 and material to the ongoing criminal investigation of the Target
10 Subjects that is being conducted by the DEA.

11 **WHEREFORE**, it is hereby ordered that:

12 **Interception and Pen Register/ Trap and Trace**

13     1.  The DEA and all other law enforcement agencies
14 investigating this matter, and individuals operating under a
15 contract with the government and acting under the supervision of
16 these law enforcement agencies are authorized to intercept wire
17 communications, including push-to-talk (digital dispatch/ direct
18 connect) communications and contemporaneously received or
19 retrieved voice mail, to and from, and any background
20 conversations intercepted in the vicinity of, the Target
21 Telephones.

22     2.  The communications of the Target Subjects, and others
23 known, unknown, or unidentified are to be intercepted.

24     3.  Such interception shall not automatically terminate
25 upon the first interception concerning the Target Offenses, but
26 shall continue until communications are intercepted which fully
27 achieve the goals of the investigation or for a period of 30 days

28

ER000302

USA000642

1 (defined as 24 hour periods), whichever occurs first (the
2 "Interception Period").

3      4.    Pursuant to Title 18, United States Code, Section
4 2518(5), such Interception Period is authorized to begin for
5 **Target Telephone #5** on the date of this Court's Order authorizing
6 the interception, and on the earlier of the day on which the
7 investigative or law enforcement officers first begin to conduct
8 an interception under this Court's order or ten days after the
9 date of the Court order for **Target Telephone #7**, **Target Telephone
10 #8**, and **Target Telephone #9**.

11      5.    Such interception is authorized to and from any changed
12 telephone numbers subsequently assigned to any instrument bearing
13 the same ESN/MEID or IMSI as the Target Telephones, or any
14 changed ESN/MEID or IMSI subsequently assigned to the same
15 telephone number as the Target Telephones.

16      6.    Pursuant to Title 18, United States Code, Section
17 2518(3), in the event the Target Telephones are transferred
18 outside the territorial jurisdiction of the Court, the act of
19 interception may take place in, or using cellular tower equipment
20 located in, any other jurisdiction within the United States.

21      7.    Pursuant to 18 U.S.C. §§ 3122 and 3123, agents of the
22 DEA: (1) may install, or cause to be installed, and use a pen
23 register anywhere in the United States to record or decode
24 dialing, routing, addressing, or signaling information for the
25 Target Telephones, including "post-cut-through dialed digits"[2]

26

27      [2]    To the extent additional digits that are received are
electronic content as discussed in the application, the
28 government shall not use such information for any investigative
purposes or attempt to decode such information.

8

USA000643

1 and dialing, routing, addressing, or signaling information
2 transmitted over the Service Provider's (defined below) network
3 by a two-way radio feature transmitted from the Target
4 Telephones, to record the date and time of such dialings or
5 transmissions, and to record the length of time the telephone
6 receiver in question is "off the hook" for incoming or outgoing
7 calls; and (2) may install, or cause to be installed, and use a
8 trap and trace device anywhere in the United States to capture
9 and record the incoming electronic or other impulses for the
10 Target Telephones which identify the originating numbers or other
11 dialing, routing, addressing, or signaling information reasonably
12 likely to identify the source of a wire or electronic
13 communication, and to record the date, time, and duration of
14 calls created by such incoming impulses; both for a period of
15 sixty days from the date this order is filed by the court. The
16 tracing operations and use of the caller identification feature
17 shall be without geographical limits.

18 **Service Providers**

19     8.    Pursuant to 18 U.S.C. §§ 2518(4), 2703, 3122, 3123, and
20 Federal Rule of Criminal 41, if applicable, SBC Communications,
21 Inc. or any subsidiary thereof, Ameritech, Southern New England
22 Telephone Company, Verizon California, Inc., XO Communications,
23 Comcast Cable Communications Inc./AT&T Corporation, Verizon,
24 Verizon New York, Inc., Verizon California, Inc., General
25 Telephone Company, MPower Communications, Verizon New Jersey
26 Inc., Bell South Telephone Company, Allegiance Telecom, Cox
27 Communications and Qwest Communications, AT&T, U.S. Sprint,
28 WorldCom, Pacific Bell Telephone Company, Pacific Bell Wireless,

USA000644

1  Cellco Partnership, dba Verizon Wireless, AT&T Wireless Services,
2  AirTouch Cellular Telephone Company, U.S. Cellular, MetroPCS,
3  Cingular Wireless, Nextel of California, Inc., Boost Mobile LLC,
4  Cricket Communications, Sprint Communications, T-Mobile USA,
5  Inc., Virgin Mobile USA, AT&T Broadband, Nextel Communications
6  and Western Wireless Corp., and any other telephone companies,
7  and local long distance or wireless carriers who are providers of
8  wire and electronic communications services as defined in 18
9  U.S.C. § 2510(15), including any subsequent service provider
10 which provides such defined service to the Target Telephones,
11 ("the Service Providers") are ordered to do the following:

12          a.   Provide the DEA and other law enforcement agencies
13 involved in this investigation with 24-hour-a-day, seven-days-a-
14 week information, facilities, and technical assistance necessary
15 to accomplish the interception over the Target Telephones
16 unobtrusively, expeditiously, and with a minimum of interference
17 to the services that the Service Providers are providing to the
18 persons whose communications are to be intercepted.  The switch
19 mechanisms which allow law enforcement to receive audio shall be
20 programmed within four business hours of receipt of the court's
21 Order.

22          b.   Provide the DEA with such 24-hour-a-day
23 information and services for the Target Telephones as the
24 following: rotary numbers associated with the Target Telephones,
25 call forwarding, speed dialing, call waiting, cell site and real-
26 time locations/ Global Positioning Satellite (GPS) information
27 (including User Name(s), Pass Code(s), and historical and on-
28 going activity related to the physical location of the Target

1 Telephones), pen register data, toll data, trap and trace
2 extended digit dialed data, Direct Connect/Digital Dispatch
3 services ("Push to Talk"), three-way calling, and all other
4 services.  In addition, the Service Providers shall (if
5 available) initiate a signal to determine the location of the
6 Target Telephones on the Service Provider's network or with such
7 other reference points as may be reasonably available and at such
8 intervals and times as directed by the DEA.

9       c.    Within 48 hours of an oral or written demand of
10 the DEA or other law enforcement agencies involved in the
11 investigation, disclose to same: all non-content account
12 information and records in their files for the Target Telephones
13 and the telephones calling to or from the Target Telephones
14 (based on the DEA's written representation of same), including
15 but not limited to subscriber names and addresses whether
16 published or unpublished, listed or unlisted, and any changes
17 (defined here to include additions, deletions, and transfers)
18 thereto; MEIDs, ESNs, IMSIs, IMFIs, SIMs or other identifying
19 information and any changes thereto; subscriber date of birth,
20 driver's licenses (state and number), social security number,
21 contact names and numbers, and employment information and any
22 changes thereto; all telephone numbers listed to subscribers
23 under the same or different account; method of payment; length of
24 service, periods of telephone activation, and type of service
25 utilized; applications, account and billing information; and
26 incoming and outgoing toll information (both historical and
27 ongoing), including Direct Connect/Digital Dispatch ("Push to
28 Talk") services and call detail.

USA000646

1     d.    Disclose on a real time or near real time basis
2  when requested to do so by the DEA the geographic analysis
3  information (including the physical address of the cell
4  site/sector) regarding cell sites used and corresponding antenna
5  information to identify the location of the Target Telephones, to
6  include configuration (omni directional or sectorized, sector
7  orientation) control channels used, address and latitude/
8  longitude of antennas.

9     e.    Enter the telephone numbers of the Target
10 Telephones into the pen register system and supply originating
11 and terminating cell site information during the Interception
12 Period.

13      f.    Authorize the installation and/or use of "dialed
14 number recorders" to detect and record all numbers dialed or
15 pulsed by the Target Telephones.

16     g.    Execute the Court's Order as soon as practicable
17 after it is signed.  If a copy of the Order is given to any
18 Service Provider, the copy may be redacted to exclude the Target
19 Subjects and a description of the Target Offenses under
20 investigation.

21     h.    To avoid prejudice to this criminal investigation,
22 the Service Providers and their agents and employees shall not
23 disclose to or cause a disclosure of this Court's order or the
24 request for information, assistance, and facilities by the DEA or
25 other law enforcement agencies involved in the investigation or
26 the existence of this investigation to any person other than
27 those of their agents and employees who require said information
28 to accomplish the services herein requested.  In particular, the

1  Service Providers and their agents and employees are ordered not
2  to make such disclosure to the lessee, telephone subscribers or
3  any interceptee or participant in the intercepted communications.

4          i.    In the event that the Service Providers (currently
5  MetroPCS, Sprint/Nextel and T-Mobile) change during the course of
6  the Interception Period, interception may continue with the new
7  Service Provider without further order of this court.  Both the
8  previous and the new Service Provider shall inform the DEA
9  immediately if the Service Provider changes during the
10 Interception Period, or if the ESN/MEID or IMSI or telephone
11 number for the Target Telephones is supplied to another Service
12 Provider.

13         j.    The Service Providers furnishing such facilities,
14 service, or technical assistance shall be compensated for
15 reasonable expenses incurred in doing so.

16 **Progress Reports, Monitoring, and Sealing**

17     9.    Pursuant to 18 U.S.C. § 2518(6), an Assistant United
18 States Attorney familiar with the facts of this case shall
19 provide the Court with a report after about the fifteenth day of
20 the Interception Period showing what progress has been made
21 toward achievement of the authorized objectives of the
22 investigation and the need for continued interception.  In the
23 event that the DEA is made aware that the Service Provider has
24 changed during the course of the interception, the periodic
25 progress report will include that information.

26     10.   Pursuant to 18 U.S.C. § 2518(5), the interception may
27 be conducted in whole or in part by government personnel (full or
28 part-time), or by an individual operating under a contract with

USA000648

1 the government, acting under the supervision of investigative or
2 law enforcement officers authorized to conduct the interception.

3     11. All intercepted communications will be minimized in
4 accordance with Chapter 119 of Title 18 U.S.C. In the event the
5 intercepted language is in a code or foreign language (other than
6 English), and foreign language-speaking monitoring personnel or
7 an expert in that foreign language or code is not reasonably
8 available during the interception period, the entirety of the
9 foreign language conversations may be intercepted and recorded
10 and minimization shall be accomplished as soon as practicable
11 after the interception.

12     12. The interception shall be conducted in such a way as to
13 minimize the interception of communications not otherwise subject
14 to interception pursuant to the Order. Monitoring will be
15 discontinued if a monitor determines that the conversation is not
16 criminal in nature, is privileged, or is not subject to
17 interception pursuant to the Order. If monitoring is
18 discontinued, monitoring agents may spot check the conversation
19 in order to determine whether the conversation has become
20 criminal in nature or otherwise is now subject to interception
21 pursuant to the Order. A memorandum outlining all of the
22 guidelines for minimization and application of privileges, as
23 well as a copy of the application and Order, will be provided to
24 all monitors.

25     13. Pursuant to 18 U.S.C. § 2518(8)(b), this Order, the
26 accompanying application and all interim reports filed with the
27 Court shall be sealed until further order of this Court. Copies
28 of the Order may be given by the DEA to any other law enforcement

1  officer involved in the investigation and to the Service

2  Providers as is necessary to implement the Order.

3  DATED: July 17, 2009

**MANUEL L. REAL**

HONORABLE MANUEL L. REAL
UNITED STATES DISTRICT JUDGE

6  Prepared by:

REEMA M. EL-AMAMY
Assistant United States Attorney

15

USA000650

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   REEMA M. EL-AMAMY (Cal. Bar No. 237743)
4  Assistant United States Attorney
   Violent & Organized Crime Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-0552
7       Fax: (213) 894-3713
        E-mail:reema.el-amamy@usdoj.gov
8
   Attorneys for Plaintiff
9  United States of America

10              UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13  IN THE MATTER OF THE        )    CR Misc. No. 09-0038(D)-R
    APPLICATION OF THE UNITED   )
14  STATES OF AMERICA FOR AN    )    FIFTEEN-DAY REPORT AND [PROPOSED]
    ORDER AUTHORIZING           )    ORDER
15  INTERCEPTION OF WIRE        )
    COMMUNICATIONS              )         [UNDER SEAL]
                                )
                                )

17       Pursuant to the Court's Order of July 17, 2009, the

18  government hereby files this fifteen-day report regarding the

19  interception of wire communications.

20  DATED: August 4, 2009
                              THOMAS P. O'BRIEN
21                            United States Attorney

22                            CHRISTINE C. EWELL
                              Assistant United States Attorney
23                            Chief, Criminal Division

24

25                            _____
                              REEMA M. EL-AMAMY
26                            Assistant United States Attorney

27                            Attorneys for Plaintiff
                              United States of America
28

FILED
CLERK, U.S. DISTRICT COURT

AUG - 5 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

1          **FIFTEEN-DAY REPORT**

2            **I.   INTRODUCTION**

3        On July 17, 2009, the Honorable Manuel L. Real, United

4    States District Judge for the Central District of California,

5    signed an order in criminal miscellaneous matter ("CR Misc.") 09-

6    0038(D)-R, authorizing:

7

8            a.    the continued interception of a Sprint/Nextel

9                  cellular telephone subscribed to Whaterver, Crazt Legs,

10                 at 1925 Eloise Way, Upland, CA 91784, with a telephone

11                 number of 909-489-8277, IMSI # 000009097178960, and

12                 believed to be used primarily by DAVID NAVARRO (**"Target**

13                 **Telephone #5"**) or any subsequently changed telephone

14                 number assigned to the same ESN with the same

5                  subscriber information, and/or any subsequently changed

16                 ESN assigned to the same telephone number with the same

17                 subscriber information;

18

19           b.    the initial interception of a Metro PCS cellular

20                 telephone, with unknown subscriber information, with a

21                 telephone number of 909-545-1313, an unknown IMSI/ESN

22                 number  and believed to be used primarily by Daniel

23                 REYES   (**"Target Telephone #7"**);

24

25           c.    the initial interception of a pre-paid T-Mobile

26                 cellular telephone, subscribed to Jose Silba, without

7                  an address, with a telephone number of 909-319-2187,

28

IMSI #310260493015199, and believed to be used primarily by Jose LNU (**"Target Telephone #8"**); and

d.   the initial interception of a Sprint/Nextel cellular telephone, subscribed to Jessica Medina at P.O. Box 54988, Irvine, CA, with a telephone number of 909-419-9937, UFMI 126*295*2097, IMSI #316010154431162, and believed to be used primarily by Carlos RIVERA (**"Target Telephone #9"** and collectively with **Target Telephone #5, Target Telephone #7** and **Target Telephone #8**, the **"Target Telephones"**) or any subsequently changed telephone number assigned to the same ISMI or ESN with the same subscriber information, and/or any subsequently changed ISMI or ESN assigned to the same telephone number with the same subscriber information.

The government submits this fifteen-day report to inform the Court of the course of the wire interception and related investigation during the first fifteen days of interception. The interception of the **Target Telephones** began on or about July 17, 2009.

The government submits this fifteen-day report to inform the Court of the course of the wire interception and related investigation during the first fifteen days of interception. Interception of the **Target Telephones** will continue pursuant to the Court's order through August 15, 2009, unless otherwise ordered by the Court. The related investigation seeks to: (1) identify members and associates of the Ontario Black Angeles

3
ER000313

USA000653

1 criminal street gang and Mexican Mafia that are involved in
2 narcotics trafficking, extortion activities, and other related
3 crimes within the boundaries of the Ontario Black Angeles
4 criminal street gang's influence; and (2) target the narcotics
5 dealing enterprise of JOSE LNU, his associates, and his
6 suppliers, as well as the narcotics dealing enterprises of other
7 narcotics traffickers presently being extorted by members of the
8 Ontario Black Angels criminal street gang.

9 **II.  DISCUSSION**

10   This report includes statistical information and summaries
11 of conversations from a sampling of calls intercepted from July
12 17, 2009, through and including July 31, 2009 on the **Target**
13 **Telephones**.  TFO Lavoie has supervised the compilation of
14 statistical data with respect to the monitoring of telephone
5 conversations and the preparation of some of the relevant
16 intercepted telephone conversations for inclusion in this report.

17 A.   **Statistical Information for Target Telephone #5**:
18 Total Number of Calls: 603
19 Total Number of Pertinent Calls: 177
20 Number of Minimized Calls: 0

21 B.   **Statistical Information for Target Telephone #7**:
22 Total Number of Calls: 1,202
23 Total Number of Pertinent Calls: 121
24 Number of Minimized Calls: 14

25 C.   **Statistical Information for Target Telephone #8**:
26 Total Number of Calls: 1,084
7 Total Number of Pertinent Calls: 531
28 Number of Minimized Calls: 1

USA000654

1 **D. Statistical Information for Target Telephone #9:**

2 Total Number of Calls: 1,525

3 Total Number of Pertinent Calls: 427

4 Number of Minimized Calls: 1

5 **E. Summaries of Selected Intercepted Conversations for Target**

6 **Telephone #5**

7 As discussed herein, and based on a review of the pertinent

8 telephone conversations, TFO Lavoie continues to believe that

9 NAVARRO is using **Target Telephone #5** to further the criminal

10 activities of the Ontario Black Angeles criminal street gang.

11 Below are summaries of two pertinent calls intercepted on

12 **Target Telephone #5.**

13 1. On July 20, 2009 at 3:22 p.m., NAVARRO made an outgoing

14 call on **Target Telephone #5** to ALEX using 909-559-0925. During

15 this Spanish language conversation, NAVARRO asked when ALEX would

16 send "the dude over."[1] ALEX said he would call NAVARRO at

17 "around 6." NAVARRO asked if ALEX could "do it now." ALEX said

18 no. NAVARRO said 6 would be fine and asked if "it" was going to

19 be the "270." ALEX said yes. NAVARRO said he would call ALEX

20 back at 6. Based on his training, experience, and knowledge of

21 the investigation, TFO Lavoie believes this call relates to a

22 pending weekly extortion payment by ALEX to NAVARRO. When

23 NAVARRO asks ALEX if "it" was going to be "270," TFO Lavoie

24 believes NAVARRO is asking if the payment he is going to receive

25 will be 270 dollars.

26

27 [1] The words contained in quotation marks in intercepted Spanish language conversations are translations made by the
28 certified Spanish language interpreters monitoring the intercepted calls.

USA000655

2. On July 23, 2009 at 10:34 a.m., NAVARRO received an incoming call on **Target Telephone #5** from Alex using 909-559-0925. During this Spanish language conversation, NAVARRO referred to a previous conversation in which ALEX connected NAVARRO to another subject through a three-way conversation. NAVARRO said if he had known ALEX was going to talk to this guy ("Chamu"), NAVARRO would have "hung up." NAVARRO said this phone was "screwed now." NAVARRO said he had used this phone for "a while now" and had talked to people about "certain things." NAVARRO stated maybe the phone was not screwed but he did not want not "take a chance." ALEX asked if NAVARRO was going to get "another one" (phone) a "cheap phone." NAVARRO said "yes." NAVARRO added that he already had "another phone," but was not going to activate it until "the 3rd" (possibly August 3rd) when the "current phone bill was due." ALEX said alright.

a. NAVARRO asked when he could talk to ALEX. NAVARRO said they could meet at the restaurant like the last time. ALEX said he was working now and would get out at 6pm. NAVARRO said they could meet at that time. ALEX said he would call NAVARRO.

b. NAVARRO asked what time ALEX was going to "send the guy." ALEX said "between 1 and 2pm." NAVARRO asked if ALEX was going to send the guy with "the red car." ALEX said yes. NAVARRO said to tell him or to "send him with $270." ALEX said okay. NAVARRO said last time there were "many excuses as to why it was less than 270." NAVARRO said he was not going to tell him because it was "not his decision on how much money to turn in." ALEX said he would tell him. NAVARRO said he would call ALEX around 1pm to send the guy. ALEX said okay.

ER000316 USA000656

1         c.   Based on his training, experience, and knowledge

2 of the investigation, TFO Lavoie believes this call relates to

3 NAVARRO using **Target Telephone #5** for "certain things" referring

4 to illegal activity, and his need to activate a new telephone in

5 an attempt to avoid detection by law enforcement.   TFO Lavoie

6 believes that the remainder of the call relates to another

7 pending extortion payment where NAVARRO explains to ALEX the

8 importance of paying the entire amount of the extortion payment,

9 and the responsibility of the payment belonging to ALEX, not his

10 runner.[2]

11 **F.   Summaries of Selected Intercepted Conversations for Target**

12     **Telephone #7**

13     As discussed herein, and based on a review of the pertinent

14 telephone conversations, TFO Lavoie continues to believe that

5 Daniel REYES was using **Target Telephone #7** to further the

16 activities of the Ontario Black Angels criminal street gang,

17 including activities related to narcotics sales and extortion.

18     On August 1, 2009, law enforcement performed a traffic stop

19 on REYES and discovered a sawed-off .22 caliber rifle.   REYES was

20 taken into custody.   Based on intercepted calls on other

21 telephone lines and the lack of any activity on **Target Telephone**

22 **#7** after August 3, 2009, TFO Lavoie believes REYES has ceased

23 using **Target Telephone #7** as a result of his arrest.   Thus,

24 interception of **Target Telephone #7** was discontinued on August 3,

25

26

7     [2]   **Target Telephone #5** continues to remain active, however,
TFO Lavoie will discontinue interception of **Target Telephone #5**
28 if it becomes apparent over the course of the next several days
that NAVARRO has discontinued using his telephone.

7

USA000657

1 2009 and the government will move to seal the recordings from
2 **Target Telephone #7.**

3       Below are summaries of two pertinent calls intercepted on
4 **Target Telephone #7.**

5       1.    On July 22, 2009, at 4:57 p.m., REYES received an
6 incoming call on **Target Telephone #7** from HUGO LNU using
7 909-212-3735.  HUGO said he had got "rid of everything" and had
8 like "225."  REYES asked where HUGO was.  HUGO said he was by his
9 house.  REYES said he would be over there in about "15, 20
10 minutes."  HUGO asked REYES if he could bring "another one."  (no
11 response, end of call).  Based on his training, experience, and
12 knowledge of the investigation, TFO Lavoie believes this
13 conversation relates to a narcotics transaction.  When HUGO
14 states he got rid of everything and had 225, TFO Lavoie believes
15 HUGO sold his supply of narcotics, and had 225 dollars in
16 narcotics proceeds.  When HUGO asked if REYES could bring
17 "another one," TFO Lavoie believes he is referring to an
18 undisclosed quantity of narcotics.

19       2.    On July 24, 2009, at 8:43 p.m., REYES made an outgoing
20 call on **Target Telephone #7** to HUGO LNU using 909-212-3735.  HUGO
21 asked REYES if he still wanted to "come through tonight."  REYES
22 said he would pick him up.  HUGO told REYES he was already there.
23 REYES asked HUGO if it was "cool" with his "home boy."  HUGO said
24 it was "nothing fishy going to go on" and mentioned it was only
25 him (Hugo) and "homies."  REYES said alright.  REYES asked what
26 time they (Hugo and others) were supposed to "roll up."  HUGO
27 said like "about 9:30 to 10:00."  HUGO said he had "3 ½"
28 (possibly $350) for REYES.  Based on his training, experience,

1  and knowledge of the investigation, TFO Lavoie believes this call
2  substantiates the belief that HUGO may be selling narcotics for
3  REYES.  When HUGO stated he had 3 ½ for REYES, TFO Lavoie
4  believes he was referring to 350 dollars in narcotics proceeds.
5  Intercepted calls indicate that REYES and HUGO speak often, and
6  these are two examples of conversations pertaining to the
7  possible sales of narcotics.

8  **G.**  **Summaries of Selected Intercepted Conversations for Target**
9      **Telephone #8**

10     As discussed herein, and based on a review of the pertinent
11  telephone conversations, TFO Lavoie continues to believe that
12  JOSE LNU is using **Target Telephone #8** to traffic in narcotics,
13  including using the telephone to contact his source(s) of supply.
14     Below are summaries of three pertinent calls intercepted on
5  **Target Telephone #8.**

16     1.  On July 21, 2009 at 11:53 a.m., JOSE LNU made an
17  outgoing call on **Target Telephone #8** to JOSUE using 909-235-1453.
18  During this Spanish language conversation, JOSE said that "Paton"
19  wanted "a whole one" and was at his house, by the gate/entrance.
20  JOSUE said he would "head out there."  JOSE said he (Paton) "owed
21  40" and had to give him "220."  JOSE said that "Manuel with the
22  ponytail from Quizno's" would meet JOSUE at Taco Bell.  JOSE said
23  to go to "Paton's first."  JOSUE asked if Paton was going to send
24  "it" for sure.  JOSE said he already talked to Paton and "he had
25  the $40" and was going to give "the additional," but for JOSUE
26  not to give him "anything if he did not have the money."  JOSUE
7  said ok.  Based on his training, experience, and knowledge of the
28  investigation, TFO Lavoie believes this call relates to two

USA000659

1 pending narcotics transactions. JOSE LNU is sending his runner
2 JOSUE to meet with "Manuel from Quiuzno's" and "Paton," who are
3 potential narcotics customers. According to JOSE, Paton owes 40
4 dollars, possibly for a previous transaction, and 220 dollars for
5 the pending transaction.

6     2.    On July 21, 2009 at 2:41 p.m., Jose LNU received an
7 incoming call on **Target Telephone #8** from an unidentified female
8 ("UF") using 909-574-5122. During this Spanish language
9 conversation, the UF asked for the price on "a pound." The UF
10 said she was not sure she was "getting it" but wanted to ask
11 "price first." JOSE said that the UF would have to come to him
12 for that and "by herself." The UF said she knew that, she was
13 "not new to this." JOSE said that the least he could "give it"
14 to her would be "17,800." The UF said the price went up because
5 JOSE said it was "17,000 before." JOSE said there was some for
16 "16,500" but if she got that one, she would "not like it." The
17 UF said but she had asked him about wanting the "good kind."
18 JOSE said it would be "17,800," but there was some "better
19 stuff." The UF told JOSE she also, wanted to "make something,"
20 but didn't know if she would get it, if it was so expensive.
21 JOSE said that to get in "pounds" it was better to get "a hand or
22 10."

23     a.    JOSE said if she wanted "a better price" then he
24 would get "10 pounds together" and go to someone that knows him
25 and trusts him, but "to try to get just one 1 pound was not
26 easy." JOSE repeated that the least he could give it was 17,800.
7 The UF said what she was looking for was the good stuff, but she
28 would let JOSE know.

1         b.    Based upon his training, experience, and knowledge
2 of the investigation, TFO Lavoie believes this call relates to a
3 possible pending narcotics transaction. JOSE gives a price of
4 "17,800" for a pound, which is consistent with the price for a
5 pound of methamphetamine. JOSE informs the UF that it is "not
6 easy" to get a single pound, and it is better to get "a hand or
7 10," meaning 5 or 10 pounds to make a profit. The UF said she
8 was not sure she was "getting it," but was checking "price
9 first," and subsequent calls indicated this narcotics transaction
10 did not take place.

11     3.    On July 27, 2009 at 6:57 p.m., JOSE LNU received an
12 incoming call on **Target Telephone #8** from an unidentified male
13 ("UM") using 909-239-3963. During the Spanish language
14 conversation, the UM asked JOSE about "one and a quarter, 35."
15 JOSE asked "one and a quarter?" The UM said "yes, 35," then said
16 "1,125." JOSE said he did not remember, and the UM said "yes, at
17 900 an ounce," and he makes "5 instead of 4, it would be 1125."
18 JOSE said okay, then asked if he was home or he was coming. The
19 UM said however he wanted. JOSE said he was busy and asked if he
20 could come. The UM said he would go and would see him in 30
21 minutes. Based on TFO Lavoie's training, experience, and
22 knowledge of the investigation, he believes this conversation
23 relates to a pending narcotics transaction. When the UM and JOSE
24 refer to "one and a quarter" or "35," TFO Lavoie believes they
25 are referring to a 1 1/4 ounce quantity of methamphetamine, which
26 equals 35 grams. When the reference to "1,125" is made, TFO
7 Lavoie believes they are referring to $1,125 for the price of the
8 methamphetamine.

USA000661

**H.  Summaries of Selected Intercepted Conversations for Target
Telephone #9**

As discussed herein, and based on a review of the pertinent
telephone conversations, TFO Lavoie continues to believe that
Carlos RIVERA is using **Target Telephone #9** to further the
activities of the Ontario Black Angels criminal street gang,
including activities related to narcotics sales and extortion.

Below are summaries of four pertinent calls intercepted on
**Target Telephone #9.**

1.    On July 20, 2009, at 12:16 p.m., RIVERA made an
outgoing call on **Target Telephone #9** to JORGE LNU using
909-781-0385.  RIVERA asked what he was doing.  JORGE said he was
at the house, "chilling."  RIVERA asked if he was "almost done
with that."  JORGE said yes.  RIVERA said he had "some bills to
pay."  JORGE said he was "almost done," he had like "a little
teener left."  RIVERA said if all he had was "a C-note."  JORGE
said yes.  RIVERA said if he had "a C-note, that would do for
now."  RIVERA asked what time would he be over.  JORGE said he
did not know, "later today."  RIVERA said to let him know what
was "cracking."  JORGE said he would go over later.  RIVERA said
he had "just picked up yesterday," so he had "no faith."  JORGE
agreed.  Based on his training, experience, and knowledge of the
investigation, TFO Lavoie believes this call relates to RIVERA's
collection of narcotics proceeds from JORGE.  JORGE stated he was
"almost done," referring to selling almost his full supply of
narcotics, and had a "little teener" left, which TFO Lavoie is
aware, based on his training and experience, is a term commonly
used for a 1/16 of an ounce quantity of methamphetamine.  RIVERA

asked JORGE if he had a "C-Note," which, TFO Lavoie is aware,
based on his training and experience, is a term commonly used for
a 100 dollar bill. RIVERA stated that would "do" for now,
because he had bills to pay, and had just "picked up," meaning he
had to pay for his supply of narcotics and did not have money
left to pay his bills.

2. On July 21, 2009, at 11:57 a.m., RIVERA received an
incoming call on **Target Telephone #9** from LUIS using
909-489-7340. RIVERA called out for LUIS and asked if had called
yesterday. LUIS said yes. RIVERA asked what was up. LUIS said
a friend of his was selling "a gun, a 38 for 300," but he had not
seen it yet. RIVERA asked why was it "so much," if it was "only
a 38." LUIS said he had not seen it. RIVERA asked if it was
"brand new." LUIS said it was supposed to be "in the box."
RIVERA said if it was brand new and in the box, he would "get it"
but to find out right now. LUIS okay. Based on his training,
experience, and knowledge of the investigation, TFO Lavoie
believes this call relates to a pending firearm transaction.
LUIS stated his friend had a "38 for 300" meaning a .38 caliber
revolver for 300 dollars. RIVERA inquired as to why it was so
much money if it was only a .38 caliber. LUIS informed RIVERA it
was supposed to be "in the box," meaning brand new, and RIVERA
said if that was true, he would "get it."

3. On July 21, 2009, at 7:50 p.m., RIVERA made an outgoing
call on **Target Telephone #9** to an unidentified male ("UM") using
909-218-0852. RIVERA asked what the UM was doing. The UM said
he was talking with the "homies." RIVERA asked if he had "the
brand new." The UM said he had it and "it was good." RIVERA

USA000663

1  asked the UM if he wanted "two (possibly 200) for it."  The UM
2  said "250," adding that he had "a case for it and a holster that
3  was already loaded."  RIVERA said he wanted "it."  The UM asked
4  by when.  RIVERA said for "tomorrow" and asked if he would "hold
5  it."  The UM said yes.  RIVERA asked the UM if it was his.  The
6  UM said yes.  RIVERA told the UM to hold it until tomorrow once
7  he got out of work.  The UM said for sure.  RIVERA said because
8  he had just got back to the pad.  RIVERA told the UM not to sell
9  it because he "needed it."  The UM said if he got a ride, he
10  would go show it to RIVERA.  RIVERA told the UM not to "trip,"
11  that he believed him.  RIVERA repeated again to the UM to "hold
12  it" for him because he wanted it.  The UM said alright.

13       a.  Based on his training, experience, and knowledge
14  of the investigation, TFO Lavoie believes this call is related to
5  a pending firearm transaction.  RIVERA agreed to pay 250 dollars
16  for the "brand new" gun, and the UM stated it was in a "case"
17  with a "holster" and it was "already loaded."

18       b.  The transaction was to take place the following
19  day, July 22, 2009.  That day, surveillance was established on
20  RIVERA, who was seen in the front yard of 642 East E Street,
21  Ontario, holding what appeared to be a wool lined gun case when
22  officers attempted to contact him.  RIVERA ran from officers into
23  the residence prior to being detained.  A protective sweep of the
24  residence revealed a loaded .38 caliber revolver in a wool lined
25  gun case, which had been placed in a large industrial
26  refrigerator.  The firearm was seized and determined to be loaded
7  and not registered.  RIVERA stated that he had no knowledge of
8  the firearm.  RIVERA is a convicted felon, currently on parole.

USA000664

1 After being detained, RIVERA was released at the request of TFO
2 Lavoie to allow this investigation to progress.

3    4.   On July 31, 2009, at 1:21 p.m., RIVERA received an
4 incoming call on **Target Telephone #9** from ROB LNU using
5 909-723-2961.  During this conversation, ROB said he needed "a
6 quarter."  RIVERA said it would "go for three."  ROB asked if he
7 could "go lower."  RIVERA said "no, because it was bomb and
8 guaranteed."  Based on his training, experience, and knowledge of
9 the investigation TFO Lavoie believes ROB was referring to a 1/4
10 ounce quantity of methamphetamine when he said he needed a
11 "quarter."  When RIVERA replied it would "go for three" and that
12 it was "bomb and guaranteed," TFO Lavoie believes RIVERA was
13 selling 1/4 ounce quantities of methamphetamine for $300.00, and
14 that it was of high quality.

5 **I.   Confidential Informant**

16    On July 15, 2009, TFO Lavoie learned about an investigation
17 run by San Bernardino County Sheriff's Deputy Mike Martinez.
18 That investigation utilizes a confidential informant ("CI") who
19 is able to call ALEX and order narcotics from ALEX.  Despite the
20 connection to ALEX, TFO Lavoie believes that the CI does not
21 further the goals of this investigation because the information
22 provided by the CI does not reveal additional details about
23 ALEX's organization which TFO Lavoie does not already know, nor
24 can he satisfy the other goals of the investigation, including
25 providing information regarding the criminal activities of JOSE
26 LNU, the Ontario Black Angel criminal street gang, or other
7 narcotics dealers presently being extorted by the Ontario Black
28 Angels criminal street gang.

USA000665

1 **J.   State Wiretap**

2      On July 24, 2009, the Honorable Judge Edward Webster of the
3 California Superior Court, Riverside County, authorized
4 interception of 909-636-5140, a telephone number used by one of
5 ALEX's sources of supply, who is being investigated by TFO Tony
6 Dorcon of DEA Task Force Group 2.   That investigation involves
7 narcotics traffickers and lists ALEX as a target.   The identity
8 of that source of supply is presently unknown, but he has been
9 observed at Carlos and Saul's Appliance shop during past
10 surveillance.   TFO Lavoie remains in frequent contact with TFO
11 Dorcon to ensure that all relevant information is made available
12 to this investigation.

13 **K.   Inadvertent Interception of Text Messages on Target Telephone**
14    **#7**

5      On July 20, 2009, TFO Lavoie was informed that Metro PCS had
16 been providing text messages sent over **Target Telephone #7** for
17 the period of July 17, 2009 through July 20, 2009.   The Court's
18 order did not include the interception of text messages and it
19 appears that Metro PCS provided them inadvertently.   Upon TFO
20 Lavoie's learning that the text messages had been intercepted,
21 agents contacted Technician Paul Potter of IRNET to stop the
22 interception of such text messages.   Neither TFO Lavoie, nor any
23 other investigating agent has reviewed any of the inadvertently-
24 intercepted text messages.   The text messages that were
25 intercepted are currently stored on the same disc as the wire
26 intercepts and will be sealed with the wire intercepts.

7

28

USA000666

III.   CONCLUSION

Thus far, while pertinent calls have been intercepted, the goals of the investigation have not yet been attained.

TFO Lavoie believes that continued interception of the **Target Telephones** will provide the following information:

a.   **Target Telephone #5:** Assistance in the identification of Ontario Black Angels and their criminal activities, including the collection of extortion payments and narcotics trafficking.

b.   **Target Telephone #8:** Assistance in the identification of Jose LNU, his narcotics customers, and source(s) of supply. TFO Lavoie plans to prepare and execute a search warrant at Jose LNU's residence if/when interceptions indicate that Jose LNU has received a shipment of narcotics from his source of supply.

c.   **Target Telephone #9:** Assistance in the identification of Ontario Black Angels and their criminal activities, including the collection of extortion payments and narcotics trafficking.

Therefore, permission is respectfully requested to continue interception on **Target Telephone #5, Target Telephone #8**, and **Target Telephone #9** pursuant to the Court's Order.  The government will file a request to seal the recordings of **Target Telephone #7**.

It is further requested, pursuant to the Court's Order and 18 U.S.C. § 2518(8)(b), that this report be sealed until further order of the Court.  The interception of the **Target Telephone #5, Target Telephone #8**, and **Target Telephone #9** will continue pursuant to the Court's Order of July 17, 2009, unless otherwise directed by the Court.  The government will provide additional information concerning the interception or related investigative

1 information concerning the interception or related investigative
2 findings upon request of the Court.

3

4 DATED: August 4, 2009          Respectfully submitted,

5                                THOMAS P. O'BRIEN
                                 United States Attorney
6
                                 CHRISTINE C. EWELL
7                                Assistant United States Attorney
                                 Chief, Criminal Division
8

9                                REEMA M. EL-AMAMY
                                 Assistant United States Attorney
10                               Violent & Organized Crime Section

11

12                     [proposed] ORDER

13       The Court has reviewed the above report and authorizes
14 continued interception over **Target Telephone #5, Target Telephone**
15 **#8, and Target Telephone #9** pursuant to the Court's July 17, 2009
16 Order.   This Report and Order shall be filed under seal.

17       IT IS SO ORDERED.

18 DATED: August 5, 2009.             MANUEL L. REAL

19
                                 HONORABLE MANUEL L. REAL
20                               UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

USA000668

FILED COPY

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   JUSTIN R. RHOADES (Cal. SBN 230463)
4  Assistant United States Attorney
   Violent and Organized Crime Section
5      1500 United States Courthouse
       312 North Spring Street
6      Los Angeles, California 90012
       Telephone: (213) 894-3380
7      Facsimile: (213) 894-3713
       E-mail: justin.rhoades@usdoj.gov
8
   Attorneys for Applicant
9  UNITED STATES OF AMERICA

2009 AUG -6 AM 9:30

DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY _____

10          UNITED STATES DISTRICT COURT

11      FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  IN THE MATTER OF THE         )  CR Misc. No. 09-0038(D)-R
    APPLICATION OF THE UNITED    )
13  STATES OF AMERICA FOR AN     )  GOVERNMENT'S EX PARTE APPLICATION FOR
    ORDER AUTHORIZING (1) THE    )  AN ORDER SEALING ORIGINAL RECORDINGS
14  INTERCEPTION OF WIRE         )  FOR TARGET TELEPHONE; MEMORANDUM OF
    COMMUNICATIONS; (2) THE      )  POINTS AND AUTHORITIES; DECLARATION
15  INSTALLATION AND USE OF A    )  OF JUSTIN R. RHOADES
    PEN REGISTER AND A TRAP AND  )
16  TRACE DEVICE AND (3) THE     )  (UNDER SEAL)
    RELEASE OF SUBSCRIBER        )
17  INFORMATION AND CELL SITE    )
    INFORMATION                  )
18  _____ )

19      The government hereby files this ex parte application for an

20  order sealing certain original digital versatile disc recordings.

21  The government also requests that this ex parte application and the

22  Court's sealing order be filed under seal, and that the notification

23  requirements under Title 18, United States Code, Section 2518(d), be

24  delayed until further order from the Court.

25  //

26  //

27  //

28

1    This application is based upon the files and records of this
2  matter, the attached memorandum of points and authorities and the
3  attached declaration of Justin R. Rhoades.

4

5  DATED: August 5, 2009                Respectfully submitted,

6                                        THOMAS P. O'BRIEN
                                         United States Attorney
7
                                         CHRISTINE C. EWELL
8                                        Assistant United States Attorney
                                         Chief, Criminal Division
9

10

11

12                                       JUSTIN R. RHOADES
                                         Assistant United States Attorney
13
                                         Attorneys for Applicant
14                                       UNITED STATES OF AMERICA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        2

                    USA000670

1  <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2  On July 17, 2009, the Honorable Manuel L. Real, United States

3  District Judge for the Central District of California, signed an

4  order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R,

5  authorizing:

6

7          a.   the continued interception of a Sprint/Nextel

8          cellular telephone subscribed to Whaterver, Crazt Legs, at

9          1925 Eloise Way, Upland, CA 91784, with a telephone number

10          of 909-489-8277, IMSI # 000009097178960, and believed to

11          be used primarily by DAVID NAVARRO (**"Target Telephone #5"**)

12          or any subsequently changed telephone number assigned to

13          the same ESN with the same subscriber information, and/or

14          any subsequently changed ESN assigned to the same

15          telephone number with the same subscriber information;

16

17          b.   the initial interception of a Metro PCS cellular

18          telephone, with unknown subscriber information, with a

19          telephone number of 909-545-1313, an unknown IMSI/ESN

20          number  and believed to be used primarily by Daniel REYES

21          (**"Target Telephone #7"**);

22

23          c.   the initial interception of a pre-paid T-Mobile

24          cellular telephone, subscribed to Jose Silba, without an

25          address, with a telephone number of 909-319-2187, IMSI

26          #310260493015199, and believed to be used primarily by

27          Jose LNU (**"Target Telephone #8"**); and

28

1

1    d. the initial interception of a Sprint/Nextel cellular

2    telephone, subscribed to Jessica Medina at P.O. Box 54988,

3    Irvine, CA, with a telephone number of 909-419-9937, UFMI

4    126*295*2097, IMSI #316010154431162, and believed to be

5    used primarily by Carlos RIVERA  (**"Target Telephone #9"**

6    and collectively with **Target Telephone #5**, **Target**

7    **Telephone #7** and **Target Telephone #8**, the "Target

8    **Telephones**") or any subsequently changed telephone number

9    assigned to the same ISMI or ESN with the same subscriber

10    information, and/or any subsequently changed ISMI or ESN

11    assigned to the same telephone number with the same

12    subscriber information.

13  Pursuant to CR Misc. 09-0038(D)-R, monitoring on the **Target**

14 **Telephones** was initiated on or about July 17, 2009.  Monitoring of

15 **Target Telephone #5** was discontinued on August 4, 2009, as described

16 in more detail in the attached declaration.

17  Title 18, United States Code, Section 2518(8)(a) provides in

18 pertinent part:

19    The contents of any wire . . . communication intercepted
    by any means authorized by this chapter shall, if
20    possible, be recorded on tape or wire or other comparable
    device.  The recording of the contents of any wire . . .
21    communication under this subsection shall be done in such
    way as will protect the recording from editing or other
22    alterations.  Immediately upon the expiration of the
    period of the order, or extensions thereof, such
23    recordings shall be made available to the judge issuing
    such order and sealed under his directions.  Custody of
24    the recordings shall be wherever the judge orders.  They
    shall not be destroyed except upon an order of the issuing
25    or denying judge and in any event shall be kept for ten
    years.
26

27  Pursuant to this section, the government presents the original

28 intercepted digital versatile disc ("DVD") recordings to the Court

2

1 and requests that the Court direct its sealing order as set forth
2 below, and further requests that the sealed disc be placed in the
3 custody of the Drug Enforcement Administration ("DEA") and remain
4 sealed until further order of the Court.

5     The government further requests that the notification
6 requirements under Title 18, United States Code, Section 2518(8)(d)
7 be postponed as to all parties intercepted under the afore-described
8 surveillance period until further order of this Court.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

1         <u>DECLARATION OF JUSTIN R. RHOADES</u>

2     I, JUSTIN R. RHOADES, hereby declare and state as follows:

3     1.   I am an Assistant United States Attorney for the Central

4 District of California.  I am an "investigative or law enforcement

5 officer" as defined in Title 18, United States Code, Section

6 2510(7), that is, an attorney authorized by law to prosecute

7 offenses enumerated in Title 18, United States Code, Section 2516.

8     2.   On July 17, 2009, the Honorable Manuel L. Real, United

9 States District Judge for the Central District of California, signed

10 an order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R,

11 authorizing:

12

13         a.   the continued interception of a Sprint/Nextel

14         cellular telephone subscribed to Whaterver, Crazt Legs, at

15         1925 Eloise Way, Upland, CA 91784, with a telephone number

16         of 909-489-8277, IMSI # 000009097178960, and believed to

17         be used primarily by DAVID NAVARRO ("**Target Telephone #5**")

18         or any subsequently changed telephone number assigned to

19         the same ESN with the same subscriber information, and/or

20         any subsequently changed ESN assigned to the same

21         telephone number with the same subscriber information;

22

23         b.   the initial interception of a Metro PCS cellular

24         telephone, with unknown subscriber information, with a

25         telephone number of 909-545-1313, an unknown IMSI/ESN

26         number  and believed to be used primarily by Daniel REYES

27         ("**Target Telephone #7**");

28

c.   the initial interception of a pre-paid T-Mobile cellular telephone, subscribed to Jose Silba, without an address, with a telephone number of 909-319-2187, IMSI #310260493015199, and believed to be used primarily by Jose LNU (**"Target Telephone #8"**); and

d.   the initial interception of a Sprint/Nextel cellular telephone, subscribed to Jessica Medina at P.O. Box 54988, Irvine, CA, with a telephone number of 909-419-9937, UFMI 126*295*2097, IMSI #316010154431162, and believed to be used primarily by Carlos RIVERA (**"Target Telephone #9"** and collectively with **Target Telephone #5**, **Target Telephone #7** and **Target Telephone #8**, the "Target **Telephones"**) or any subsequently changed telephone number assigned to the same ISMI or ESN with the same subscriber information, and/or any subsequently changed ISMI or ESN assigned to the same telephone number with the same subscriber information.

4.   DEA Task Force Officer ("TFO") Kris Lavoie has informed me that, on August 4, 2009, a Spanish language call was intercepted on **Target Telephone #8** between Target Subjects JOSE LNU and NAVARRO, during which NAVARRO stated that his old number (**Target Telephone #5**) was "done" and that he had obtained a new telephone number. Based on this call and the fact that there was not additional traffic over this telephone line, on August 4, 2009, law enforcement discontinued interceptions of **Target Telephone #5**.

2

5.     TFO Lavoie has informed me that the wire interceptions on **Target Telephone #5** during the period of court-authorized interception have now been recorded on a digital versatile disc ("DVD"). That DVD will be brought before this Court for sealing and subsequent storage in a secure DEA facility, in order to preserve the recordings and to prevent editing or alteration thereof.

6.     TFO Lavoie has further informed me that the investigation of the Target Subjects identified in CR Misc. 09-0038(D)-R is ongoing. Accordingly, notification of those individuals of the existence of interception under CR Misc. 09-0038(D)-R would alert those individuals to the existence and nature of the underlying investigation.

7.     I request that the Court direct the sealing of the DVD and order that the sealed DVD be placed in the custody of the DEA and remain sealed until further order of the Court.

8.     I also request that this order and application be sealed until further order of the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

DATED: August 5, 2009

_____
JUSTIN R. RHOADES
Assistant United States Attorney

3

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   JUSTIN R. RHOADES (Cal. SBN 230463)
4  Assistant United States Attorney
   Violent and Organized Crime Section
5      1500 United States Courthouse
       312 North Spring Street
6      Los Angeles, California 90012
       Telephone: (213) 894-3380
7      Facsimile: (213) 894-3713
       E-mail: justin.rhoades@usdoj.gov
8

9  Attorneys for Applicant
   UNITED STATES OF AMERICA
10

11                 UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13
   IN THE MATTER OF THE        )  CR Misc. No. 09-0038(D)-R
14 APPLICATION OF THE UNITED   )
   STATES OF AMERICA FOR AN    )
15 ORDER AUTHORIZING (1) THE   )
   INTERCEPTION OF WIRE        )  ORDER SEALING ORIGINAL RECORDINGS FOR
16 COMMUNICATIONS; (2) THE     )  TARGET TELEPHONE
   INSTALLATION AND USE OF A   )
17 PEN REGISTER AND A TRAP AND )  (UNDER SEAL)
   TRACE DEVICE AND (3) THE    )
18 RELEASE OF SUBSCRIBER       )
   INFORMATION AND CELL SITE   )
19 INFORMATION                 )
   _____)

20

21      This matter having come before the Court upon the government's

22 application for an order sealing recordings contained on a digital

23 versatile disc ("DVD"), the Court finds:

24      On July 17, 2009, the Honorable Manuel L. Real, United States

25 District Judge for the Central District of California, signed an

26 order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R,

27 authorizing:

28

                               1

FILED
CLERK, U.S. DISTRICT COURT

AUG - 6 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

1    a.   the continued interception of a Sprint/Nextel

2         cellular telephone subscribed to Whaterver, Crazt Legs, at

3         1925 Eloise Way, Upland, CA 91784, with a telephone number

4         of 909-489-8277, IMSI # 000009097178960, and believed to

5         be used primarily by DAVID NAVARRO ("**Target Telephone #5**")

6         or any subsequently changed telephone number assigned to

7         the same ESN with the same subscriber information, and/or

8         any subsequently changed ESN assigned to the same

9         telephone number with the same subscriber information;

10

11   b.   the initial interception of a Metro PCS cellular

12        telephone, with unknown subscriber information, with a

13        telephone number of 909-545-1313, an unknown IMSI/ESN

14        number  and believed to be used primarily by Daniel REYES

15        ("**Target Telephone #7**");

16

17   c.   the initial interception of a pre-paid T-Mobile

18        cellular telephone, subscribed to Jose Silba, without an

19        address, with a telephone number of 909-319-2187, IMSI

20        #310260493015199, and believed to be used primarily by

21        Jose LNU ("**Target Telephone #8**"); and

22

23   d.   the initial interception of a Sprint/Nextel cellular

24        telephone, subscribed to Jessica Medina at P.O. Box 54988,

25        Irvine, CA, with a telephone number of 909-419-9937, UFMI

26        126*295*2097, IMSI #316010154431162, and believed to be

27        used primarily by Carlos RIVERA  ("**Target Telephone #9**"

28        and collectively with **Target Telephone #5, Target**

2

1           **Telephone #7** and **Target Telephone #8**, the "**Target**

2           **Telephones**") or any subsequently changed telephone number

3           assigned to the same ISMI or ESN with the same subscriber

4           information, and/or any subsequently changed ISMI or ESN

5           assigned to the same telephone number with the same

6           subscriber information.

7     Pursuant to CR Misc. 09-0038(D)-R, monitoring on **Target Target**

8 **Telephone #5** was initiated on or about July 17, 2009 and was

9 discontinued on August 4, 2009.

10     One DVD was used to record conversations on **Target Telephone #5**

11 during the period of court-authorized wire interception, which has

12 been brought before this Court, pursuant to Title 18, United States

13 Code, Section 2518(8)(a).

14 WHEREFORE IT IS ORDERED THAT:

15     1.    The DVD containing wire and electronic interceptions be

16 sealed in an envelope, verified by the initials of the Court;

17     2.    The United States Drug Enforcement Administration, or

18 other designated law enforcement agency, shall maintain custody of

19 the DVD in its sealed condition, in a safe and secure place for a

20 period of not less than ten (10) years from the date of this order;

21     3.    The DVD shall not be destroyed, except upon order of this

22 Court;

23     4.    The DVD shall be protected from editing or alteration;

24     5.    Except as provided by Title 18, United States Code,

25 Section 2517, the DVD shall remain sealed and the contents of the

26 disc shall be disclosed only upon order of the Court, and the

27 notification requirements under Title 18, United States Code,

28 Section 2518(8)(d) shall be postponed until further order of this

3

1  Court; and

2      6.   This order and application shall be sealed until further

3  order of this Court.

4

5

6  DATED: August **6** , 2009

7

8

9

10                                    **MANUEL L. REAL**
                                  _____
11                                HONORABLE MANUEL L. REAL
                                  UNITED STATES DISTRICT COURT JUDGE

12  Presented By:

13

14  _____
    JUSTIN R. RHOADES
15  Assistant United States Attorney
    Violent & Organized Crime Section
16

17

18

19

20

21

22

·23

24

25

26

27

·28

4

          USA000680

COPY

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   REEMA M. EL-AMAMY (Cal. SBN 237743)
4  Assistant United States Attorney
   Violent and Organized Crime Section
5       1500 United States Courthouse
        ·312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-0552
7       Facsimile: (213) 894-3713
        E-mail: reema.el-amamy@usdoj.gov
8
   Attorneys for Applicant
9  UNITED STATES OF AMERICA

10               UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 IN THE MATTER OF THE        )  CR Misc. No. 09-0038(D)-R
   APPLICATION OF THE UNITED   )
13 STATES OF AMERICA FOR AN    )  GOVERNMENT'S EX PARTE APPLICATION FOR
   ORDER AUTHORIZING (1) THE   )  AN ORDER SEALING ORIGINAL RECORDINGS
14 INTERCEPTION OF WIRE        )  FOR TARGET TELEPHONE; MEMORANDUM OF
   COMMUNICATIONS; (2) THE     )  POINTS AND AUTHORITIES; DECLARATION
15 INSTALLATION AND USE OF A   )  OF REEMA M. EL-AMAMY
   PEN REGISTER AND A TRAP AND )
16 TRACE DEVICE AND (3) THE    )  (UNDER SEAL)
   RELEASE OF SUBSCRIBER       )
17 INFORMATION AND CELL SITE   )
   INFORMATION .               )
18 _____ )

19      The government hereby files this ex parte application for an

20 order sealing certain original digital versatile disc recordings.

21 The government also requests that this ex parte application and the

22 Court's sealing order be filed under seal, and that the notification

23 requirements under Title 18, United States Code, Section 2518(d), be

24 delayed until further order from the Court.

25 //

26 //

27 //

28

ER000341                                    USA000681

1       This application is based upon the files and records of this

2   matter, the attached memorandum of points and authorities and the

3   attached declaration of Reema M. El-Amamy.

4

5   DATED: August 4, 2009          Respectfully submitted,

6                                THOMAS P. O'BRIEN
                             United States Attorney

7

8                                CHRISTINE C. EWELL
                             Assistant United States Attorney
                             Chief, Criminal Division

9

10

11

                             REEMA M. EL-AMAMY

12                               Assistant United States Attorney

13

14                               Attorneys for Applicant
                             UNITED STATES OF AMERICA

15

16

17

18

19

20

21

22

23

24

25

26

27

28                         2

MEMORANDUM OF POINTS AND AUTHORITIES

On July 17, 2009, the Honorable Manuel L. Real, United States District Judge for the Central District of California, signed an order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R, authorizing:

a. the continued interception of a Sprint/Nextel cellular telephone subscribed to Whaterver, Crazt Legs, at 1925 Eloise Way, Upland, CA 91784, with a telephone number of 909-489-8277, IMSI # 000009097178960, and believed to be used primarily by DAVID NAVARRO (**"Target Telephone #5"**) or any subsequently changed telephone number assigned to the same ESN with the same subscriber information, and/or any subsequently changed ESN assigned to the same telephone number with the same subscriber information;

b. the initial interception of a Metro PCS cellular telephone, with unknown subscriber information, with a telephone number of 909-545-1313, an unknown IMSI/ESN number and believed to be used primarily by Daniel REYES (**"Target Telephone #7"**);

c. the initial interception of a pre-paid T-Mobile cellular telephone, subscribed to Jose Silba, without an address, with a telephone number of 909-319-2187, IMSI #310260493015199, and believed to be used primarily by Jose LNU (**"Target Telephone #8"**); and

1

USA000683

1        d.    the initial interception of a Sprint/Nextel cellular

2        telephone, subscribed to Jessica Medina at P.O. Box 54988,

3        Irvine, CA, with a telephone number of 909-419-9937, UFMI

4        126*295*2097, IMSI #316010154431162, and believed to be

5        used primarily by Carlos RIVERA  (**"Target Telephone #9"**

6        and collectively with **Target Telephone #5**, **Target**

7        **Telephone #7** and **Target Telephone #8**, the "Target

8        **Telephones**") or any subsequently changed telephone number

9        assigned to the same ISMI or ESN with the same subscriber

10       information, and/or any subsequently changed ISMI or ESN

11       assigned to the same telephone number with the same

12       subscriber information.

13    Pursuant to CR Misc. 09-0038(D)-R, monitoring on the **Target**

14 **Telephones** was initiated on or about July 17, 2009.  Monitoring of

15 **Target Telephone #7** was discontinued on August 3, 2009, as described

16 in more detail in the attached declaration.

17    Title 18, United States Code, Section 2518(8)(a) provides in

18 pertinent part:

19

20        The contents of any wire . . . communication intercepted
          by any means authorized by this chapter shall, if
21        possible, be recorded on tape or wire or other comparable
          device.  The recording of the contents of any wire . . .
22        communication under this subsection shall be done in such
          way as will protect the recording from editing or other
23        alterations.  Immediately upon the expiration of the
          period of the order, or extensions thereof, such
24        recordings shall be made available to the judge issuing
          such order and sealed under his directions.  Custody of
25        the recordings shall be wherever the judge orders.  They
          shall not be destroyed except upon an order of the issuing
26        or denying judge and in any event shall be kept for ten
          years.

27

28                                     2

1    Pursuant to this section, the government presents the original
2    intercepted digital versatile disc ("DVD") recordings to the Court
3    and requests that the Court direct its sealing order as set forth
4    below, and further requests that the sealed disc be placed in the
5    custody of the Drug Enforcement Administration ("DEA") and remain
6    sealed until further order of the Court.

7    The government further requests that the notification
8    requirements under Title 18, United States Code, Section 2518(8)(d)
9    be postponed as to all parties intercepted under the afore-described
10   surveillance period until further order of this Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                  3

1  <u>DECLARATION OF REEMA M. EL-AMAMY</u>

2  I, REEMA M. EL-AMAMY, hereby declare and state as follows:

3  1.  I am an Assistant United States Attorney for the Central
4  District of California.  I am an "investigative or law enforcement
5  officer" as defined in Title 18, United States Code, Section
6  2510(7), that is, an attorney authorized by law to prosecute
7  offenses enumerated in Title 18, United States Code, Section 2516.

8  2.  On July 17, 2009, the Honorable Manuel L. Real, United
9  States District Judge for the Central District of California, signed
10  an order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R,
11  authorizing:

12

13       a.  the continued interception of a Sprint/Nextel
14       cellular telephone subscribed to Whaterver, Crazt Legs, at
15       1925 Eloise Way, Upland, CA 91784, with a telephone number
16       of 909-489-8277, IMSI # 000009097178960, and believed to
17       be used primarily by DAVID NAVARRO (**Target Telephone #5**")
18       or any subsequently changed telephone number assigned to
19       the same ESN with the same subscriber information, and/or
20       any subsequently changed ESN assigned to the same
21       telephone number with the same subscriber information;

22

23       b.  the initial interception of a Metro PCS cellular
24       telephone, with unknown subscriber information, with a
25       telephone number of 909-545-1313, an unknown IMSI/ESN
26       number  and believed to be used primarily by Daniel REYES
27       (**Target Telephone #7**");

28

ER000346                                          USA000686

c.    the initial interception of a pre-paid T-Mobile
cellular telephone, subscribed to Jose Silba, without an
address, with a telephone number of 909-319-2187, IMSI
#310260493015199, and believed to be used primarily by
Jose LNU ("**Target Telephone #8**"); and

d.    the initial interception of a Sprint/Nextel cellular
telephone, subscribed to Jessica Medina at P.O. Box 54988,
Irvine, CA, with a telephone number of 909-419-9937, UFMI
126*295*2097, IMSI #316010154431162, and believed to be
used primarily by Carlos RIVERA  ("**Target Telephone #9**"
and collectively with **Target Telephone #5**, **Target
Telephone #7** and **Target Telephone #8**, the "**Target
Telephones**") or any subsequently changed telephone number
assigned to the same ISMI or ESN with the same subscriber
information, and/or any subsequently changed ISMI or ESN
assigned to the same telephone number with the same
subscriber information.

4.    TFO Lavoie has informed me of the following:

a.    On August 1, 2009, law enforcement performed a
traffic stop on REYES and discovered a sawed-off .22 caliber rifle.
REYES was taken into custody.  Based on intercepted calls on other
telephone lines and the lack of any activity on **Target Telephone #7**
after August 3, 2009, TFO Lavoie believes REYES has ceased using
**Target Telephone #7** as a result of his arrest.  Thus, interception
of **Target Telephone #7** was discontinued on August 3, 2009.

b.    On July 20, 2009, TFO Lavoie was informed that Metro

2

1  PCS had been providing text messages sent over **Target Telephone #7**
2  for the period of July 17, 2009 through July 20, 2009.  The Court's
3  order did not include the interception of text messages and it
4  appears that Metro PCS provided them inadvertently.  Upon TFO
5  Lavoie's learning that the text messages had been intercepted,
6  agents contacted Technician Paul Potter of IRNET to stop the
7  interception of such text messages.  Neither TFO Lavoie, nor any
8  other investigating agent has reviewed any of the inadvertently-
9  intercepted text messages.  The text messages that were intercepted
10 are currently stored on the same disc as the intercepted wire
11 communications.

12     5.   TFO Lavoie has further informed me that the investigation
13 of the Target Subjects identified in CR Misc. 09-0038(D)-R is
14 ongoing.  Accordingly, notification of those individuals of the
15 existence of interception under CR Misc. 09-0038(D)-R would alert
16 those individuals to the existence and nature of the underlying
17 investigation.

18     6.   I request that the Court direct the sealing of the DVD and
19 order that the sealed DVD be placed in the custody of the DEA and
20 remain sealed until further order of the Court.

21     7.   I also request that this order and application be sealed
22 until further order of the Court.

23     I declare under penalty of perjury under the laws of the United
24 States of America that the foregoing is true and correct to the best
25 of my knowledge and belief.

26
DATED: August 4, 2009
27                                    REEMA M. EL-AMAMY
                                     Assistant United States Attorney
28

3

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   REEMA M. EL-AMAMY (Cal. SBN 237743)
4  Assistant United States Attorney
   Violent and Organized Crime Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-0552
7       Facsimile: (213) 894-3713
        E-mail: reema.el-amamy@usdoj.gov
8

9  Attorneys for Applicant
   UNITED STATES OF AMERICA
10

11              UNITED STATES DISTRICT COURT

12         FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 IN THE MATTER OF THE        )  CR Misc. No. 09-0038(D)-R
14 APPLICATION OF THE UNITED   )
   STATES OF AMERICA FOR AN    )
15 ORDER AUTHORIZING (1) THE   )
   INTERCEPTION OF WIRE        )  ORDER SEALING ORIGINAL RECORDINGS FOR
16 COMMUNICATIONS; (2) THE     )  TARGET TELEPHONE
   INSTALLATION AND USE OF A   )
17 PEN REGISTER AND A TRAP AND )  (UNDER SEAL)
   TRACE DEVICE AND (3) THE    )
18 RELEASE OF SUBSCRIBER       )
   INFORMATION AND CELL SITE   )
19 INFORMATION                 )
                               )
20

21      This matter having come before the Court upon the government's

22 application for an order sealing recordings contained on a digital

23 versatile disc ("DVD"), the Court finds:

24      On July 17, 2009, the Honorable Manuel L. Real, United States

25 District Judge for the Central District of California, signed an

26 order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R,

27 authorizing:

28

                              1

ER000349                                    USA000689

FILED
CLERK, U.S. DISTRICT COURT

AUG - 6 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

LODGED

a.   the continued interception of a Sprint/Nextel
cellular telephone subscribed to Whaterver, Crazt Legs, at
1925 Eloise Way, Upland, CA 91784, with a telephone number
of 909-489-8277, IMSI # 000009097178960, and believed to
be used primarily by DAVID NAVARRO ("**Target Telephone #5**")
or any subsequently changed telephone number assigned to
the same ESN with the same subscriber information, and/or
any subsequently changed ESN assigned to the same
telephone number with the same subscriber information;

b.   the initial interception of a Metro PCS cellular
telephone, with unknown subscriber information, with a
telephone number of 909-545-1313, an unknown IMSI/ESN
number  and believed to be used primarily by Daniel REYES
("**Target Telephone #7**");

c.   the initial interception of a pre-paid T-Mobile
cellular telephone, subscribed to Jose Silba, without an
address, with a telephone number of 909-319-2187, IMSI
#310260493015199, and believed to be used primarily by
Jose LNU ("**Target Telephone #8**"); and

d.   the initial interception of a Sprint/Nextel cellular
telephone, subscribed to Jessica Medina at P.O. Box 54988,
Irvine, CA, with a telephone number of 909-419-9937, UFMI
126*295*2097, IMSI #316010154431162, and believed to be

2

used primarily by Carlos RIVERA ("**Target Telephone #9**"
and collectively with **Target Telephone #5**, **Target
Telephone #7** and **Target Telephone #8**, the "**Target
Telephones**") or any subsequently changed telephone number
assigned to the same ISMI or ESN with the same subscriber
information, and/or any subsequently changed ISMI or ESN
assigned to the same telephone number with the same
subscriber information.

Pursuant to CR Misc. 09-0038(D)-R, monitoring on **Target Target
Telephone #7** was initiated on or about July 17, 2009 and was
discontinued on August 3, 2009.

One DVD was used to record conversations on **Target Telephone #7**
during the period of court-authorized wire interception, which has
been brought before this Court, pursuant to Title 18, United States
Code, Section 2518(8)(a). This DVD also contains the text messages
that were inadvertently intercepted over **Target Telephone #7**.

WHEREFORE IT IS ORDERED THAT:

1.   The DVD containing wire and electronic interceptions be
sealed in an envelope, verified by the initials of the Court;

2.   The United States Drug Enforcement Administration, or
other designated law enforcement agency, shall maintain custody of
the DVD in its sealed condition, in a safe and secure place for a
period of not less than ten (10) years from the date of this order;

3.   The DVD shall not be destroyed, except upon order of this
Court;

4.   The DVD shall be protected from editing or alteration;

5.   Except as provided by Title 18, United States Code,

3

1  Section 2517, the DVD shall remain sealed and the contents of the
2  disc shall be disclosed only upon order of the Court, and the
3  notification requirements under Title 18, United States Code,
4  Section 2518(8)(d) shall be postponed until further order of this
5  Court; and
6      6.   This order and application shall be sealed until further
7  order of this Court.
8
9
10 DATED: August **6** , 2009
11
12
13                                    **MANUEL L. REAL**
14                        _____
                         HONORABLE MANUEL L. REAL
15                       UNITED STATES DISTRICT COURT JUDGE
16 Presented By:
17
18 _____
   REEMA M. EL-AMAMY
19 Assistant United States Attorney
   Violent & Organized Crime Section
20
21
22
23
24
25
26
27
28

                                    4

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CRIMINAL MINUTES -- GENERAL

Case No.: __CR-MISC-09-38(D)-R__                     Date: __August 19, 2009__

PRESENT: HON._____ __MANUEL L. REAL_____ , JUDGE

| __Andrea Keifer__ | __Bridget Montero__ | __Justin Rhoades__ |
|---|---|---|
| **Deputy Clerk** | **Court Reporter** | **Asst. U. S. Attorney** |

PROCEEDINGS:        **GOVERNMENT'S APPLICATION FOR AN ORDER SEALING ORIGINAL RECORDINGS OF TARGET TELEPHONE**

**Task Force Officer Kris Lavoie, D.E.A., presents 2 digitally recorded disks, contained in a plastic case, to the Court.**

**The agent seals the disk in a separate paper envelope with tape in the presence of the Court.**

**The Court signs across the seal on the envelope as made by the agent.**

**The Court signs the order sealing the recordings of wire communications.**

**2 min**

**CR-MIN**

____AK_____
**Deputy Clerk**

FILED

COPY

```
 1  THOMAS P. O'BRIEN
    United States Attorney
 2  CHRISTINE C. EWELL                    2009 AUG 18 PM 4:02
    Assistant United States Attorney
 3  Chief, Criminal Division               ....... ....TRICT COURT
    REEMA M. EL-AMAMY (Cal. SBN 237743)   ... ... DIST. OF CALIF.
 4  Assistant United States Attorney        :0S ANGELES
    Violent and Organized Crime Section_____
 5       1500 United States Courthouse
         312 North Spring Street
 6       Los Angeles, California 90012
         Telephone: (213) 894-0552
 7       Facsimile: (213) 894-3713
         E-mail: reema.el-amamy@usdoj.gov
 8
    Attorneys for Applicant
 9  UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  IN THE MATTER OF THE      )  CR Misc. No. 09-0038(D)-R
    APPLICATION OF THE UNITED )
13  STATES OF AMERICA FOR AN  )  GOVERNMENT'S EX PARTE APPLICATION FOR
    ORDER AUTHORIZING (1) THE  )  AN ORDER SEALING ORIGINAL RECORDINGS
14  INTERCEPTION OF WIRE      )  FOR TARGET TELEPHONE; MEMORANDUM OF
    COMMUNICATIONS; (2) THE   )  POINTS AND AUTHORITIES; DECLARATION
15  INSTALLATION AND USE OF A )  OF REEMA M. EL-AMAMY
    PEN REGISTER AND A TRAP AND)
16  TRACE DEVICE AND (3) THE  )  (UNDER SEAL)
    RELEASE OF SUBSCRIBER     )
17  INFORMATION AND CELL SITE )
    INFORMATION               )
18                            )
```

19       The government hereby files this _ex parte_ application for an

20  order sealing certain original digital versatile disc recordings.

21  The government also requests that this _ex parte_ application and the

22  Court's sealing order be filed under seal, and that the notification

23  requirements under Title 18, United States Code, Section 2518(d), be

24  delayed until further order from the Court.

25  //

26  //

27  //

28

1     This application is based upon the files and records of this

2 matter, the attached memorandum of points and authorities and the

3 attached declaration of Reema M. El-Amamy.

4

5 DATED: August 18, 2009        Respectfully submitted,

6                         THOMAS P. O'BRIEN
                            United States Attorney

7
                          CHRISTINE C. EWELL

8                         Assistant United States Attorney
                          Chief, Criminal Division

9

10

11

                         REEMA M. EL-AMAMY

12                     Assistant United States Attorney

13
                         Attorneys for Applicant

14                     UNITED STATES OF AMERICA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                           2

1  MEMORANDUM OF POINTS AND AUTHORITIES

2  On July 17, 2009, the Honorable Manuel L. Real, United States

3  District Judge for the Central District of California, signed an

4  order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R,

5  authorizing:

6

7  a.   the continued interception of a Sprint/Nextel

8  cellular telephone subscribed to Whaterver, Crazt Legs, at

9  1925 Eloise Way, Upland, CA 91784, with a telephone number

10  of 909-489-8277, IMSI # 000009097178960, and believed to

11  be used primarily by DAVID NAVARRO ("**Target Telephone #5**")

12  or any subsequently changed telephone number assigned to

13  the same ESN with the same subscriber information, and/or

14  any subsequently changed ESN assigned to the same

15  telephone number with the same subscriber information;

16

17  b.   the initial interception of a Metro PCS cellular

18  telephone, with unknown subscriber information, with a

19  telephone number of 909-545-1313, an unknown IMSI/ESN

20  number  and believed to be used primarily by Daniel REYES

21  ("**Target Telephone #7**");

22

23  c.   the initial interception of a pre-paid T-Mobile

24  cellular telephone, subscribed to Jose Silba, without an

25  address, with a telephone number of 909-319-2187, IMSI

26  #310260493015199, and believed to be used primarily by

27  Jose LNU ("**Target Telephone #8**"); and

28

1

ER000356                                            USA000696

1              d.   the initial interception of a Sprint/Nextel cellular

2           telephone, subscribed to Jessica Medina at P.O. Box 54988,

3           Irvine, CA, with a telephone number of 909-419-9937, UFMI

4           126*295*2097, IMSI #316010154431162, and believed to be

5           used primarily by Carlos RIVERA  (**"Target Telephone #9"**

6           and collectively with **Target Telephone #5, Target**

7           **Telephone #7** and **Target Telephone #8**, the **"Target**

8           **Telephones"**) or any subsequently changed telephone number

9           assigned to the same ISMI or ESN with the same subscriber

10          information, and/or any subsequently changed ISMI or ESN

11          assigned to the same telephone number with the same

12          subscriber information.

13    Pursuant to CR Misc. 09-0038(D)-R, monitoring on the **Target**

14 **Telephones** was initiated on or about July 17, 2009.  Monitoring of

15 **Target Telephone #8** and **Target Telephone #9** was discontinued on

16 August 15, 2009.

17    Title 18, United States Code, Section 2518(8)(a) provides in

18 pertinent part:

19          The contents of any wire . . . communication intercepted
            by any means authorized by this chapter shall, if

20          possible, be recorded on tape or wire or other comparable
            device.  The recording of the contents of any wire . . .

21          communication under this subsection shall be done in such
            way as will protect the recording from editing or other

22          alterations.  Immediately upon the expiration of the
            period of the order, or extensions thereof, such

23          recordings shall be made available to the judge issuing
            such order and sealed under his directions.  Custody of

24          the recordings shall be wherever the judge orders.  They
            shall not be destroyed except upon an order of the issuing

25          or denying judge and in any event shall be kept for ten
            years.

26

27    Pursuant to this section, the government presents the original

28 intercepted digital versatile disc ("DVD") recordings to the Court

2

1   and requests that the Court direct its sealing order as set forth

2   below, and further requests that the sealed disc be placed in the

3   custody of the Drug Enforcement Administration ("DEA") and remain

4   sealed until further order of the Court.

5       The government further requests that the notification

6   requirements under Title 18, United States Code, Section 2518(8)(d)

7   be postponed as to all parties intercepted under the afore-described

8   surveillance period until further order of this Court.

3

USA000698

1      <u>DECLARATION OF REEMA M. EL-AMAMY</u>

2          I, REEMA M. EL-AMAMY, hereby declare and state as follows:

3          1.   I am an Assistant United States Attorney for the Central

4      District of California.  I am an "investigative or law enforcement

5      officer" as defined in Title 18, United States Code, Section

6      2510(7), that is, an attorney authorized by law to prosecute

7      offenses enumerated in Title 18, United States Code, Section 2516.

8          2.   On July 17, 2009, the Honorable Manuel L. Real, United

9      States District Judge for the Central District of California, signed

10     an order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R,

11     authorizing:

12

13              a.   the continued interception of a Sprint/Nextel

14                   cellular telephone subscribed to Whaterver, Crazt Legs, at

15                   1925 Eloise Way, Upland, CA 91784, with a telephone number

16                   of 909-489-8277, IMSI # 000009097178960, and believed to

17                   be used primarily by DAVID NAVARRO (**Target Telephone #5**)

18                   or any subsequently changed telephone number assigned to

19                   the same ESN with the same subscriber information, and/or

20                   any subsequently changed ESN assigned to the same

21                   telephone number with the same subscriber information;

22

23              b.   the initial interception of a Metro PCS cellular

24                   telephone, with unknown subscriber information, with a

25                   telephone number of 909-545-1313, an unknown IMSI/ESN

26                   number  and believed to be used primarily by Daniel REYES

27                   (**Target Telephone #7**);

28

1      c.   the initial interception of a pre-paid T-Mobile

2      cellular telephone, subscribed to Jose Silba, without an

3      address, with a telephone number of 909-319-2187, IMSI

4      #310260493015199, and believed to be used primarily by

5      Jose LNU (**"Target Telephone #8"**); and

6

7      d.   the initial interception of a Sprint/Nextel cellular

8      telephone, subscribed to Jessica Medina at P.O. Box 54988,

9      Irvine, CA, with a telephone number of 909-419-9937, UFMI

10     126*295*2097, IMSI #316010154431162, and believed to be

11     used primarily by Carlos RIVERA  (**"Target Telephone #9"**

12     and collectively with **Target Telephone #5**, **Target**

13     **Telephone #7** and **Target Telephone #8**, the "**Target**

14     **Telephones**") or any subsequently changed telephone number

15     assigned to the same ISMI or ESN with the same subscriber

16     information, and/or any subsequently changed ISMI or ESN

17     assigned to the same telephone number with the same

18     subscriber information.

19    4.   DEA Task Force Officer ("TFO") Kris Lavoie has informed me

20 that, pursuant to the Court's Order, monitoring on **Target Telephone**

21 **#8** and **Target Telephone #9** was discontinued on August 15, 2009.

22    5.   TFO Lavoie has informed me that the wire interceptions on

23 **Target Telephone #8** and **Target Telephone #9** during the period of

24 court-authorized interception have now been recorded on digital

25 versatile discs ("DVDs").  The DVDs will be brought before this

26 Court for sealing and subsequent storage in a secure DEA facility,

27 in order to preserve the recordings and to prevent editing or

28

2

                     USA000700

1  alteration thereof.

2      6.   TFO Lavoie has further informed me that the investigation

3  of the Target Subjects identified in CR Misc. 09-0038(D)-R is

4  ongoing.  Accordingly, notification of those individuals of the

5  existence of interception under CR Misc. 09-0038(D)-R would alert

6  those individuals to the existence and nature of the underlying

7  investigation.

8      7.   I request that the Court direct the sealing of the DVD and

9  order that the sealed DVDs be placed in the custody of the DEA and

10 remain sealed until further order of the Court.

11     8.   I also request that this order and application be sealed

12 until further order of the Court.

13     I declare under penalty of perjury under the laws of the United

14 States of America that the foregoing is true and correct to the best

15 of my knowledge and belief.

16 DATED: August 18, 2009              _____

17                                     REEMA M. EL-AMAMY
                                       Assistant United States Attorney

18

19

20

21

22

23

24

25

26

27

28

ER000361                              USA000701

```
 1  THOMAS P. O'BRIEN
    United States Attorney
 2  CHRISTINE C. EWELL
    Assistant United States Attorney
 3  Chief, Criminal Division
    REEMA M. EL-AMAMY (Cal. SBN 237743)
 4  Assistant United States Attorney
    Violent and Organized Crime Section
 5       1500 United States Courthouse
         312 North Spring Street
 6       Los Angeles, California 90012
         Telephone: (213) 894-0552
 7       Facsimile: (213) 894-3713
         E-mail: reema.el-amamy@usdoj.gov
 8
 9  Attorneys for Applicant
    UNITED STATES OF AMERICA
10
11              UNITED STATES DISTRICT COURT
12         FOR THE CENTRAL DISTRICT OF CALIFORNIA
13
14  IN THE MATTER OF THE        )  CR Misc. No. 09-0038(D)-R
    APPLICATION OF THE UNITED   )
15  STATES OF AMERICA FOR AN    )
    ORDER AUTHORIZING (1) THE   )
16  INTERCEPTION OF WIRE        )  ORDER SEALING ORIGINAL RECORDINGS FOR
    COMMUNICATIONS; (2) THE     )  TARGET TELEPHONE
17  INSTALLATION AND USE OF A   )
    PEN REGISTER AND A TRAP AND )  (UNDER SEAL)
18  TRACE DEVICE AND (3) THE    )
    RELEASE OF SUBSCRIBER       )
19  INFORMATION AND CELL SITE   )
    INFORMATION                 )
20  _____)
21       This matter having come before the Court upon the government's
22  application for an order sealing recordings contained on digital
23  versatile discs ("DVDs"), the Court finds:
24       On July 17, 2009, the Honorable Manuel L. Real, United States
25  District Judge for the Central District of California, signed an
26  order in criminal miscellaneous matter ("CR Misc.") 09-0038(D)-R,
27  authorizing:
28
```

FILED
CLERK. U.S. DISTRICT COURT

AUG 1 9 2009

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

LODGED

1

a.   the continued interception of a Sprint/Nextel
cellular telephone subscribed to Whaterver, Crazt Legs, at
1925 Eloise Way, Upland, CA 91784, with a telephone number
of 909-489-8277, IMSI # 000009097178960, and believed to
be used primarily by DAVID NAVARRO (**Target Telephone #5**")
or any subsequently changed telephone number assigned to
the same ESN with the same subscriber information, and/or
any subsequently changed ESN assigned to the same
telephone number with the same subscriber information;

b.   the initial interception of a Metro PCS cellular
telephone, with unknown subscriber information, with a
telephone number of 909-545-1313, an unknown IMSI/ESN
number  and believed to be used primarily by Daniel REYES
(**"Target Telephone #7"**);

c.   the initial interception of a pre-paid T-Mobile
cellular telephone, subscribed to Jose Silba, without an
address, with a telephone number of 909-319-2187, IMSI
#310260493015199, and believed to be used primarily by
Jose LNU (**"Target Telephone #8"**); and

d.   the initial interception of a Sprint/Nextel cellular
telephone, subscribed to Jessica Medina at P.O. Box 54988,
Irvine, CA, with a telephone number of 909-419-9937, UFMI
126*295*2097, IMSI #316010154431162, and believed to be
used primarily by Carlos RIVERA  (**"Target Telephone #9"**
and collectively with **Target Telephone #5, Target**

2

1      **Telephone #7** and **Target Telephone #8**, the "**Target**
2      **Telephones**") or any subsequently changed telephone number
3      assigned to the same ISMI or ESN with the same subscriber
4      information, and/or any subsequently changed ISMI or ESN
5      assigned to the same telephone number with the same
6      subscriber information.

7      Pursuant to CR Misc. 09-0038(D)-R, monitoring on **Target**
8 **Telephone #8** and **Target Telephone #9** was initiated on or about July
9 17, 2009 and was discontinued on August 15, 2009.

10     DVDs were used to record conversations on **Target Telephone #8**
11 and **Target Telephone #9** during the period of court-authorized wire
12 interception, which has been brought before this Court, pursuant to
13 Title 18, United States Code, Section 2518(8)(a).

14 WHEREFORE IT IS ORDERED THAT:

15     1.   The DVDs containing wire interceptions be sealed in an
16 envelope, verified by the initials of the Court;

17     2.   The United States Drug Enforcement Administration, or
18 other designated law enforcement agency, shall maintain custody of
19 the DVDs in its sealed condition, in a safe and secure place for a
20 period of not less than ten (10) years from the date of this order;

21     3.   The DVDs shall not be destroyed, except upon order of this
22 Court;

23     4.   The DVDs shall be protected from editing or alteration;

24     5.   Except as provided by Title 18, United States Code,
25 Section 2517, the DVDs shall remain sealed and the contents of the
26 disc shall be disclosed only upon order of the Court, and the
27 notification requirements under Title 18, United States Code,
28 Section 2518(8)(d) shall be postponed until further order of this

3

1   Court; and

2      6.   This order and application shall be sealed until further

3   order of this Court.

4

5

6   DATED: August _19_, 2009

7

8

9                     **MANUEL L. REAL**

10               HONORABLE MANUEL L. REAL

11               UNITED STATES DISTRICT COURT JUDGE

12   Presented By:

13

14

    REEMA M. EL-AMAMY

15   Assistant United States Attorney

    Violent & Organized Crime Section

16

17

18

19

20

21

22

23

24

25

26

27

28

4

ER000365               USA000705

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system.

I certify that all participants in the case are register CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Joseph F. Walsh
JOSEPH F. WALSH